UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| NORTHERN NEW MEXICO STOCKMAN'S ASSOCIATION and OTERO COUNTY CATTLEMEN'S ASSOCIATION,<br><br>   Petitioners and Plaintiffs,<br> v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE and GREG SHEEHAN, Principal Deputy Director & Acting Director of the United States Fish and Wildlife Service, in his official capacity,<br><br>   Respondents and Defendants. | Civil Action Case No._____<br><br>**PETITION FOR REVIEW AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

  1. Petitioners and Plaintiffs, the Northern New Mexico Stockman's Association and Otero County Cattlemen's Association, ask for review and action for declaratory and injunctive relief against Respondents and Defendants United States Fish and Wildlife Service and Principal Deputy Director and Acting Director of the United States Fish and Wildlife Service Greg Sheehan (collectively "the Service") for violating the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. By final rule, dated March 16, 2016, 81 Fed. Reg. 14,264, Respondents and Defendants, through the U.S. Fish and Wildlife Service, designated critical habitat for the New Mexico Meadow Jumping Mouse. Because the Service's decision was made after a legally deficient assessment

1

of the economic impacts of the designation and because the Service failed to exclude certain areas from the designation that bear disproportionate costs of the designation, the designation of critical habitat was in violation of the ESA and APA. The Service's actions are arbitrary, capricious, constitute an abuse of discretion, and are contrary to law. Therefore, this Court must set aside the designation.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction); 16 U.S.C. § 1540(c) and (g) (actions arising under the citizen suit provision of the Endangered Species Act); and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act).

3.      Petitioners and Plaintiffs Northern New Mexico Stockman's Association (NNMSA) and Otero County Cattlemen's Association (OCCA) (collectively "Associations") satisfied the notice requirement of the Endangered Species Act citizen suit provision, 16 U.S.C. § 1540(g)(2). More than 60 days ago, by letter dated December 5, 2017, both Associations provided the Service written notice of the violations that are the subject of this complaint in accordance with 16 U.S.C. § 1540(g)(2)(C). The notice is attached as Exhibit 1 and is incorporated herein by reference. The Service responded to this notice by letter dated February 1, 2018, stating that it was the Service's position that the designation is lawful.

4.      An actual, justiciable controversy now exists between the Associations and the Service. Relief is proper under 28 U.S.C. § 2201 (authorizing declaratory relief) and § 2202 (authorizing injunctive relief).

2

Petition for Review & Complaint

5. The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

6. The Associations have exhausted all available administrative remedies.

7. Venue is proper in this Court under 28 U.S.C. § 1391(e) in that a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, in this district.

## PARTIES

### Petitioners and Plaintiffs

8. NNMSA is an association of those involved in the livestock industry in Northern New Mexico. Many of its members are the "Hispanic Ranching Families" of New Mexico, whose histories date back to the original founding of the livestock industry in North America, beginning with the colonization of the area by Don Juan de Oñate in 1598. The majority of the members trace their family traditions back to this founding date and represent the longest unbroken history of any non-indigenous people in this nation. The mouse's critical habitat designation threatens the livelihood of these families, through proposed modifications to grazing in the area. NNMSA's members hold grazing allotments in many areas of the mouse's critical habitat, including subunits 3A, 3B, and 3C. Prior to the final designation, NNMSA and its members submitted comments in opposition to the proposed designation.

9. OCCA was formed for the purpose of protecting and defending the livestock industry in Otero County, and to support and encourage similar associations throughout New Mexico and other western states. OCCA is committed to preserving ranching families' customs and culture, which directly support the economy of rural communities. The mouse's critical

habitat designation puts these customs and culture at risk. In fact, the ranching operations of some of OCCA's members have already been injured through the installation of fencing that precludes the use of members' water rights. OCCA's members hold grazing allotments in many areas of the mouse's critical habitat, including subunits 4B, 4C, 4D, and 4E. Prior to the final designation, several OCCA members submitted comments in opposition of the proposed designation.

