# EXHIBIT 1



**PACIFIC LEGAL FOUNDATION**

December 5, 2017

The Honorable Ryan Zinke  
Secretary  
U.S. Department of Interior  
1849 C Street NW  
Washington, DC  20240

**VIA CERTIFIED MAIL**  
**RETURN RECEIPT REQUESTED**

The Honorable Greg Sheehan  
Principal Deputy Director and Acting Director  
U.S. Fish & Wildlife Service  
1849 C Street NW, Room 3331  
Washington, DC  20240

**VIA CERTIFIED MAIL**  
**RETURN RECEIPT REQUESTED**

Re:  <u>60-Day Notice of Intent to Bring Suit Pursuant to 16 U.S.C. § 1540(g)</u>

Dear Secretary Zinke and Director Sheehan:

This letter provides notice of intent to commence civil litigation for violation of the Endangered Species Act, 16 U.S.C. §§ 1531–1544. This notice is submitted on behalf of the Northern New Mexico Stockman's Association (NNMSA) and the Otero County Cattleman's Association (OCCA).

Unless corrective action is taken, NNMSA and OCCA intend to challenge the final rule designating critical habitat for the New Mexico Meadow Jumping Mouse, 81 Fed. Reg. 14,264 (Mar. 16, 2016). As detailed below, the mouse's critical habitat designation violates the Endangered Species Act and its implementing regulations. Specifically, the designation is illegal because the Service failed to properly consider the economic impacts of the designation prior to the adoption of the final rule. Reliance on this improper analysis renders the critical habitat designation arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law. Furthermore, the designation is infirm because even the inadequate economic analysis shows that the critical habitat designation will result in significant economic impacts to NNMSA, OCCA, their members, and others. Yet, despite the designation's significant economic impacts, the Service declined to exclude any areas from the designation pursuant to

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 2

Section 4(b)(2) of the Endangered Species Act (ESA). This failure to exclude areas from the designation notwithstanding the designation's significant economic impacts was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

## PARTIES

NNMSA is an association of those involved in the livestock industry in Northern New Mexico. Many of its members are the "Hispanic Ranching Families" of New Mexico, whose histories date back to the original founding of the livestock industry in North America, beginning with the colonization of the area by Don Juan de Oñate in 1598. The majority of the members trace their family histories back to this founding date and represent the longest unbroken history of any colonial-era people in this nation. The mouse's critical habitat designation threatens the livelihood of these families, through proposed modifications to grazing in the area. NNMSA's members hold grazing allotments in many areas of the mouse's critical habitat, including subunits 3A, 3B, and 3C. Prior to the final designation, NNMSA submitted comments in opposition to the proposed designation.

OCCA was formed for the purpose of protecting and defending the livestock industry in Otero County, and to support and encourage similar associations throughout New Mexico and other western states. OCCA is committed to preserving the custom and culture of ranching families which have a direct effect on the economic stability of rural communities. The mouse's critical habitat designation puts this custom and culture at risk. In fact, the ranching operations of some of OCCA's members have already been affected through the installation of fencing that precludes the use of members' water rights OCCA's members hold grazing allotments in many areas of the mouse's critical habitat, including subunits 4B, 4C, 4D, and 4E. Prior to the final designation, several OCCA members submitted comments in opposition of the proposed designation.

## BACKGROUND

The mouse is a small rodent found mainly in New Mexico. It dwells in wetland vegetation along streams and creeks. In 2014, the Service listed the mouse as endangered under the Endangered Species Act due in part to alleged habitat threats

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 3

from grazing. *See, e.g.*, 79 Fed. Reg. 33,119, 33,122 (June 10, 2014). Two years later, the Service finalized the mouse's critical habitat. 81 Fed. Reg. 14,264; *cf.* 16 U.S.C. § 1532(5)(A) (critical habitat consists of those areas containing a species' essential physical or biological features, or that otherwise are essential to the species' conservation).

The Endangered Species Act requires the Secretary (and thus his delegate the Service) to assess the economic impact of designating areas as critical habitat. 16 U.S.C. § 1533(b)(2). It also provides that the Service "may exclude any area" from the designation if the benefits of exclusion outweigh the benefits of inclusion, and if the exclusion would not result in the species' extinction. *Id*. Prior to finalizing the designation, the Service allegedly analyzed the economic impacts of the proposed designation, although it failed to take into account all of the impacts from the listing and designation of critical habitat. *See* 81 Fed. Reg. at 14,284. Despite the analysis clearly underestimating the impacts of designation, the agency's economic impact analysis still estimates that it will lead to about $20 million in added regulatory costs, 81 Fed. Reg. at 14,308, owing mainly to mitigation measures—such as fencing along streams—that the Forest Service and its permittees will have to undertake if grazing is to continue on National Forest lands within the mouse's designation.