### Respondents and Defendants

10. Respondent and Defendant United States Fish and Wildlife Service is an agency of the United States Department of Interior. The Service has been delegated responsibility by the Secretary of Interior for day-to-day administration of the Endangered Species Act, including the designation of critical habitat.

11. Respondent and Defendant Greg Sheehan is the Principal Deputy Director of the United States Fish and Wildlife Service. In that capacity, Director Sheehan oversees the Fish and Wildlife Service's administration of the Endangered Species Act. He is sued in his official capacity.

## LEGAL FRAMEWORK

### Listing of Threatened or Endangered Species

12. Under Section 4 of the Endangered Species Act, the Service must list a species as "threatened" or "endangered" based on certain factors, including those relating to habitat, overutilization, disease or predation, and existing regulatory mechanisms. *See* 16 U.S.C. §§ 1532(20), 1533(a).

13. An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

14. Endangered species are specifically protected by Section 9 of the Endangered Species Act, which, among other things, makes it unlawful for any person to "take" such species. *See* 16 U.S.C. § 1538(a)(1)(B). The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," and may include habitat modification. 16 U.S.C. § 1532(19). *See* 50 C.F.R. § 17.3.

### Critical Habitat Designation

15. Under Section 4 of the Endangered Species Act, when a species is listed as threatened or endangered, the Service must designate critical habitat for that species "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A).

16. Critical habitat is defined as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act [15 USCS § 1533], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act [15 USCS § 1533], upon a determination by the Secretary that such areas are essential for the conservation of the species.
>
> . . . .
>
> (C) Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

16 U.S.C. § 1532(5)(A)–(C).

17. "The statute thus differentiates between 'occupied' and 'unoccupied' areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010).

18. The term "conservation" means the use of all methods and procedures necessary to bring a threatened or endangered species to "the point" at which the protections of the Act are no longer required. 16 U.S.C. § 1532(3).

19. The ESA requires that all critical habitat designations be based on "the best scientific data available" after taking into consideration "the economic impact, . . . and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

20. To ensure that any decision to designate critical habitat is informed, the Service must perform an economic analysis of the effects of the designation before it is finalized. *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1280 (10th Cir. 2001).

21. The ESA also provides that the Service "may exclude any area" from the designation if the benefits of exclusion outweigh the benefits of inclusion, so long as the exclusion would not result in the species's extinction. 16 U.S.C. § 1533(b)(2).

**Consultation**

22. Public or private property designated as critical habitat is subject to federal regulation.

23. In consultation with the Service, every federal agency is required to ensure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence

of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

24.     Section 7 of the Endangered Species Act also requires every federal agency to consult with the Service at the request of a permit applicant, if the applicant "has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3).

25.     Under Section 7, the Service must provide the consulting federal agency and applicant (if any) with a Biological Opinion detailing how the project will affect a species or its critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A). If it is determined that the project is likely to jeopardize the species's "continued existence" or "result in the destruction or adverse modification of critical habitat" of such species, the opinion must suggest "reasonable and prudent alternatives" that may be taken by the consulting agency or applicant to avoid such impacts. *Id.* § 1536(a)(4), (b)(3)(A).

26.     If it is determined that the "taking of an endangered species or a threatened species incidental to the agency action will not" jeopardize the species's continued existence, or result in the destruction or adverse modification of critical habitat of such species, a written "incidental take statement" must be issued that: (1) specifies the impact of such incidental taking on the species; (2) specifies those reasonable and prudent measures that are necessary or appropriate to minimize such impact; and (3) sets forth the terms and conditions with which the agency or applicant must comply to implement the specified measures. 16 U.S.C. § 1536(b)(4)(B)(c)(i), (ii), and (iv).

### Administrative Procedure Act

27. Pursuant to the Administrative Procedure Act, a court must set aside agency action that fails to meet statutory, procedural, or constitutional requirements; or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)–(D).

28. The Administrative Procedure Act provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

### FACTUAL ALLEGATIONS

### Listing and Critical Habitat Designation

29. The New Mexico Meadow Jumping Mouse is a small rodent found mainly in New Mexico. It dwells in wetland vegetation along streams and creeks.