## VIOLATIONS OF THE ENDANGERED SPECIES ACT

### I. Failure to correctly assess the economic impact of the mouse's critical habitat designation, 16 U.S.C. § 1533(b)(2)

The ESA requires that all critical habitat designations be based on "the best scientific data available" after taking into consideration "the economic impact, . . . and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). To ensure that any decision to designate critical habitat is informed, the Service must perform an economic analysis of the effects of the designation before it is finalized. *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1280 (10th Cir. 2001).

In the past, the Service has attempted to assess economic impact by what is known as the "incremental" method, *i.e.*, by assessing only the economic impacts *solely* attributable to critical habitat designation, and disregarding any impacts attributable to

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 4

causes *in addition to* critical habitat designation (principally, a species' listing). This method generally results in a conclusion that the critical habitat designation will result in relatively minor economic impacts. The Tenth Circuit has rejected this approach, holding that the Service is required to analyze economic impacts under what has been termed a "coextensive" analysis. *N.M. Cattle Growers Ass'n*, 248 F.3d at 1285. According to this methodology, *all* economic impacts—even those that may be attributable to causes in addition to critical habitat designation—are to be considered. *Id.*

As the Service purportedly recognized, it is bound by Tenth Circuit law when considering the economic impacts for the designation of the New Mexico meadow jumping mouse. Fish and Wildlife Service, *Incremental Effects Memorandum for the Economic Analysis for the Proposed Rule to Designate Critical Habitat for the New Mexico meadow jumping mouse* (July 8, 2013) (hereinafter "Incremental Effects Memo")[1] at 2. Despite this recognition, the Service merely analyzed the incremental effects of the designation. The economic analysis of the designation is contained entirely within the February 18, 2016 economic screening memorandum from Industrial Economics, Incorporated. 81 Fed. Reg. at 14,284 ("The economic screening memorandum is our economic analysis of the proposed critical habitat designation . . . .").

By the Service's own admission, the screening memorandum assessed economic impacts solely through the "incremental method." Industrial Economics, Incorporated, *Consideration of Economic Impacts: Screening Analysis of the Likely Economic Impacts of Critical Habitat Designation for the New Mexico Meadow Jumping Mouse* (Feb. 18, 2014) (hereinafter "Screening Memo")[2] at 6 ("This screening analysis focuses on the likely incremental effects of the critical habitat designation."). The analysis in the rest of the memo confirms that the Service did not analyze the economic impacts of the designation under a coextensive approach, as required by Tenth Circuit precedent.

Throughout the memo, the analysis excludes the costs associated with the listing of the mouse, instead focusing solely on the purported costs associated with the critical habitat designation. *See* Screening Memo Exhibits 5, 6, 7, 9. For example, when assessing the costs of animal-unit-month (AUM) reductions as a result of the designation, the memo only analyzes reductions in habitat unoccupied by the mouse,

---

[1] *Available at* https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0042.
[2] *Available at* https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0044.

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 5

because "AUM reductions attributed to occupied habitat are considered baseline." As a result, the memo focused its "analysis on AUM reductions in unoccupied habitat where impacts are considered *incremental*." Screening Memo at 10 (emphasis added). The same incremental analysis was conducted for the costs of additional fencing. Screening Memo at 14 ("For areas where the species is present, the costs of fencing would be baseline costs and are therefore not included in our estimate. For areas considered to be unoccupied, the costs of fencing are considered incremental costs of critical habitat designation.").

Despite the Service's claim that it complied with the governing law in the Tenth Circuit, the Service produced a narrative description of the types of coextensive costs attributable to designation, but it only quantified the incremental costs.[3] *Compare* Incremental Effects Memo, *with* Screening Memo. This truncated analysis is prejudicial, because it significantly understated the designation's economic impact. This deficiency infected the Service's subsequent decision not to exclude any areas on account of excessive economic impacts. Accordingly, the Service should rescind the current designation and conduct a new economic analysis that takes into account all of the costs resulting from and associated with the critical habitat designation.

II. **Failure to exclude areas from the designation, 16 U.S.C. § 1533(b)(2)**

Even accepting the economic analysis as sufficient, the Service acted arbitrarily and capriciously, abused its discretion, and otherwise failed to act in accordance with law when it failed to exclude certain areas from the critical habitat designation as a result of the designation's economic impacts. The purpose of the economic analysis is to identify those areas that should be excluded from the critical habitat designation. Despite the designation's significant economic impacts, the Service declined to exclude any areas from the designation on account of those impacts.

---

[3] Additionally, the Service failed to accurately measure the incremental costs of the designation. For example, the Screening Memo only analyzes some of the costs associated with fencing enclosures. *See* Screening Memo at 10. The Screening Memo does not account for the costs associated with the taking of water rights through exclusionary fencing. *Sacramento Grazing Ass'n, Inc. v. United States*, No. 04-786 L, 2017 WL 5029063, at *32 (Fed. Cl. Nov. 3, 2017). As a result, even if the Service were allowed to only analyze the incremental costs of the designation, the Service still minimizes the costs of the designation.