30. In 2014, the Service listed the mouse as endangered under the Endangered Species Act due in part to alleged habitat threats from grazing. 79 Fed. Reg. 33,119, 33,122 (June 10, 2014).

31. Two years later, the Service finalized the mouse's critical habitat designation. 81 Fed. Reg. 14,264.

32. In total, the Service designated an area of approximately 13,973 acres along 272.4 kilometers of flowing streams, ditches, and canals in eight units within: Colfax, Mora, Otero, Sandoval, and Socorro Counties in New Mexico; Las Animas, Archuleta, and La Plata Counties in Colorado; and Apache and Greenlee County in Arizona. 81 Fed. Reg. at 14,264, 14,299.

33. The critical habitat is divided into eight units, each divided into additional subunits of critical habitat. 81 Fed. Reg. at 14,297–99. The Service designated two subunits, 3C and 4B, as unoccupied critical habitat. *Id.* at 14,299. The Service designated the other units as "partially occupied" critical habitat. *Id.*

34. Many of the Associations' members hold grazing allotments on federal land in and around several units of the designated critical habitat.

35. Several members of NNMSA hold grazing allotments in and around Unit 3 in Sandoval Counties in New Mexico.

36. These members include Chevy L Ranch, Orlando Lucero, Fred Lucero, Gabriel Lucero, Candido Trujillo, Brandon Trujillo, Henry Trujillo, Ramon Trujillo, Robert Trujillo, Willie Trujillo, David Sanchez, Ivan Trujillo; and Hernandez Sons & Daughters, LLC, Pablo Aragon Cattle Company, Lucero's Ranch, San Miguel Ranch.

37. Several members of OCCA hold grazing allotments in and around Unit 4 in Otero County.

38. These members include Justin "Spike" Goss, the President of the Sacramento Grazing Association, who holds an allotment in and around subunits 4B and 4D; Bill Mershon, who holds an allotment in and around subunit 4C; and Judyann Holcomb Medeiros, who holds an allotment in and around subunit 4E.

### Economic Impacts Analysis

39. Prior to finalizing the designation, as required by the Act, the Service produced an analysis of the economic impacts of the proposed designation. *See* 81 Fed. Reg. at 14,284.

9

Petition for Review & Complaint

40. As part of the agency's preparation for the economic analysis, the Service issued a memorandum to Industrial Economics, Inc. The memo's purpose was "to provide information to serve as a basis for conducting an economic analysis" of the proposed critical habitat designation. Fish and Wildlife Service, *Incremental Effects Memorandum for the Economic Analysis for the Proposed Rule to Designate Critical Habitat for the New Mexico meadow jumping mouse* (July 8, 2013) (hereinafter "Incremental Effects Memo") at 1, *available at* https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0042.

41. The Incremental Effects Memo describes several impacts of critical habitat designation and states that, among other things,

> [c]onservation measures would likely include protection of riparian areas through fencing, changing the timing or duration of the action (e.g., dormant season grazing), encouraging the reestablishment of beaver through habitat enhancement or active translocation, or ensuring that a constant supply of water is provided throughout the stream, ditch, or canal during the growing season.

Incremental Effects Memo at 16.

42. On February 18, 2014, Industrial Economics issued a screening memorandum along with its analysis of the economic impacts of the proposed critical habitat designation. Indus. Econ., Inc., *Consideration of Economic Impacts: Screening Analysis of the Likely Economic Impacts of Critical Habitat Designation for the New Mexico Meadow Jumping Mouse* (Feb. 18, 2014) (hereinafter "Screening Memo") at 6, *available at* https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0044.

43. The Screening Memo analyzed "the incremental costs" of designating critical habitat for the New Mexico Meadow Jumping Mouse. *See* Screening Memo at 6. The "incremental costs" include those costs "over and above" baseline costs. Baseline costs are "any

Petition for Review & Complaint

existing regulatory and socio-economic burden imposed on landowners, managers, or other resource users absent the designation of critical habitat" including "the economic impacts of listing the species under the Act . . . ." *Id.*

44. Industrial Economics conducted its analysis based on the information the Service provided in the Incremental Effects Memo. Screening Memo at 6.