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 6

Even with its underestimates, the economic analysis demonstrates the high economic impacts of critical habitat designation in those areas where NNMSA's and OCCA's members hold grazing allotments. According to the Screening Memo, the incremental costs to grazing activities are estimated at $1.4 million for subunit 3A, $1.9 million for subunit 3B, and $3.4 million for subunit 3C. Screening Memo at 11. In southern New Mexico, the estimated incremental costs to grazing activities are $670,000 for 4B, $420,000 for 4C, $530,000 for 4D, and $730,000 for 4E. *Id.* These impacts are significant both in absolute terms and in relation to other critical habitat units. Moreover, they are merely the estimated incremental costs, not the total costs associated with the critical habitat designation. The Service's analysis concedes that total impacts are higher. For example, the Screening Memo states that "[f]encing costs for occupied portions of critical habitat are attributed to the baseline, while fencing costs for unoccupied portions are considered to be incremental." *Id.* at 10.

The Service declined to exclude any areas from the designation because it purportedly could not identify "any disproportionate costs that are likely to result from the designation." 81 Fed. Reg. at 14,307. However one might interpret a "disproportionate costs" standard, the Service's decision does not withstand scrutiny.

First, if by "disproportionate costs" the Service meant that the designation resulted in no area with a highly imbalanced cost-benefit ratio, then that conclusion is irrational in light of the agency's failure to assess the benefits of designation. *See* Screening Memo at 22 ("The magnitude of benefits is highly uncertain, and quantification would require primary research and the generation of substantial new amounts of data, which is beyond the scope of this memorandum . . . ."). Although the final designation purports to conclude that the benefits of designation outweigh the costs, the benefits are not actually quantified. Rather, the purported "benefits" are vague statements of belief about the value of designation. *See* 81 Fed Reg. at 14,307 ("In the case of the jumping mouse, the benefits of critical habitat include promotion of public awareness of the presence of the jumping mouse and the importance of habitat protection . . . ."). Therefore, the record does not support a conclusion that the costs of including areas in the designation are outweighed by the benefits of excluding those areas.

Second, if instead the Service meant that no "disproportionate costs" meant that no unit of critical habitat was being burdened more than any other unit, then that

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 7

conclusion is contradicted by the agency's own analysis. *See* Screening Memo at 17 ("[P]roposed critical habitat Subunit 3C is expected to generate the greatest incremental costs. This is due to particularly high costs associated with fencing costs related to grazing."). In fact, the analysis concludes that some areas (subunits 1, 2, 4A, 6A, 6B, 6C, 7, and 8) have no incremental effects. Screening Memo at 11–13. Accordingly, that means that other areas must be more burdened by the designation than others.

Third, if the Service meant that the impacts of the mouse's designation are not significant standing alone or as compared to other designations, *see* 81 Fed. Reg. at 14,307–08 (noting repeatedly that the total impacts would not exceed $100 million), then the agency's conclusion is contrary to established policy, *see Policy Regarding Implementation of Section 4(b)(2) of the Endangered Species Act*, 81 Fed. Reg. 7226, 7248 (Feb. 11, 2016) ("When the Services are determining whether to undertake a[n] . . . exclusion analysis as a result of . . . economic impacts . . . , it is the nature of those impacts, not necessarily a particular threshold level, that is relevant to the Services' determination."). There is no justification in the record for the $100 million threshold, but rather it seems to have been chosen in order to minimize the impact of the designation.

The record demonstrates that the economic impacts are significant, and the Service should have excluded at least some areas from the designation. The Service's failure to explain its "disproportionate costs" rationale, and the absence of any plausible support for that rationale in the agency's own economic analysis, renders the decision not to exclude any area on account of economic impacts arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

## CONCLUSION

The Service should rescind its final critical habitat designation for the New Mexico Meadow Jumping Mouse. Not only did the Service conduct a flawed economic analysis that underestimated the impact of the designation, the Service ignored even that incorrect analysis when finalizing the designation. The designation results in significant economic impacts in many areas of the designation, including subunits 3A, 3B, 3C, 4B, 4C, 4D, and 4E. By failing to exclude these areas, the Service's designation was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance

Secretary Ryan Zinke
Acting Director Greg Sheehan
December 5, 2017
Page 8

with law. If the Service does not take action within the next 60 days, NMSA and OCCA will file a suit in federal court requesting that the designation be set aside.

                                              Respectfully submitted,

                                              *[signature]*

                                              JEFFREY W. MCCOY (Colo. Bar 43562)
                                              DAMIEN M. SCHIFF (Cal. Bar 235101)
                                              ANTHONY L. FRANÇOIS (Cal. Bar 184100)
                                              *Attorneys for Northern New Mexico*
                                              *Stockman's Association and the Otero*
                                              *County Cattleman's Association*