45. Despite the errors, alleged below, in assessing the impacts of designation, the Screening Memo still estimated that the designation would lead to about $20 million in incremental regulatory costs, *i.e.*, costs in addition to those attributable to the mouse's listing or other causes, 81 Fed. Reg. at 14,308. These incremental costs would be due mainly to grazing exclusion measures—such as fencing along streams and forced reduction in the amount of cattle grazed—that the United States Forest Service and its permittees would have to undertake if grazing were to continue on National Forest lands within the mouse's designation. *See id.* at 14,287 ("Specifically, the analysis estimates costs associated with [Animal Unit Month ("AUM")] reductions and fencing where allotments overlap proposed critical habitat."); Screening Memo at 22.

## INJUNCTIVE RELIEF ALLEGATIONS

46. The Associations re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs.

47. If an injunction does not issue enjoining the Service from enforcing the critical habitat designation for the New Mexico Meadow Jumping Mouse, the Associations and their members will be irreparably harmed. This harm includes, but is not limited to, AUM reductions and installation of fencing that precludes the use of members' water rights.

11

48. The Associations and their members have no plain, speedy, and adequate remedy at law.

49. If not enjoined by this Court, the Service will continue to enforce or rely on the critical habitat designations in derogation of the Association and their members' rights.

50. Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

51. The Associations re-allege and incorporate by reference all of the allegations set forth by the preceding paragraphs.

52. An actual and substantial controversy exists between the Associations and the Service as to their legal rights and duties with respect to the ESA and the APA in the designation of critical habitat for the New Mexico Meadow Jumping Mouse.

53. This case is currently justiciable because the Service's failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to the Associations and their members. Because the critical habitat designation impacts how the Associations' members can graze their livestock and whether certain members can access their water rights, the Associations and their members have a vital interest in knowing whether the designation is statutorily valid.

54. Declaratory relief is therefore appropriate to resolve this controversy.

## CLAIMS FOR RELIEF

**First Claim for Relief**
**Inadequate Economic Analysis**
**Incremental Effect Analysis**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

55. The Associations re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs.

56. As the Service purportedly recognized in the Incremental Effects Memo, it is bound by Tenth Circuit law when considering the economic impacts for the designation of the New Mexico Meadow Jumping Mouse. Incremental Effects Memo at 2.

57. The Tenth Circuit has held that the Service is required to analyze economic impacts of critical habitat designation under what has been termed a "coextensive" analysis. *N.M. Cattle Growers Ass'n*, 248 F.3d at 1285. According to this methodology, *all* economic impacts—even those that may be attributable to causes in addition to critical habitat designation—are to be considered. *Id.* Thus, under Tenth Circuit law, the Service cannot solely analyze the incremental impacts of a critical habitat designation.

58. In its February 1, 2018, response letter, the Service argued that regulations adopted in 2013 require the Service to analyze only the incremental impacts of a critical habitat designation. *See* 78 Fed. Reg. 53,058 (Aug. 28, 2013).

59. The court's holding in *N.M. Cattle Growers Ass'n* was not based on an interpretation of any Service regulation; rather the opinion was based on the statutory language of the ESA. 248 F.3d at 1285 ("Thus, we hold the baseline approach to economic analysis is not in accord with the language or intent of the ESA.").

60. The Service is bound by the Tenth Circuit's precedent in *N.M. Cattle Growers Ass'n* unless and until the court overturns that precedent.

61. Thus, Tenth Circuit case law precludes the Service from only measuring the incremental impacts of the critical habitat designation for the New Mexico Meadow Jumping Mouse.

62. The economic analysis of the designation is contained entirely within the Screening Memo. 81 Fed. Reg. at 14,284 ("The economic screening memorandum is our economic analysis of the proposed critical habitat designation . . . .").

63. By the Service's own admission, the Screening Memo assessed economic impacts solely through the "incremental method." Screening Memo at 6 ("This screening analysis focuses on the likely incremental effects of the critical habitat designation."). The analysis in the rest of the memo confirms that the Service did not analyze the economic impacts of the designation under a coextensive approach, as required by Tenth Circuit precedent.

64. By failing to analyze all of the economic impacts, the Screening Memo underestimates the impacts of designating critical habitat for the New Mexico Meadow Jumping Mouse. As a result of the faulty analysis, the Service was unable to make a fully informed decision about whether to exclude certain areas from the designation, including those areas where the Association's members hold grazing allotments.

65. By these acts or omissions the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and, alternatively, the APA, 5 U.S.C. § 706. Therefore, the final rule designating critical habitat for the New Mexico Meadow Jumping Mouse is invalid and must be set aside.

## Second Claim for Relief

**Inadequate Economic Analysis**
**Failure to Analyze Economic Impacts to Water Rights**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

66. The Associations re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs.

67. In addition to the violation stated above, the Service failed to accurately measure the incremental costs of the designation.

68. For example, the Screening Memo only analyzes some of the costs associated with fencing enclosures. *See* Screening Memo at 10. The Screening Memo does not account for the costs associated with the taking of water rights through exclusionary fencing. *See Sacramento Grazing Ass'n, Inc. v. United States*, 135 Fed. Cl. 168 (2017) (holding that the Sacramento Grazing Association (SGA) owns a right to beneficial use of stock water in the Lincoln National Forest and the Forest Service effected a taking under the Fifth Amendment when it prevented SGA from accessing stock water through fencing and other means).

69. Several of the Associations' members, including the named Plaintiff in *Sacramento Grazing Ass'n*, own water rights that will be prejudiced by the critical habitat designation.

70. Several of the Associations' members and other members of the public commented that the critical habitat designation would injure their water rights. The Service merely responded that "[w]e did not conduct an analysis of privately owned water rights

because it is beyond the scope of the environmental assessment and economic analysis." 81 Fed. Reg. at 14,275.

71. As a result, even if the Service were allowed to analyze only the incremental costs of the designation, the Service still incorrectly analyzed the costs of the designation.

72. As a result of the faulty analysis, the Service was unable to make a fully informed decision about the true costs of the designation on the Associations' members and others.

73. By these acts or omissions the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and, alternatively, the APA, 5 U.S.C. § 706. Therefore, the final rule designating critical habitat for the New Mexico Meadow Jumping Mouse is invalid and must be set aside.

### Third Claim for Relief
### Failure to Exclude
### (Violation of ESA, 16 U.S.C. § 1533(b)(2); Alternatively, APA, 5 U.S.C. § 706)

74. The Associations re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs.

75. Even accepting the economic analysis as sufficient, the Service acted arbitrarily and capriciously, abused its discretion, and otherwise failed to act in accordance with law when it failed to exclude certain areas, namely Units 3 and 4, from the critical habitat designation as a result of the designation's economic impacts.

76. The purpose of the economic analysis is to identify those areas that should be excluded from the critical habitat designation.

77. Even with its underestimates, the economic analysis demonstrates the high economic impacts of critical habitat designation in those areas where NNMSA's and OCCA's members hold grazing allotments. According to the Screening Memo, the incremental costs to grazing activities are estimated at $1.4 million for subunit 3A, $1.9 million for subunit 3B, and $3.4 million for subunit 3C. Screening Memo at 11. In lower southern New Mexico, the estimated incremental costs to grazing activities are $670,000 for 4B, $420,000 for 4C, $530,000 for 4D, and $730,000 for 4E. *Id.*

78. These impacts are significant both in absolute terms and in relation to other critical habitat units. The incremental costs associated with grazing activities near these subunits account for over 60% of all the estimated incremental costs associated with grazing activities resulting from the designation. Screening Memo at 11–12. The Screening Memo also estimated that designating several units, including units 1, 2, 6, 7, and 8, would result in no incremental costs associated with grazing activities.

79. The stated economic impacts for Units 3 and 4 account for about 45% of the total estimated economic impact of the critical habitat designation. 81 Fed. Reg. at 14,308.

80. Moreover, the stated impacts are merely the estimated incremental costs, not the total costs associated with the critical habitat designation. The Service's analysis concedes that total impacts are higher. For example, the Screening Memo states that "[f]encing costs for occupied portions of critical habitat are attributed to the baseline, while fencing costs for unoccupied portions are considered to be incremental." Screening Memo at 10.

17

81. The final rule designating critical habitat only excludes two areas, both on tribal lands, and none of the lands where the Associations' members hold grazing allotments. 81 Fed. Reg. at 14308–13.

82. The Service declined to exclude any other areas from the designation because it purportedly could not identify "any disproportionate costs that are likely to result from the designation." 81 Fed. Reg. at 14,307.

83. Although not codified in regulation, the Service regularly employs the "disproportionate costs" standard in critical habitat designations. *See, e.g.*, 81 Fed. Reg. 59,046, 59,087 (Aug. 26, 2016) (various California amphibians); 81 Fed. Reg. 14,264, 14,307 (Mar. 16, 2016) (New Mexico meadow jumping mouse); 81 Fed. Reg. 3866, 3883 (Jan. 22, 2016) (two Florida plants); 79 Fed. Reg. 54,635, 54,645 (Sept. 12, 2014) (Georgia rockcress).

84. However one might interpret a "disproportionate costs" standard, the Service's decision is unsupported by the record and does not withstand scrutiny.

85. Thus the rationale for not excluding critical habitat was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Natural Resources Defense Council v. U.S. Department of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) (A court must ask "whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" (citation omitted)).

86. By these acts or omissions, the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and, alternatively, the APA, 5 U.S.C. § 706. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, No. 17-71, slip op. at 14, 2018 WL 6174253, at *10 (U.S. Nov. 27, 2018) (entertaining a challenge to the Service's failure to exclude from critical habitat on the ground

that "the agency did not appropriately consider all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion"). *See also id.* ("When reviewing an agency action, we must assess . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). Therefore, the final rule designating critical habitat for the New Mexico Meadow Jumping Mouse is invalid and must be set aside.

## PRAYER FOR RELIEF

Wherefore, the Associations respectfully request the following relief:

1. Declare that the Service acted arbitrarily, capriciously, abused its discretion, or otherwise failed to act in accordance with law when it designated critical habitat for the New Mexico Meadow Jumping Mouse;

2. Declare that the Service's decision to analyze only the incremental costs of the critical habitat designation was arbitrary, capricious, in abuse of discretion, or otherwise not in accordance with law;

3. Declare that the Service's failure to analyze the economic impact to water rights through exclusionary fencing was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

4. Declare that the Service's decision not to exclude critical habitat for all or additional subunits was arbitrary, capricious, in abuse of discretion, or otherwise not in accordance with law;

5. Set aside the final rule designating critical habitat for the New Mexico Meadow Jumping Mouse;

6. Award Petitioners and Plaintiffs' attorney fees to the extent permitted by law; and

7. Any other relief that the Court determines to be just and proper.

DATED: December 6, 2018.

Respectfully submitted,

s/ A. Blair Dunn
A. BLAIR DUNN
Western Agriculture, Resource and Business Advocates, LLP
400 Gold Ave. SW, Suite 1000
Albuquerque, New Mexico 87102
Telephone: (505) 750-3060
Email: abdunn@ablairdunn-esq.com

s/ Anthony L. François
ANTHONY L. FRANÇOIS
DAMIEN M. SCHIFF*
JEFFREY W. McCOY*
KAYCEE M. ROYER*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Email: tfrancois@pacificlegal.org
Email: dschiff@pacificlegal.org
Email: jmccoy@pacificlegal.org
Email: kroyer@pacificlegal.org

*Pro Hac Vice Pending*

*Attorneys for Petitioners and Plaintiffs*