IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NORTHERN NEW MEXICO STOCKMAN'S
ASSOCIATION and OTERO COUNTY
CATTLEMAN'S ASSOCIATION,

       Plaintiffs,

vs.                                                             No. CIV 18-1138 JB\JFR

UNITED STATES FISH & WILDLIFE
SERVICE and GREG SHEEHAN, Principal
Deputy Director & Acting Director of the United
States Fish & Wildlife Service, in his official
capacity,

       Defendants,

and

CENTER FOR BIOLOGICAL DIVERSITY and
WILDEARTH GUARDIANS,

       Intervenors.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Opening Brief in Support of Petition for Review, filed August 8, 2019 (Doc. 26)("Petition"); (ii) Petitioners' Brief on Remedy, filed December 6, 2019 (Doc. 40)("P. Remedy Brief"); (iii) Federal Respondents' Brief on Remedy, filed December 6, 2019 (Doc. 41)("D. Remedy Brief"); and (iv) Respondent-Intervenors' Brief on Remedy, filed December 6, 2019 (Doc. 42)("I. Remedy Brief").  The Court held a hearing on October 31, 2019.   The primary issues are: (i) whether Plaintiffs Northern NM Stockman's Association ("Northern NM Stockman's Association") and Otero Cattleman's Association ("Otero Cattleman's Association")(collectively, "the Stockman's Associations") suffer economic injury to establish associational standing under Article III of the Constitution of the United States of America to challenge the decision made by Defendants United States Fish & Wildlife Service and its Principal Deputy director and acting director, Greg Sheehan (collectively, "Fish & Wildlife"), to designate land on which members of the Stockman's Associations graze cattle as critical habitat designation[1] ("the designation") for the New Mexico Meadow Jumping Mouse ("Jumping Mouse"); (ii) whether Fish & Wildlife's use of the "incremental effects"

---

[1]The Endangered Species Act requires Fish & Wildlife to designate "critical habitat" for all species that Fish & Wildlife lists as threatened or endangered.  16 U.S.C. § 1533(a)(3)(A)(i). See 16 U.S.C. § 1532(5) (defining "critical habitat").

approach[2] -- which the United States Court of Appeals for the Tenth Circuit explicitly rejected in

2001, see New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Service, 248 F.3d 1277,

1285-86 (10th Cir. 2001)[3] -- when Fish & Wildlife considered economic impacts associated with

the designation, violates Section 4(b)(2) of the Endangered Species Act, 16 U.S.C. § 1552(b)(2),

and the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"); (iii) whether Fish & Wildlife

abused its discretion by not considering designation costs, such as compensating the members of

the Stockman's Associations for reducing the value of their water rights with respect to property

_____

[2] In New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service, 248 F.3d 1277, 1285 (10th Cir. 2001), the United States Court of Appeals for the Tenth Circuit described the "incremental effects approach" in the following manner:

> The Endangered Species Act ("ESA"), which controls CHDs [critical habitat designations], requires FWS [Fish & Wildlife] to perform an economic analysis of the effects of the CHD before making a final designation. 16 U.S.C. § 1533(b)(2). In order to determine what the "economic impact" of a [critical habitat designation] will be, FWS has adopted an incremental baseline approach (the "baseline approach"). The baseline approach utilized by FWS is premised on the idea that the listing of the species (which will occur prior to or simultaneously with the CHD will have economic impacts that are not to be considered. The primary statutory rationale for this position comes from 16 U.S.C. § 1533(b)(1)(A), which states that listing determinations be made "solely on the basis of the best scientific and commercial data available." Thus, the baseline approach moves any economic impact that can be attributed to listing below the baseline and, when making the [critical habitat designation], takes into account only those economic impacts rising above                          the                          baseline.

New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 248 F.3d at 1280.

[3]In New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service, the Tenth Circuit rejected Fish & Wildlife's use of the incremental approach, concluding that "the baseline approach to economic analysis is not in accord with the language or intent of the [Endangered Species Act]." 248 F.3d at 1285. The Tenth Circuit rationalized the holding based on its statutory interpretation of the text of the Endangered Species Act:

> The statutory language is plain in requiring some kind of consideration of economic impact in the [critical habitat designation] phase. Although 50 C.F.R. § 402.02 is not at issue here, the regulation's definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless. We are compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation. Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Compensation Programs, 927 F.2d 1150, 1153 (10th Cir. 1991)("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous."). Because economic analysis done using the FWS's baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02, we conclude Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes.

New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service 248 F.3d at 1285.

within the designation, an interference which the Stockman's Associations allege amounts to a taking under the Fifth Amendment to the Constitution of the United States of America; (iv) whether the Stockman's Associations administratively waived their claims challenging Fish & Wildlife's decision not to exclude particular units of land -- Units 3 and 4[4] -- from the designation, because no Stockman's Associations members raised this issue for these units, except for subunit 3C, during the proposed designation's public comment period; (v) whether a sufficiently reasoned explanation supports Fish & Wildlife's conclusion not to exclude Units 3 and 4 from the designation, because it could not identify any disproportionate costs; and (vi) whether the Court should vacate the designation in its entirety, or tailor vacatur in a manner that leaves untouched critical habitat protections for the Jumping Mouse, should the Court remand to Fish & Wildlife to comply with its statutory obligations. The Court concludes that: (i) the Stockman's Associations show sufficient concrete economic injuries to establish Article III associational standing to challenge Fish & Wildlife's critical habitat designation for the Jumping Mouse species; (ii) Fish & Wildlife's decision to use the incremental effects approach to consider economic impacts associated with the designation is consistent with the Endangered Species Act's § 4(b)(2); (iii) Fish & Wildlife did not abuse its discretion by failing to consider other designation costs, such as compensating the members of the Stockman's Associations for reducing the value of their water rights, and the interference with members' water rights does not amount to a taking under the Fifth Amendment; (iv) the Stockman's Associations administratively waived their claims challenging Fish & Wildlife's decision not to exclude Units 3 and 4 from the designation because no member of the Stockman's Associations raised any challenge to the inclusion of these units, except for subunit 3c, during the proposed designation's public comment period; (v) notwithstanding the waiver, however, Fish & Wildlife has provided a sufficiently reasoned explanation to support its conclusion not to exclude Units 3 and 4 from the designation pursuant to the Endangered Species Act's § 4(b)(2) and its internal Section 4(b)(2) Policy governing its decision-making standards regarding exclusion. Furthermore, because of the Court's rejection of the Stockman's

---

[4]Units 3 and 4 of the designation are located within the State of New Mexico's Jemez and Sacramento Mountains, respectively, and the subunits comprising units 3 and 4 are in the following locations: (i) 3A -- San Antonio: San Antonio Creek; (ii) 3B -- Rio Cebolla; (iii) 3C -- Rio de las Vacas; (iv) 4A -- Silver Springs: Silver Springs Creek; (v) 4B -- Upper Peñasco: Rio Peñasco; (vi) 4C -- Middle Peñasco: Rio Peñasco; (vii) 4D -- Wills Canyon: Mauldin Springs; and (viii) 4E -- Agua Chiquita Canyon: Agua Chiquita Creek. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse; Final Rule, 81 Fed. Reg. 14,264, 14,297-98 (Mar. 16, 2016)(to be codified at 50 C.F.R. pt. 17)

Associations challenges here, it deems remedy unnecessary in this case. If the Court were to have ruled favorably on any one of the aforementioned questions, however, the Court would not still vacate the critical habitat designation in its entirety; rather, it would tailor vacatur in a narrow manner as to address only the units in which the Stockman's Associations' members show concrete injuries. This tailored vacatur, therefore, would leave untouched remaining units of the critical habitat designation.

## FACTUAL BACKGROUND

This case involves Fish & Wildlife's designation of critical habitat ("the designation") for the New Mexico Meadow Jumping Mouse ("the Jumping Mouse") pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531-1544. The Northern NM Stockman's Association consists of individuals who are involved in the livestock industry in northern New Mexico, and the Otero Cattleman's Association consists of New Mexico ranchers whose families have been ranching for generations. See Petition for Review and Complaint for Declaratory and Injunctive Relief ¶¶ 8-9, at 3-4, filed December 6, 2018 (Doc. 1)("Complaint"); Petition at 8-9. Part of the designation encompasses land on which members of the Stockman's Associations hold grazing allotments and maintain water rights. See Complaint ¶¶ 35-38, at 9. The Court provides the following background information regarding: (i) the Jumping Mouse's habitat and characteristics; (ii) Fish & Wildlife's procedure to list the Jumping Mouse as an endangered species and to designate critical habitat for the Jumping Mouse; (iii) Fish & Wildlife's decision to list the Jumping Mouse as an endangered species; (iv) Fish & Wildlife's economic analysis of the designation's impact; (v) the designation's scope, size, and locations; (vi) Fish & Wildlife's decisions to exclude and not exclude certain areas from the designation; and (vii) the grazing allotments that members of the Stockman's Associations hold. The parties largely do not contest these facts.

1.      **The Jumping Mouse.**

The Jumping Mouse is a small rodent that is found in wetlands and near streams in New Mexico, eastern Arizona, and southern Colorado. See NM Meadow Jumping Mouse: Home Page, United States Department of Agriculture, https://www.fs.usda.gov/detail/r3/home/ ?cid=STELPRD3809040 (last visited September 2, 2020)("Jumping Mouse Home Page"). The Jumping Mouse is approximately seven to nine inches in length, and its tail accounts for more than half its length. See New Mexico Meadow Jumping Mouse at 1, Colorado Parks & Wildlife (Feb. 2019),       https://cpw.state.co.us/Documents/LandWater/WetlandsProgram/PrioritySpecies/

Factsheet_and_Habitat_Scorecard_NMMeadowJumpingMouse.pdf (last visited September 2, 2020)("Jumping Mouse Fact Sheet").  People in the southwest United States refer to the Jumping Mouse as the kangaroo mouse or the kangaroo rat, because it "looks somewhat like a tiny kangaroo," and because it "can leap more than 2 feet into the air."  Susan Montoya Bryan, "Endangered New Mexico meadow jumping mouse populations discovered," The Columbian (Nov. 2, 2016), https://www.columbian.com/news/2016/nov/02/endangered-new-mexico-meadow-jumping-mouse-populations-discovered/ (last visited September 2, 2020).  The Jumping Mouse is primarily nocturnal, see Jumping Mouse Fact Sheet at 1, and it hibernates for approximately nine months each year -- from mid-September to mid-June, see Jumping Mouse Home Page.  The Jumping Mouse consumes various plant material, such as forbs,[5] grass seeds, flowers, and small fruits.  See Jumping Mouse Fact Sheet at 1.  Starting in the late 1980s and early 1990s, the Jumping Mouse's population began to decline sharply.  See Jumping Mouse Fact Sheet at 1.

---

[5]According to the United States Department of Agriculture (USDA), a forb is classification of "[v]ascular plant[s] without significant woody tissue."  Growth Habits Codes and Definitions, United States Department of Agriculture, https://plants.usda.gov/growth_habits_def.html, last visited October 8, 2010.  Forbs grow "above or at the ground," and "may be annual, biennial, or perennial."  USDA, https://plants.usda.gov/growth_habits_def.html.  Furthermore, forbs are distinctive in that they "always lack significant thinking by secondary woody growth and have perennating buds borne at or below the ground service."  USDA, https://plants.usda.gov/growth_habits_def.html.  Forbs include "ferns, horsetails, lycopods, and whisk-ferns."  USDA, https://plants.usda.gov/growth_habits_def.html.



Figure 1 -- A photograph of the Jumping Mouse in its streambank habitat.

Source: New Mexico Meadow Jumping Mouse, U.S. Fish & Wildlife Service, https://www.fws.gov/southwest/es/NewMexico/NMMJM.cfm (last visited September 2, 2020).



Figure 2 -- A photograph of the Jumping Mouse being weighed.

Source: Susan Montoya Bryan, Phys. Org, https://phys.org/news/2016-11-rare-mexico-meadow-mouse-populations.html (last visited October 9, 2020).



Figure 3 -- A photograph of the Jumping Mouse along a meadow stream in New Mexico.

Source: Ron Loehman, New Mexico Trout, https://www.newmexicotrout.org/little-mouse-may-rescue-trout-habitat/ (last visited October 9, 2020).



Figure 4 -- A photograph of the Jumping Mouse at the Bosque del Apache National Wildlife Refuge in southern New Mexico.

Source: Bosque del Apache, U.S. Fish & Wildlife Service, https://www.fws.gov/refuge/bosque_del_apache/science/jumping_mouse/ (last visited October 9, 2020).



Figure 5 -- A close-up image of the Jumping Mouse residing in a New Mexico wetland.

Source: New Mexico Meadow Jumping Mouse, KUNM, The University of New Mexico, https://www.kunm.org/post/new-mexico-meadow-jumping-mouse-sign-whats-come (last visited October 9, 2020).



Figure 6 -- Map of the Jumping Mouse's Habitat in Arizona, Colorado, and New Mexico.

Source: Jumping Mouse Fact Sheet at 2.

**2.**     **Fish & Wildlife's Procedure for Listing the Jumping Mouse as an Endangered Species and for Designating Critical Habitat for the Jumping Mouse.**

On June 20, 2013, Fish & Wildlife issued proposed rules to list the Jumping Mouse as an endangered species and to designate critical habitat for the Jumping Mouse pursuant to the Endangered Species Act.  See Proposed Rule: Endangered and Threatened Wildlife and Plants; Listing Determination for the New Mexico Meadow Jumping Mouse, 78 Fed. Reg. 37,363 ("Listing Proposed Rule"); Proposed Rule: Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse, 78 Fed. Reg. 37,328 ("Designation Proposed Rule").  Fish & Wildlife subsequently opened sixty-day public comment periods on both proposed rules.  See Listing Proposed Rule, 78 Fed. Reg. 37,363; Designation Proposed Rule, 78 Fed. Reg. 37,328 .  On April 8, 2014, Fish & Wildlife announced the reopening of the public comment period on the Designation Proposed Rule, and it made available "a draft economic analysis and draft environmental assessment of the proposed designation, as well as an amended required determinations of the proposal."  Proposed Rule: Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse, 79 Fed. Reg. 19,307 ("Reopening of Comment Period on Designation Proposed Rule")(citing Draft Environmental Assessment for the Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse, prepared by Harris Environmental Group, Inc. (March 11, 2014), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0040 (last visited September 2, 2020)(AR D002757)("Draft Environmental Report"); Draft Species Status Assessment Report for the New Mexico Meadow Jumping Mouse, prepared by the U.S. Fish and Wildlife Service Listing Review Team (May 30, 2013), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0041 (last visited September 2, 2020)(AR D002315)("Draft Species Status Report").  The public comment period on the Designation Proposed Rule lasted for a total of ninety days, and Fish & Wildlife held four public information meetings with interested stakeholders, sought comments from four independent specialists, sought opinions from three scientific experts, and considered comments from the public.  See Final Rule: Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse, 81 Fed. Reg. 14,264 ("Designation Final Rule").

3.    <u>The Listing</u>.

On June 10, 2014, Fish & Wildlife issued a final rule that listed the Jumping Mouse as an endangered species, because of significant habitat loss and fragmentation, which had caused the Jumping Mouse's populations to decline.  <u>See</u> Final Rule: Endangered and Threatened Wildlife Plants; Determination of Endangered Status for the New Mexico Meadow Jumping Mouse Throughout Its Range, 79 Fed. Reg. 33,119 ("Listing Final Rule").  Specifically, habitat loss "has resulted in the extirpation of historical populations, reduced the size of existing populations, and isolated existing small populations."  Listing Final Rule, 79 Fed. Reg. at 33,122.  In the Listing Final Rule, Fish & Wildlife cites several reasons for the Jumping Mouse's habitat loss:

> The primary sources of current and future habitat losses include grazing pressure (which removes the needed vegetation) and water management and use (which causes vegetation loss from mowing and drying of soils), lack of water because drought (exacerbated by climate change), and wildfires (also exacerbated by climate change).  Additional sources of habitat loss are likely to occur from scouring floods, loss of beaver, highway reconstruction, residential and commercial development, coalbed methane development, and unregulated recreation.

Listing Final Rule, 79 Fed. Reg. at 33,122.  Since 2005, researchers have identified twenty-nine populations of the Jumping Mouse -- two in Colorado, fifteen in New Mexico, and twelve in Arizona -- which are spread across eight geographic management areas.  <u>See</u> Listing Final Rule, 79 Fed. Reg. at 33,121.  Most of the Jumping Mouse populations are "isolated and widely separated," and researchers have concluded that all twenty-nine populations "have patches of suitable habitat that are too small to support resilient populations" of the Jumping Mouse.  Listing Final Rule, 79 Fed. Reg. at 33,121.

4.    <u>Fish & Wildlife's Economic Impact Analysis Before Issuing the Designation</u>.

Before Fish & Wildlife issued the designation, it conducted an economic impact analysis of the proposed designation, <u>see</u> Designation Final Rule, 81 Fed. Reg. at 14,284-14,290, which the Endangered Species Act requires, <u>see</u> 16 U.S.C. § 1533(b)(2).  On July 8, 2013, Fish & Wildlife issued a memorandum to Industrial Economic, Inc. to "serve as a basis for conducting an economic analysis of the proposed critical habitat designation for the New Mexico meadow jumping mouse."  Incremental Effects Memorandum for the Economic Analysis for the Proposed Rule to Designate Critical Habitat for the New Mexico jumping meadow mouse at 1, United States Department of the Interior, U.S. Fish and Wildlife Service (July 8, 2013)("Incremental Effects Memo")(AR D002524)(https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0042).    In the Incremental Effects Memo, Fish & Wildlife states that

an economic analysis for critical habitat that is being designated within States that fall within the jurisdiction of the Tenth Circuit should include a coextensive cost evaluation which addresses, and quantifies to the extent feasible, all of the conservation-related impacts associated with the regulatory baseline (those resulting under the jeopardy standard under section 7 of the Act, and under sections 9 and 10 of the Act). In other words, the allocation of impacts should show those that are part of the regulatory baseline and those that are unique to the critical habitat designation.

Incremental Effects Memo at 2, AR D002525. The Incremental Effects Memo also indicates that

Fish & Wildlife

anticipate[s] that additional project modifications as a result of designating critical habitat are predictable because: (1) the majority of each proposed critical habitat unit is considered unoccupied by the species; and (2) the jumping mouse is intimately tied to its habitat such that any potential project modifications to avoid adverse modification of unoccupied critical habitat would likely differ substantially from those that are likely to be required to avoid jeopardizing this species. This difference in anticipated project modifications results from the difference in the riparian vegetation within occupied and unoccupied areas within units. The unoccupied areas of proposed critical habitat do not presently contain suitable habitat. . . . There is nothing to indicate that the situation will improve without significant conservation intervention focused on allowing the currently lacking physical features related to the wetland vegetation to regrow (either naturally or through management or protection) into suitable habitat . . . . If we determine that an action adversely modifies unoccupied critical habitat, . . . recommended project modifications could include

. . . .

3.      Avoid ground disturbing activities or reduce project elements that would preclude the development of habitat patches containing dense herbaceous riparian vegetation.

4.      Implement in-situ conservation (on-site conservation of this species) by restoration of dense herbaceous riparian vegetation to expand the remaining populations and improve the degraded status of the jumping mouse within a project's action area. Conservation measures would likely include protection of riparian areas through fencing, changing the timing or duration of the action (e.g., dormant season grazing), encouraging the reestablishment of beaver through habitat enhancement or active translocation, or ensuring that a constant supply of water is provided throughout the stream, ditch, or canal during the growing season.

. . . .

7.      Modify livestock grazing activities through fencing, reconfiguration of grazing units, off-site water development, and seasons of use.

8.      Modify off-road vehicle management through fencing, signage, education, and timing of use.

Incremental Effects Memo at 15-16, AR D002538-D002539.

a.       **Industrial Economics' Economic Impact Analysis.**

On February 18, 2014, Industrial Economics issued to Fish & Wildlife a memorandum that "provides information to the Service on the potential for the proposed critical habitat to result in costs exceeding $100 million in a single year," in accordance with 16 U.S.C. § 1533(b)(2) and Executive Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)("Exec. Order 12866"). Industrial Economics, Consideration of Economic Impacts: Screening Analysis of the Likely Economic Impacts of Critical Habitat Designation for the New Mexico Jumping Mouse at 1 (Feb. 18, 2014), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0094 (last visited September 2, 2020)("Screening Memo") (AR D002735).   In the Screening Memo, Industrial Economics states that,

> based on information provided in the proposed rule, the Service's incremental effects memorandum, and follow-up communication with the Service, we identified grazing as the main activity occurring within the areas proposed for designation that is likely to experience impacts from the rule.   In addition, we consider possible impacts to water use and management; transportation; recreation; development; and species and habitat management.

Screening Memo at 6 (AR D002740).  The Screening Memo "focuses on the likely incremental effects of the critical habitat designation" -- that is, "costs and benefits that are incremental to the baseline."  Screening Memo at 6 (AR D002740) (internal quotation marks omitted).  The United States Office of Management and Budget ("OMB") defines the baseline as the "best assessment of the way the world would look absent the proposed action."  Circular A-4 at 15, United States Office of Management and Budget (Sept. 17, 2003), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf ("OMB Circular")(AR D000582).   Incremental effects are the difference between a proposed action's costs and benefits and the baseline, or the costs and benefits of not pursing the proposed action.  See OMB Circular at 16.

Industrial Economics identified two categories of incremental effects associated with the Jumping Mouse's proposed designation: (i) incremental effects "that may be generated by section 7 of the Act"; and (ii) "other types of impacts outside of the context of section 7."  Screening Memo at 6 (AR D002740).  Under the Endangered Species Act § 7, other federal agencies must, "in consultation with" Fish & Wildlife, ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary [of the Interior] . . . to be critical."  16 U.S.C. § 1536(a)(2).

See Screening Memo at 6 (AR D002740).  Industrial Economics concluded that these consultations -- frequently called "§ 7 consultations" -- "are the regulatory mechanism through which critical habitat rules are implemented.  Any time and effort spent on this additional analysis, as well as the costs and benefits of implementing any recommendations resulting from this review, are economic impacts of the critical habitat designation."   Screening Memo at 6 (AR D002740).  As for incremental effects that are not related to § 7 consultations, Industrial Economics identified the following:

> Critical habitat may also trigger additional regulatory changes.  For example, the designation may cause other Federal, state, or local permitting or regulatory agencies to expand or change standards or requirements.  Regulatory uncertainty generated by critical habitat may also have impacts.  For example, landowners or buyers may perceive that the rule will restrict land or water use activities in some way and therefore value the resource less than they would have absent critical habitat.  This is a perceptional, or stigma, effect of critical habitat on markets.

Screening Memo at 7 (AR D002741).

Industrial Economics determined that the designation's § 7 consultation costs related to grazing "are likely to differ depending on whether a project occurs in unoccupied or occupied areas."  Screening Memo at 7 (AR D002741).  First, for areas that the Jumping Mouse occupies, Industrial Economics estimated that there would be almost zero incremental effects "resulting from project modifications in occupied areas," because almost all costs can be attributed to the baseline, such as the Jumping Mouse's listing, and, accordingly, the "incremental costs are likely to be limited to the additional administrative effort to consider adverse modification during the consultation process."  Screening Memo at 7 (AR D002741).  As for areas that the Jumping Mouse does not occupy, Industrial Economics forecasted that the incremental costs "would be both the administrative costs and the costs of developing and implementing conservation measures needed to avoid adverse modification of critical habitat."  Screening Memo at 8 (AR D002742).  The primary conservation efforts related to grazing on unoccupied area include animal unit month[6] ("AUM") reductions on United States Forest Service grazing allotments and "construction of fencing exclosures to keep livestock out of critical habitat."  Screening Memo at 8, (AR D002742). In addition, Industrial Economics noted that Fish & Wildlife anticipates that the Santa Fe National Forest, the Lincoln National Forest, and the Apache-Sitgreaves National Forest -- all of which

---

[6]An animal unit month ("AUM") is defined as "the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month."  43 C.F.R. § 4100.00-0.05.

contain critical habitat under the proposed designation -- "will undergo a programmatic consultation" with Fish & Wildlife "to consider grazing activities," and Industrial Economics' "analysis include[d] the additional administrative costs of considering critical habitat as part of these programmatic consultations." Screening Memo at 10 (AR D002744). Industrial Economics estimated that § 7 consultation costs related to grazing allotments total $15,000,000.00. See Screening Memo at 12 (AR D002746).

As for activities other than grazing, Industrial Economics identified several activities that Fish & Wildlife anticipates will require § 7 consultations and produce incremental costs. See Screening Memo at 12-16 (AR D002746-D002750). First, Industrial Economics accounts for several agency actions by the United States Forest Service that Fish & Wildlife anticipates will require § 7 consultations. See Screening Memo at 12-14 (AR D002746-D002748). Industrial Economics forecasted that a road paving project by the United States Forest Service will require § 7 consultations, but it determined that "it is unlikely that critical habitat would generate additional requests for conservation efforts beyond what would be requested because the listing of the species." Screening Memo at 13 (AR D002747). Industrial Economics estimated that the "incremental costs of critical habitat for this project are likely limited to the additional administrative costs of considering critical habitat as part of the informal consultation." Screening Memo at 13, AR D002747. In addition, Industrial Economics forecasted that the three National Forests that contain proposed critical habitat will require fencing around recreation areas that the Jumping Mouse does not occupy. See Screening Memo at 13-14 (AR D002747-D002748). Industrial Economics estimated that the incremental costs of constructing fencing around "unoccupied critical habitat within the National Forests but outside of the grazing allotments" to be approximately $4,200,000.00. Screening Memo at 14 (AR D002748).

Second, Industrial Economics accounted for several agency actions by the United States Army Corps of Engineers that Fish & Wildlife anticipates will require § 7 consultations and produce incremental costs. See Screening Memo at 14-16 (AR D002748-D002750). Industrial Economics forecasted that a proposed habitat restoration project by the United States Army Corps of Engineers will require § 7 consultations. See Screening Memo at 14 (AR D002748). Industrial Economics determined, however, that, because Fish & Wildlife "does not expect to recommend conservation measures above and beyond [] those already required by the Corps, . . . the

incremental costs associated with this project will be limited to the costs of the consultation." Screening Memo at 14, (AR D002748).  Next, Industrial Economics forecasted that several water management projects by the United States Army Corps of Engineers -- the construction of levees, the rehabilitation of two lakes, and the continued operation of a dam -- will require § 7 consultations.  See Screening Memo at 15 (AR D002749).  The levee construction will occur in areas that the Jumping Mouse does not occupy, and, thus, "incremental costs of critical habitat designation for this project include both the costs of consultation and the costs of any conservation measures recommended by the Service."  Screening Memo at 15 (AR D002749).  Industrial Economics determined, however, that Fish & Wildlife "is unlikely to recommend additional conservation measures beyond what the Corps would require as part of their standard procedures except for possibly requesting that surveys be conducted in the area to determine whether the species is present," and that these surveys will cost approximately $9,000.00.  Screening Memo at 15 (AR D002749).  The lake rehabilitation and the dam operation will occur in land that the Jumping Mouse occupies, and, thus, incremental costs "are likely limited to the additional administrative costs" of considering critical habitat and addressing adverse modifications during § 7 consultations.  Screening Memo at 15 (AR D002749).

Last, Industrial Economics accounted for the "re-initiation of a programmatic consultation for water use and management activities on the Middle Rio Grande," which Fish & Wildlife anticipates will require § 7 consultations.  Screening Memo at 16 (AR D002750).  The re-initiation will occur in areas that the Jumping Mouse partially occupies, so the "re-initiation is expected to occur regardless of critical habitat designation."  Screening Memo at 16 (AR D002750).  Industrial Economics further determined that it "is unlikely that critical habitat would generate additional requests for conservation efforts beyond what would be required because the presence of the species," and, thus, Industrial Economics forecasted that the incremental costs "will be limited to the administrative costs of consultation."  Screening Memo at 16 (AR D002750).  Industrial Economics estimated that § 7 consultation costs related to activities other than grazing total $4,400,000.00.  See Screening Memo at 16-17 (AR D002750-D002751).  In sum, Industrial Economics estimated that the total costs of designating critical habitat for the Jumping Mouse would be $20,000,000.00 in 2014, and, "therefore, costs of the proposed critical habitat designation are unlikely to exceed $100 million in a given year."  Screening Memo at 17 (AR D002751).

Industrial Economics identified two incremental costs unrelated to § 7 consultations: (i) the costs of "additional requirements or project modifications under state laws or regulations"; and (ii) "perceptional effects on markets."  Screening Memo at 18 (AR D002752).  Industrial Economics noted that Arizona, Colorado, and New Mexico each provide some level of protection for the Jumping Mouse, and it determined that "the designation of  critical habitat is unlikely to trigger state-level impacts as a result of increased awareness of the species and its habitat in states where the mouse is afforded some protective status.  The Service did not receive any public comments on the proposed rule suggesting this conclusion was incorrect."  Screening Memo at 18-19 (AR  D002752-D002753).  Industrial  Economics  also  acknowledged  that  incremental impacts to grazing allotments on federal land may impact the value of private land, because "the ranching community may perceive that the designation of certain parcels as critical habitat will limit future grazing activities in those areas," and because "private landowners hold renewable leases that are both inheritable and transferrable with the sale of the land . . . [or] the transfer of livestock."  Screening Memo at 19-20 (AR D002753-D002754).  Industrial Economics determined that impacts to grazing on federal land "may affect the value of connected private holdings," but it concluded that the incremental cost that the designation would impose on private landowners "is unlikely to exceed $100 million."  Screening Memo at 19-20 (AR D002754).

> **b.**      **Fish & Wildlife's Adoption of Industrial Economics' Economic Impact Analysis.**

Industrial Economics' Screening Memo served as Fish & Wildlife's economic impact analysis of the proposed designation pursuant to the Endangered Species Act's § 4(b)(2).  See Designation Final Rule, 81 Fed. Reg. at 14,308.

> In order to consider economic impacts, we prepared an incremental effects memorandum and screening analysis, which together with our narrative and interpretation of effects, we consider our draft economic analysis of the proposed critical habitat designation and related factors . . . .
>
> The analysis, dated April 8, 2014, was made available for public review from April 8, 2014, through May 8, 2014 . . . .  The draft economic analysis addressed potential economic impacts of critical habitat designation for jumping mouse.  Following the close of the comment period, we reviewed and evaluated all information submitted during the comment period that may pertain to our consideration of the probable incremental economic impacts of this critical habitat designation . . . .
>
> The economic screening memorandum is our economic analysis of the proposed critical habitat designation . . . .  The purpose of the economic analysis is to provide us with the information on the potential for the proposed critical habitat rule to result in costs exceeding $100 million in a single year.  The draft economic analysis addressed potential economic impacts of critical habitat designation for the

> jumping mouse.  To that end, the analysis estimates impacts to activities, including grazing, water use, and recreation, that may experience the greatest impacts in compliance with section 4(b)(2) of the Act.  The draft screening memo is provided to the public for review and comment.  Following the close of the comment period, we reviewed and evaluated all information submitted during the comment period that may pertain to our consideration of the probable economic impacts of this critical habitat designation.  We conclude that critical habitat designation for the jumping mouse is unlikely to generate costs exceeding $100 million in a single year.

Designation Final Rule, 81 Fed. Reg. at 14,307 (citations omitted).  Fish & Wildlife echoed

Industrial Economics' determination that, "[i]n occupied areas, the economic impacts of

implementing the rule through section 7 of the Act will most likely be limited to additional

administrative effort to consider adverse modification."  Designation Final Rule, 81 Fed. Reg. at

14,307-08.  Fish & Wildlife based this conclusion on two factors: (i) "[a]ny activities with a

Federal nexus occurring within occupied habitat will be subject to section 7 consultation

requirements regardless of critical habitat designation, because the presence of the listed species";

and (ii) "[i]n most cases, project modifications requested to avoid adverse modification are likely

to be the same as those needed to avoid jeopardy in occupied habitat," and thus do not produce

incremental effects.  Designation Final Rule, 81 Fed. Reg. at 14,308.  Fish & Wildlife confirmed

that its economic analysis forecasts: (i) the administrative costs of § 7 consultations "likely to occur

for grazing, transportation, recreation, water management, and species and habitat management

undertaken by or permitted by Federal agencies within the study area"; and (ii) the "costs

associated with conservation efforts that may be recommended in consultation for those activities

occurring in unoccupied areas."  Designation Final Rule, 81 Fed. Reg. at 14,308.  Like Industrial

Economics, Fish & Wildlife estimated that the designation's economic impact would total

$20,000,000.00 in 2014, and that the designation's total costs "are unlikely to exceed $100 million

in a given year."  Designation Final Rule, 81 Fed. Reg. at 14,308.

###   5.      **The Designation.**

On March 16, 2016, almost two years after listing the Jumping Mouse as an endangered

species, Fish & Wildlife issued the final rule designating critical habitat for the Jumping Mouse

("the designation").  Designation Final Rule, 81 Fed. Reg. at 14,264.  The designation

encompasses approximately 13,973 acres along 169.3 miles "of flowing streams, ditches, and

canals . . . in the States of Colorado, New Mexico, and Arizona."  Designation Final Rule, 81 Fed.

Reg. at 14,297.  The designation is divided into "eight units within Colfax, Mora, Otero, Sandoval,

and Socorro Counties in New Mexico; Las Animas, Archuleta, and La Plata Counties in Colorado;

and Greenlee and Apache Counties in Arizona."  Designation Final Rule, 81 Fed. Reg. at 14,264.



Figure 7 -- Map of the Designation's Eight Units

Source: Designation Final Rule, 81 Fed. Reg. at 14,317.

        Of these eight units, Fish & Wildlife designated Units 1, 2, 6, 7, and 8 as partially occupied

by the Jumping Mouse.  See Designation Final Rule, 81 Fed. Reg. at 14,297-14,299.  Fish &

Wildlife divided Unit 3 into three subunits, Unit 4 into five subunits, and Unit 5 into eight subunits.

See Designation Final Rule, 81 Fed. Reg. at 14,297-14,299.  Of these sixteen subunits, Fish &

Wildlife designated all subunits as partially occupied by the Jumping Mouse, except for subunits

3C and 4A, which Fish & Wildlife designated as unoccupied by the Jumping Mouse.  See

Designation Final Rule, 81 Fed. Reg. at 14,298.

- 18 -



Figure 8 -- Map of Unit 3 and its Subunits

Source: Designation Final Rule, 81 Fed. Reg. at 14,320.



Figure 9 -- Map of Unit 4 and its Subunits.

Source: Designation Final Rule, 81 Fed. Reg. at 14,321.



Figure 10 -- Map of Unit 5 and its Subunits.

Source: Designation Final Rule, 81 Fed. Reg. at 14,322.

**6.      Fish & Wildlife's Exclusion Decisions.**

Fish & Wildlife did not exclude any areas from the designation based on economic impacts,

because its "economic analysis did not identify any disproportionate costs that are likely to result

from the designation."  Designation Final Rule, 81 Fed. Reg. at 14,307.  Under the Endangered

Species Act's § 4(b)(2), Fish & Wildlife:

> may exclude an area from critical habitat if [it] determines that the benefits of such
> exclusion outweigh the benefits of specifying such area as part of the critical
> habitat, unless [it] determines, based on the best scientific data available, that the
> failure to designate such area as critical habitat will result in the extinction of the
> species.

Designation Final Rule, 81 Fed. Reg. at 14,306-07.

Fish & Wildlife, accordingly, excluded from the designation "a number of historical

locations of the jumping mouse," because it concluded that such locations are "of lesser quality,

have a low potential of being restored, and would not contribute to connectivity, stability, or

protection against catastrophic loss."  Designation Final Rule, 81 Fed. Reg. at 14,269.  Moreover,

although Fish & Wildlife designated Subunits 3C, 4B, 6A, and 6B as areas that the Jumping Mouse does not occupy currently, Fish & Wildlife included Subunits 3C and 4B in the designation, because they "contain perennial flowing water with saturated soils, making these units highly restorable and essential for the conservation of the species." Designation Final Rule, 81 Fed. Reg. at 14,296. Fish & Wildlife excluded Subunits 6A and 6B, however, "because the benefits of exclusion outweigh the benefits of including these areas as critical habitat." Designation Final Rule, 81 Fed. Reg. at 14,296. During the public comment period, some commenters opposed the designation of Units 3 and 4 as critical habitat, because they contended that Fish & Wildlife lacked a scientific basis for designating the units, see, e.g., Designation Final Rule, 81 Fed. Reg. at 14,279-81, but the Stockman's Associations and its members did not comment that Fish & Wildlife should exclude Units 3 and 4 from the designation altogether.

### 7.    Grazing by Members of the Stockman's Associations Within the Designation.

Many members of the Stockman's Associations hold grazing allotments or graze cattle on federal land that is in or around Units 3 and 4 of the designation. See Complaint ¶¶ 34-38, at 9. Many members of the Northern NM Stockman's Association hold grazing allotments or raise cattle on federal land located in and around Unit 3. See Complaint ¶¶ 35-36, at 9; Declaration of Carlos Salazar on Behalf of Northern NM Stockman's Association in Support of Petition for Review ¶¶ 12-15, at 4 (dated July 22, 2019), filed August 8, 2019 (Doc. 26-2)("Salazar Decl."); Declaration of Manuel Lucero in Support of Petition for Review ¶¶ 6-8, at 2 (dated July 16, 2020), filed August 8, 2019 (Doc. 26-4)("Manuel Lucero Decl."); Declaration of Mariano Lucero in Support of Petition for Review ¶ 6, at 2 (dated August 7, 2019), filed August 8, 2019 (Doc. 26-5)("Mariano Lucero Decl."); Declaration of Michael Lucero ¶ 10, at 6 (dated August 7, 2019), filed August 8, 2019 (Doc. 26-6)("Michael Lucero Decl."). For example, Mariano Lucero, of Lucero's Ranch, raises cattle in and around Subunit 3A, see Salazar Decl. ¶ 15, at 4; Mariano Lucero Decl. ¶ 6, at 2; Gabriel and Orlando Lucero, of the Lucero Brother Ranch, and Michael Lucero, of Chevy L. Ranch, raise cattle in and around Subunits 3B and 3C, see Salazar Decl. ¶¶ 12-14, at 4; Michael Lucero Decl. ¶ 10, at 6. In addition, Manuel Lucero owns land on several allotments that are in and around Subunits 3B and 3C, and he is a member of a cooperative association that permits its members to graze on allotments that are in and around Subunits 3B and 3C, see Manuel Lucero Decl. ¶¶ 6-8, at 2. Moreover, several members of the Otero Cattleman's Association hold grazing allotments on federal land located in or around Unit 4 or Fish &

Wildlife's designation of Unit 4 as critical habitat affects the allotments. See Complaint ¶¶ 37-38, at 9; Declaration of Gary Stone on Behalf of Otero Cattleman's Association in Support of Petition for Review ¶ 12, at 4 (dated July 24, 2019), filed August 8, 2019 (Doc. 26-3)("Stone Decl."); Declaration of Justin Goss in Support of Petition for Review ¶ 11, at 3 (dated July 22, 2019), filed August 8, 2019 (Doc. 26-7)("Goss Decl."); Declaration of Judyann Medeiros in Support of Petition for Review ¶ 11, at 3 (dated July 22, 2019), filed August 8, 2019 (Doc. 26-8)("Medeiros Decl."); Declaration of William Mershon in Support of Petition for Review ¶ 9, at 3 (dated August 1, 2019), filed August 8, 2019 (Doc. 26-9)("Mershon Decl.").  For example, Justin "Spike" Goss holds a grazing allotment in and around Subunits 4B and 4D, see Stone Decl. ¶ 12, at 4; Goss Decl. ¶ 11, at 3; Bill Mershon holds a grazing allotment in and around Subunit 4C, see Stone Decl. ¶ 12, at 4; Mershon Decl. ¶ 9, at 3; and Judyann Medeiros holds a grazing allotment in and around Subunit 4E, see Stone Decl. ¶ 12, at 4; Medeiros Decl. ¶ 11, at 3.

## PROCEDURAL BACKGROUND

On December 6, 2018, the Stockman's Associations filed the Complaint, which alleges that Fish & Wildlife violated the Endangered Species Act and the APA.  See Complaint ¶ 1, at 1. The Stockman's Associations first allege that Fish & Wildlife erroneously ignored many economic impacts of the designation for the Jumping Mouse's habitat, thus contravening precedent from the Tenth Circuit which allegedly requires that Fish & Wildlife consider all economic impacts of designating habitat as critical, not only a designation's incremental impacts.  See Complaint ¶¶ 55-65, at 13-14.  Second, the Stockman's Associations allege that Fish & Wildlife omitted some incremental costs of the designation, such as the costs associated with the alleged taking of water rights that members of the Stockman's Associations possess as a result of exclusionary fencing. See Complaint ¶¶ 66-73, at 15-16.  Third, the Stockman's Associations allege that Fish & Wildlife should have excluded units 3 and 4 from the designation as a result of calculating the costs associated with including these units in the designation, and that Fish & Wildlife's lack of a reasoned explanation for its decision not to exclude these areas is an abuse of discretion.  See Complaint ¶¶ 74-86, at 16-19.  The Stockman's Associations ask that the Court set aside Fish & Wildlife's final rule designating critical habitat for the Jumping Mouse.  See Complaint ¶ 5, at 19. On July 3, 2019, the Center for Biological Diversity and WildEarth Guardians (collectively, the "Environmental Intervenors"), filed a motion to intervene as respondents and defendant-intervenors under rule 24 of the Federal Rules of Civil Procedure.  See Motion to Intervene at 1,

filed July 3, 2019 (Doc. 15).  On August 7, 2019, the Court granted the Motion to Intervene.  See

Order Granting Motion to Intervene as Respondents and Defendants at 2, filed August 7, 2019

(Doc. 25).

       1.      **The Petition.**

On August 8, 2019, the Stockman's Associations filed the Petition.  See Petition at 1.  The

Stockman's Association's main argument is that Fish & Wildlife has not properly followed the

Endangered Species Act's § 4(b)(2)'s "'unified process for weighing the impact of designating an

area as critical habitat,'" because Fish & Wildlife ignored many economic and other impacts before

designating critical habitat for the Jumping Mouse.  Petition at 16 (quoting Weyerhaeuser Co. v.

U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 371 (2018)("Weyerhaeuser")).   The Stockman's

Associations argue that Fish & Wildlife committed two fundamental errors in its economic

analysis of the designation's costs: (i) Fish & Wildlife did not "take into account the costs of the

listing itself, contrary to the requirement of the [Endangered Species Act] as well as binding Tenth

Circuit precedent"; and (ii) Fish & Wildlife's "analysis ignores the costs associated with the taking

of water rights resulting from the designation."  Petition at 16.  The Stockman's Associations

further argue that Fish & Wildlife abused its discretion and acted arbitrarily and capriciously by

not providing "a reasoned basis for not excluding certain units from the designation," namely, units

3 and 4.  Petition at 16.

       a.      **The Stockman's Associations Assert That They Have Standing to Challenge the Designation on Their Members' Behalves.**

The Stockman's Associations assert that they have standing to challenge Fish & Wildlife's

critical habitat designation for the Jumping Mouse.  See Petition at 17.  They argue that they have

satisfied all three elements for an association to establish standing to sue on its members' behalf:

(i) the members of the Stockman's Associations would otherwise have standing; (ii) the

Stockman's Associations were established for a purpose that is relevant to their members' interests

that the Stockman's Associations strive to protect; and (iii) members of the Stockman's

Associations are not required to participate in the lawsuit based on claims and requests for relief.

See Petition at 17 (citing Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

The Stockman's Associations argue that they satisfy the first element to establish

associational standing, because many of their members demonstrate an "'injury in fact' that is

'fairly traceable' to defendants with 'a likelihood that the requested relief will redress the alleged

injury.'"  Petition at 17 (quoting <u>Steel Co. v. Citizens for a Better Env't</u>, 532 U.S. 83, 102-03 (1998)).  They argue that their members suffer economic injury, because the designation: (i) increases the costs to members of the Stockman's Associations, such as "costs associated with fencing exclosures in grazing allotments" and animal unit month[7] ("AUM") reductions, Petition at 17; (ii) increases the regulatory costs for members of the Stockman's Associations, because renewing their grazing permits will require consultations under Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2)("Section 7 consultations"), which "can be both lengthy and costly to the applicant," Petition at 18; and (iii) decreases the property value of the property owned by the Stockman's Associations, because designating land as critical habitat results in a "negative public perception" of the land's value, Petition at 18.  The Stockman's Associations assert that they satisfy the first element to establish associational standing, because their formation's purpose is "to protect the ranching interests of their members." Petition at 18.  Finally, they argue that they satisfy the third element, because they seek "only prospective relief" and ask the Court "to hold unlawful and set aside" Fish & Wildlife's designation.  Petition at 19 (citing <u>United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.</u>, 517 U.S. 544, 553 (1996)).

> **b.  The Stockman's Associations Argue That Fish & Wildlife Violated the Endangered Species Act by Not Considering the Designation's <u>Economic and Other Impacts</u>.**

The Stockman's Associations next argue that Fish & Wildlife violated the Endangered Species Act's § 4(b)(2), because Fish & Wildlife underestimated the designation's economic impacts by not considering costs beyond the designation itself.  <u>See</u> Petition at 19.  They argue that Fish & Wildlife unlawfully used the "incremental effects" approach -- also known as the "baseline" or "incremental baseline" approach -- which only considers the designation's economic impacts which exceed baseline costs, and disregards any economic impacts that can be attributed to the Jumping Mouse's listing as an endangered species.  <u>See</u> Petition at 19.  The Stockman's Associations assert that the Endangered Species Act mandates the use of a "coextensive" approach which accounts for the designation's economic impacts that can also be consequences of the listing.  <u>See</u> Petition at 20, 23.

---

[7]In 43 C.F.R. § 4100.00-0.05, animal unit month ("AUM") is defined as "the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month." 43 C.F.R. § 4100.00-0.05.  The Stockman's Associations argue that the designation will reduce the number of cattle that their members can graze within the critical habitat.  <u>See</u> Petition at 17.

The Stockman's Associations argue that Fish & Wildlife unlawfully used the incremental effects approach and is required to use the coextensive approach, because: (i) the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to consider economic impacts when designating critical habitat, see Petition at 19; (ii) the Endangered Species Act requires Fish & Wildlife to disregard economic impacts while considering the listing, because, although "'Congress intended endangered species to be afforded the highest of priorities,'" the Endangered Species Act requires Fish & Wildlife to consider economic impacts concurrently with the designation of critical habitat, see Petition at 20 (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 175 (1978)("Tenn. Valley Auth."), and citing 16 U.S.C. §1533(a)(3)(A)(i), (b)(2)); (iii) Fish & Wildlife cannot satisfy the Endangered Species Act's requirement that it balance species protections and conservation efforts with the economic impacts imposed by such protections unless it considers the designation's economic impacts, see Petition at 21 (citing H.R. Rep. No. 97-567, at 10, 12, 1982 U.S.C.C.A.N. 2807, 2809, 2811-12); (iv) the Tenth Circuit decided in 2001 that Fish & Wildlife must use the coextensive approach when designating critical habitat, because the incremental effects approach "'is not in accord with the language or intent of the Endangered Species Act' . . . [and] threatens to render meaningless Section 4(b)(2) . . . [because] the costs associated with designating critical habitat will often be subsumed by the costs of the listing itself . . . [so] in many instances, [Fish & Wildlife] will not conduct any economic analysis," Petition at 21-22 (quoting N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 248 F.3d 1277, 1283, 1285 (10th Cir. 2001)("N.M. Cattle Growers Ass'n")); (v) "[t]he Tenth Circuit's precedent is binding on this Court," and the Court should order Fish & Wildlife to use the coextensive approach when designating critical habitat "within States that fall within the jurisdiction of the Tenth Circuit," Petition at 22-23; and (vi) Fish & Wildlife sent an Incremental Effects Memo to Industrial Economics, Inc., a private contractor, instructing Industrial Economics to apply the coextensive approach when evaluating the designation's economic impacts within the Tenth Circuit, and, consequently, Fish & Wildlife abused its discretion by not following its own stated procedures, see Petition at 23 (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267 (1954)).

The Stockman's Associations further assert that, even if the incremental effects approach is lawful, Fish & Wildlife "must still assess all of the pertinent incremental impacts," which Fish & Wildlife did not do. Petition at 24. They argue that Fish & Wildlife failed to consider costs

associated with fencing, such as the cost of reducing access to water for the members of the Stockman's Associations.  See Petition at 25.  According to the Stockman's Associations, the designation interferes with their members' water rights in the Santa Fe and Lincoln National Forests, which is a taking under the Fifth Amendment, and Fish & Wildlife must pay just compensation to their members and account for this cost when it calculates the designation's economic impacts.  See Petition at 24-25 (citing Sacramento Grazing Association, Inc. v. United States, 135 Fed. Cl. 168, 197 (2017)).  The Stockman's Associations assert that, "[w]hen ranchers commented that the fencing of riparian areas would constitute a taking, Fish & Wildlife dismissed those concerns," because the fencing exclusions would not to be on privately owned land.  Petition at 25.  The Stockman's Associations note that, "[u]nder New Mexico law, the right to beneficial use of water is a property interest distinct and severable from a right to use land."  Petition at 25 (quoting Sacramento Grazing Association, Inc. v. United States, 135 Fed. Cl. at 197)(alteration added).

        **c.**       **The Stockman's Associations Argue That Fish & Wildlife Abused Its Discretion and Acted Arbitrarily and Capriciously, Because It Did Not Provide a Reasoned Explanation for Not Excluding Units 3 and 4 From the Designation.**

The Stockman's Associations' second argument is that Fish & Wildlife violated the Endangered Species Act and APA by not providing a reasoned explanation for not providing a reasoned explanation for not excluding units 3 and 4 from the designation.  See Petition at 26 (citing 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1533(b)(2)).  They note that, in 2018, the Supreme Court of the United States of America concluded that Fish & Wildlife's decisions concerning whether to exclude areas from a critical habitat designation may be subject to judicial review for abuse of discretion.  See Petition at 26 (citing Weyerhaeuser, 139 S. Ct. at 371).  The Stockman's Associations argue that the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to balance economic and other impacts when deciding whether to exclude areas from critical habitat designation, and then provide a reasoned explanation for its final decision.  See Petition at 26 (citing Judulang v. Holder, 565 U.S. 42, 53 (2011)).  The Stockman's Associations note that, when Fish & Wildlife finalized the designation, they "declined to exclude Units 3 and 4 from the designation because it purportedly could not identify 'any disproportionate costs that are likely to result from the designation.'"  Petition at 26 (quoting Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse; Final Rule, 81 Fed. Reg. 14,264, 14,307 (March 16,

2016)(to be codified at 50 C.F.R. pt. 17)("Jumping Mouse Designation")).  They assert that Fish & Wildlife's "failure to explain its decision is, by definition, an abuse of discretion."  Petition at 16 (citing Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

The Stockman's Associations assert that Fish & Wildlife's decision not to exclude units 3 and 4 from the designation was "fatally vague and indecisive."  Petition at 27 (citing SEC v. Chenery Corp., 332 U.S. 194 (1947)).  They contend that Fish & Wildlife must set forth a decision-making standard for determining whether to exclude areas from critical habitat designation.  See Petition at 29-30.  The Stockman's Associations argue that Fish & Wildlife's decision-making process will be opaque and amorphous if Fish & Wildlife does not establish and follow such a standard, leading to consequences, such as "keeping the public in the dark" and courts having no "yardstick to measure the rationality of Fish & Wildlife's determinations."  Petition at 29-30 (citing Sierra Club v. Salazar, 177 F. Supp. 3d 512, 532 (D.D.C. 2016)(Walton, J.)).

The Stockman's Associations indicate that Fish & Wildlife typically uses a "disproportionate costs" approach which weighs economic and other impacts to include versus exclude areas from critical habitat designation.  Petition at 27 (citing, e.g., Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad, 81 Fed. Reg. 59,046, 59,087 (Aug. 26, 2016)(to be codified at 50 C.F.R. pt. 17)("Yellow-Legged Frogs and Yosemite Toad Designation")).  They assert that Fish & Wildlife did not apply its conventional disproportional costs standard in deciding not to exclude units 3 and 4; instead, Fish & Wildlife "[p]urportedly examined the costs of designating critical habitat, [but Fish & Wildlife did not provide an] explanation for what it would weigh those costs against."  Petition at 27.  They contend that the only indication that Fish & Wildlife used any standard in its exclusion decision-making process is Fish & Wildlife's "repeated statement" that the economic impacts of the designation were less than an arbitrary $100,000,000.00 threshold.  See Petition at 28.  The Stockman's Associations note, however, that economic impacts assigned to particular subunits are significantly higher than others, and, even if those costs were not disproportional, the Court should not "'guess at the theory underlying the agency's action; nor . . . chisel that which must be precise from what the agency has left vague and indecisive.'"  Petition at 27 (quoting SEC v. Chenery

Corp., 332 U.S. at 196-97).   Altogether, the Stockman's Association contend, Fish & Wildlife arrived at its conclusion not to exclude units 3 and 4 from the designation by using a "nebulous" and "ad-hoc" decision-making process, which "'is likely to be arbitrary and capricious under the Administrative Procedure Act.'"   Petition at 27-28 (quoting Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 34 n.11 (1st Cir. 1998)).

>     **2.     The Response.**

On September 23, 2019, Fish & Wildlife responded to the Petition.   See Response at 1. Fish & Wildlife contends that the Court should not reach the merits of the arguments that the Stockman's Associations raise, because the Stockman's Associations lack standing.   See Response at 6.   Fish & Wildlife further argues that it "satisfied its obligation to consider the economic impacts of the critical habitat designation by conducting an economic analysis that was consistent with" the Endangered Species Act, relevant regulations, and agency policy.   Response at 6. According to Fish & Wildlife, it "thoroughly address[ed] the likely economic impacts and benefits of designating critical habitat for the imperiled Jumping Mouse," and the Court should reject the challenges that the Stockman's Associations raise.   Response at 6.

>     **a.     Fish & Wildlife Asserts That the Stockman's Associations Lack Standing to Challenge the Designation on Their Members' Behalves and That the Members of The Stockman's Associations Also Lack Standing.**

Fish & Wildlife first argues that the Stockman's Associations' lack standing.   See Response at 6.   It notes that the Stockman's Associations can only have standing if their members could otherwise have standing in their own right.   See Response at 11 (citing Utah Ass'n of Ctys. v. Bush, 455 F.3d 1094, 1099 (10th Cir. 2006)).   It asserts that the Stockman's Associations' members do not have standing, because they have not suffered "concrete and particularized" injuries which are "'fairly traceable'" to Fish & Wildlife's decision to finalize the designation, and the members' alleged injuries would not be redressed by a favorable outcome.   Response at 11-12 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992), and citing e.g., Stewart v. Kempthorne, 554 F.3d 1245, 1253 (10th Cir. 2009)).   Fish & Wildlife argues that its decision to finalize the designation does not regulate directly the Stockman's Associations or their members, and that the members' alleged economic injuries would be traceable only to "subsequent actions by" Fish & Wildlife.   Response at 12 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,262). It contends that the members of the Stockman's Associations merely provided "conclusory

standing allegations" which lack sufficient evidence to establish standing.  Response at 12 (citing

Qwest Commc'ns Int'l v. FCC, 240 F.3d 886, 891, 893 (10th Cir. 2001)).  Finally, Fish & Wildlife

asserts that, although the economic impacts analysis it conducted before finalizing the designation

shows that some ranchers will be burdened economically, the Stockman's Associations' members

have not demonstrated that they are part of the affected group.  See Response at 15-16 (citing Am.

Forest & Paper Ass'n v. EPA, 154 F.3d 1155, 1159-60 (10th Cir. 1998)).

Fish & Wildlife asserts that the Stockman's Associations' members have not and will not

suffer economic injuries that purportedly arise from decreased access to water rights, and the

diminution of property value that purportedly results from the negative perception of property

designated as critical habitat.  See Response at 12.  It notes that a diminution-of-property-value

economic injury cannot be traceable fairly to a critical habitat designation unless devaluation is a

consequence of the property itself being designated as critical habitat.  See Response at 12 (citing

Weyerhaeuser, 139 S. Ct. 361, 364, 368 n.1).  Fish & Wildlife notes that none of the members of

the Stockman's Associations report that the designation: (i) physically occupies their privately

owned property; (ii) limits access to water on their privately owned land; or (iii) diminishes the

value of their privately owned properties for any other reason.  See Response at 12.

Fish & Wildlife also contends that the Stockman's Associations' members will not suffer

economic injury from costs that will purportedly result from Section 7 consultations and their

ensuing recommendations.  See Response at 12-13.  It notes that only the United States Forest

Service will incur costs associated with the grazing permit consultations, because Endangered

Species Act Section 7(a)(2) consultations apply only to federal agencies.  See Response at 12-13

(citing 16 U.S.C. § 1536(a)(2)).  It also indicates that, even if those consultations result in permit

renewal delays that could economically burden members of the Stockman's Associations, the

members "provide no reason to attribute these hypothetical delays to the designation as opposed

to the listing."  Response at 13 (citing Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv., 369

F. Supp. 3d 141, 145-47 (D.D.C. 2019)(McFadden, J.)("Cal. Cattlemen's Ass'n")).  Furthermore,

Fish & Wildlife asserts that the consultation processes' ensuing recommendations, such as habitat

fencing exclosures, do not burden economically the members of the Stockman's Associations.  See

Response at 13.  It notes that none of the members of the Stockman's Associations have "provided

specific facts indicating that fencing small portions of the allotments . . . would materially impair

their ability to graze or water livestock," and that, although the designation was finalized three

years ago, no members have reported AUM reductions.  Response at 13-14 (citing San Diego

Cattlemen's Coop. Ass'n v. Vilsack, No. CIV 14-0818 RB/RHS, 2014 WL 11332357, at *4-5

(D.N.M. Oct. 9, 2014)(Brack, J.)).  Fish & Wildlife additionally notes that

> less than 1% of acres [of grazing allotments on the Lincoln and Santa Fe National
> Forests] has been excluded from livestock use, resulting in no adjustment to
> permitted numbers or seasons of use' and most of this fencing occurs on "occupied
> critical habitat" and therefore results from the listing, not the designation.

Response at 14 n.4 (quoting NM Meadow Jumping Mouse: Home Page at 6, Forest Service,

United States Department of Agriculture, filed Sept. 23, 2019 (Doc. 32-2)("Jumping Mouse Home

Page"), also available at  https://www.fs.usda.gov/detail/r3/home/?cid=STELPRD3809040 (last

visited June 23, 2020)).

As to the Stockman's Associations' takings arguments, Fish & Wildlife contends that the

members of the Stockman's Associations will not face increased risks of liability for incidentally

"taking" an endangered species under the Endangered Species Act's § 9, because § 9 liability

"arises only from the *listing* of a species and not the designation of critical habitat."  Response

at 14 (citing Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 703 (1995)).

Fish & Wildlife also argues that the Stockman's Associations offer no facts to support their

assertion that their members' water rights will be taken.  See Response at 14-15.  Fish & Wildlife

asserts that, under New Mexico law, none of the members of the Stockman's Associations have

established ownership for the grazing-allotment water rights they contest the designation infringes.

See Response at 15.  It notes that members of the Stockman's Associations have not demonstrated

that "[they] or [their] predecessor-in-interest ha[ve] consistently put the claimed amount of water

to beneficial use since before the United States withdrew the land from the public domain."

Response at 15 (citing Walker v. United States, 2007-NMSC-038, 162 P.3d 882, 888-90

("Walker"); Diamond Bar Cattle Co. v. United States, 168 F.3d 1209, 1210 (10th Cir. 1999)).  It

also notes that, even if members of the Stockman's Associations are lawfully entitled to those

water rights, those water rights are not "'tied to a particular location or even a particular source';

as long as water can be accessed, even if from a different location, no taking has occurred."

Response at 15 (quoting Walker, 2007-NMSC-038, ¶ 27, 162 P.3d at 890).  Fish & Wildlife

indicates that grazing-allotment water sources can be accessed in the purportedly burdened areas

of the designation through existing cattle lanes, with plans for future lane installments, and it notes that other accessible water sources are located outside the designation.  <u>See</u> Response at 15.

     **b.**    **Fish & Wildlife Argues That It Properly Considered Economic and Other Impacts Before It Designated Critical Habitat for the Jumping Mouse.**

    Fish & Wildlife responds to the Stockman's Associations' allegation that Fish & Wildlife incorrectly considered the designation's costs.  <u>See</u> Response at 16.  It argues that the Endangered Species Act gives Fish & Wildlife discretion to choose the method by which to consider the designation's economic impacts.  <u>See</u> Response at 16 (citing 16 U.S.C. § 1533(b)(2)).  Fish & Wildlife first argues that the incremental effects approach is a lawful methodology for evaluating economic impacts of designating critical habitat, because it is dissimilar to the baseline approach -- which Fish & Wildlife re-termed the "functional equivalence" approach -- that the Tenth Circuit rejected in <u>N.M. Cattle Growers Ass'n</u>.  Response at 16-17.  Fish & Wildlife notes that the baseline approach had two premises: (i) Fish & Wildlife "should only consider costs attributable to the critical habitat designation itself, and not the separate decision to list the species"; and (ii) "the impact of designating critical habitat would be functionally equivalent to the impact of the listing."  Response at 16-17.  Fish & Wildlife refers to this second premise as the "functional equivalence theory," under which Fish & Wildlife "would attribute all or almost all costs to the listing and not the critical habitat designation."  Response at 17.  It asserts that the Tenth Circuit invalidated the baseline approach, because Fish & Wildlife could use that approach to attribute little or no economic impacts to a critical habitat designation -- as the Tenth Circuit stated, the "'root of the problem' was the Service's position that critical habitat did not add any significant protections beyond those associated with the listing."  Response at 17 (quoting <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1283).

    Fish & Wildlife argues that the incremental effects approach is different from the baseline approach invalidated in <u>N.M. Cattle Growers Ass'n</u>, because the incremental effects approach incorporates amended regulatory definitions.  <u>See</u> Response at 17-19.  It notes that the baseline approach and the "functional equivalence" theory at issue in <u>N.M. Cattle Grower's Ass'n</u> were based on regulatory definitions that "defined 'destruction or adverse modification of critical habitat' as occurring only when an action appreciably diminished the value of the habitat for both survival and recovery."  Petition at 17 (quoting 50 C.F.R. § 402.02).  According to Fish & Wildlife, this definition "overlapped with the regulatory definition of 'jeopardize the continued existence

- 32 -

of' a listed species ('jeopardy'), under which jeopardy occurs when an action reduces 'the likelihood of both the survival and recovery of a listed species in the wild.'" Petition at 17 (quoting 50 C.F.R. § 402.02). Fish & Wildlife says that the "functional equivalence" theory developed from these past regulatory definitions, because any action in an area designated as critical habitat that would probably result in adverse modifications would also likely jeopardize the listed species -- "meaning that the costs of Section 7 consultations and project modifications could be attributed to the listing instead of the critical habitat designation." Response at 17. It notes that the Tenth Circuit addressed this issue, even though the plaintiffs had not raised the issue, by: (i) stating that "'the regulation's definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless'"; (ii) noting that it was "'compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation'"; and (iii) holding that,

> "[b]ecause economic analysis done using the [the Service's] baseline model *is rendered essentially without meaning by 50 C.F.R. § 402.02,* we conclude Congress intended that the [Service] conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes."

Response at 17-18 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285)(alterations in Petition and not in N.M. Cattle Growers Ass'n).

Fish & Wildlife notes that, in 2004, the United States Court of Appeals for the Ninth Circuit invalidated the regulatory definition of "'destruction or adverse modification' in 50 C.F.R. § 402.02." Response at 18 (quoting Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1069 (9th Cir. 2004)("Gifford Pinchot"), amended on other grounds, 387 F.3d 968 (2004)). Fish & Wildlife notes that, in response to Gifford Pinchot, it amended the definition of the adverse modification standard,[8] retired the functional equivalence approach, and began using

---

[8]At the time of the designation, the amended adverse modification standard was defined as the

> [d]estruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

Response at 18 n.7 (quoting 50 C.F.R. § 402.02 (effective October 31, 1984))(alteration added).

the incremental effects approach that, unlike the baseline approach and "false equivalence" theory, accounts for economic impacts of "designating critical habitat that go[] beyond the listing itself." Response at 18.   Fish & Wildlife evidences the difference between the methodologies by emphasizing that it used the incremental effects approach to calculate the designation's economic impacts, which it calculated as approximately $23,000,000.00, and that this estimation is "a far cry from the assertion" in N.M. Cattle Growers Ass'n that the designation there would cost nothing, Response at 18 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,262; N.M. Cattle Growers Ass'n., 248 F.3d at 1280).   It argues that, because the Tenth Circuit invalidated the baseline approach and the underlying "functional equivalence" theory based on regulatory definitions in 50 C.F.R § 402.02, subsequent amendment of 50 C.F.R. § 402.02 "renders the Tenth Circuit's holding in New Mexico Cattle Growers Ass'n outdated and inapplicable' to the Service's current approach."   Response at 19 (quoting Colo. Dep't of Nat. Res. v. U.S. Fish & Wildlife Serv., 362 F. Supp. 3d 951, 988 (D. Colo. 2018)(Arguello, J.)("Colorado v. Fish & Wildlife")).

Fish & Wildlife also notes that, after the Tenth Circuit decided N.M. Cattle Growers Ass'n, Fish & Wildlife "underwent formal rulemaking codifying the incremental effects approach it uses today."   Response at 19.   Fish & Wildlife notes that the codified regulation states that "'[t]he Secretary will consider impacts at a scale that the Secretary determines to be appropriate, and will compare the impacts with and without the designation.'"   Response at 19 (quoting 50 C.F.R. § 424.19(b))(alteration in Response and not in 50 C.F.R. § 424.19(b)).   Fish & Wildlife argues that the Endangered Species Act is ambiguous, and, as a result, Fish & Wildlife lawfully exercised delegated legislative authority to codify a reasonable interpretation of the Endangered Species Act that effectively overrules N.M. Cattle Growers Ass'n.   See Response at 19 (citing Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1143 (10th Cir. 2016)(Gorsuch, J.)).

Fish & Wildlife insists that, because its interpretation of the Endangered Species Act is codified through formal rulemaking, its interpretation is entitled to Chevron deference.   See Response at 20 (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc., 467 U.S. 837 (1984)("Chevron")).   It notes that the two elements which an agency must satisfy to be afforded Chevron deference are: (i) the statute must be ambiguous; and (ii) the agency's answer must be based on a permissible construction of the statute.   Response at 20 (citing Sinclair Wyo. Refining Co. v. EPA, 887 F.3d 986, 991 (10th Cir. 2017)).   Fish & Wildlife argues that it satisfies

the first <u>Chevron</u> deference element, because the Tenth Circuit clearly indicated that the Endangered Species Act was ambiguous by noting that, "'if the statutory language is ambiguous, a court can then resort to legislative history as an aid to interpretation' and [then the Tenth Circuit proceeded] to utilize legislative history to discern Congressional intent." Response at 20 (quoting <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1282). Fish & Wildlife insists that it satisfies the second <u>Chevron</u> deference requirement, because the incremental effects approach is the best interpretation of the Endangered Species Act's § 4(b)(2) for the following reasons: (i) the incremental effects approach, which only accounts for economic impacts that are solely attributable to designating critical habitat, is consistent with the Endangered Species Act's requirement that "the agency [] consider 'the economic impact . . . *of specifying any particular area as critical habitat*,'" Response at 20-21 (quoting 16 U.S.C. § 1533(b)(2))(emphasis added in Response); (ii) the incremental effects approach does not account for economic impacts that exist regardless whether critical habitat is designated, <u>see</u> Response at 21; and (iii) the coextensive approach is incompatible with considering the costs and benefits of excluding areas from critical habitat designation, <u>see</u> Response at 21.

Fish & Wildlife argues that the incremental effects approach is lawful, because, after <u>Gifford Pinchot</u>, "numerous courts have upheld Fish & Wildlife's discretion to utilize the incremental effects approach." Response at 21 (citing <u>Ariz. Cattle Growers' Ass'n v. Salazar</u>, 606 F.3d 1160, 1173 (9th Cir. 2010)("<u>Ariz. Cattle Growers' Ass'n</u>"); <u>Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior</u>, 344 F. Supp. 2d 108, 129 (D.D.C. 2004)(Lamberth, J.); <u>Fisher v. Salazar</u>, 656 F. Supp. 2d 1357, 1371 (N.D. Fla. 2009)(Stafford, J.)). It also notes that the only Tenth Circuit district court to consider this issue held that Fish & Wildlife's use of the incremental effects approach is lawful and that <u>N.M Cattle Growers Ass'n</u> is not controlling. <u>See</u> Response at 21 (citing <u>Colo Dep't of Nat. Res.</u>, 362 F. Supp. 3d at 988). Additionally, Fish & Wildlife maintains that <u>N.M. Cattle Growers Ass'n</u> is not controlling, because the Tenth Circuit in that case did not consider <u>Chevron</u> deference, because, at that time, Fish & Wildlife had not codified the standard for considering economic impacts associated with designating critical habitat. <u>See</u> Response at 20. Finally, Fish & Wildlife notes that although the Incremental Effects Memo instructed Industrial Economics to use the coextensive approach in the Tenth Circuit, Fish & Wildlife promulgated its

new regulation after it issued the Incremental Effects Memo, and Industrial Economics followed

the new regulation.  See Response at 19 n.8.

        **c.**    **Fish & Wildlife Argues That It Acted Reasonably by Not Considering Speculative and Hypothetical Costs Associated with the Taking of Water Rights .**

      Fish & Wildlife's next argument is that it acted reasonably by not accounting for "highly

speculative" costs directly associated with the designation "hypothetically" infringing upon the

grazing allotment water rights of the Stockman's Association's members.  Response at 22.  It

asserts that it does not need to consider economic impacts associated with designating critical

habitat "'deemed too uncertain or speculative.'"  Response at 23-24 (quoting Alaska Oil & Gas

Ass'n v. Jewell, 815 F.3d 544, 565 (9th Cir. 2016)).  Fish & Wildlife indicates that economic

impacts in relation to the purported water-rights infringement were "factored in the costs for the

Forest Fish & Wildlife to *avoid* taking grazers' water rights."  Response at 22 (emphasis in

original).  It notes that its economic impacts analysis offsets grazers' potential loss of water access

resulting from fencing exclosures by including costs for developing "'cattle lanes'" and pipes for

transporting water from fenced-off sources.  Response at 22 (quoting U.S. Forest Fish & Wildlife,

Southwestern Region: Comments on the economic analysis for New Mexico meadow jumping

mouse          proposed          critical          habitat          (posted          May          7,          2014)

https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0053)(Fish          &          Wildlife

Public Comment") (AR D003496).  Fish & Wildlife also notes that it factored economic impacts

relating to potential AUM reductions, and that "reducing AUMs for grazing on federal land does

not 'take' water rights or other private property rights."  Response at 22 (quoting Walker, 162 P.3d

at 888, and citing Screening Memo at 8-10).

      Fish & Wildlife further contends that it did not account for costs associated with the

hypothetical water rights "taking," because: (i) "fencing of critical habitat was not proposed nor

expected on private lands," and Fish & Wildlife could not identify a single location where the

designation would significantly impact water rights, Response at 22 (citing Jumping Mouse

Designation, 81 Fed. Reg. at 14,276, 14,281, 14,283); (ii) water rights are not ownership of a

particular source of water, or "'tied to a particular location or even a particular source'"; rather,

"'a right to use a certain amount of water to which one has a claim via beneficial use,'"  Response

at 22-23 (quoting Walker, 162 P.3d at 890); (iii) the members of the Stockman's Associations still

have enough access to water sources to satisfy their permitted AUMs, see Response at 22-23;

(iv) neither the Stockman's Associations nor other public commenters provided any resources that could identify which potentially affected parties allege ownership over allotment water rights, see Response at 23; (v) none of the members of the Stockman's Associations alleging to have their water rights infringed upon have established ownership of those rights under New Mexico law by "demonstrat[ing] that they have consistently put the claimed amount of water to beneficial use since before the National Forests at issue were created," Response at 23 (citing Walker, 162 P.3d at 888-90; Diamond Bar Cattle Co. v. United States, 168 F.3d at 1210); and (vi) before or at the time the designation was finalized, the Stockman's Associations did notify Fish & Wildlife of any information or resource that identifies the economic scope or value of the alleged water rights that are purportedly being infringed upon, see Response at 23.

Fish & Wildlife notes that, although the United States Court of Federal Claims held in Sacramento Grazing Association, Inc. that one of the members of the Stockman's Associations had established allotment water rights in a different allotment, those rights were "taken" by plant listing protections and not by the Jumping Mouse's designation.  Response at 23 n.10.  It further notes that: (i)  the designation was finalized before Sacramento Grazing Association, Inc. was decided, see Response at 23 n.10; (ii) Sacramento Grazing Association, Inc. is not binding precedent and is inconsistent with the New Mexico law which governs this issue, see Response at 23 n.10 (citing Sacramento Grazing Association, Inc., 135 Fed. Cl. at 203-07; Walker, 162 P.3d at 890); (iii) Sacramento Grazing Association, Inc. "does not address whether water rights would be taken because [the designation]," Response at 23 n.10 (emphasis in original); (iv) Sacramento Grazing Ass'n, Inc. did not decide whether that member of the Stockman's Associations is entitled to just compensation for the "taking," Response at 23 n.10; (v) Fish & Wildlife's decision not to consider costs associated with "taking" water rights is likely irreversible, even if just compensation is required, because, under the APA, only prejudicial error requires reversal, Response at 23 n.10 (citing Prairie Band Pottawatomie Nation v. Fed. Highway Admin., 684 F.3d 1002, 1008 (10th Cir. 2012)); and (vi) Fish & Wildlife's decision was not prejudicial, because it accounted for $1,500,000.00 of economic impacts to avoid infringing upon water rights, see Response at 23 n.10 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,287).

      **d.**      **Fish & Wildlife Argues That It Did Not Abuse Its Discretion by Not**
            **Excluding Units 3 and 4 From the Designation.**

Fish & Wildlife's final argument is that it did not act arbitrarily or capriciously, or abuse its discretion, by not excluding units 3 and 4 from the designation. See Response at 24. Fish & Wildlife first asserts that the Stockman's Associations administratively waived this claim, except with respect to subunit 3C, because "neither [the Stockman's Associations] nor any other individual raised this issue during the public comment periods." Response at 24. It maintains that contentions not pressed upon an agency during decision-making process should not be eligible for judicial review, because, without notice, an agency does not have enough time or resources to "'ferret out every possible alternative' and explicitly and individually discuss why they did not exclude every possible segment of critical habitat." Response at 24 (quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 551 (1978), and citing Wilson v. Hodel, 758 F.2d 1369, 1372-73 (10th Cir. 1985)). Fish & Wildlife notes that it issued the proposed designation along with an economic impacts analysis for possibly excluding particular areas from the designation, and "*explicitly* solicited comments regarding the exclusion of other areas." Response at 24-25 (emphasis in original)(citing Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse, 78 Fed. Reg. 37,328, 37,328-62 (proposed June 20, 2013)(to be codified at 50 C.F.R. pt. 17)("Proposed Mouse Designation"); Proposed Mouse Designation; reopening of comment period, 79 Fed. Reg. 19,307, 19,308-10 (reopened Apr. 8, 2014)(to be codified at 50 C.F.R. pt. 17)). It argues that, although some public commenters "opposed the *designation* of Units 3 and 4 as critical habitat" based on procedural defects or the habitat's biological incompatibilities, there are different critical habitat analyses associated with designating versus excluding areas under the Endangered Species Act's § 4(b)(2). Response at 24 n.12 (emphasis in original)(citing Charles N. Lakins, Esq., Public Comments on Proposed Mouse Designation at 3 (AR D002376)(posted Aug. 22, 2013), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0035 (last visited June 15, 2020); Charles N. Lakins, Esq., Public Comments on Proposed Mouse Designation at 8 (AR D003054)(posted May 8, 2014), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0055 (last visited June 15, 2020); Pete Domenici, Esq., Public Comments on Proposed Mouse Designation at 4 (issued May 8, 2014)(not posted); Judyann Medeiros, Public Comments on Proposed Mouse Designation, (AR D003490)(posted May 9, 2014),

https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0088 (last visited June 15, 2020)).  Fish & Wildlife asserts that, because the Stockman's Associations and their members "'did not raise this argument in [their] comments on the proposed rule, [they] cannot raise it now,' and [the] Court should dismiss this claim for all but Unit 3C."  Response at 25 (quoting US Magnesium, LLC v. EPA, 690 F.3d 1157, 1167 n.3 (10th Cir. 2012)).

Fish & Wildlife further argues that, even if the Stockman's Associations did not waive this claim, Fish & Wildlife's decision not to exclude units 3 and 4 from the designation was a reasonable use of its discretion.  See Response at 25.  It notes that "Section 4(b)(2) provides that Fish & Wildlife 'may exclude any area from critical habitat if [the Secretary] determines that the benefits of such exclusion outweigh the benefits' of inclusion, and exclusion will not cause the species' extinction."  Response at 25 (quoting 16 U.S.C. § 1533(b)(2))(alteration added).  Fish & Wildlife indicates that several courts determined that Fish & Wildlife has discretion whether to exclude areas from critical habitat; and, until recently, its exclusion decisions were not eligible for judicial review.  See Response at 25 (citing Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce, 792 F.3d 1027, 1034-35 (9th Cir. 2015); Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010)(Lamberth, J.)).  It also indicates that, in 2018, the Supreme Court concluded in Weyerhaeuser, 139 S. Ct. at 371, "'[t]he use of the word "may"' in the second sentence of Section 4(b)(2) 'certainly confers discretion on the Secretary'"; yet, Fish & Wildlife's decisions whether to exclude areas from critical habit may be judicially reviewed for abuse of discretion.  Response at 25.  Altogether, Fish & Wildlife asserts that, it "has broad discretion over exclusion and is never *required* to exclude an area even if the benefits of exclusion outweigh the benefits of inclusion." Response at 25-26 (emphasis in original).

Fish & Wildlife asserts that it did not abuse its discretion by deciding not to exclude units 3 and 4, because it followed its own policy, which is in accordance with the Endangered Species Act's § 4(b)(2).  See Response at 26 (citing Policy Regarding Implementation of Section 4(b)(2) of the Endangered Species Act, 81 Fed. Reg. 7,226 (Feb. 11, 2016)(to be codified at 50 C.F.R. pt. 424)("Section 4(b)(2) Policy").  It notes that it relied on a draft version of the Section 4(b)(2) Policy for most of Fish & Wildlife's decision-making process, because the final version was published a few weeks before the designation was finalized.  See Response at 26 n.13 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,279).  Fish & Wildlife justifies having used the

draft version, because the draft and final versions of the Section 4(b)(2) Policy align on the criteria that Fish & Wildlife followed while considering whether to exclude areas from the designation. See Response at 26 n.13 (citing Section 4(b)(2) Policy, 81 Fed. Reg. at 7,227).  It indicates that the criteria it followed recommends and encourages Fish & Wildlife to: (i) "conduct an 'initial screening' to evaluate potential exclusions and then has discretion to decide which areas warrant discussion in further detail"; (ii) "consider excluding tribal lands and areas subject to conservation plans or agreements"; and (iii) "'focus designation of critical habitat on Federal lands,' both to avoid real or perceived burdens on private land[,] and[,] because the benefits of designating federal land are often high because Endangered Species Act Section 7's requirements for federal actions." Response at 26 (quoting Section 4(b)(2) Policy, 81 Fed. Reg. at 7,228, 7,231-32, and citing Section 4(b)(2) Policy, 81 Fed. Reg. at 7,229-31).

Fish & Wildlife asserts that, while adhering to the Section 4(b)(2) Policy, it provided a sufficiently reasoned explanation for deciding which areas to exclude from the designation.  See Response at 26.  It justifies its position by outlining its exclusion decision-making process: (i) Fish & Wildlife conducted an initial screening for areas that may be good candidates for exclusion, see Response at 26 (citing Jumping Mouse Designation, 81 Fed. Reg. at, 14,306-12); (ii) it identified and analyzed economic impacts associated with the designation, see Response at 26 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,287, 14,307; Supplemental Information on Perceptional Effects on Grazing -- Critical Habitat Designation for the New Mexico Meadow Jumping Mouse at 1-9 (2014)("Perceptional Effects Memo"); Screening Memo at 1-22); (iii) Fish & Wildlife assessed the designation's qualitative benefits, including "'the promotion of public awareness of the presence of the jumping mouse and the importance of habitat protection' and 'potentially greater habitat protection for the jumping mouse,'" Response at 26-27 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,278, 14,307); (iv) it analyzed those qualitative benefits around Jumping Mouse's "unique biological characteristics and particular vulnerability to habitat destruction and fragmentation,"  Response at 27 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,292-93; Species Status Assessment Report: New Mexico meadow jumping mouse (Zapus hudsonius luteus) at 83-129 (2014)("Jumping Mouse Status Report")); (v) Fish & Wildlife also "specifically explained why costs to grazing and agricultural interests did not counsel against the designation of critical habitat," Response at 27 (citing Jumping Mouse Designation, 81 Fed.

Reg. at 14,292); (vi) furthermore, Fish & Wildlife explained that, in light of other impacts and benefits, it was reasonable "to give substantial weight to preventing the species' extinction when concluding that economic costs were not disproportionate to the benefits of designating critical habitat," Response at 27 (citing Tenn. Valley Auth., 437 U.S. at 194); (vii) it responded to commenter requests for particular areas to be excluded, see Response at 27 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,277-80); and (viii) Fish & Wildlife ultimately decided to exclude two areas on Tribal land, because preferentially excluding Tribal land is consistent with the Section 4(b)(2) Policy, Tribes and the federal government have a "unique trust relationship," and "the [T]ribes[] are commit[ted] to protect[ing] Jumping Mouse habitat on their lands," Response at 26, 26 n.12 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,277-80, 14,309-11).

Fish & Wildlife also argues that it provided a sufficiently reasoned explanation for deciding not to exclude subunit 3C -- "the only subunit in Units 3 and 4 that a commenter actually proposed be excluded." Response at 27. It asserts that the Court should only review whether Fish & Wildlife's exclusion decision "'appropriately consider[ed] all of the relevant factors that the [Endangered Species Act] sets forth to guide the [Fish & Wildlife] in the exercise of its discretion.'" Response at 26 (quoting Weyerhaeuser, 139 S. Ct. at 371)(alteration added). Fish & Wildlife notes that it "specifically identified the factors it considered in determining not to exclude Unit 3C." Response at 27. It indicates that it identified those factors by: (i) estimating the economic impacts within subunit 3C; (ii) explaining that the subunit's unoccupied habitat is "'essential to the conservation of the [J]umping [M]ouse'"; and (iii) explaining that the subunit has no conservation plans, and, as a result, including subunit 3C will not significantly impact national security, the human environment, or other relevant factors. Response at 27 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,279-80). It also asserts that, after citing these factors, "'commenter[s] did not provide any additional information for Fish & Wildlife to consider'" before deciding not to exclude unit 3C. Response at 27 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,280).

Fish & Wildlife next responds to the Stockman's Associations' allegation that Fish & Wildlife failed to provide a reasoned explanation, because the Endangered Species Act and APA require Fish & Wildlife to establish and follow a "'disproportionate costs'" standard for deciding whether to exclude areas from critical habitat designation. Response at 27 (quoting Petition

at 29-30).  It asserts that the Endangered Species Act's exclusion-consideration requirement merely sets forth factors for which Fish & Wildlife must account when deciding whether to exclude areas from critical habitat.  See Response at 28.  Fish & Wildlife indicates, however, that the statutory provision does not mandate a universal application standard.  See Response at 28. Consequently, it argues, it may lawfully implement that statutory provision via a discretionary, "'case-by-case'" approach.  Response at 28 (quoting In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig., 709 F.3d 1, 15 (D.C. Cir. 2013); Maier v. EPA, 114 F.3d 1032, 1043 (10th Cir. 1997)).  Fish & Wildlife further contends that the Court "should not impose requirements that go beyond the statutory provisions."  Response at 28 (citing Weyerhaeuser, 139 S. Ct. at 370; Vt. Yankee Nuclear Power Corp., 435 U.S. at 524-25).

Fish & Wildlife also responds to the argument that it must *quantify* all impacts and benefits when considering whether to exclude units 3 and 4 from the designation, and it asserts that the Endangered Species Act does not include such a requirement.  Response at 28 (citing Petition at 28)(emphasis added in Response).  It notes that: (i) the OMB has "explained that costs and benefits can include 'qualitative and non-monetized factors,'" Response at 28 (quoting Office of Mgmt. & Budget, Circular A-4: Regulatory Analysis at 3 (2003)); (ii) "the economic benefits of designating critical habitat are particularly difficult to quantify for most species and may be assessed qualitatively," Response at 28 (citing Section 4(b)(2) Policy, 81 Fed. Reg. at 7,238); and (iii) the economic benefits associated with the designation are not quantifiable, because there is no available data that indicates the economic value for preserving the Jumping Mouse, see Response at 28 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,290, 14,308; Screening Memo at 2).

Finally, Fish & Wildlife contends that its $100,000,000.00 threshold for determining which areas to exclude from the designation was not arbitrary.  See Response at 29.  It notes that the monetary threshold comes from Executive Order 12866, which requires "agencies to quantify costs and benefits if an action may have an effect on the economy of $100 million or more in a single year."  Response at 29 (citing Screening Memo at 1).  Fish & Wildlife maintains that it calculated quantifiable economic impacts associated with the designation, then compared those costs to the $100,000,000.00 threshold to: (i) demonstrate that Executive Order 12866 is not triggered; and (ii) summarize those quantified costs by contextualizing them against a government standard.  See Response at 29.  Fish & Wildlife asserts, however, that it "never indicated that the decision of

whether to exclude specific areas was based on whether or not the overall designation exceeded $100 million in costs in a given year." Response at 29.

### 3.     The Environmental Intervenors' Response.

On September 30, 2019, the Environmental Intervenors responded to the Petition. See I. Response at 1. The Environmental Intervenors argue that Fish & Wildlife "carefully considered the likely economic impacts of the critical habitat designation." I. Response at 6-7. According to the Environmental Intervenors, Fish & Wildlife did not abuse its discretion by deciding not to exclude any areas from the designation, and they argue that the Court should uphold the designation. See I. Response at 6-7.

#### a.     The Environmental Intervenors Argue That Fish & Wildlife Adequately Considered the Designation's Economic Impacts.

The Environmental Intervenors first argue that Fish & Wildlife properly used the incremental effects approach to assess economic impacts associated with the designation. See I. Response at 12. They assert that the incremental effects approach correctly calculates economic impacts, because those costs are solely attributable to "Federal actions for which the designation is the 'but for' cause." I. Response at 12 (quoting Endangered and Threatened Wildlife and Plants; Revisions to the Regulations for Impact Analysis of Critical Habitat, 78 Fed. Reg. 53,058, 53,062 (Aug. 28, 2013)(to be codified at 50 C.F.R. pt. 424)("Regulation Revisions for Impact Analysis")). The Intervenors also argue that N.M. Cattle Growers Ass'n does not bind the Court. See I. Response at 13-17. They note that the Court stated in Montoya v. Sheldon, 286 F.R.D. 602, 612 n.5 (D.N.M. 2012)(Browning, J.): "'Generally, a district court must faithfully follow controlling Tenth Circuit precedent, but there is an exception when the statute or rule on which the prior decision was based has changed.'" I. Response at 14-15.

The Environmental Intervenors argue that, in the time since the Tenth Circuit decided N.M. Cattle Growers Ass'n, the regulation on which that decision was based has changed. See I. Response at 13-17. The Environmental Intervenors note that the Tenth Circuit rejected the "'baseline approach,'" because it "'render[ed] any purported economic analysis . . . virtually meaningless'"; and was "'compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation.'" I. Response at 13 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285). They also note that the Tenth Circuit concluded that "the 'root of the problem' was Fish & Wildlife's

'long held policy position that [critical habitat designations were] unhelpful, duplicative, and unnecessary.'" I. Response at 13 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1283)(alteration in I. Response). The Environmental Intervenors further indicate that the Tenth Circuit arrived at this conclusion, because it viewed Fish & Wildlife as coalescing regulatory definitions regarding "'adverse modification'" to critical habitat designation, and "'jeopardy'" to listed species. I. Response at 13 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285). They note that the Tenth Circuit stated that "the jeopardy standard 'fully encompass[ed] the adverse modification standard[,] render[ing] any purported economic analysis done utilizing the baseline approach virtually meaningless.'" I. Response at 14 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285, and citing 50 C.F.R. § 402.02 (2001))(alterations in I. Response). They assert that N.M. Cattle Growers Ass'n is not controlling, because those regulatory definitions were invalidated and amended to resolve the regulatory issue on which the Tenth Circuit based its decision. See I. Response at 14-15 (citing 50 C.F.R. § 402.02 (2001)(amended on February 11, 2016 and again on August 27, 2019); Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 443 (5th Cir. 2001); Gifford Pinchot, 378 F.3d at 1069-71; Colorado v. Fish & Wildlife, 362 F. Supp. 3d at 988). Finally, the Environmental Intervenors' note that, after 50 C.F.R. § 402.02 (2001) was amended, courts outside of the Tenth Circuit have not followed N.M. Cattle Growers Ass'n. See I. Response at 14 n.2. They indicate that the Ninth Circuit rejected the Tenth Circuit's reasoning as "'relying on a faulty premise[,]'" and held that Fish & Wildlife may use the incremental effects approach, because it is more logical than the coextensive approach, which analyzes "'costs that will exist regardless of the decision [to designate critical habitat].'" I. Response at 14-15 n.2 (quoting Ariz. Cattle Growers' Ass'n, 606 F.3d at 1173)(alteration added).

The Environmental Intervenors also argue that the N.M. Cattle Growers Ass'n does not bind the Court, because the Tenth Circuit "found Chevron deference inapplicable to Fish & Wildlife's baseline approach because it had 'never undergone a formal rulemaking process.'" I. Response at 15 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1281). They note that Fish & Wildlife is entitled to Chevron deference, because, after N.M. Cattle Growers Ass'n was decided, Fish & Wildlife formally promulgated the incremental effects approach as its official standard for analyzing economic impacts associated with designating critical habitat. See I. Response at 15 (citing Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,058; Sinclair Wyo. Ref. Co.

v. EPA, 874 F.3d at 1164).  The Environmental Intervenors indicate that, "[w]hen promulgating

the current regulations, Fish & Wildlife explicitly addressed N.M. Cattle Growers Ass'n and found

that the invalidation of the regulation 'eliminated the predicate for the Tenth Circuit's analysis.'"

I. Response at 16 (quoting Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,062-63).

They further indicate that Fish & Wildlife decided that the incremental effects approach is the most

rational standard, because it is the only method that can be used to determine whether to exclude

areas from critical habitat designation.  See I. Response at 16 (citing Regulation Revisions for

Impact Analysis, 78 Fed. Reg. at 53,062).

The Environmental Intervenors also argue that N.M. Cattle Growers Ass'n is "'outdated

and inapplicable,'" because Fish & Wildlife promulgated the incremental effects approach, which

is different from the baseline approach that the Tenth Circuit rejected.  I. Response at 15 (quoting

Colorado v. Fish & Wildlife, 362 F. Supp. 3d at 988).  They reiterate that the Tenth Circuit

concluded that "'the root of the problem'" was Fish & Wildlife's stance that critical habitat

designations are "'unhelpful, duplicative, and unnecessary.'"  I. Response at 16 (quoting N.M.

Cattle Growers Ass'n, 248 F.3d at 1283).  The Environmental Intervenors indicate that Fish &

Wildlife now considers critical habitat designations to help federal agencies: (i) "'focus their

conservation programs and use their authorities to further the purposes of the [Endangered Species

Act] Act[]'"; (ii) "'focus the efforts of other conservation partners[]'"; (iii) "'provide[] early

conservation planning guidance to bridge the gap until Fish & Wildlife can complete more

thorough recovery planning'"; and (iv) "'consider the effects of [their] actions on habitat important

to species' conservation [so that they can] avoid[] or modif[y] those actions that are likely to

destroy or adversely modify critical habitat.'"  I. Response at 16 (quoting Regulation Revisions

for Impact Analysis, 78 Fed. Reg. at 53,059)(alterations added).  They also indicate that Fish &

Wildlife considers critical habitat designations to "'provide significant regulatory protection[s,]'"

which are "'especially valuable for [the designation,]'" because "'protecting [] unoccupied habitat

is essential for the conservation of the [the Jumping Mouse].'"  I. Response at 16-17 (quoting

Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,059, and citing Jumping Mouse

Designation, 81 Fed. Reg. at 14,296).

The Environmental Intervenors further argue that the Stockman's Associations erroneously

assert that "Congress intended Fish & Wildlife to 'take[] into account the economic impacts of

listing such habitat as critical.'"  I. Response at 17 (quoting Petition at 14)(alteration in I. Response).  They argue that the legislative history to which the Stockman's Associations cited is vague, and does not express that Congress intended Fish & Wildlife to account for economic impacts associated with the listing when evaluating costs for designating critical habitat.  See I. Response  at 17.  The Environmental Intervenors assert that, even if the legislative history had expressed that which the Stockman's Associations allege, the plain language in the Endangered Species Act's § 4(b)(2) clearly states otherwise: Fish & Wildlife shall "'tak[e] into consideration the economic impact . . . *of specifying any particular area as critical habitat*.'"  I. Response at 17 (quoting 16 U.S.C.§ 1533(b)(2))(alteration in I. Response )(emphasis added in I. Response).  They argue that the Endangered Species Act's language indicates that Fish & Wildlife should consider only economic impacts associated with the designation, and, had Congress intended Fish & Wildlife to concurrently consider costs attributed to the listing, Congress would have expressly crafted the Endangered Species Act's language  accordingly.  See I. Response at 17-18 (citing Stark-Romero v. AMTRAK Co., 763 F. Supp. 2d 1231, 1273 (D.N.M. 2011)(Browning, J.)).

The Environmental Intervenors next contend that Fish & Wildlife properly used the incremental effects approach to consider the designation's economic impacts.  See I. Response at 18.  They assert that Fish & Wildlife did not undervalue any economic impacts as a result of using the incremental effects approach, because, as the Environmental Intervenors have demonstrated, Fish & Wildlife lawfully used that approach.  See I. Response at 18 n.3.  They also assert that the Stockman's Associations have waived their right to challenge all examples of Fish & Wildlife ignoring costs associated with the designation, with the exception of the alleged taking of members' water rights, because the Stockman's Associations did not cite to other examples.  See I. Response at 18 n.4 (citing Direct Commc'ns. Cedar Valley, Ltd. Liab. Co. v. FCC, 753 F.3d 1015, 1137 (10th Cir. 2014)).

The Environmental Intervenors argue that Fish & Wildlife acted appropriately by not accounting for the designation's economic impacts associated with fencing that excludes ranchers and infringes upon ranchers' water rights.  See I. Response at 18.  The Environmental Intervenors first outline the Stockman's Associations' allegations on which they base their conclusion: (i) the designation infringes upon their members' water rights, and, the scope of infringement is great enough to warrant just compensation, see I. Response at 18 (citing Petition at 17-18); (ii) the

Stockman's Associations say that "'[t]he fencing of riparian areas [that only allows] wildlife to access the water is illegal and represents an unconstitutional taking of private property water rights in violation of the Fifth Amendment of the U.S. Constitution,'" I. Response at 19 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,276, and citing Petition at 25)(alteration added); and (iii) one member of the Stockman's Associations says that Fish & Wildlife "'proposed to claim private water and grazing rights on federal land'" belonging to members of the Stockman's Associations "'as suitable for the mouse,'" I. Response at 19 (quoting Goss Family Ranch, Public Comments on Proposed Mouse Designation at D00290 (posted May 12, 2014), https://www.regulations.gov/document?D=WS R2 ES 201300140091 (last visited June 17, 2020))(alterations added).

The Environmental Intervenors argue that the assertion that Fish & Wildlife acted unreasonably by not accounting for just compensation associated with the hypothetical taking of water rights lacks support, because: (i) the Stockman's Associations provide only assumptions that their members' water rights will be infringed, and that the infringement will "rise to the level of a compensable taking," I. Response at 18; (ii) none of the Stockman's Associations' members have demonstrated, New Mexico law requires, ownership of federal land water rights by either presenting a permit from a State engineer; or "show[ing] '[t]he establishment, maintenance, and extent [of a] right' through 'beneficial use,'" I. Response  at 19-20 (quoting Sacramento Grazing Association, Inc., 135 Fed. Cl. At 197); and (iii) even if the members of the Stockman's Associations had established water rights, they would have needed to demonstrate "'that any [alleged] water taken could have been put to beneficial use,'" because "'beneficial use is not considered ownership in any particular water source, but rather *a right to use a certain amount of water to which one has a claim via beneficial use*,'" I. Response at 20 (quoting Sacramento Grazing Association, Inc., 135 Fed. Cl. at 197)(alteration added)(emphasis in I. Response only).

The Environmental Intervenors also argue that economic impacts associated with the "take and appropriate compensation" are "speculative and unreliable." I. Response at 17.  They assert that Fish & Wildlife must assign an arbitrary value to those costs, because the true value of compensation is only discernable after governmental action reveals the scope of the taking.  See I. Response at 17.  The Environmental Intervenors note that Fish & Wildlife disclosed their plans to construct fencing exclosures around particular areas of riparian habitat and considered other

measures to mitigate habitat destruction from grazing.  See I. Response at 21 (citing Incremental

Effects Memo at 15-16; Screening Memo at 10).  They indicate that Fish & Wildlife's proposed

protections at the time it considered economic impacts, rendered speculative any potential water

rights infringement and associated compensation, because the "location and extent of [proposed]

fencing [protections], would 'depend[] on the proposed action.'"  I. Response at 21 (quoting

Incremental Effects Memo at 15).  The Environmental Intervenors assert that, because "a potential

Fifth Amendment taking occurs . . . 'when all the events have occurred that fix the alleged liability

of the government and entitle the claimant to institute an action,'" Fish & Wildlife's plans for

future fencing protections "[are] not the type of 'act' under which a taking claim can arise."  I.

Response at 21 (quoting Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009)).  They

insist that the Stockman's Associations allege only that the designation "'impinges'" upon the

water rights of their members, and they have not demonstrated complete deprivation of those

rights.  I. Response at 22 (quoting Petition at 25).  They also add that the Endangered Species Act

does not mandate Fish & Wildlife to act "'only when it can justify its decision with absolute

confidence,'" and, although Fish & Wildlife "'cannot act on pure speculation or contrary to the

evidence, the Endangered Species Act accepts agency decisions in the face of uncertainty.'"

I. Response at 22 (quoting Ariz. Cattle Growers' Ass'n, 606 F.3d at 1164)(alteration in

I. Response).

    The Environmental Intervenors additionally argue that Fish & Wildlife properly accounted

for economic impacts by considering measures and associated costs to avoid infringing upon

potential water rights.  See I. Response  at 21 (citing Jumping Mouse Designation, 81 Fed. Reg. at

14,287).  They note that Fish & Wildlife "'acknowledged *that if* fencing limits access to water,

costs could be higher than what was estimated in' Fish & Wildlife's original analysis."  I. Response

at 21 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,287)(emphasis in I. Response).

The Environmental Intervenors further note that Fish & Wildlife incorporated $1,500,000.00 of

costs associated with alternative water source development.  See I. Response at 22 (citing Jumping

Mouse Designation, 81 Fed. Reg. at 14,287-88).

    The Environmental Intervenors next argue that the Endangered Species Act "does not

require the Service to determine whether a taking has occurred as part of its economic impact

analysis," and, contrary to the assertion by the Stockman's Associations, the designation will not

"*per se* result in a Fifth Amendment tak[ing]" of at least one of their member's water rights.  I. Response at 19-20 (citing Petition at 26)(emphasis added by Petition).  The Environmental Intervenors note that <u>Sacramento Grazing Association, Inc.</u> was decided more than eighteen months after Fish & Wildlife finalized the designation and that there is no evidence that Fish & Wildlife received notice of that case's proceedings.  <u>See</u> I. Response at 19 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,262).  They assert that, under the APA, courts may review only the "'Administrative Record that was before the agency *when the agency rendered its decision*.'" I. Response at 19 (quoting <u>N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.</u>, No. CIV 02-0199 JB/LCS, 2004 U.S. Dist. LEXIS 28293, at \*10-15 (D.N.M. Aug. 31, 2004)(Browning, J.))(emphasis added by I. Response).  The Environmental Intervenors also assert that "'a federal appropriation of a private water source does not, *per se*, constitute a taking.'"  I. Response at 19 (quoting <u>Sacramento Grazing Association, Inc.</u>, 135 Fed. Cl. at 197)(emphasis in original).

The Environmental Intervenors further argue that the holding in <u>Sacramento Grazing Association, Inc.</u> is inapplicable to Fish & Wildlife's decision not to account for the alleged water rights infringement.  <u>See</u> I. Response at 20.  The Environmental Intervenors note that, in <u>Sacramento Grazing Association,</u> the Court of Federal Claims decided that the United Stated "'effected a taking'" of the plaintiff's water rights, because the United States sufficiently abridged "'the beneficial use of stock water.'"  I. Response at 20 (quoting <u>Sacramento Grazing Association, Inc.</u>, 135 Fed. Cl. at 206)(citations omitted by I. Response).  They also note that the Court of Federal Claims arrived at this holding only after reviewing two decades' worth of records and deciding that the United States "'finally denied' the plaintiff all access to stock water rights within the plaintiff's grazing allotment."  I. Response at 20 (quoting <u>Sacramento Grazing Association, Inc.</u>, 135 Fed. Cl. at 206-07).  The Environmental Intervenors assert that a "physical taking occurs when the government 'denies an owner all <u>access</u> to a property interest.'"  I. Response  at 20 (quoting  <u>Sacramento  Grazing  Association,  Inc.</u>, 135 Fed. Cl.  at 206).   The Environmental Intervenors argue that the Endangered Species Act only requires Fish & Wildlife to consider economic impacts associated with critical habitat designation infringing upon private property if the "'regulation on its face denies the property owners all economically beneficial or productive use of their land,'" and, according to the Environmental Intervenors, the finalized version of the designation does not "'on its face den[y]'" members of the Stockman's Associations all economic

and productive use of their alleged water rights.  I. Response at 20-21 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,283).

> **b.    The Environmental Intervenors Argue That Fish & Wildlife Provided an Adequate and Reasoned Explanation for Its Decision Not to <u>Exclude Units 3 and 4 From the Designation</u>.**

The Environmental Intervenors argue that Fish & Wildlife provides a reasoned explanation for its decision not to exclude Units 3 and 4 from the designation.  <u>See</u> I. Response at 24.  The Environmental Intervenors first assert that the Stockman's Associations ignore that Endangered Species Act's purpose, which is to provide ecosystem-preservation measures for the conservation of threatened and endangered species.  <u>See</u> I. Response at 24 (citing <u>Middle Rio Grande Conservancy Dist. v. Babbitt</u>, 206 F. Supp. 2d 1156, 1169 (D.N.M. 2000)(Mechem, J.); <u>Gifford Pinchot</u>, 378 F.3d at 1070).  They insist that Fish & Wildlife's exclusion decision primarily focused on that purpose, which is especially important for the designation, because the Jumping Mouse's habitat: (i) "'has exceptionally specialized [] requirements'"; (ii) has been and is presently being lost, which has "'resulted in the extirpation of historic populations [], reduced the size of existing populations, and isolated existing small populations'"; and (iii) is expected to be lost in the future, and that will lead to "'additional extirpations of more populations.'"  I. Response at 24-25 (quoting Jumping Mouse Status Report at 3, 5).

The Environmental Intervenors argue that Fish & Wildlife's reasoning for its exclusion decision included more than "'vague statements of belief about the value of critical habitat designation.'"  I. Response at 25 (quoting Petition at 28).  They assert that the Stockman's Associations ignore the ecological benefits that the designation provides for the Jumping Mouse, such as: (i) areas occupied by the Jumping Mouse do not contain enough connected, suitable habitat to sustain robust populations; (ii) areas unoccupied by the Jumping Mouse that contain water sources need to be large enough to accommodate population expansion during the specie's active season; (iii) unoccupied areas need protections to promote habitat restoration, so that future Jumping Mouse populations may be transplanted or reintroduced; and (iv) "'multiple local populations along streams are important to maintaining genetic diversity within the populations and for providing for recolonization if local populations are extirpated.'"  I. Response at 25 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,299-305).  The Environmental Intervenors indicate that Fish & Wildlife specifically addressed ecological benefits for subunits that the Stockman's Associations challenge -- 3A-C and 4B, C, and E -- noting that those subunits

"required protection to address impacts from severe wildland fires, recreation, grazing, floods, the reduction and distribution of beaver ponds, development, and highway reconstruction, and that the units provided potential areas for recolonization by the mouse and connectivity between currently occupied areas." I. Response at 25 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,301-02). They also indicate that Fish & Wildlife calculated economic impacts assigned to each subunit, then considered each subunit's costs and benefits before deciding not to exclude any of the subunits from the designation. See I. Response at 25-26 (citing Screening Memo at 11-12; Jumping Mouse Designation, 81 Fed. Reg. at 14,307-08). The Environmental Intervenors assert that Fish & Wildlife "considered the 'relevant factors,' did not make 'a clear error in judgment,' and exercised its 'expertise and experience in administering' the [Endangered Species Act], which 'no court can properly ignore.'" I. Response at 26 (quoting Judulang, 565 U.S. at 53).

The Environmental Intervenors assert that Fish & Wildlife considered recreation to be the only "economic benefit" and lawfully considered non-economic benefits as well. I. Response at 26. The Environmental Intervenors insist that "economic benefits are only *a* benefit Fish & Wildlife may consider and that the primary benefit is the conservation value of the critical habitat designation for the species." I. Response  at 26 (emphasis in I. Response). They support their position by noting that: (i) the Endangered Species Act requires Fish & Wildlife to consider the most important non-economic benefit -- survival and recovery of the listed species -- by mandating that Fish & Wildlife may consider excluding areas from critical habitat designation, unless "'the failure to designate such area as critical habitat will result in the extinction of the species concerned,'" I. Response at 26 (quoting 16 U.S.C. § 1533(b)(2)); and (ii) Fish & Wildlife's regulations state that, when identifying benefits, "'*in addition to the mandatory consideration of impacts conducted pursuant to paragraph (b) of this section*, [Fish & Wildlife] may assign the weight given to any benefits relevant to the designation of critical habitat,'" I. Response at 26 (quoting 50 C.F.R. § 424.19)(alteration in I. Response)(emphasis in I. Response). The Environmental Intervenors also assert that Fish & Wildlife maintains great discretion when deciding whether to exclude areas from critical habitat designation, even though the Supreme Court decision in Weyerhaeuser recently made Fish & Wildlife's exclusion decisions judicially reviewable, see 139 S. Ct. at 371. See also  I. Response at 26. They note that Fish & Wildlife "'may choose not to exclude an area even if the impact analysis and subsequent discretionary . . .

exclusion analysis indicate that the benefits of exclusion exceed the benefits of inclusion, and even if such exclusion would not result in the extinction of the species.'"  I. Response at 26 (quoting Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,063).

The Environmental Intervenors also respond to the argument that Fish & Wildlife arrived at its exclusion decision by concluding that the total economic impacts were less than an arbitrary $100,000,000.00 threshold.  See I. Response at 27 (citing Petition at 28-29).   They note that the $100,000,000.00 threshold comes from the Unfunded Mandates Reform Act ("UMRA"), 2 U.S.C. § 1501, and Executive Order 12866.  See I. Response at 27 (citing Screening Memo at 1; Jumping Mouse Designation, 81 Fed. Reg. at 14,313-14).   The Environmental Intervenors assert that, although Fish & Wildlife must account for those monetary thresholds, Fish & Wildlife considers them separately from its exclusion decision.  See I. Response  at 27.

The Environmental Intervenors argue that Fish & Wildlife used proper discretion by providing a sufficiently reasoned explanation to support its decision not to exclude units 3 and 4 from the designation.  See I. Response at 27.  They assert that Fish & Wildlife properly considered impacts and benefits when deciding not to exclude areas from the designation.  See I. Response at 27.  The Environmental Intervenors argue that the Court should rule in Fish & Wildlife's favor on this issue, because, even if Fish & Wildlife's explanation provides '"less than ideal clarity[,]'" it must be '"upheld[,] [because Fish & Wildlife's] path may be reasonably discerned.'"  I. Response at 27 (quoting Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007))(alterations added).

     **c.**     **The Environmental Intervenors Contend That, if the Stockman's Associations Prevail on Their Claims, the Court Should Remand Without Vacatur, and Thus Leave the Designation in Place During Remand.**

The Environmental Intervenors finally argue that, if the Court remands to Fish & Wildlife to comply with its statutory obligations, remand should be without vacatur.  See I. Response at 27. They note that, "'ordinarily, when a regulation is not promulgated in compliance with the APA, the regulation is invalid,'" but, "'when equity demands, the regulation can be left in place while the agency follows the necessary procedures.'"  I. Response at 28 (quoting Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Salazar, No. 07-CV-00876 JEC/WPL, 2009 WL 8691098, at *3 (D.N.M. May 4, 2009)(Conway, J.)("Coal. of Ariz./N.M. Ctys.")).  The Environmental Intervenors request that the Court consider equitable remand based on: "'(1) the purpose of the substantive

statute under which the agency was acting; (2) the consequences of invalidating or enjoining the agency action; (3) potential prejudice to those who will be affected by maintaining the status quo; and (4) the magnitude of the administrative error and how extensive and substantive it was.'" I. Response at 28-29 (quoting Coal. of Ariz./N.M. Ctys., 2009 WL 8691098, at *3).

The Environmental Intervenors argue that equitable considerations warrant remand without vacatur, because: (i) the Endangered Species Act exists to provide ecological preservation measures for the conservation of threatened and endangered species, see I. Response at 29 (citing 16 U.S.C. § 1531(b)); (ii) the Jumping Mouse's essential and unique habitat would be stripped of critical protections, such as agencies having the ability to act without concern for the Jumping Mouse, which could doom local populations within one year, see I. Response at 29 (citing 1 U.S.C. § 1536(a)(2); Jumping Mouse Status Report at 3); (iii) leaving the Jumping Mouse's critical habitat protections untouched would not unduly prejudice the Stockman's Associations by limiting grazing or depriving water rights, see I. Response at 29; and (iv) "the magnitude of the alleged administrative error may be negligible, and [Fish & Wildlife] will retain significant discretion on remand to not exclude critical habitat," I. Response at 29.   The Environmental Intervenors altogether argue that equitable remand is proper, because the designation's protections curbing the threat to the Jumping Mouse's extinction outweighs "unspecified impacts" on the members of the Stockman's Associations.   I. Response at 29. They also add that many courts have "fashioned [equitable] remedies for Endangered Species Act violations that provide the most benefit to imperiled species in light of the Endangered Species Act's salient conservation purpose."   I. Response at 28 (citing Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405-06 (9th Cir. 1995); Ctr. for Biological Diversity v. Norton, 240 F. Supp. 2d 1090, 1109 (D. Ariz. 2003)(Bury, J.); WildEarth Guardians v. U.S. Dep't of the Interior, 205 F. Supp. 3d 1176, 1190 (D. Mont. 2016)(Christensen, J.); Ctr. for Native Ecosystems v. Salazar, 795 F. Supp. 2d 1236, 1243–44 (D. Colo. 2011)(Kane, J.)).

4.    **The Reply.**

On October 18, 2019, the Stockman's Associations replied to the Response.   See Petitioner's Reply Brief in Support of Petition for Review at 1, filed October 18, 2019 (Doc. 35)("Reply").   The Stockman's Associations contend that they have standing to challenge the designation on their members' behalf, because: (i) the designation reduces the value of their members' private property; and (ii) the designation increases grazing costs for their members.   See

Reply at 6-9.   The Stockman's Associations argue that the Tenth Circuit has rejected the incremental effects approach that Fish & Wildlife used to designate critical habitat for the Jumping Mouse and that Fish & Wildlife must use the coextensive approach to assess a designation's economic impacts.   See Reply at 9-12.   The Stockman's Associations reiterate that Fish & Wildlife erroneously ignored the costs associated with the taking of water rights, see Reply at 13-10, and they argue that Fish & Wildlife abused its discretion by not providing a reasoned explanation for its decision not to exclude Units 3 and 4 from the designation.

<blockquote>

**a.** **The Stockman's Associations Assert That They Have Standing to Challenge the Designation, Because the Designation Affects the Value of Their Members' Property and Increases Grazing Costs for Their <u>Members.</u>**

</blockquote>

The Stockman's Associations first argue that they have standing to challenge Fish & Wildlife's decision to promulgate the designation.   <u>See</u> Reply at 6.   The Stockman's Associations argue that the designation causes economic injury to their members, because: (i) members of the Stockman's Associations hold grazing allotments on federal land that are being occupied by subunits 3A-C and 4B-E of the designation, <u>see</u> Reply at 6 (citing Salazar Decl. ¶ 14, at 4; Stone Decl. ¶¶ 11-12, at 5; Manuel Lucero Decl.  ¶¶ 5-6, at 3; Mariano Lucero Decl.  ¶¶ 5-6, at 3; Michael Lucero Decl. ¶¶ 9-10, at 3; Goss Decl. ¶ 11, at 3; Medeiros Decl. ¶¶ 7, 11, at 3; Mershon Decl. ¶ 9, at 3); (ii) the grazing allotments that are within subunits 3A-C and 4B-E of the designation are subjected to "negative 'perceptional effects,'" which is a "stigma that attaches to private land associated with critical habit designation" arising from "'[p]ublic attitudes about the limits and costs that the [Endangered Species] Act may impose,'" Reply at 6 (quoting Screening Memo at 19, and citing Perceptional Effects Memo at 1)(first alteration in Reply, and second alteration added); (iii) the Stockman's Associations members' grazing allotments within subunits 3A-C and 4B-E are legally tied to "'base property'" ranches which are owned by the members of the Stockman's Associations, and may be transferred upon the sale of the attached base property, Reply at 6-7 (quoting 36 C.F.R. § 222.3(c)(1)(i)-(iv);Forest  Service,  Forest  Service Manual       2020,       §       2231a       (effective       July,       2003), http://www.fs.fed.us/im/directives/field/santafe/2200/2200-2003-1%202230.doc (last visited June 19, 2020)); (iv) the negative perceptional effects have "'real economic effects to owners of property, regardless of whether such limits are actually imposed,'" Reply at 6 (quoting Screening Memo at 19); (v) perceived limitations on grazing allotments diminish the value to base properties

to which the grazing allotments legally attach, see Reply at 7 (citing New Mexico State University: Range Improvement Task Force, Comments on Proposed Mouse Designation at D002308 (issued May 8, 2013)(not posted); Declaration of Eric Van Pelt in Support of Petition for Review ¶¶ 7-8, at 3-4 (dated October 17, 2019), filed October 18, 2019 (Doc. 35-1)("Van Pelt Decl.")); and (vi) reduction in value to base properties that members of the Stockman's Associations own is grounds for standing, Reply at 7 (citing Weyerhaeuser, 139 S. Ct. at 368 n.1).

The Stockman's Associations further allege that they have standing, because the designation harms their members.  See Reply at 7-9.  They assert that, in 2017, the designation likely reduced AUMs from twelve to nine months in subunit 4C, which harmed economically one member of the Stockman's Associations; and, Fish & Wildlife anticipate the designation to reduce AUMs in two other allotments.  See Reply at 7 n.3 (citing Mershon Decl. ¶¶ 7, 11, at 3; Screening Memo at 8).  The Stockman's Associations also insist that the designation will harm their members economically, because grazing costs will increase as a result of new fencing additions, which will be constructed in each area that members of the Stockman's Associations use.  See Reply at 8 (citing Screening Memo at 11).  They assert that "[s]uch fencing substantially burdens [a job of a member of the Stockman's Associations] while increasing his or her own management costs."  Reply at 8 (citing Supplemental Declaration of Judyann Holcomb Medeiros ¶ 7, at 4 (dated October 8, 2019), filed October 18, 2019 (Doc. 35-2)("Supp. Medeiros Decl.").[9]  The Stockman's Associations indicate that their members would otherwise have standing as a result of increased work and managements costs, because those costs are similar to "increased compliance costs" which may establish standing.  Reply at 8 (citing Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 457-58 (D.C. Cir. 2012)).

The Stockman's Associations argue that increased costs to work and management of their members are "traceable" to the designation.  Reply at 8.  They note that Fish & Wildlife oppose this assertion by relying on Cal. Cattlemen's Ass'n, 369 F. Supp. 3d at 141.  See Reply at 8 (citing Response at 13).  The Stockman's Associations assert that, in Cal. Cattlemen's Ass'n, the listed species occupied all areas of the critical habitat designation, and, as a result, Fish & Wildlife

---

[9]The Stockman's Associations assert that the Court should consider the Van Pelt Decl. and the Supp. Medeiros Decl., because "standing is an issue that can be raised at any time," so "considering standing material submitted with a reply brief" is proper.  Reply at 7 n.2 (citing N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 81 F. Supp. 2d 1141, 1149 (D.N.M. 1999)(Hansen, J.), rev'd on other grounds, 248 F.3d 1277 (10th Cir. 2001)).

"anticipated no increased conservation requirements attributable just to the habitat designation." Reply at 8-9 (citing <u>Yellow-Legged Frogs and Yosemite Toad Designation</u>, 81 Fed. Reg. at 59,087). They indicate that this situation is different from <u>Cal. Cattlemen's Ass'n</u>, because the designation contains areas which the Jumping Mouse does not occupy, and, "precisely for that reason[,] Fish & Wildlife has estimated that the designation will result in an incremental increase in conservation actions, principally fencing." Reply at 9 (citing Screening Memo at 7-8, 11). The Stockman's Associations indicate that those expected costs are fairly traceable to the designation and would be redressed should the designation be set aside, because, unlike in <u>Cal. Cattlemen's Ass'n</u>, those costs are solely attributable to the designation. See Reply at 9.

     **b.**  **The Stockman's Associations Argue That Fish & Wildlife Must Use the Coextensive Approach, Rather Than the Incremental Effects Approach, to Assess the Designation's Economic Impacts.**

   The Stockman's Associations next argue that Fish & Wildlife should have used the coextensive approach when considering the economic impacts of the designation. See Reply at 9. They insist that Fish & Wildlife is bound by the Tenth Circuit's decision in <u>N.M. Cattle Growers Ass'n</u>. See Reply at 9. The Stockman's Associations indicate that Fish & Wildlife and the Environmental Intervenors purport that <u>N.M. Cattle Growers Ass'n</u> is no longer controlling, because: (i) the Tenth Circuit rejected the baseline approach based on the "'functional equivalence,' theory" -- which assigns all economic impacts associated with critical habitat designations to the listings of species, such that the critical habitat designations will always appear to have zero costs; and (ii) Fish & Wildlife alleges to have abandoned the baseline approach -- which was premised on the functional equivalence theory -- and replaced it with the incremental effects approach which, unlike the baseline approach, accounts for economic impacts of critical habitat designations that go beyond costs of listings the species. Reply at 9 (quoting Response at 18-19; I. Response at 14-16). They argue that Fish & Wildlife misinterprets <u>N.M. Cattle Growers Ass'n</u>, because: (i) the Tenth Circuit stated that the baseline approach would "'render[] any purported economic analysis done utilizing the baseline approach virtually meaningless,' or 'essentially without meaning,'" Reply at 10 (quoting <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1285)(alteration in Reply); (ii) the Tenth Circuit's language clearly demonstrates that it did not reject the baseline approach based on zero economic impacts always being assigned to critical habitat designations; <u>see</u> Reply at 9; and (iii) the Tenth Circuit rejected the baseline approach, because that approach is inconsistent with the Endangered Species Act's language, which the

Tenth Circuit highlighted by stating that "'Congress clearly intended that economic factors were to be considered in connection with [critical habitat designation],'" Reply at 10 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1283-85)(alteration in Reply).  The Stockman's Associations argue that N.M. Cattle Growers Ass'n binds Fish & Wildlife, because the incremental effects approach "fails to fully vindicate this congressional intention [as] it excludes by design the consideration of at least one prime economic factor -- coextensive costs."  Reply at 10.

The Stockman's Associations next argue that Fish & Wildlife should not be entitled to Chevron deference.  See Reply at 10 (citing Chevron, 467 U.S. at 837).  They assert that "a court owes an 'agency's interpretation of the law no deference unless, after employing traditional tools of statutory construction,' the court is 'unable to discern Congress's meaning.'"  Reply at 10 (quoting SAS Inst., Inc. v. Iancu, 138 S. Ct. 1348, 1358 (2018)).  The Stockman's Associations insist that the Tenth Circuit concluded that the Endangered Species Act's language is unambiguous by stating: "'The statutory language is plain in requiring some kind of consideration of economic impact in the [critical habitat designation] phase.'"  Reply at 10 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285)(alteration in Reply).  They also indicate that, "consistent with Chevron, the [Tenth Circuit] ascertained the [Endangered Species] Act's meaning by relying upon the interpretive canon that all words of a statute should be given effect."  Reply at 10-11 (citing N.M. Cattle Growers Ass'n, 248 F.3d at 1285).

The Stockman's Associations concede that the Tenth Circuit reviewed legislative history to discern the meaning of the Endangered Species Act; however, they argue that the cited history does not necessarily indicate that the Tenth Circuit viewed the statutory language at issue as ambiguous.  See Reply at 11 n.5.  They contend that the cited history pertains to the Endangered Species Act's requirement which mandates that economic impacts must not be considered during the listing of a species.  See Reply at 11 n.5.  The Stockman's Associations also assert that "a court's employment of legislative history does not necessarily mean that the court has identified a Chevron-type ambiguity."  Reply at 11 n.5 (citing State v. Dep't of Interior, 854 F.3d 1207, 1227 (10th Cir. 2017)).  They maintain that Chevron deference is not warranted, and the Tenth Circuit's decision in N.M. Cattle Growers Ass'n trumps Fish & Wildlife's interpretation of the Endangered Species Act.  See Reply at 11.  The Stockman's Associations indicate that the Tenth Circuit ruled on this issue in N.M. Cattle Growers Ass'n, and this case is the Tenth Circuit's most recent judicial

decision on this issue.  See Reply at 11.  They also note that the Tenth Circuit concluded in N.M.
Cattle Growers Ass'n that the Endangered Species Act's language unambiguously mandates
measures which Fish & Wildlife must follow when designating critical habitat.  See Reply at 11
(citing Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982-83
(2005)("Brand X")).

        The Stockman's Associations argue that, "[e]ven if the Endangered Species Act were
ambiguous, and New Mexico Cattle Growers [Ass'n] had been abrogated, the incremental [effects]
approach would still be infirm[,] because it is an impermissible interpretation of the Act's cost
consideration mandate."  Reply at 11.  They assert that Fish & Wildlife fails to satisfy the second
Chevron deference element, which requires Fish & Wildlife's interpretation of the Endangered
Species Act to be reasonable, and not arbitrary or capricious.  See Reply at 11 (citing Judulang,
565 U.S. at 42, 52 n.7).  The Stockman's Associations indicate that the Court should determine
whether Fish & Wildlife's statutory interpretation is reasonable by considering factors such as "the
common meaning of the text, the legislative purpose behind that text, and any arbitrariness
resulting from the agency's construction."  Reply at 11 (citing Harbert v. Healthcare Servs. Group,
Inc., 391 F.3d 1140, 1149-51 (10th Cir. 2004)).

        The Stockman's Associations argue that Fish & Wildlife's interpretation of the Endangered
Species Act is arbitrary and capricious.  See Reply at 11.  They contend that the incremental effects
approach's "'but for'" methodology is unreasonable and flawed, because it excludes economic
impacts associated with critical habitat designations.  Reply at 11-12 (quoting N.M. Cattle Growers
Ass'n, 248 F.3d at 1283, and citing Richard W. Wright, Causation in Tort Law, 73 Cal. L. Rev.
1735, 1775-77, 1791-94 (1985)).  The Stockman's Associations assert that the incremental effects
approach, "by definition ignores all coextensive costs . . . [and] therefore thwarts Congress's
purpose," because, "in direct response to" Tenn. Valley Auth., Congress amended the Endangered
Species Act to make critical-habitat-designation decisions more flexible and cost-sensitive.  See
Reply at 12 (citing Tenn. Valley Auth., 437 U.S. at 184; H.R. Rep. No. 97-418, at 10 (1982); James
Salzman, Evolution and Application of Critical Habitat Under the Endangered Species Act, 14
Harv. Envtl. L. Rev. 311, 317-20 (1990); Jacob P. Byl, Accurate Economics to Protect Endangered
Species and Their Critical Habitats, 35 Pace Envtl. L. Rev. 309, 321 (2018)).  They also argue that
Fish & Wildlife's use of the incremental effects approach likely would have resulted in zero

economic impacts being assigned to the designation if the Jumping Mouse occupied all designated areas.  See Reply at 12.

          **c.**    **The Stockman's Associations Argue That Fish & Wildlife Should Have Considered the Economic Costs Associated with the Taking of Their Members' Water Rights.**

The Stockman's Associations reply to several procedural and substantive arguments regarding Fish & Wildlife's failure to consider costs of the designation infringing upon water rights.  See Reply at 13 (citing Response at 22-23, 23 n.10; I. Response at 18-22).  The Stockman's Associations note that Fish & Wildlife and the Environmental Intervenors contend that the designation does not take water rights, because the designation would not result in fencing that occupies privately owned property or that "'significantly impact[s]'" water rights generally.  Reply at 13 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,276, 14,284, 14, 314).  They argue that these procedural defenses are defective, because they are founded upon information which Fish & Wildlife considered in relation to its economic and environmental analyses, and relevant documents do not discuss taking water rights or just compensation.  See Reply at 13 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,276; Screening Memo at 8; Perceptional Effects Memo at 4-8; Harris Env. Group, Inc., Environmental Assessment for the Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse (2016) at 61, 109-10).  The Stockman's Associations argue that, as a result, Fish & Wildlife cannot assert defenses which rely on information that was not considered or articulated during the administrative process.  See Reply at 13 (citing Forest Guardians v. U.S. Forest Serv., 641 F.3d 423, 435 (10th Cir. 2011)).

The Stockman's Associations next contend that the substantive defenses for Fish & Wildlife's failure to consider the costs of takings of water rights by the designation are inadequate.  See Reply at 13.  They then summarize each substantive defenses: (i) Fish & Wildlife argues that calculating just compensation for water rights upon which the designation infringes is speculative and too difficult to quantify; see Reply at 13 (citing Screening Memo at 20-21); (ii) Sacramento Grazing Ass'n -- which concluded that the plaintiff had established water rights and that plant listing protections infringed upon those rights -- was decided after the designation was finalized, and does not demonstrate directly that the designation takes water rights, see Reply at 14 (citing Response at 23 n.10; I. Response at 19-20); (iii) Fish & Wildlife cites the "harmless error rule" to contest that "any costs associated with the taking of a water right are subsumed in [Fish & Wildlife's] assessment of [costs to avoid taking water rights]," Reply at 15 (citing Response at 23

n.10; I. Response at 21-22); and (iv) the Environmental Intervenors suggest that the designation does not, "'on its face,'" infringe upon water rights, Reply at 15 n.6 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,283, and citing I. Response at 20-21), but Fish & Wildlife asserts that fencing is one consequence of the designation, and fencing "could result in a taking," Reply at 15 n.6 (citing Sacramento Grazing Ass'n, 135 Fed. Cl. at 206-07).

       The Stockman's Associations refute each of the above-mentioned substantive defenses. See Reply at 13-15, 15 n.6. They first argue that, even if Fish & Wildlife could not quantify compensatory costs for takings of water rights, it should have qualified those impacts, just as it qualified benefits of the designation that were allegedly unqualifiable. See Reply at 13-14 (citing Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,058, 53,061). They assert that Fish & Wildlife acted unreasonably by applying inconsistent consideration standards to benefits and impacts of the designation. See Reply at 13 (citing Contractors Trans. Corp. v. United States, 537 F.2d 1160, 1162 (4th Cir. 1976)). The Stockman's Associations next insist that Sacramento Grazing Ass'n demonstrates that, "under New Mexico law, water rights are not necessarily tied to a given parcel"; thus, Fish & Wildlife's "only stated reason for ignoring water rights takings -- fencing of mouse-habitat streams will occur only on federal land -- does not withstand scrutiny." Reply at 14.

       The Stockman's Associations argue that Fish & Wildlife's harmless error defense "ignores the dual purpose of the Endangered Species Act's cost consideration mandate: to assess impact *and* to determine whether an exclusion would be appropriate." Reply at 15 (emphasis in Reply). They indicate that "'[a]n economic analysis is a tool that informs both the required impact analysis and the discretionary [] exclusion analysis'" under the Endangered Species Act's § 4(b)(2). Reply at 15 (quoting Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,060)(alterations added). The Stockman's Associations assert that "exclusion decision-making turns on 'the nature of [the] impacts, not necessarily a particular threshold level'"; consequently, Fish & Wildlife's area-exclusion analysis was deficient, because it did not consider quantified impacts of the takings of water rights. Reply at 15 (quoting Section 4(b)(2) Policy, 81 Fed. Reg. at 7,248)(alteration in Reply).

       The Stockman's Associations argue that Fish & Wildlife acted prejudicially toward members of the Stockman's Associations by ignoring the designation's economic impacts on

individuals' water rights.  See Reply at 15.  They contend that Fish & Wildlife made no effort "to support good relations with [members of the Stockman's Associations] by avoiding even the appearance of the taking of their water rights"; yet, Fish & Wildlife sought to maintain "'tribal relations'" by "avoiding even the appearance of federal intrusion."  Reply at 15 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,310, 14,312)(alteration added).   The Stockman's Associations also insist that, here, the "'harmless error doctrine is especially inappropriate,'" because "'the rule in question involves complex matters, and procedural injuries to [their members] exist.'"  Reply at 15 (quoting Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv., 910 F. Supp. 2d 1269, 1278 (D. Colo. 2012)(Martinez, J.))(alteration added).   Finally, the Stockman's Associations argue that Sacramento Grazing Ass'n demonstrates that the designation, on its face, could plausibly take water rights, because Fish & Wildlife acknowledged expressly that the designation's fencing exclusions restrict stream access.  See Reply at 15 n.6 (citing Screening Memo at 8-10).

> ### d.   The Stockman's Associations Reiterate That Fish & Wildlife's Lack of Reasoned Explanation for Its Decision Not to Exclude Units 3 and 4 From the Designation Is an Abuse of Discretion.

The Stockman's Associations next argue that Fish & Wildlife acted arbitrarily, capriciously, and abused its discretion by providing an insufficiently reasoned explanation for its exclusion decision.  See Reply at 16.  They assert that, even though neither they nor their members commented during the rulemaking process to challenge problems with the Fish & Wildlife exclusion decision-making process, the Stockman's Associations have not administratively waived this allegation.  See Reply at 16 (citing Response at 24-25).  The Stockman's Associations argue that they have not waived this claim, because the exhaustion doctrine does not apply.  See Reply at 17.  They note that, "'[w]here . . . an administrative proceeding is not adversarial, . . . the reasons for a court to require issue exhaustion are much weaker.'"  Reply at 17 (quoting Sims v. Apfel, 530 U.S. 103, 110 (2000))(alteration added).  The Stockman's Associations indicate that the exhaustion rule applies to "'matters where the agency has not had an opportunity to make a factual record or apply its expertise.'"  Reply at 17 (quoting N.M. Envtl. Imp. Div. v. Thomas, 789 F.2d 825, 835 (10th Cir. 1986)).  They assert, however, that they do not challenge Fish & Wildlife's exclusion decision "based on data that [Fish & Wildlife] did not have before it or analysis that [Fish & Wildlife] omitted because no one asked for it."  Reply at 17.  The Stockman's Associations assert that they challenge Fish & Wildlife's voluntary analysis, and the exhaustion rule does not

apply "'when an agency, for whatever reason, considers a potential issue.'"  Reply at 17 (quoting N.M. Health Connections v. U.S. Dep't of Health & Human Servs., 340 F. Supp. 3d 1112, 1168 (D.N.M. 2018)(Browning, J.)("N.M. Health Connections"), rev'd on other grounds 946 F.3d 1138 (10th Cir. 2019)).  They also argue that the exhaustion doctrine does not apply when "'the problems underlying the claim are obvious.'"  Reply at 17 (quoting Forest Guardians v. U.S. Forest Serv., 495 F.3d 1162, 1170 (10th Cir. 2007)).  The Stockman's Associations insists that they were not required to issue comments which remind Fish & Wildlife to provide a more reasoned and record-supported explanation than the "no disproportionate impacts" "blanket determination." Reply at 17 (citing Screening Memo at 11-12; Jumping Mouse Designation, 81 Fed. Reg. at 14,307).  They maintain that their challenge to the designation does not implicate "concerns about unfair surprise or waste of scarce agency resources which underlie the exhaustion rule."  Reply at 17 (citing N.M. Health Connections, 340 F. Supp. 3d at 1162).

The Stockman's Associations also argue that, even if the exhaustion doctrine applies, they satisfy the exhaustion requirement.  See Reply at 16.  They contend that "issue exhaustion does not impose a 'magic words' requirement," Reply at 16 (quoting Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 966 (9th Cir. 2002)).  They note that, before filing the Complaint, they issued a notice letter to Fish & Wildlife which raised problems specific to its exclusion decision-making process.  See Reply at 16 (citing Exhibit 1 at 6-7, filed August 8, 2019 (Doc. 26-1)).  The Stockman's Associations insist that they can "'satisfy the exhaustion requirement merely by making a general objection under [the Endangered Species Act] to [Fish & Wildlife's exclusion decision] without referencing any specific violations of [the Act].'"  Reply at 16 (quoting Or. Nat. Desert Ass'n v. McDaniel, 751 F. Supp. 2d 1151, 1161 (D. Or. 2011)(Papak, J.))(alterations added).  The Stockman's Associations indicate that, during the rulemaking process, they commented with general objections to the designation's foreseeable harm to grazing allotments, water rights, and base properties of their members and other ranchers.  See Reply at 16 (citing Carlos Salazar, Comments on New Mexico Jumping Mouse Designation of Critical Habitat at D0029221-23 (issued May 7, 2014)(not posted)).  The Stockman's Associations also note that other parties commented with general objections to the designation's expected effects on livestock businesses, water rights, and grazing rights.  See Reply at 16 n.7 (citing Charla Johnson, Public Comments Processing: US Fish & Wildlife Service Designation of Critical Habitat for

the New Mexico Meadow Jumping Mouse at D002986 (issued May 8, 2014)(not posted); Omar Holcomb Lt Col USAF (RET), Comment on Proposed Agua Chiquita Habitat at 1-2(issued April 27, 2014)(posted May 5, 2014), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0045 (last visited June 24, 2020)).  The Stockman's Associations argue that they notified Fish & Wildlife of their concerns that costs were too burdensome to warrant promulgating the designation, which is the central consideration for the exclusion process under the Endangered Species Act's § 4(b)(2).  See Reply at 16.

The Stockman's Associations next argue that Fish & Wildlife does not provide a reasoned explanation for its exclusion decision, because it "refus[ed] to exclude based on economic impact." Reply at 18.  They assert that the Court should evaluate whether Fish & Wildlife's "refusal to exclude was arbitrary, capricious, or an abuse of discretion," even though Fish & Wildlife asserts that the Court should review this issue only for abuse of discretion.  Reply at 18 n.8 (citing Weyerhaeuser, 139 S. Ct. at 372).  The Stockman's Associations disagree with Fish & Wildlife's assertion that it properly assessed the benefits of inclusion by accounting for mitigating the risk of the Jumping Mouse's extinction and recovery.  Reply at 18 (citing Response at 26-27; I. Response at 24-25).  According to the Stockman's Associations, this defense is inconsistent with the Endangered Species Act's exclusion-consideration mandate, which requires Fish & Wildlife to "weigh the benefits of inclusion against the benefits of exclusion."  Reply at 19.

The Stockman's Associations also argue that the Endangered Species Act's exclusion-consideration mandate would be moot if it permits Fish & Wildlife to base its exclusion decisions primarily on whether an area is essential for species conservation.  See Reply at 18.  They indicate that all areas considered for exclusion are, by definition, essential or contain features which are essential to the conservation of species.  The Stockman's Associations assert that, as a result, no area would ever be excluded from critical habitat designation if Fish & Wildlife may center exclusion decision around an area's essentialness for species conservation.  See Reply at 18 n.9 (citing 16 U.S.C. § 1532(5)(A)(i)-(ii); United States v. Atl. Research Corp., 551 U.S. 128, 137 (2007)). The Stockman's Associations also assert that Fish & Wildlife's "desire to give 'substantial weight to preventing [the Jumping Mouse's] extinction'" is irrelevant to the exclusion-balancing process, because the Endangered Species Act mandates that an area must not be excluded if exclusion would result in the species' extinction.  Reply at 18-19 (quoting Response

at 27, and citing I. Response at 25; 16 U.S.C. 1533(b)(2)).  They indicate that, because Fish & Wildlife "made no finding during the administrative process that any would-be exclusion would result in extinction, the agency cannot now rely on that rationale to justify its decision not to exclude."  Reply at 19 (citing N.M. Health Connections, 340 F. Supp. 3d at 1178-79).

The Stockman's Associations next challenge Fish & Wildlife's second defense. See Reply at 18-19.  They reference Fish & Wildlife's allegation that it concluded correctly that economic impacts were not "'disproportionate'" to justify not excluding any area from the designation. Reply at 18-19 (quoting Response at 27; Jumping Mouse Designation 81 Fed. Reg. at 14,283). The Stockman's Associations argue that Fish & Wildlife's conclusion is "unexplained and unsupported by the record."  Reply at 27.  They insist that the Court should not uphold Fish & Wildlife's exclusion decision, because: (i) Fish & Wildlife failed to provide "transparent rules[,] and [did not] engage in reasoned decision-making"; and (ii) no plausible interpretation of the administrative record supports the no-disproportionate-economic-impacts conclusion.  Reply at 19 (citing Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43; S. Ute Indian Tr. v. Amoco Prod. Co., 119 F.3d 816, 835-36 (10th Cir. 1997); San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n, 789 F.2d 26, 48 (D.C. Cir. 1986)).

Last, the Stockman's Associations challenge Fish & Wildlife's final exclusion-decision defense, which purports that Fish & Wildlife is not required to establish a one-size-fits-all statutory standard.  See Reply at 19.  They note that Fish & Wildlife does not elaborate on "what is and is not 'disproportionate,'" because it contends that it may lawfully use a "case-by-case analysis." Reply at 18 (quoting Response at 27-28).  The Stockman's Associations indicate that Fish & Wildlife must provide a reasoned explanation for all decision-making when designating critical habitat.  See Reply at 19 (citing Weyerhaeuser, 139 S. Ct. at 371).  They concede that Fish & Wildlife may define differently the term "disproportionate" depending on distinct factors considered for varying critical habitat designations. Reply at 19.  They assert that Fish & Wildlife is not absolved, however, from providing reasoned analysis for the standard it chose "for *this* designation."  Reply at 19 (emphasis in Reply).  The Stockman's Associations maintain that Fish & Wildlife's exclusion decision cannot be upheld, because it explained insufficiently the analysis standard that it applied, and because Fish & Wildlife's standard and its "plausible meanings" are "nowhere explained" or "supported by the record."  Reply at 20-21 (citing U.S. Chamber of

Commerce v. U.S. Dep't of Labor, 885 F.3d 360, 382 (5th Cir. 2018); Olenhouse v. Commodity

Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994)).

###   5.   The October 31, 2019, Hearing.

On October 31, 2019, the Court held a hearing.  See Draft Transcript of Evidentiary

Hearing at 1 (held October 31, 2019)("Tr.").[10]  The parties first addressed their standing

arguments, see Tr. at 4:6-21:10 (Schiff, Flanagan), then they discussed which approach Fish &

Wildlife must apply to determine a designation's impacts, see Tr. at 22:4-78:20 (Schiff, Flanagan,

Shannon), and then they argued whether Fish & Wildlife has provided an adequate explanation for

its decision not to exclude units 3 and 4 from the designation, see Tr. at 80:3-114:9 (Schiff,

Flanagan, Shannon).  Last, the parties addressed the proper remedy, should the Court decide to

remand the case to Fish & Wildlife, see Tr. at 106:19-115:10 (Flanagan, Shannon, Schiff), and the

parties agreed that they would submit additional briefing on the issue, see Tr. at 110:17-111:9

(Court, Shannon); id. at 114:21-25 (Schiff).

###   a.   Arguments Regarding Standing.

The Stockman's Associations began by summarizing their arguments for standing.  See Tr.

at 4:6-8:16 (Schiff).  They asserted that "all sides agree that the diminution in the value of private

property is adequate to establish standing."  Tr. at 4:8-10 (Schiff).  The Stockman's Associations

noted that Fish & Wildlife agrees that this principle applies but says that no members of the

Stockman's Association owns private property that the designation encompasses.  See Tr. at 4:10-

19 (Schiff).  They challenged Fish & Wildlife's contention, in part, because "of the nature of how

grazing allotments operate."  Tr. at 4:19-21 (Schiff).

The Stockman's Associations argued that their members hold grazing allotments on federal

land, and they argued that the right to use a grazing allotment "entails the requirement to have

private base property associated with that grazing allotment."  Tr. at 4:21-24 (Schiff).  See id.

at 7:19-8:1 (Schiff).  They argued that the negative "perceptional effects phenomenon," which

occurs when base property is associated with a grazing allotment that is designated as critical

habitat, reduces the value of base property, and they contended that Fish & Wildlife agrees with

this characterization.  Tr. at 4:24-5:4 (Schiff).  The Stockman's Associations indicated that base

property's value is tied to the grazing-allotment permit, and a certified appraiser has determined

---

[10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

that the perceptional effects phenomenon reduces the fair market value of base properties owned by members.  See Tr. at 5:6-11, 8:14-16 (Schiff).  They contended that their members' economic injuries establish standing to challenge Fish & Wildlife's decision to promulgate the designation. See Tr. at 5:11-13 (Schiff).

The Stockman's Associations also argued that, even though they allege that Fish & Wildlife's economic impact analysis is deficient, Fish & Wildlife's analysis demonstrates that the designation directly causes economic harm to members of the Stockman's Associations.  See Tr. at 5:14-7:8 (Schiff).  They argued that their members' ranching costs have and will continue to increase, because the designation's current and anticipated fencing exclosures on their members' grazing allotments restrict access to livestock-watering sources.  See Tr. at 5:14-8:2 (Schiff).  The Stockman's Associations insisted that fencing exclosures and watering lanes increase costs to their members, because: (i) additional ranching management is necessary to herd livestock through the congested watering lanes or to alternative water sources which are miles away; and (ii) this process reduces livestock value by stressing the cattle.  See Tr. at 6:17-7:8 (Schiff).  They argued that they have standing, because Fish & Wildlife's deficient economic analysis and exclusion decision overlap economically to injure members of the Stockman's Associations.  See Tr. at 7:13-18 (Schiff).

Fish & Wildlife argued that Northern NM Stockman's Association does not have standing to challenge the designation, but it no longer challenges the standing of Otero County Cattleman's Association.  See Tr. at 9:4-17:20 (Flanagan).  It conceded that Otero Stockman's Association has explained sufficiently how the designation harms its members who hold grazing allotments within or near unit 4.  See Tr. at 9:17-10:3 (Flanagan).  Fish & Wildlife indicated that it no longer argues for the entire case to be dismissed on standing, yet it contends that Northern NM Stockman's Association does not have standing to challenge the decision not to exclude unit 3.  See Tr. at 10:4-14; id. at 13:15-22 (Flanagan).  It asserted that Northern NM Stockman's Association provides only conclusory allegations that the designation concretely harms their members.  See Tr. at 14:22-16:8 (Flanagan).  Fish & Wildlife contended that next to none of [the members of Northern NM Stockman's Association] "allege that they own property which has been designated as critical habitat" or provide any factual support for the purported takings of their water rights.  Tr. at 16:9-19 (Flanagan).  It also contended that, even though the Stockman's Associations included

declarations in the Reply to fill evidentiary gaps on standing, only members of Otero Cattleman's Association issued declarations to support their standing arguments.  See Tr. at 16:14-17:7 (Flanagan).  Fish & Wildlife conceded, however, that "it may be possible" for Northern NM Stockman's Association and its members to file affidavits that will satisfy standing.  Tr. at 17:8-14 (Flanagan).

The Environmental Intervenors did not press the issue of standing.  See Tr. at 17:21-18:5 (Shannon).  The Stockman's Associations responded to Fish & Wildlife, arguing that Northern NM Stockman's Association has established standing through the declarations submitted that three of its members submitted.  See Tr. at 18:12-19:12 (Schiff).  The Stockman's Associations indicated that Northern NM Stockman's Association members submitted declarations that demonstrate that they suffer injury, because they hold and use grazing allotments that have been designated as critical habitat.  See Tr. at 18:18-22 (Schiff).  The Stockman's Associations noted, as an example, that Manuel Lucero, a livestock producer in the Santa Fe National Forest and a member of the Northern NM Stockman's Association, declares that "'[t]he critical habitat designation also lowers my and other ranchers' property values as a result of negative perception of land designated critical habitat.'"  Tr. at 18:22-19:4 (Schiff)(quoting Manuel Lucero Decl. ¶15 at 4).  They contended that the perceptional effects phenomenon, which establishes standing for the Otero Cattleman's Association, also caused Lucero's injury.  See Tr. at 19:4-12 (Schiff).

The Stockman's Associations argued that the Court should reach the merits of this case, even if only Otero Cattleman's Association has standing to challenge each issue.  See Tr. at 19:13-19 (Schiff).  The Stockman's Associations also argued that "the fact that" Northern NM Stockman's Association and Otero Cattleman's Association use land in units 3 and 4 of the designation, respectively, is irrelevant, because "the legal problem is with the critical habitat rule as a whole."  Tr. at 19:20-25 (Schiff).  They noted that, if the Court decides that any part of Fish & Wildlife's economic impact analysis or exclusion decision is legally deficient, then, during remand, Fish & Wildlife must arrive at a new decision that is not limited to certain sub-units.  See Tr. at 19:25-20:9 (Schiff).  The Stockman's Associations, at the request of the Court, explained in three sentences that Northern NM Stockman's Association has standing, because: (i) "[t]he Supreme Court in Weyerhaeuser held that an allegation that one's property has been reduced in value because of critical habitat is sufficient to establish standing"; (ii) "[t]he administrative

record, as well as declarations submitted, substantiate the relationship between critical habitat on an allotment, and a connected reduction in value for associated base property"; and (iii) "[a]ll of the declarants for Northern New Mexico have stated that they have permits to use allotments that have been designated as critical habitat; therefore, it necessarily follows that any base property privately owned that is associated with those critical habitat allotments will likely have a reduction in value." Tr. at 20:10-21:10 (Schiff).

        **b.**    **Arguments Regarding the Appropriate Approach to Assess the Designation's Costs.**

     The Stockman's Associations argued that Fish & Wildlife's use of the incremental effects approach to consider economic impacts of the designation is arbitrary, capricious, and unlawful under the Endangered Species Act. See Tr. 22:4-35:25 (Schiff). They asserted that the incremental effects approach accounts only for economic impacts that are solely attributable to critical habitat designation, and it ignores any cost which can be assigned to other causal factors, such as listing a species as threatened or endangered. See Tr. at 22:11-23:16 (Schiff). The Stockman's Associations asserted that the incremental effects approach is illegitimate specifically in relation to the Endangered Species Act. See Tr. at 23:17-25:15 (Schiff). They insisted that using the incremental effects approach with respect to the Endangered Species Act is unlike using the methodology where a business has three options: (i) doing nothing at a cost of $100.00; (ii) doing something at a cost of $100.00; (iii) doing something else at a cost of $150.00. See Tr. at 24:13-25 (Schiff). The Stockman's Associations noted that a business using the incremental effects approach views the costs of option three to be $50.00, because the business will incur costs of at least $100.00 by choosing any of the three options. See Tr. at 24:13-25 (Schiff). The Stockman's Associations contended that using the incremental effects approach under the Endangered Species Act is distinguishable from the business example, because "there is no rule that says that a business has to ignore the additional hundred dollars in cost[s]." Tr. at 25:21-23 (Schiff). They asserted that, unlike the business example, the Endangered Species Act is restrained artificially, because courts interpret the Act as requiring Fish & Wildlife to ignore all costs when listing a species. See Tr. at 26:3-27:23 (Schiff). The Stockman's Associations asserted that the Endangered Species Act's artificial restraint was a primary motivating factor for the Tenth Circuit's decision in N.M. Cattle Growers Ass'n. See Tr. at 26:24-27:8 (Schiff).

The Stockman's Associations argued that, in <u>N.M. Cattle Growers Ass'n</u>, the Tenth Circuit ruled that Fish & Wildlife must use the coextensive approach when designating critical habitat, in part, because, the Endangered Species Act requires economic impacts to be considered under circumstances which are abnormal in the private sector and federal agency context.  <u>See</u> Tr. at 26:24-27:8 (Schiff).  They also argued that the baseline approach that the Tenth Circuit held is unlawful in <u>N.M. Cattle Growers Ass'n</u> is indistinguishable from the incremental effects approach. <u>See</u> Tr. at 27:13-16 (Schiff).  The Stockman's Associations contended that Fish & Wildlife and the Environmental Intervenors erroneously argue that Fish & Wildlife's recently codified regulation effectively abrogates <u>N.M. Cattle Growers Ass'n</u>, because, although Fish & Wildlife must ignore economic costs when listing a species, such costs will never be scrutinized if Fish & Wildlife does not consider them when it analyzes the economic impacts of critical habitat designation.  <u>See</u> Tr. at 27:16-28:7 (Schiff).

The Stockman's Associations argued that the Court should not rely on cases from other Courts of Appeals and district courts that were decided after <u>N.M. Cattle Growers Ass'n</u> and which upheld Fish & Wildlife's use of the incremental effects approach.  <u>See</u> Tr. at 29:15-32:3 (Schiff). They noted that there are at least two cases which have arrived at such a conclusion: (i) <u>Ariz. Cattle Growers' Ass'n</u> in the Ninth Circuit; and (ii) a case decided by the Honorable Christine Arguello, United States District Judge for the United States District Court for the District of Colorado.[11]  <u>See</u> Tr. at 29:10-19 (Schiff).  The Stockman's Associations asserted that Judge Arguello's analysis was "very short . . . [and] arguably dicta," because she noted that Fish & Wildlife used the incremental effects approach in accordance with its updated regulations, and, additionally used the coextensive approach, because the critical habitat designation was in the Tenth Circuit.  <u>See</u> Tr. at 30:1-10 (Schiff).  They insisted, consequently, that Judge Arguello's opinion has little persuasive value. <u>See</u> Tr. at 30:10-12 (Schiff).

The Stockman's Associations also criticized the Ninth Circuit's decision in <u>Ariz. Cattle Growers' Ass'n</u>, which upheld Fish & Wildlife's use of the incremental effects approach.  <u>See</u> Tr. at 30:13-31:2 (Schiff).  They maintained that the Ninth Circuit did not "acknowledge [the] critical point [that the Stockman's Associations] mentioned earlier," which is that, even though the incremental effects approach is a rational methodology when considering costs generally, the

---

[11]Based on the Court's independent research, the Court concludes that the Stockman's Associations refer to <u>Colorado v. Fish & Wildlife</u>, 362 F. Supp. 3d at 951.

approach is incompatible with the Endangered Species Act because of its artificial restraint.  See Tr. at 30:18-23 (Schiff).  The Stockman's Associations reiterated that the Endangered Species Act requires Fish & Wildlife to ignore costs when listing a species as threatened or endangered, and, when using the incremental effects approach, those costs are never considered during the listing or designation processes.  See Tr. at 30:23-31:2 (Schiff).  They also argued that there may be an absence of favorable case law supporting their position, because, after N.M. Cattle Growers Ass'n, if Fish & Wildlife's use of the incremental effects approach was challenged judicially, it would concede and "request voluntary remand . . . to employ a broader coextensive analysis."  Tr. at 31:16-32:3 (Schiff).

The Stockman's Associations argued that N.M. Cattle Growers Ass'n is controlling, and, consequently, Fish & Wildlife must consider all economic impacts of the designation in the Tenth Circuit, including the listing's economic costs.  See Tr. at 32:4-35:25 (Schiff).  They asserted that N.M. Cattle Growers Ass'n's two controlling sentences are: (i) "'Congress clearly intended that economic factors were to be considered in connection with [critical habitat designation]'"; and (ii) "'[t]he statutory language [in 16 U.S.C. § 1533(b)(2)] is plain in requiring some kind of consideration of economic impacts in the [critical habitat designation] phase.'"  Tr. at 32:21-33:3 (Schiff)(quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285)(alterations added).  The Stockman's Associations also argued that Chevron deference is not appropriate, because courts apply the Chevron doctrine only when statutory language is ambiguous, and the Tenth Circuit employed what amounts to a "plain meaning or non[-]ambiguous analysis."  Tr. at 33:22-34:3 (Schiff).  They note that the Endangered Species Act's language which the Tenth Circuit interpreted as having plain meaning is: "'The designation is required to consider the economic impact and any other relevant impact of specifying any particular area as critical habitat.'"  Tr. at 34:12-17 (Schiff)(quoting 16 U.S.C. § 1533(b)(2)).

The Stockman's Associations countered Fish & Wildlife's assertion that the incremental effects approach is distinguishable from the baseline methodology which N.M. Cattle Growers Ass'n invalidated.  See Tr. at 34:18-35:25 (Schiff).  They noted that Fish & Wildlife contends that the cost-analysis approach in N.M. Cattle Growers Ass'n would regularly assign zero economic impacts to critical habitat designation, because the methodology regarded critical habitat protections as being duplicative needlessly with protections associated with the listing of the

species.  See Tr. at 34:18-35:5 (Schiff).  The Stockman's Associations insisted that the Fish &

Wildlife's argument is flawed, because, at the time the Tenth Circuit decided N.M. Cattle Growers

Ass'n, designations were equally capable of producing significant economic impacts.  See Tr. at

35:6-10 (Schiff).  They maintained that, today, the negative perceptional phenomenon is the same

as when the Tenth Circuit decided N.M. Cattle Growers Association, but the current incremental

effects approach has attributed $20,000,000.00 of economic costs to the designation for the

Jumping Mouse.  See Tr. at 35:10-15 (Schiff).   The Stockman's Associations contended,

consequently, that the Tenth Circuit did not invalidate the incremental effects approach based on

the methodology's frequency for calculating little or no costs to designate critical habitat.  See Tr.

at 35:15-18 (Schiff).  They asserted that the Tenth Circuit recognized that the problem with the

incremental effects approach was that it "ignores a whole category of costs."  Tr. at 35:18-20

(Schiff).   The Stockman's Associations insisted that the Tenth Circuit held unlawful the

incremental effects approach, because the methodology is inconsistent with the Endangered

Species Act's language, which requires consideration of "the economic impacts" and not just some

costs.  Tr. at 35:20-25 (Schiff).

        Fish & Wildlife responded, arguing that the Endangered Species Act requires it to consider

the economic impacts of "'specifying any particular area as critical habitat.'"  Tr. at 36:17-20

(Flanagan)(quoting 16 U.S.C. § 1533(b)(2)).  It asserted that the article "the" in the phrase "the

economic impacts" indicates only that Fish & Wildlife must consider all of the economic impacts

of designating critical habitat, but it can ignore costs of the species' listing and other decisions

made earlier in the process.  See Tr. at 36:21-37:12 (Flanagan).  Fish & Wildlife insisted that its

argument is consistent with the Endangered Species Act's language, because the language does

not require explicitly that Fish & Wildlife consider the listing's economic impact during the

designation phase.  See Tr. at 37:13-16 (Flanagan).  It also argued that its interpretation is

consistent with the OMB's policies, which recommend that federal agencies ignore costs that will

exist regardless of the agency's decision when they conduct cost-benefit analyses.  See Tr. at

37:18-38:1 (Flanagan).

        Fish & Wildlife responded to the business example that the Stockman's Associations

earlier illustrated.  See Tr. at 38:2-39:20 (Flanagan).  It argued that, if a business spends $100.00

on facility improvements, and later considers spending an additional $50.00 to improve its

facilities, then the business focuses only on the incremental costs and benefits of the additional $50.00 worth of improvements.  See Tr. at 38:2-10 (Flanagan).  It asserted that the incremental effects approach appropriately ignores costs of decisions made before designating critical habitat, just like the business would not account for the already-spent $100.00 when considering whether to buy the additional facility improvements.  See Tr. at 38:10-14 (Flanagan).  It contended that the listing was finalized two years before the designation and that Fish & Wildlife ignored only the costs of the listing when it considered economic impacts of the designation.  See Tr. at 39:6-10 (Flanagan).  Fish & Wildlife indicated that the Endangered Species Act mandates that economic costs must be ignored when listing a species, because that decision must be based solely on scientific considerations.  See Tr. at 39:14-18 (Flanagan).  It insisted that, under the Endangered Species Act, the costs of listing a species are "simply not relevant," and that, consequently, Fish & Wildlife can lawfully ignore those costs when considering economic impacts of designating critical habitat.  Tr. at 39:18-20 (Flanagan).

Fish & Wildlife argued that using the incremental effects approach when designating critical habitat aligns with cost-benefit methodologies that are common throughout the federal government.  See Tr. at 39:21-24 (Flanagan).  It contended that agency conduct under the National Environmental Policy Act ("NEPA"), 14 U.S.C. § 4321, which the APA governs, is analogous to the incremental effects approach.  See Tr. at 39:24-40:1 (Flanagan).  Fish & Wildlife asserted that, when it or another agency proposes an action under the NEPA, the agency will compare multiple alternative actions with non-action.  See Tr. at 40:1-3 (Flanagan).  It insisted that the non-action alternative and the proposed action are analogous to the listing of a species and considering economic impacts of designating critical habitat, respectively.  See Tr. at 40:4-7 (Flanagan).  Fish & Wildlife argued that the analogous cost-benefit analysis conducted under the NEPA is consistent with the Endangered Species Act's plain language.  See Tr. at 40:11-14 (Flanagan).

Fish & Wildlife argued that, even though the Tenth Circuit legally invalidated a methodology similar to the incremental effects approach, and the Supreme Court has not considered the issue, multiple courts have upheld the incremental effects approach.  See Tr. at 40:13-24 (Flanagan).  It noted that the Ninth Circuit and at least three United States district courts outside of the Ninth Circuit, including the United States District Courts for the District of Columbia, the Northern District of Florida, and Colorado, have upheld the incremental effects

approach.  See Tr. at 40:25-42:10 (Flanagan).  Fish & Wildlife indicated that a United States District Judge for the Northern District of Florida has ruled that the Endangered Species Act unambiguously requires Fish & Wildlife to use the incremental effects approach when considering economic impacts of designating critical habitat.  See Tr. at 42:10-15 (Flanagan).  It noted, however, that the Court need not "go that far" and reach the same conclusion as did the District Court for the Northern District of Florida.  Tr. at 42:15-17 (Flanagan).

Fish & Wildlife argued that the methodology that the Tenth Circuit invalidated in N.M. Cattle Growers Ass'n is distinguishable from the incremental effects approach.  See Tr. at 42:25-43:16 (Flanagan).  It asserted that the Tenth Circuit held unlawful the baseline approach, because it is not a permissible interpretation of the Endangered Species Act.  See Tr. at 42:25-43:4 (Flanagan).  Fish & Wildlife noted that the Tenth Circuit stated that the Endangered Species Act requires only "some kind of economic consideration . . . [and the Tenth Circuit did not] specify any particular methodology" that must be used.  Tr. at 43:5-8 (Flanagan).  It indicated, consequently, that the Court should determine that the Endangered Species Act is ambiguous.  See Tr. at 43:3-5 (Flanagan).  Fish & Wildlife insisted that the incremental effects approach is the best interpretation of the Endangered Species Act, but the Court needs only to decide whether the methodology is a permissible interpretation of the Act.  See Tr. at 43:8-12 (Flanagan).  It asserted that Congress authorized Fish & Wildlife to interpret the Endangered Species Act, and, as a result, the incremental effects approach should be upheld so long as it is not an arbitrary or capricious interpretation of the Act.  See Tr. at 43:12-16 (Flanagan).

Fish & Wildlife argued that, under the current regulations, it is authorized to consider voluntarily coextensive costs of designating critical habitat, but it is unlikely to use that methodology unless it would benefit the impact analysis.  See Tr. at 44:4-24 (Flanagan).  It contended that current regulations and the Endangered Species Act requires Fish & Wildlife to consider economic impacts of designating versus not designating critical habitat.  See Tr. at 45:3-7 (Flanagan).  Fish & Wildlife also argues that it is due Chevron deference, because Fish & Wildlife codified the incremental effects approach, and it alleges that the Endangered Species Act is ambiguous.  See Tr. at 44:1-4, 45:8-15 (Flanagan).  It maintains that, even without Chevron deference, the incremental effects approach is lawful, because it is reasonable interpretation of the Endangered Species Act.  See Tr. at 45:14-20 (Flanagan).

Fish & Wildlife argued that the Tenth Circuit's analysis in N.M. Cattle Growers Ass'n does not limit the Endangered Species Act's language and that the Tenth Circuit's analysis implies that the Act is ambiguous.  See Tr. at 45:21-48:25 (Flanagan).  It noted that the Endangered Species Act's language states: "[Fish & Wildlife] shall designate critical habitat and make revisions thereto on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact of specifying any particular area as critical habitat."  Tr. at 47:1-6 (Flanagan)(quoting 16 U.S.C. § 1533(b)(2))(alteration added).  Fish & Wildlife indicated that the Tenth Circuit stated in N.M. Cattle Growers Ass'n that the Endangered Species Act's "'language is plain in requiring some kind of consideration of economic impact in the critical habitat designation phase.'"  Tr. at 46:18-20 (Flanagan); id. at 47:15-18 (Flanagan)(quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1285).  It contended that the Tenth Circuit's analysis demonstrates that Fish & Wildlife must use a reasonable cost-benefits analysis when considering economic impacts of designating critical habitat.  See Tr. at 48:13-16 (Flanagan).  Fish & Wildlife asserted that the Tenth Circuit implicitly acknowledged a statutory ambiguity, because there is a disconnect between the Tenth Circuit's conclusion -- that the Endangered Species Act requires some kind of consideration to economic impact -- and the Endangered Species Act's silence on which methodology should be used to consider economic impacts.  See Tr. at 48:18-25 (Flanagan).

Fish & Wildlife argued that the methodology that the Tenth Circuit reviewed in N.M. Cattle Growers Ass'n, which Fish & Wildlife names the "negligible impact" approach, is fundamentally different from the incremental effects approach.  Tr. at 49:6-52:4 (Flanagan).  It noted that the Tenth Circuit reasoned that the negligible impact approach's "functional equivalence theory" was the "root of the problem."  Tr. at 49:12-13 (Flanagan).  Fish & Wildlife asserted that the functional equivalence theory informed Fish & Wildlife's position that critical habit protections did not add meaningfully to listing protections and, as a result, designating critical habitat did not impose additional costs.  See Tr. at 49:16-22 (Flanagan).  It argued that one of the Endangered Species Act's main protections is found in § 7,  "which requires federal agencies to ensure that their actions will not jeopardize a listed species or destroy or adversely modify critical habitat."  Tr. at 50:1-5 (Flanagan).  Fish & Wildlife contended that the functional equivalence theory was the product of regulatory definitions at the time of N.M. Cattle Growers Ass'n, and that these definitions were

almost identical the Endangered Species Act's § 7 criteria of avoiding jeopardizing a listed species or modifying critical habitat.  See Tr. at 50:5-9 (Flanagan)(citing 50 C.F.R. § 402.02).

Fish & Wildlife argued that the incremental effects and negligible impact approaches are dissimilar, because the former methodology does not unify critical habitat and listing protections under the Endangered Species Act's § 7.  See Tr. at 50:9-14 (Flanagan).  It asserted that the United States Courts of Appeals for the Fifth and Ninth Circuits invalidated the regulatory definitions underlying the functional equivalence theory after N.M. Cattle Growers Ass'n.  See Tr. at 51:14-18 (Flanagan).  Fish & Wildlife insisted that it amended its regulatory definitions regarding jeopardizing a species and destroying critical habitat, and the amended definitions differentiate "between when an agency may find that an action has adversely modified critical habitat versus when it may find that the action jeopardies a listed species."  Tr. at 50:19-22 (Flanagan).  It contended, consequently, that the incremental effects approach acknowledges that designating critical habitat can have significant benefits and impacts that go beyond the listing.  See Tr. at 51:8-17 (Flanagan).  Fish & Wildlife indicated that, here, it issued two economic impacts memoranda, conducted additional analyses before issuing the final rule, and ultimately assigned costs of $23,000,000.00 and qualitative impacts to the designation.  See Tr. at 51:19-25 (Flanagan).  Fish & Wildlife asserted that its "thorough . . . [and] meaningful" economic impacts analysis evidences that the incremental effects approach is "unlike what the Tenth Circuit was looking at in [N.M.] Cattle Growers [Ass'n]."  Tr. at 51:25-52:4 (Flanagan).

Fish & Wildlife argued that, in relation to the Endangered Species Act, the incremental effects approach is a more reasonable methodology than the coextensive approach.  See Tr. at 52:5-55:19 (Flanagan).  It insisted that the coextensive approach can be unhelpful, counterproductive, and a waste of agency resources when used to consider impacts of critical habitat designation.  See Tr. at 52:15-54:9 (Flanagan).  Fish & Wildlife asserted that it may, under the Endangered Species Act's § 4(b)(2), exclude areas from critical habitat should the benefits of excluding an area outweigh the benefits of inclusion.  See Tr. at 52:22-53:5 (Flanagan).  It contended that the coextensive approach analyzes many economic impacts that are irrelevant to the exclusion decision, whereas the incremental effects approach naturally categorizes the benefits for including versus excluding an area.  See Tr. at 53:9-16 (Flanagan).  Fish & Wildlife noted that, if it initially

considers economic impacts of designating critical habitat, then afterwards it must use the incremental effects approach for the area-exclusion analysis. See Tr. at 53:16-54:9 (Flanagan).

Fish & Wildlife argued that the coextensive approach can lead to irrational area-exclusion decisions. See Tr. at 54:11-55:19 (Flanagan). It noted that, in Tenn. Valley Auth., the Supreme Court enjoined the construction of a dam that would have cost around $80,000,000.00 to build, because building the dam would have jeopardized an endangered species and destroyed its critical habitat. See Tr. at 54:15-22 (Flanagan). Fish & Wildlife insisted that, if the coextensive approach had been used in Tenn. Valley Auth, then Fish & Wildlife's exclusion decision would have accounted for costs of building the damn and some areas would have been excluded inappropriately. See Tr. at 54:23-55:3. It asserted that, as a result, it would have been discouraged from designating critical habitat based on costs that did not exist, because the dam's construction would have inevitably been enjoined for jeopardizing the endangered species. See Tr. at 55:4-12 (Flanagan). Fish & Wildlife asserted that this hypothetical demonstrates that using the coextensive approach for area-exclusion analysis is illogical under the Endangered Species Act, because the Endangered Species Act requires Fish & Wildlife to "weigh[] the benefits of exclusion versus the benefits of inclusion[,] and not add[] other cost[s] that would occur regardless of exclusion." Tr. at 55:12-19 (Flanagan).

Fish & Wildlife responded to the argument that the Stockman's Association raised -- that, after N.M. Cattle Growers Ass'n, Fish & Wildlife used the coextensive approach throughout the nation or requested voluntary remand when challenged for using the incremental effects methodology. See Tr. at 55:22-56:24 (Flanagan). Fish & Wildlife insisted that, after N.M Cattle Growers Ass'n was decided, but before Fish & Wildlife codified the incremental effects approach, Fish & Wildlife routinely used the coextensive approach only in the Tenth Circuit. See Tr. at 56:1-8 (Flanagan). Fish & Wildlife purported that, during the same time period, it generally used the incremental effects approach outside of the Tenth Circuit, because all of the courts that reviewed the incremental effects approach, other than the Tenth Circuit, upheld the methodology. See Tr. at 56:8-14 (Flanagan). It indicated that courts throughout the United States -- including the Ninth Circuit and the United States District Courts for the District of Columbia, for the Northern District of Florida, and for the District of Colorado -- decided that the incremental effects approach was lawful. See Tr. at 56:13-57:22 (Flanagan). Fish & Wildlife contended that, if the

Court decides that Fish & Wildlife must use the coextensive approach when designating critical habitat, then Fish & Wildlife will only use the methodology within the Tenth Circuit.  See Tr. at 56:21-24 (Flanagan).

Fish & Wildlife noted that the Stockman's Associations cite to a sole academic legal source regarding impacts of N.M Cattle Growers Ass'n, yet that source supports the incremental effects approach's legality.  See Tr. at  57:23-59:11 (Flanagan).  It said that the academic source is a 2018 Pace Environmental Law Review article by Jacob Byl.[12]  See Tr. at 58:3-5 (Flanagan); id. at 58:24-25 (Flanagan); id. at 59:3-5 (Flanagan).  Fish & Wildlife asserted that the academic article predicts that N.M. Cattle Growers Ass'n likely would be decided differently today, because Fish & Wildlife codified the incremental effects approach, the Endangered Species Act is ambiguous, and Fish & Wildlife would be entitled to Chevron deference.  See Tr. at 58:7-13 (Flanagan).  It also contended that, even though the academic article does not address the functional equivalence theory or the amended regulatory definitions, Professor Jacob Byl recognizes that the negligible impact approach, which Fish & Wildlife no longer employs, was the type of "zero cost conclusion" methodology that Congress did not intend to be used.  Tr. at 58:13-21 (Flanagan)(citing 50 C.F.R. § 402.02).  Fish & Wildlife maintained that it lawfully used the incremental effects approach to consider economic impacts of the designation, because: (i) the Tenth Circuit held unlawful the negligible impact methodology, which is different from the incremental effects approach, and, as a result, N.M. Cattle Growers Ass'n is not controlling; and (ii) the incremental effects approach is a permissible interpretation of the Endangered Species Act.  See Tr. at 59:17-60:8 (Flanagan).

The Environmental Intervenors noted that they disagree with Fish & Wildlife as to how the Endangered Species Act should be interpreted.  See Tr. at 60:17:61:1 (Shannon).  They argued that the Endangered Species Act unambiguously requires Fish & Wildlife to use the incremental effects approach when designating critical habitat.  See Tr. at 60:17-64:20 (Shannon).  The Environmental Intervenors indicated that the Ninth Circuit in Arizona Cattle Growers' Ass'n, and a United States District Judge in Florida,[13] have concluded that Fish & Wildlife Services should consider only the designation's economic impacts.  See Tr. at 61:24-62:5 (Shannon).  The Environmental

---

[12]Based on the Court's independent research, the Court concludes that Fish & Wildlife refers to Jacob Byl, Accurate Economics to Protect Endangered Species and Their Critical Habitats, 35 Pace Envtl. L. Rev. 308 (2018).

[13]Based on the Court's independent research, the Court concludes that the Environmental Intervenors refer to Fisher v. Salazar, 656 F. Supp. at 1357.

Intervenors also noted that the Florida case directly supports their position, because it interpreted the Endangered Species Act as unambiguously requiring the use of the incremental effects approach.  See Tr. at 62:22-63:5 (Shannon).  The Environmental Intervenors asserted that Court should adhere to the canon of statutory interpretation that requires one "to look at the language of the act as a whole when interpreting specific sub-provisions."  Tr. at 61:5-7 (Shannon).  They insisted that Congress clearly intended the Endangered Species Act's language to require Fish & Wildlife to consider only economic impacts that would not occur "but for" designating critical habitat, because: (i) under 16 U.S.C. § 1533(a)(1), Fish & Wildlife must ignore costs when listing a species as threatened or endangered; (ii) § 1533(b)(2) requires Fish & Wildlife to consider "'the economic impact . . . [of] specifying any particular area as critical habitat'"; and (iii) it would be illogical for Fish & Wildlife to consider economic impacts that exist regardless of critical habitat designation, because § 1533(b)(2) also expresses that "'[Fish & Wildlife] may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat.'"  Tr. at 63:14-64:20 (Shannon)(quoting 16 U.S.C. § 1533(b)(2))(alterations added).

The Environmental Intervenors argued that a 2008 memorandum by David Bernhardt -- then-Solicitor of the Department of the Interior and current Secretary of the Interior -- supports their argument, even though the memorandum was released before Fish & Wildlife codified the incremental effects approach on October 30, 2013.  See Tr. at 65:1-66:13 (Shannon)(citing Dept. of Interior, M-37106, The Secretary's Authority to Exclude Areas from a Critical Habitat Designation under Section 4(b)(2) of the Endangered Species Act (Oct. 3, 2008)("Solicitor's Memo")).  They indicated that the Solicitor's Memo is not in the official record, yet the regulations adopting the incremental effects approach cite it.  See Tr. at 66:16-67:1 (Shannon)(citing Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,063).  The Environmental Intervenors asserted that the Solicitor's Memo guided Fish & Wildlife on which methodology to use in N.M. Cattle Growers Ass'n's wake and effectively became the later-codified regulations. See Tr. at 65:12-14 (Shannon); id. at 67:4-9 (Shannon).  They indicated that the Solicitor's Memo concluded that, following N.M. Cattle Growers Ass'n, Fish & Wildlife should use the incremental effects approach throughout the nation, because it is based on the Endangered Species Act's plain

language and Fish & Wildlife's duties under the Endangered Species Act.  See Tr. at 66:10-13 (Shannon).

The Environmental Intervenors argued that N.M. Cattle Growers Ass'n is not controlling and that the District Court of Colorado -- the only United States District Court within the Tenth Circuit to review this issue after N.M. Cattle Growers Ass'n -- affirmed this position.  See Tr. at 67:14-69:19 (Shannon).  They asserted that N.M. Cattle Growers Ass'n does not bind the Court, because, as the Court stated in Montoya v. Sheldon, "'[g]enerally, while a district court must faithfully follow controlling Tenth Circuit precedent, there is an exception when the statute or rule on which the prior decision was based has been changed.'"  Tr. at 67:14-22 (Shannon)(quoting Montoya v. Sheldon, 286 F.R.D. at 612 n.5)(alteration added).  The Environmental Intervenors contended that Fish & Wildlife, after the Tenth Circuit in N.M. Cattle Growers Ass'n struck down the non-codified cost-analysis approach, subsequently amended that approach and codified the current incremental effects approach.  See Tr. at 69:1-7 (Shannon).

The Environmental Intervenors also argued that N.M. Cattle Growers Ass'n is not controlling, because Fish & Wildlife are entitled to Chevron deference.  See Tr. at 69:7-19 (Shannon).  The Environmental Intervenors indicated that the Tenth Circuit stated in N.M. Cattle Growers Ass'n that it could not apply Chevron deference analysis, because, at that time, Fish & Wildlife had not formalized an impact-analysis standard through a Solicitor opinion or codified regulation.  See Tr. at 68:1-6 (Shannon).  They contended that, although there is contradictory caselaw questioning whether Solicitor opinions are entitled to Chevron deference, common law clearly commands that Chevron deference is proper when regulations are promulgated through the APA's standard procedure.  See Tr. at 68:9-16 (Shannon).  The Environmental Intervenors insisted that, after N.M. Cattle Growers Ass'n, Fish & Wildlife expressly recognized that it could codify a reasonable regulation such as the incremental effects approach, because the Tenth Circuit neither applied Chevron deference nor concluded that the Endangered Species Act is unambiguous.  See Tr. at 69:7-19 (Shannon)(citing Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,062-63).

The Environmental Intervenors reiterated that the Endangered Species Act's language requires Fish & Wildlife to use the incremental effects approach when designating critical habitat.  See Tr. at 69:22-71:7 (Shannon).  They argued that Fish & Wildlife will make arbitrary area-

exclusion decisions if it must consider economic impacts which occur "but for" critical habitat designation. See Tr. at 69:22-70:21 (Shannon). The Environmental Intervenors indicated that Fish & Wildlife designates critical habitat by first determining, using the best available science, which areas are essential to the survival and recovery of a listed species. See Tr. at 70:7-10 (Shannon). They asserted that Fish & Wildlife's subsequent exclusion decision would be arbitrary if Fish & Wildlife excluded areas essential to the conservation of a listed species based on costs not associated with designating critical habitat. See Tr. at 70:10-21 (Shannon). The Environmental Intervenors contended that such an exclusion decision would result in no economic benefit for regulated parties, and the listed species would lose critical habitat protections. See Tr at 70:18-21 (Shannon).

The Stockman's Associations responded by arguing that the Court should not evaluate whether the coextensive approach is appropriate based on the methodology's potential inconsistencies with the area-exclusion analysis. See Tr. at 71:18-72-6, 72:24-73:8. They indicated that the Endangered Species Act's § 4(b)(2) authorizes, but does not require, Fish & Wildlife to conduct a discretionary area-exclusion analysis. See Tr. at 71:21-72:2, 73:2-5 (Schiff). The Stockman's Associations asserted, consequently, that the coextensive approach's imperfect fit with the area-exclusion analysis, which Fish & Wildlife may or may not conduct, does not evidence that Fish & Wildlife's use of the coextensive methodology is inappropriate during the required critical habitat designation phase. See Tr. at 72:2-6, 73:5-8 (Schiff). They also argued that, even though Fish & Wildlife amended its regulatory definitions underlying the functional equivalence theory, N.M. Cattle Growers Ass'n is still controlling. See Tr. at 73:8-22 (Schiff). The Stockman's Associations contended that the incremental effects and negligible impacts approaches are not different fundamentally, because both methodologies account for economic impacts of designating critical habitat areas that are unoccupied by the listed species. See Tr. at 73:13-22 (Schiff).

The Stockman's Associations argued that, if Fish & Wildlife must use the coextensive approach in the Tenth Circuit only, then that would be "nothing new for [Fish & Wildlife] with respect to NEPA, National Environmental Policy Act, applied to critical habitat." Tr. at 73:23-74:4 (Schiff). They indicated that, following N.M. Cattle Growers Ass'n, Fish & Wildlife has been required to conduct NEPA analyses for critical habitat within only the Tenth Circuit. See Tr.

at 74:4-8 (Schiff).  The Stockman's Associations insisted that Fish & Wildlife has been able to satisfy its NEPA obligations under Tenth Circuit caselaw when designating critical habitat that the Tenth Circuit and other Courts of Appeals cover.  See Tr. at 74:8-14 (Schiff).  They maintained, consequently, that Fish & Wildlife exaggerated the significance of this administrative concern. See Tr. at 74:20-22 (Schiff).

The Stockman's Associations argued that Judge Stafford's holding in Fisher v. Salazar -- that the Endangered Species Act unambiguously requires the use of the incremental effects approach -- cannot be reconciled with N.M. Cattle Growers Ass'n.  See Tr. at 74:23-75:17 (Schiff). They contended that, in N.M. Cattle Growers Ass'n, the Tenth Circuit ruled either that the Endangered Species Act requires the use of the coextensive approach or, as Fish & Wildlife argues, that the Endangered Species Act's language is ambiguous, and that Fish & Wildlife may apply lawfully the coextensive or incremental effects approach as circumstances change.  See Tr. at 75:8-14 (Schiff).  The Stockman's Associations asserted that the Tenth Circuit's holding in N.M. Cattle Growers Ass'n and Judge Stafford's holding in Fisher v. Salazar cannot be unified.  See Tr. at 75:14-17 (Schiff).  Fish & Wildlife agreed, arguing that the Endangered Species Act does not require the use of any particular methodology.  See Tr. at 75:18-76:13 (Flanagan).

Fish & Wildlife argued that the clearest interpretation of N.M. Cattle Growers Ass'n is that the Endangered Species Act is ambiguous and that the Tenth Circuit held that the coextensive approach may be appropriate under certain circumstances.  See Tr. at 76:3-9 (Flanagan).  It said that it would take the same position if this case occurred outside of the Tenth Circuit.  See Tr. at 76:14-20 (Flanagan).  Fish & Wildlife asserted that the Endangered Species Act affords it the flexibility and discretion to use the most suitable impact-analysis methodology for a particular critical habitat designation.  See Tr. at 76:20-77:5 (Flanagan).  It contended that the Endangered Species Act does not preclude Fish & Wildlife from using any particular impact-analysis methodology, and it may use any reasonable methodology, not only the incremental effects and coextensive approaches.  See Tr. at 77:6-17 (Flanagan).  The Stockman's Associations argued that, even if the Court decides that the Endangered Species Act is ambiguous, Fish & Wildlife is not entitled to Chevron deference, because the incremental effects approach is not a reasonable interpretation of the Endangered Species Act.  See Tr. at 78:14-20 (Schiff).

       c.       **Arguments Regarding Fish & Wildlife's Decision Not to Exclude Units 3 and 4 from the Designation.**

The Stockman's Associations argued that Fish & Wildlife's area-exclusion decision is arbitrary and capricious. See Tr. at 80:3-81:11 (Schiff). The Stockman's Associations contended that Fish & Wildlife's conclusion -- that there are "no disproportionate costs" -- is an insufficiently reasoned explanation for its exclusion decision, and unsupported by the administrative record. Tr. at 80:12-20 (Schiff). They asserted that Fish & Wildlife has provided no analysis whether: (i) costs are disproportionate or not to benefits; (ii) costs for excluding particular units from the designation are disproportionate or not to costs for excluding the designation's other units; or (iii) costs for excluding units from the designation are disproportionate or not to costs for excluding units from other critical habitat designations. See Tr. at 80:21-81:2 (Schiff). The Stockman's Associations insisted that Fish & Wildlife likely determined that a sufficiently reasoned explanation was unnecessary, because the exclusion decision was issued before the Supreme Court decided Weyerhaeuser and, therefore, the exclusion decision could not be reviewed judicially. See Tr. at 81:3-11 (Schiff).

Fish & Wildlife argued that its explanation is "more than adequate" under Weyerhaeuser to support its exclusion decision. Tr. at 82:20-23 (Flanagan). See Weyerhaeuser, 139 S. Ct. at 371. It said that it had concluded that there are no disproportionate costs based on a thorough decision-making process. See Tr. at 83:11-84:2 (Flanagan). Fish & Wildlife noted that it issued two economic memoranda to support the costs and benefits for including versus excluding designated areas of critical habitat, which the final rule discussed extensively. See Tr. at 83:14-20 (Flanagan). It also indicated that it reviewed the cost-benefit analysis throughout the record before ultimately deciding that there are no disproportionate costs. See Tr. at 83:21-84:2 (Flanagan).

Fish & Wildlife responded to the assertion that Fish & Wildlife's exclusion decision is arbitrary and capricious, because, while the exclusion analysis must assess only quantitative costs and benefits, Fish & Wildlife considered only qualitative benefits. See Tr. at 84:3-12 (Flanagan). It asserted that its regulations permit Fish & Wildlife to assess qualitative and quantitative impacts. See Tr. at 84:13-16 (Flanagan)(citing 50 C.F.R. § 424.19(b)). Fish & Wildlife insisted that analyzing qualitative impacts is common among agency decision making, because some benefits cannot be assigned quantitative value, and it said it has a lot of discretion to acknowledge and assign weight to different impacts of potentially excluding designated areas of critical habitat. See

Tr. at 84:17-85:8 (Flanagan).  It noted that the Ninth Circuit concluded in Building Industry Association of the Bay Area v. United States Department of Commerce, 792 F.3d 1027, 1033 (9th Cir. 2015) that "there is no rule as to how the Service must weigh various types of benefits."  Tr. at 85:9-14 (Flanagan).  Fish & Wildlife contended that the Ninth Circuit's conclusion would unlikely be different at the time of the hearing, even though the Ninth Circuit decided Building Industry Association of the Bay Area v. United States Department of Commerce before the Supreme Court decided Weyerhaeuser, because neither Weyerhaeuser nor the Endangered Species Act require Fish & Wildlife to value economic impacts more than environmental benefits.  See Tr. at 85:16-86:10 (Flanagan).

Fish & Wildlife argued that, in its area-exclusion analysis, it properly assessed and valued qualitative environmental benefits, because the Supreme Court determined in Tenn. Valley Auth. that Congress enacted the Endangered Species Act to afford endangered species the highest priority.  See Tr. at 86:10-14 (Flanagan).  It contended that it appropriately considered whether including versus excluding areas of the designation would result in greater environmental and conservation benefits for the Jumping Mouse.  See Tr. at 86:14-21 (Flanagan)(citing Jumping Mouse Designation, 81 Fed. Reg. at 14,307).  Fish & Wildlife insisted that assessing qualitative impacts where quantification is not possible is consistent with it's the Endangered Species Act's § 4(b)(2), policy, and the OMB's guidelines.  See Tr. at 87:1-9 (Flanagan).  It asserted that the Endangered Species Act and its regulations do not prohibit Fish & Wildlife from considering and discretionarily assigning weight to quantifiable and qualitative impacts on a case-by-case basis. See Tr. at 86:21-25 (Flanagan); Tr. at 87:9-15 (Flanagan).

Fish & Wildlife argued that Weyerhaeuser does not require Fish & Wildlife to alter its exclusion decision-making process.  See Tr. at 87:21-89:11 (Flanagan).  It contended that Weyerhaeuser primarily affected exclusion decisions by making them reviewable judicially.  See Tr. at 87:24-88:1 (Flanagan).  Fish & Wildlife asserted, as a result, that the final exclusion decision here would not change, although it may draft more detailed explanations for future decisions.  See Tr. at 88:1-7 (Flanagan).  It also argued that the Supreme Court acknowledged in Weyerhaeuser that, in the Endangered Species Act's § 4(b)(2), the "word 'may' leaves a lot of discretion to the Service."  Tr. at 88:17-21 (Flanagan).  See 16 U.S.C. § 1533(b)(2).

Fish & Wildlife argued that the Supreme Court's conclusion in <u>Weyerhaeuser</u> -- that Fish & Wildlife has much discretion to decide whether to exclude areas from critical habitat -- is consistent with the Endangered Species Act.  <u>See</u> Tr. at 88:17-89:11 (Flanagan).  It asserted that the Endangered Species Act's § 4(b)(2) exclusion provision never requires Fish & Wildlife to exclude areas from critical habitat designation, even when Fish & Wildlife determines that exclusion's benefits outweigh benefits of inclusion.  <u>See</u> Tr. at 88:11-17 (Flanagan).  Fish & Wildlife also argued that, in <u>Weyerhaeuser</u>, the Supreme Court held that it "should not substitute its judgement in place of the Service," and the Court should uphold Fish & Wildlife's exclusion decision, "as long as the Service has considered relevant factors and has not made a clear error of judgment."  Tr. at 88:22-89:1 (Flanagan).  It noted that <u>Weyerhaeuser</u> and the Endangered Species Act's § 4(b)(2) indicate that the relevant factors which Fish & Wildlife must consider are: (i) economic impacts; (ii) impacts on national security; and (iii) other relevant factors.  <u>See</u> Tr. at 89:2-7 (Flanagan).  Fish & Wildlife insisted that it properly considered the qualitative environmental benefits, because other relevant factors should be considered, and there is no law precluding such impacts from being assessed.  <u>See</u> Tr. at 89:7-11 (Flanagan).

Fish & Wildlife argued that, after <u>N.M. Cattle Growers Ass'n</u>, Fish & Wildlife voluntarily remanded cases outside the Tenth Circuit until the Ninth Circuit decided <u>Gifford Pinchot</u> in 2004.  <u>See</u> Tr. at 89:20-90:2 (Flanagan).  It asserted that, immediately following <u>Gifford Pinchot</u>, Fish & Wildlife decided that the incremental effects approach is the correct methodology for considering impacts of designating critical habitat.  <u>See</u> Tr. at 90:6-10 (Flanagan)(citing Solicitor's Memo).  Fish & Wildlife also argued that it used both the incremental effects and coextensive methodologies within the Tenth Circuit until Fish & Wildlife codified the incremental effects approach.  <u>See</u> Tr. at 90:10-13 (Flanagan).  It insisted that it expressed in the regulations that the Supreme Court's decision in <u>Brand X</u> authorizes Fish & Wildlife to adopt the incremental effects approach, because the Endangered Species Act is ambiguous.  <u>See</u> Tr. at 90:13-17 (Flanagan).

Fish & Wildlife argued that it may, on a case-by-case basis, use the coextensive approach to consider impacts of designating critical habitat.  <u>See</u> Tr. at 90:18-22 (Flanagan).  It contended, however, that it is not required to use the coextensive approach, and that the methodology is not always relevant to Fish & Wildlife's impact analysis during the critical habitat designation phase. <u>See</u> Tr. at 90:22-91:1 (Flanagan).  Fish & Wildlife also argued that, in <u>Ariz. Cattle Growers' Ass'n</u>,

the Ninth Circuit articulated that species listing decisions are independent from, and precedential to designating critical habitat.  See Tr. at 91:5-8 (Flanagan).  It indicated that the Ninth Circuit concluded that listing decision-making may occur before or concurrently with designating critical habitat, but, as a legal matter, the species must be listed before the critical habitat rule is finalized. See Tr. at 91:8-12 (Flanagan).

Fish & Wildlife responded to the assertion that, because the listing's and the designation's impacts combine to harm to members of the Stockman's Associations, Fish & Wildlife must consider all impacts using the coextensive approach.  See Tr. at 91:12-18 (Flanagan).  It argued that this situation is unlike a tort action where two separately caused fires converge to incinerate a house. See Tr. at 91:19-23 (Flanagan).  Fish & Wildlife insisted that listing and designation rulings are independent decisions and are made at different times.  See Tr. at 91:23-92:1 (Flanagan).  It asserted, consequently, that concurrently considering impacts of listing a species and designating critical habitat during the designation phase is irrational.  See Tr. at 92:1-4 (Flanagan).

Fish & Wildlife argued that it justifiably did not consider hypothetical costs of the designation allegedly infringing upon the water rights of members of the Stockman's Associations. See Tr. at 92:11-94:2 (Flanagan).  It asserted that the taking of water rights costs were speculative, because, as the Stockman's Associations concede, no information regarding how many members might have had water rights taken nor the value of such costs was available publicly or in the administrative record.  See Tr. at 92:11-17 (Flanagan). It insisted that, when it considered the designation's impacts, whether any water rights takings would occur was unclear, making the cost of potential takings speculative.  See Tr. at 92:17-20 (Flanagan).  Fish & Wildlife also argued that the Stockman's Associations did not respond to the assertion that water rights must be established before takings can occur, and one must evidence water rights by demonstrating that he or she has maintained beneficial use of the water before the federal land became United States property.  See Tr. at 92:21-93:3 (Flanagan).

Fish & Wildlife argued that legal authorities contradict the assertion that Fish & Wildlife must consider speculative costs.  See Tr. at 93:5-94:2 (Flanagan).  It indicates that the Tenth Circuit decided in Wyoming v. United States Department of Agriculture, 661 F.3d 1209 (10th Cir. 2011), that Fish & Wildlife was not obligated to consider speculative and hypothetical costs in its NEPA analysis.  See Tr. at 93:8-14 (Flanagan).  Fish & Wildlife noted that the Stockman's Associations

cite to a statement in Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,061, which indicates that Fish & Wildlife's consideration of impacts is not based on "specific numeric likelihood." Tr. at 93:15-19 (Flanagan). It asserted that the sentence immediately preceding the regulatory statement says that Fish & Wildlife "should not consider improbable or speculative impacts." Tr. at 94:19-23 (Flanagan)(citing in Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,061). Fish & Wildlife insisted that it should consider other relevant impacts, but that it would be overly burdened if it also must "give a detailed explanation of why every irrelevant impact is irrelevant." Tr. at 93:23-94:2 (Flanagan).

Fish & Wildlife also responded to the argument by the Stockman's Associations that, if Fish & Wildlife could not quantify costs of water rights takings, then it should have considered such impacts qualitatively. See Tr. at 94:3-14 (Flanagan). It said that it considers impacts on grazers, including the burdens of limiting access to water. See Tr. at 94:7-10 (Flanagan). Fish & Wildlife contended that, even though it did not consider explicitly hypothetical takings of water rights, its decision could only result in harmless error, and "the APA does not allow reversal for nonprejudicial errors." Tr. at 94:10-14 (Flanagan). It insisted that the Court should not decide that Fish & Wildlife must approach decision-making in a manner which the Endangered Species Act and its regulations do not mandate. See Tr. at 94:15-19 (Flanagan). Fish & Wildlife also argued that its exclusion decision does not violate the APA, because, the administrative record contains a sufficiently reasoned explanation supporting the exclusion decision. See Tr. at 109:18-110:7 (Flanagan). It noted that the Supreme Court concluded that, under the APA, an agency must express its exclusion decision in the decision document, yet courts may search the entire administrate record to discern whether an exclusion decision is rational, and whether the agency considered all relevant factors. See Tr. at 109:21-110:7 (Flanagan)(citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281 (1974)).

The Environmental Intervenors said that the Supreme Court has not considered whether Fish & Wildlife lawfully may use the incremental effects approach to analyze impacts of designating critical habitat. See Tr. at 95:14-18 (Shannon). They noted, however, that, even though Fish & Wildlife did not appeal the N.M. Cattle Growers Ass'n decision to the Supreme Court, the Ariz. Cattle Growers Ass'n plaintiffs sought Supreme Court review, but the Supreme Court denied a petition for a writ of certiorari. See Tr. at 95:18-23 (Shannon)(citing Petition for

Writ of Certiorari, <u>Ariz. Cattle Growers' Ass'n</u>, 516 U.S. 1216 (No. 10-454)).  The Environmental Intervenors also reaffirmed Fish & Wildlife's argument that <u>Weyerhaeuser</u>'s holding only affects exclusion decisions by making them reviewable judicially.  <u>See</u> Tr. at 95:23-96:6 (Shannon).  They contended that, before <u>Weyerhaeuser</u>, courts determined that exclusion decisions were not eligible for judicial review, because the courts recognized and deferred to Fish & Wildlife's discretion to make such decisions.  <u>See</u> Tr. at 96:7-9 (Shannon).  The Environmental Intervenors indicated that the Supreme Court acknowledged in <u>Weyerhaeuser</u> that the word "may" in the Endangered Species Act's § 4(b)(2) "certainly confers discretion on" Fish & Wildlife."  Tr. at 96:9-12 (Shannon).  They noted, however, that the Supreme Court ruled that courts may review exclusion decisions to determine whether Fish & Wildlife considered relevant factors, and whether the agency made a clear error of judgment.  <u>See</u> Tr. at 96:12-16 (Shannon)(citing <u>Weyerhaeuser</u>, 139 S. Ct. at 371).

The Environmental Intervenors argued that, after <u>Weyerhaeuser</u>, courts may review exclusion decisions for abuse of discretion only.  <u>See</u> Tr. at 96:17-21 (Shannon).  They insisted that, as an expert agency, Fish & Wildlife has significant discretion to consider and balance the "technical, detailed, and scientific" impacts when deciding whether to exclude designated areas of critical habitat.  Tr. at 96:21-97:2 (Shannon).  The Environmental Intervenors asserted that the administrative record adequately supports Fish & Wildlife's exclusion decision.  <u>See</u> Tr. at 97:3-6 (Shannon).  They contended that the record evidences that Fish & Wildlife weighed economic impacts against environmental benefits of potentially excluding land as small as subunits -- the designation's smallest areas.  <u>See</u> Tr. at 97:6-10 (Shannon).

The Environmental Intervenors argued that 50 C.F.R. § 424.19 affords Fish & Wildlife discretion to decide how best to balance impacts of potentially excluding areas from a critical habitat designation.  <u>See</u> Tr. at 97:11-15 (Shannon).  They indicated that the Jumping Mouse's designation is relatively small, because Jumping Mouse populations and the Jumping Mouse's critical habitat are localized highly compared to those of other species.  <u>See</u> Tr. at 97:16-20 (Shannon).  The Environmental Intervenors insisted that, relative to larger critical habitat designations, Fish & Wildlife conducted a specific analysis down to the subunit level of a comparatively small designation.  <u>See</u> Tr. at 97:18-21 (Shannon).  They also argued that Fish & Wildlife concluded that the subunits on which members of the Stockman's Associations hold grazing allotments provide beneficial protections for Jumping Mouse.  <u>See</u> Tr. at 97:23-98:1

(Shannon).  The Environmental Intervenors insisted that such subunit protections safeguard critical habitat of the Jumping Mouse from impacts of "severe wildland fires, recreation, grazing, floods, the reduction and distribution of beaver ponds, [] and highway construction."   Tr. at 98:1-4 (Shannon).  They also asserted that these subunits connect areas that the Jumping Mouse occupies, and the subunit critical habitat is important for the Jumping Mouse's recolonization.  See Tr. at 98:4-8 (Shannon)(citing Jumping Mouse Designation, 81 Fed. Reg. at 14,301-02).

The Environmental Intervenors argued that Fish & Wildlife considered the impacts of potentially excluding areas in response to the comments that the Stockman's Associations and other parties submitted.  See Tr. at 98:9-12 (Shannon)(citing Jumping Mouse Designation, 81 Fed. Reg. at 14,285-91).  They said that Fish & Wildlife provided an explanation for its decisions not to exclude subunit 3E -- the only subunit to which the commenters objected.  See Tr. at 98:12-18 (Shannon).   The Environmental Intervenors noted that Fish & Wildlife also considered the incremental costs of grazing on all subunits that the Stockman's Associations challenge.  See Tr. at 98:19-91:1 (Shannon)(citing Screening Memo at 11-12).  They insisted that Fish & Wildlife considered the relevant economic impacts and environmental benefits before exercising its discretion not to exclude any subunit at issue. See Tr. 99:1-7 (Shannon).   The Environmental Intervenors asserted that, although Fish & Wildlife's impact analysis in the administrative record may not be "crystal clear," the analysis demonstrates sufficiently that Fish & Wildlife's exclusion decision is not an abuse of discretion.  Tr. at 99:8-16 (Shannon).

The Environmental Intervenors responded to the argument that the Tenth Circuit's decision in Forest Guardians v. United States Forest Service -- an en banc and per curium opinion -- evidences that Fish & Wildlife must state its exclusion decisions in the administrative record.  See Tr. at 99:17-100:21 (Shannon).  First, they insisted that Fish & Wildlife implicitly satisfied this requirement by documenting its impact analysis. See Tr. at 99:21-100:2 (Shannon)(citing Jumping Mouse Designation, 81 Fed. Reg. at 14,287).  Second, the Environmental Intervenors asserted that, in Forest Guardians v. United States Forest Service, the Tenth Circuit reviewed the Forest Service's entire administrative record and not just the final decision in the record to determine that the agency used the best scientific standard to analyze timber sales.  See Tr. at 100:2-10 (Shannon).

The Environmental Intervenors argued that the Endangered Species Act's plain language and Fish & Wildlife's regulations justify Fish & Wildlife's examination of the environmental

benefits of potentially excluding areas from the designation.  See Tr. at 100:22-101:18 (Shannon).

They asserted that economic benefits are only "a" benefit which Fish & Wildlife may consider

when deciding whether to exclude areas from critical habitat.  Tr. at 100:24-101:1 (Shannon).  The

Environmental Intervenors contended that the Endangered Species Act requires Fish & Wildlife

to list species and designate critical habitat for the primary purpose of promoting species' survival

and recovery.  See Tr. at 101:4-8 (Shannon).  They said that, if Fish & Wildlife decides to exclude

a designated area of critical habitat, then Fish & Wildlife must conclude, based on the best

available science, that the area's exclusion will not result in the extinction of the species.  See Tr.

at 101:9-16 (Shannon).  The Environmental Intervenors insisted that, under the Endangered

Species Act, ecological benefits and species survival are to are the most important consideration

for Fish & Wildlife.  See Tr. at 101:2-4 (Shannon); id. at 101:16-18 (Shannon).  They argued that

the designation's ecological benefits are important, because, in light of the Jumping Mouse's

relatively small and specialized critical habitat, such benefits are essential for the Jumping Mouse's

conservation.  See Tr. at 102:6-15 (Shannon).

The Stockman's Associations clarified that they do not challenge Fish & Wildlife's

authority to consider qualified impacts of potentially excluding areas from critical habitat

designation.  See Tr. at 103:6-10 (Schiff).  They contended that balancing qualitative and

quantitative impacts, however, is more difficult than comparing impacts of the same metric.  See

Tr. at 103:10-16 (Schiff).  The Stockman's Associations asserted that the Environmental

Intervenors did not identify any qualified benefits in the administrative record.  See Tr. at 103:16-

23 (Schiff).  The Stockman's Associations also asserted that Fish & Wildlife provided a "thin"

explanation for its exclusion decision, which is likely the result of Fish & Wildlife finalizing the

decision before the Supreme Court decided Weyerhaeuser.  Tr. at 103:23-104:1 (Schiff).  The

Stockman's Associations additionally argued that, even if Fish & Wildlife engaged in reasoned

decision-making when it considered whether to exclude areas from the designation, Fish &

Wildlife's failure to provide publicly such reasoning violates the APA.  See Tr. at 104:2-8 (Schiff).

The Stockman's Associations argued that the Court should not weigh heavily Tenn. Valley

Auth. when interpreting the Endangered Species Act's exclusion provision.  See Tr. at 94:9-19

(Schiff). They asserted that Congress amended the Endangered Species Act to include the

exclusion mandate in response to Tenn. Valley Auth., in which the Supreme Court interpreted the

Endangered Species Act as being indifferent to economic impacts. <u>See</u> Tr. at 104:13-16 (Schiff).

The Stockman's Associations contended that the Court should not interpret the exclusion provision

of the Endangered Species Act as authorizing Fish & Wildlife to make exclusion decisions without

assigning adequate weight to economic impacts. <u>See</u> Tr. at 104:16-19 (Schiff). They also argued

that the costs associated with the taking of waters rights may or may not be speculative, but Fish

& Wildlife indicated in the record that such costs were not considered, because the designation did

not infringe upon water rights on privately owned land. <u>See</u> Tr. at 104:20-105:1 (Schiff). The

Stockman's Associations noted, however, that Fish & Wildlife does not dispute that takings of

water rights can occur on non-privately owned land. <u>See</u> Tr. at 105:1-4 (Schiff).

The Environmental Intervenors responded to the assertion that Fish & Wildlife failed to

qualify the ecological benefits of potentially excluding areas from the designation. <u>See</u> Tr. at

113:5-114:9 (Shannon). They contended that, when Fish & Wildlife evaluated impacts of

excluding the subunits that the Stockman's Associations challenge, Fish & Wildlife concluded that

> [a]ll of these areas, whether they're within partially occupied or completely unoccupied units, are essential to the conservation of the jumping mouse, because the areas [] occupied by the mouses since 2005 do not contain enough suitable connected habitat to support resilient populations of jumping mouse to the currently unoccupied segments within the individual stream reaches[] or waterways, need to be of sufficient size to allow for the expansion of populations and provide connectivity between multiple populations, as they become established. Three, additional areas need habitat protection to allow restoration of necessary herbaceous vegetation for possible future reintroductions. And four, multiple local populations along streams are important to maintain genetic diversity within the populations and for providing sources of recolonization if local populations are extirpated.

Tr. at 113:12-114:5 (Shannon)(quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,300). The

Environmental Intervenors asserted that Fish & Wildlife's conclusion demonstrates that it

qualified ecological impact before deciding not to exclude the subunits at issue here. <u>See</u> Tr. at

114:5-7 (Shannon). They argued that Fish & Wildlife exercised proper discretion when deciding

that ecological benefits outweighed economic impacts. <u>See</u> Tr. at 114:7-9 (Shannon).

**d.**   **<u>Arguments Regarding the Remedy</u>.**

Fish & Wildlife argued that, if the Court rules in favor of the Stockman's Associations,

then the Court should not vacate the designation. <u>See</u> Tr. at 106:19-110:10 (Flanagan). It

contended that vacatur is an equitable remedy which the Court has the authority to order and that

the equities do not favor vacatur. <u>See</u> Tr. at 106:20-24 (Flanagan). Fish & Wildlife insisted that

the administrative record evidences that vacatur of the designation would significantly impact the

Jumping Mouse's conservation, because: (i) the Jumping Mouse is dependent on very specialized critical habitat, and local Jumping Mouse populations are rapidly extirpated when such habitat is not protected; (ii) when Fish & Wildlife finalized the designation, it found that the Jumping Mouse occupies only twenty-nine locations, and Jumping Mouse populations were compromised in eighteen of those locations; and (iii) one bad season without critical habitat protections can result in devastating and irreversible consequences to the Jumping Mouse's survival and recovery.  See Tr. at 106:24-107:21 (Flanagan).  It asserted that the equities heavily favor not vacating the designation should the Court remand to Fish & Wildlife, because, as the "Court has recognized in adopting the basic principles used by the D.C. Circuit, when the consequences of vacating can be quite disruptive, the equity point[s] to remanding the agency without vacatur."[14]  Tr. at 107:22-108:2 (Flanagan).

Fish & Wildlife argued, alternatively, that, should the Court decide that vacatur is the appropriate remedy, then the Court should limit vacatur to the designation's units 3 and 4, which purportedly impact members of the Stockman's Associations.  See Tr. at 108:2-109:17 (Flanagan).  It said, however, that, if the Court determines that Northern NM Stockman's Association does not have standing, then the Court should not consider vacating unit 3.  See Tr. at 108 at 5-7 (Flanagan).  Fish & Wildlife noted that the Stockman's Associations allege that "there is nothing constitutional[ly] suspect with the possibility of being given more relief than necessary."  Tr. at 108:9-11 (Flanagan).  It argued that, in Califano v. Yamasaki, 442 U.S. 682 (1979), the Supreme Court concluded: "'Equitable relief must be tailored to the parties before the Court and should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'"  Tr. at 108:11-18 (Flanagan)(quoting Califano v. Yamasaki, 442 U.S. at 702).  Fish & Wildlife insisted that the Stockman's Associations do not object to units of the designation outside of Otero County.  See Tr. at 108:19-24 (Flanagan).  It also argued that multiple court decisions support Fish & Wildlife's requested remedy.  See Tr. at 108:25-109:19 (Flanagan).  It said, for example, that, in Otay Mesa Prop., L.P. v. United States Department of Interior, 646 F.3d 914 (D.C. Cir. 2011), an opinion that Honorable Brett Kavanaugh, then-United States Circuit Judge for the D.C. Circuit authored, the D.C. Circuit "vacated the critical habitat rule just as to the property that was held by

---

[14]Based on the Court's independent research, the Court concludes that Fish & Wildlife refers to N.M. Health Connections, 340 F. Supp. 3d at 1177 (citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 151 (D.C. Cir. 1993)).

the plaintiff after finding that the critical habitat designation was based on a faulty premise." Tr. at 109:3-12 (Flanagan).

The Environmental Intervenors argued that vacatur is an inappropriate remedy should the Court remand to Fish & Wildlife. See Tr. at 111:9-113:4 (Shannon). They contended that the Court should evaluate whether equitable vacatur is appropriate by considering "the seriousness of the alleged deficiencies in the legislation or the extent of doubt whether the agency chose correctly, as well as the disruptive consequences and change that may itself be changed." Tr. at 111:14-19 (Shannon)(citing Coal. of Ariz./N.M. Ctys., 2009 WL 8691098 at *3). The Environmental Intervenors asserted that Fish & Wildlife conducted a sufficient impact analysis, and that any potential flaws in Fish & Wildlife's analysis are minor. See Tr. at 111:23-112:2 (Shannon). They also contended that, even if the Court finds flaws in the impact analysis, the additional analysis which Fish & Wildlife must then conduct may be small and unrelated to the entire designation. See Tr. at 112:2-9 (Shannon). The Environmental Intervenors insisted that vacatur would result in destructive consequences for Jumping Mouse before Fish & Wildlife could finalize a new designation. See Tr. at 112:10-14 (Shannon). They noted that vacatur would have dire consequences for the Jumping Mouse's survival and conservation, because: (i) Jumping Mouse populations have decreased by seventy percent since the 1980s; (ii) eleven of the twenty-nine existing Jumping Mouse populations have been compromised, and the remaining eighteen populations may have been extirpated; and (iii) when Fish & Wildlife finalized the designation in 2016, it concluded that the Jumping Mouse would likely be extinct in the next decade. See Tr. at 112:14-113:4 (Flanagan)(citing Jumping Mouse Status Report at 4).

The Stockman's Associations argued that, if the Court remands to Fish & Wildlife, then vacatur is the appropriate remedy. See Tr. at 105:11-17, 114:21-115:10 (Schiff). They noted that the Tenth Circuit decided in N.M. Cattle Growers Ass'n that the correct remedy for Fish & Wildlife's flawed economic impact analysis was vacatur of the critical habitat designation. See Tr. at 105:11-14 (Schiff). The Stockman's Associations insisted that N.M. Cattle Growers Ass'n should guide the Court's decision on whether to vacate the designation. See Tr. at 105:114-117 (Schiff). They also asserted that, although there may be an equitable defense against vacatur, non-equitable vacatur is the default remedy for agency decisions that violate the APA. See Tr.

at 115:3-10 (Schiff).  The parties said that they would submit additional briefing on remedy.  See

Tr. at 110:17-111:9 (Court, Shannon); id. at 114:21-25 (Schiff).

      **6.**     **The Plaintiffs' Remedy Brief.**

     The Stockman's Associations argue that the Court should vacate the designation if it grants

their Petition for Review.  See P. Remedy Brief at 5.  They indicate that vacatur of unlawful or

arbitrary agency decisions is the default remedy under the Endangered Species Act and under the

APA.  See P. Remedy Brief at 5.  The Stockman's Associations insist that the Court should not

deviate from that default remedy, because the designation causes significant economic harm to

their members, and the listing's protections will mitigate adverse effects to the Jumping Mouse.

See P. Remedy Brief at 5.

     The Stockman's Associations argue that, "'[b]ecause [the Endangered Species Act]

contains no internal standard for review,'" the APA governs violations of the Endangered Species

Act.  P. Remedy Brief at 5-6 (quoting Vill. of False Pass v. Clark, 733 F.2d 605, 609-10 (9th Cir

1984), and citing 5 U.S.C. § 706; Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1252 (10th

Cir. 1998); Wyo. Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1231 (10th Cir. 2000))(alterations

added).  They note that the APA mandates that "'[t]he reviewing court *shall* . . . hold unlawful and

set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law.'"  P. Remedy Brief at 6 (quoting 5. U.S.C.

§ 706(2)(A))(alterations added). The Stockman's Associations insist that, "'[t]ypically, when an

agency violates the Administrative Procedure Act and the Endangered Species Act,' a court will

'vacate the agency's action and remand to the agency to act in compliance with its statutory

obligations.'"  P. Remedy Brief at 6 (quoting Defs. of Wildlife v. EPA, 420 F.3d 946, 978 (9th

Cir. 2005), rev'd on other grounds, sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife,

551 U.S. 644 (2007).

     The Stockman's Associations argue that vacatur as the default remedy is consistent with

the APA and the Endangered Species Act, because legislation can strip equitable powers from

courts.  See P. Remedy Brief at 6 (citing Tenn. Valley Auth., 437 U.S. at 194).  They assert that

Congress sought to supersede courts' power to tailor equitable remedies for APA violations by

specifically crafting the language in 5 U.S.C. § 706(2)(A), which states that a court "'*shall* . . .

hold unlawful and set aside' unlawful and arbitrary agency action."  P. Remedy Brief at 6

(alteration in P. Remedy)(emphasis added by P. Remedy)(citing Brian S. Prestes, Remanding

Without Vacating Agency Action, 32 Seton Hall L. Rev. 108, 145–46 (2001)).  The Stockman's Associations argue that the Endangered Species Act's citizen action provision, see 16 U.S.C. § 1540(g)(5), permits relief to be sought under other statutes, including U.S.C. § 706(2)(A), and, reading together the two statutes, "vacatur is the default remedy for violating the [Endangered Species Act]."  P. Remedy Brief at 6 n.1 (citing Defs. of Wildlife, 420 F.3d at 978).  They argue that the Endangered Species Act's § 4(b)(2) "'imposes a categorical requirement that [Fish & Wildlife] tak[e] into consideration economic and other impacts *before* [designating critical habitat]'"; thus, vacatur is the default remedy, because Fish & Wildlife cannot properly designate critical habitat after improperly considering impacts. P. Remedy Brief at 7 (quoting Weyerhaeuser, 139 S. Ct. at 371, and citing N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., No. CIV 02-0199 JB/LCS, 2004 WL 6409640 at *5 (D.N.M. Aug. 31, 2004)(Browning, J.))(first and third alteration added, and second alteration in P. Remedy)(emphasis in P. Remedy Brief).   The Stockman's Associations also indicate that the Tenth Circuit vacated the critical habitat designation in N.M. Cattle Growers Ass'n after deciding that Fish & Wildlife unlawfully used the baseline approach to consider economic impacts.  See P. Remedy Brief at 8.  They argue that the Tenth Circuit's vacatur ruling also applies to Fish & Wildlife's exclusion decision, because the Endangered Species Act's exclusion-consideration provision is "part of a 'unified process for weighing the impact of designating an area as critical habitat,'" and Fish & Wildlife's exclusion decision is accompanied by a "'contemporaneous[ly] [crafted] explanation'" which was reasoned insufficiently and "'not sustainable on the administrative record made.'"  P. Remedy Brief at 8 (first quoting Weyerhaeuser, 139 S. Ct. at 371, then quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 549 (1978), and citing Jumping Mouse Designation, 81 Fed. Reg. at 14,263-325)(alterations added).

The Stockman's Associations also argue that "equities favor vacatur of [the designation]." P. Remedy Brief at 9.  They note that the Tenth Circuit has not always vacated agency decisions that violate the APA; yet, the Tenth Circuit has treated vacatur discretionarily and has not expressed factors for lower courts to discern when vacatur is appropriate.  See P. Remedy Brief at 9 (citing N.M. Health Connections, 340 F. Supp. 3d at 1175-77).  The Stockman's Associations assert that, as a result, Tenth Circuit district courts generally follow factors which other Courts of Appeals, principally the United States Court of Appeals for the District of Columbia, establish.

See P. Remedy Brief at 9 (citing N.M. Health Connections, 340 F. Supp. 3d at 1177).  They indicate that other Courts of Appeals' vacatur-consideration factors include "the seriousness of the deficiencies in the rulemaking[,] and the consequences of vacating the rule before remand."  P. Remedy Brief at 9 (citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993)("Allied-Signal").[15]  The Stockman's Associations assert, however, that courts "tend to [consider factors to determine whether vacatur is inappropriate] only 'where the agency's failure is a lack of explanation or reasoned decisionmaking.'"  P. Remedy Brief at 10 (quoting N.M. Health Connections, 340 F. Supp. 3d at 1177).  They also assert that, "[w]hen the agency's decision is unlawful for other reasons, a court likely has less discretion to remand without vacatur."  P. Remedy Brief at 10 (citing Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1290 (11th Cir. 2015)).

The Stockman's Associations argue that the designation should be vacated, because Fish & Wildlife's unlawful use of the incremental effects approach and failure to account for costs of takings of water rights amounts to "more than a failure to explain its decisionmaking.  P. Remedy Brief at 10.  They assert that Fish & Wildlife's improper economic analysis violates the substantive Endangered Species Act provision that requires Fish & Wildlife to consider economic impacts before designating critical habitat.  See P. Remedy at 10 (citing Weyerhaeuser, 139 S. Ct. at 371; N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 2004 WL 6409640 at *6).  The Stockman's Associations contend that vacatur is the proper remedy for agency decisions that violate substantive statutory provisions.  See P. Remedy Brief at 11 (citing N.M Cattle Growers Ass'n, 248 F.3d at 1285).

Finally, the Stockman's Associations argue that equities warrant vacatur of the designation for Fish & Wildlife's failure to provide a reasoned explanation for its exclusion decision.  See P. Remedy Brief at 10.  They assert that Fish & Wildlife's exclusion-decision analysis is "seriously deficient," because it is a brief, unreasoned explanation which "fail[s] to even [express] standards for when exclusion would be appropriate."  P. Remedy Brief at 10-11.  The Stockman's

---

[15]The Stockman's Associations assert that other Courts of Appeals' non-vacatur holdings are "not without controversy," that "'the Tenth Circuit has never adopted Allied-Signal and [that] the Tenth Circuit] in a 1999 decision followed a plain language interpretation of APA § 706.'"  P. Remedy at 9 n.2 (quoting Michael S. Freeman & Joel Minor, Selected Issues on Standing, Injunctions, and Remedies in Oil and Gas Litigation, 2017 No. 1 RMMLF-INST 9 at *27 (2017), and citing Checkosky v. SEC, 23 F.3d 452, 490 (D.C. Cir. 1994)(Randolph, J., concurring); Milk Train, Inc. v. Veneman, 310 F.3d 747, 758 (D.C. Cir. 2002)(Sentelle, J., dissenting))(alteration added).

Associations note that Fish & Wildlife arrived at its exclusion decision before the Supreme Court decided Weyerhaeuser.  See P. Remedy Brief at 10-11.  They indicate that, consequently, Fish & Wildlife issued a deficient exclusion analysis, because Fish & Wildlife believed its exclusion decision was not judicially reviewable at the time the decision was made.  See P. Remedy Brief at 10-11.  The Stockman's Associations argue that Fish & Wildlife's deficient exclusion analysis supports vacatur, because the deficiency is based "on an erroneous belief about what the [Endangered Species Act] required."  P. Remedy Brief at 11 (citing N.M. Health Connections, 340 F. Supp. 3d at 1179).

The Stockman's Associations further argue that equities warrant vacatur, because setting aside the designation would redress the "great[] harm[]" that members of the Stockman's Associations have suffered and "would have little effect on the protection of [the Jumping Mouse]."  P. Remedy Brief at 11-12.  They indicate that vacatur would alleviate harm that their members have suffered economically, including impacts of the diminution of value to base-property ranches of members and costs for additional Section 7 consultations.  See P. Remedy Brief at 11 (citing Reply at 6-7; 16 U.S.C. § 1536(b)(3)(A)).  The Stockman's Associations explain that Section 7 consultations indirectly harm members who hold grazing allotments in areas which overlap with the designation, especially in areas which the Jumping Mouse does not occupy.  See P. Remedy Brief at 11 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,299).  They insist that Section 7 consultations indirectly harm members of the Stockman's Associations, because "the increased time and uncertainty associated with the Section 7 process affects the [members'] ability to plan for future grazing seasons."  P. Remedy Brief at 11 (citing New Mexico State University: Range Improvement Task Force, Comments on Proposed Mouse Designation at D002309). The Stockman's Associations assert, additionally, that setting aside the designation "is unlikely to have any significant impact on [the Jumping Mouse's] continued existence."  P. Remedy Brief at 11.  They argue that Jumping Mouse populations will remain secure without the designation's protections, because: (i) the Jumping Mouse partially occupies or is absent from most areas designated as critical habit, see P. Remedy Brief at 11-12 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,296, 14,299); and (ii) the listing's Section 7 consultation protections will be triggered in areas where the Jumping Mouse is present "if any action is likely

to jeopardize the mouse's continued existence," P. Remedy Brief at 12 (citing 16 U.S.C. § 1536(a)(4)).

**7.      The Defendants' Remedy Brief.**

Fish & Wildlife argue that the Court should not vacate the designation if it remands to Fish & Wildlife to resolve issues with its decision-making.  See D. Remedy Brief at 2.  It also argues that, should the Court conclude vacatur is appropriate, "vacatur should be tailored to address alleged injuries [of members of the Stockman's Associations'] and not expose the Jumping Mouse to potentially irreparable harm in critical habitat units that do not affect the interests" of the Stockman's Associations or their members.  D. Remedy Brief at 2.  Fish & Wildlife first asserts that equitable principles oppose vacatur of the designation.  See D. Remedy Brief at 2.  It indicates that remedial vacatur is typical but not required for arbitrary, capricious, or unlawful agency decisions.  See D. Remedy Brief at 2 (citing WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d 1222, 1239 (10th Cir. 2017)).  Fish & Wildlife notes that "the Tenth Circuit considers vacatur to be a 'form of injunctive relief' . . . [and,] [l]ike other types of injunctive relief, vacatur is an equitable remedy and is 'discretionary.'"  D. Remedy Brief at 2 (first quoting WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d at 1239, then quoting Reno v. Catholic Soc. Servs., 509 U.S. 43, 57 (1993)).  It argues that the Tenth Circuit's stance on vacatur is consistent with the APA review standard under 5 U.S.C. § 706, which governs violations of the Endangered Species Act.  See D. Remedy Brief at 2 n.1.  Fish & Wildlife indicates that the APA does not "*compel* an injunction when agency action is held unlawful," because 16 U.S.C. § 1540(g)(5) "permit[s] other forms of relief for [Endangered Species Act] citizen suit claims," and, 5 U.S.C. § 703 expressly permits lawsuits for declaratory judgments, and legislative history "refer[s] to [the] possibility of suits for declaratory relief to 'determine the validity or application of a rule or order.'"  D. Remedy Brief at 2 n.1 (quoting H.R. Rep. No. 79-1980 at 42 (1946); and citing S. Rep. No. 79-752, at 26 (1945))(emphasis in D. Remedy Brief).

Fish & Wildlife argues that the Court should apply an equitable balancing test which courts outside of the Tenth Circuit use.  See D. Remedy Brief at 2.  It notes that the Tenth Circuit has not identified the factors which lower courts should follow determining whether vacatur is an appropriate remedy for unlawful agency actions.  See D. Remedy Brief at 2.  Fish & Wildlife indicates, however, that "several other Circuits and district courts within the Tenth Circuit have applied an equitable balancing test similar to the test which the D.C. Circuit used in Allied-Signal."

- 97 -

D. Remedy Brief at 2-3 (citing <u>Prometheus Radio Project v. FCC</u>, 824 F.3d 33, 52 (3d Cir. 2016);

<u>Nat'l Res. Def. Council v. EPA</u>, 808 F.3d 556, 584 (2d Cir. 2015); <u>Black Warrior Riverkeeper v.</u>

<u>U.S. Army Corps of Eng'rs</u>, 781 F.3d at 1290; <u>N.M. Health Connections</u>, 340 F. Supp. 3d at 1176-

77).  It notes that the <u>Allied-Signal</u> test's two prongs are: (i) "'the seriousness of the order's

deficiencies (and thus the extent of doubt whether the agency chose correctly)'"; and (ii) "'the

disruptive consequences of an interim change that may itself be changed.'"  D. Remedy Brief at 3

(quoting <u>Allied-Signal</u>, 988 F.2d at 150-51).  Fish & Wildlife insists that the designation should

not be vacated, because both prongs of the <u>Allied-Signal</u> test "strongly support[]" such a remedy.

D. Remedy Brief at 3.

Fish & Wildlife argues that vacating the designation would result in highly "'disruptive

consequences.'"  D. Remedy Brief at (quoting <u>Allied-Signal</u>, 988 F.2d at 150).  It asserts that,

should the Court vacate the designation, Jumping Mouse populations could suffer "irreversible

harm" by being unable to "recover to the point needed to avert extinction."  D. Remedy Brief at 3.

Fish & Wildlife indicates that the Jumping Mouse is "'highly vulnerable to extirpations when

habitat is lost or fragmented,' because its unique life history needs and exceptionally specialized

habitat requirements."  D. Remedy Brief at 3 (quoting Response at 9, and citing Jumping Mouse

Designation, 81 Fed. Reg. at 14,292).  It also notes that eighteen of the twenty-nine Jumping Mouse

populations identified since 2005 may have already been compromised.  <u>See</u> D. Remedy Brief at 4

(citing Jumping Mouse Designation, 81 Fed. Reg. at 14,274).  Fish & Wildlife indicates that, from

the time the listing was finalized to the writing of D. Remedy Brief, no Jumping Mouse population

was "'of sufficient size to be resilient' and 'all of the remaining locations [were] at considerable

risk of extirpation' in the near-term."  D. Remedy Brief at 4 (first quoting Endangered Status for

Jumping Mouse, 79 Fed. Reg. at 33,122, then quoting Jumping Mouse Status Report at 45, and

citing Declaration of Susan Millsap ¶¶ 4-5 at 3-4 (dated December 5, 2019), filed December 6,

2019 (Doc. 41-1)("Millsap Decl."))(alteration in D. Remedy).  It also indicates that the

designation's protections "add materially to the protections afforded by the listing."  D. Remedy

Brief at 3 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,278).  Fish & Wildlife insists

that the Jumping Mouse would be without critical habitat protection for potentially a few years

while Fish & Wildlife repeats the lawfully required analysis and promulgation procedures to

finalize a new designation.  <u>See</u> D. Remedy Brief at 3 (citing Millsap Decl. ¶ 9 at 4-5).  It asserts

that Jumping Mouse populations could sustain significant and irreversible harm within one or two seasons without the designation protecting areas which the Jumping Mouse occupies and unoccupied areas to which populations may expand.  See D. Remedy Brief at 4 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,300).  Fish & Wildlife also argues that, if the designation is vacated, members of the Stockman's Associations could be burdened economically for a longer time period, because the Jumping Mouse's delayed recovery would result in the species' prolonged need for the listing's protections.  See D. Remedy Brief at 3.

Fish & Wildlife further argues that vacatur of the designation would result in significantly disruptive consequences, because limited agency resources will be wasted.  See D. Remedy Brief at 4.  It first asserts that, since the designation was finalized, Fish & Wildlife has "engaged in formal consultation on [thirty-five] proposed agency actions[,] [many of which are still pending,] that may affect [] Jumping Mouse or its critical habitat."  D. Remedy Brief at 4 (citing Millsap Decl. ¶ 7, at 4).  Fish & Wildlife indicates that, should the designation be vacated, the United States Forest Service and other agencies would not be obligated legally to follow through with consultation recommendations, and could act without regard to adverse modification or destruction of Jumping Mouse habitat.  See D. Remedy Brief at 4 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,291).  It also indicates that consultations "would likely have to be reinitiated, requiring [] duplicati[ve] efforts and other inefficiencies."  D. Remedy Brief at 4 (citing Millsap Decl. ¶ 8, at 4; 50 C.F.R. § 402.16(a)(4)).

Fish & Wildlife additionally argues that vacatur's substantially disruptive effects on Jumping Mouse populations outweigh the designation's minor, "potential harm" to members of the Stockman's Associations.  D. Remedy Brief at 4-5.  It indicates that the Stockman's Associations allege that the designation merely requires their members to make minor ranching-practice adjustments because of fencing enclosures in subunit 4E, and has unquantified impacts on members' base property that will result only in material harm if the members attempt to sell their ranches.  See D. Remedy Brief at 4 (citing Van Pelt ¶¶ 6-8, at 4-5; Supp. Medeiros Decl. ¶ 7, at 4).  Fish & Wildlife asserts that the designation's slight impacts on members of the Stockman's Associations do not justify vacatur in light of substantial risks of extinction to the Jumping Mouse.  See D. Remedy Brief at 5.  It also notes that, "[i]f the Court is concerned about the length of the remand if [the designation] is left in place, the Court could impose a deadline for [Fish & Wildlife]

to issue a new proposed rule within two years of its decision, which would be subject to statutory deadlines for the publication of a final rule."  D. Remedy Brief at 5 (citing Millsap Decl. ¶ 9, at 4-5).

Fish & Wildlife next argues that vacatur is not justified, because Fish & Wildlife likely would not change the designation on remand.  See D. Remedy Brief at 5.  It indicates that "[v]acatur is often unwarranted when, as here, 'there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand.'"  D. Remedy Brief at 5 (quoting Allied-Signal, 988 F.2d at 151)(alteration in D. Remedy Brief).  Fish & Wildlife indicates that the Stockman's Associations do not challenge decisions which Fish & Wildlife were required to make under the Endangered Species Act, including whether the designated areas were suitable biologically as critical habitat, and whether areas the Jumping Mouse does not occupy or occupies partially are "'essential'" to its survival and recovery.  D. Remedy Brief at 5 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,291-305, and citing Response at 7-8).  It indicates, instead, that the Stockman's Associations challenge decisions which Fish & Wildlife made later in the critical habitat designation process -- the economic impacts of designating areas identified as critical habit and the discretionary determination of excluding those specified areas.  See D. Remedy Brief at 5 (citing  16 U.S.C. § 1533(b)(2); Section 4(b)(2) Policy, 81 Fed. Reg. at 7,228; Jumping Mouse Designation, 81 Fed. Reg. at 14,305-12).

Fish & Wildlife argues that, during remand, it could change only the designation based on the Stockman's Associations' challenge to its exclusion decision.  See D. Remedy Brief at 5.  It asserts that its reevaluation of economic impacts "cannot influence the scientific aspects of critical habitat designation, rather, considering economic impacts is 'primarily designed and intended to assist [Fish & Wildlife] as to exclusion requests.'"  D. Remedy Brief at 5 (quoting Wyo. State Snowmobile Ass'n. v. U.S. Fish & Wildlife Serv., 741 F. Supp. 2d 1245, 1267 (D. Wyo. 2010)(Freudenthal,  J.)("Wyo. Snowmobile Ass'n"),  and  citing  Weyerhaeuser, 139 S. Ct. at 371)(alteration added).  Fish & Wildlife insists that it likely will arrive at the same exclusion decision based on procedural requirements.  See D. Remedy Brief at 5.  It insists that it has complete discretion to decide whether any area should be excluded from a critical habitat designation.  See D. Remedy Brief at 5-6 (citing Response at 25-26; Section 4(b)(2) Policy at 7,228).  Fish & Wildlife also asserts that "[e]xcluding an area from critical habitat is *never*

required, and [Fish & Wildlife] can consider exclusion *only* if it finds that the 'benefits' of excluding a particular area 'outweigh the benefits of specifying such area as part of the critical habitat' and it will not cause the species' extinction."  D. Remedy Brief at 6 (emphasis in D. Remedy Brief)(quoting 16 U.S.C. § 1533(b)(2)).   It indicates, additionally, that it lawfully assigned significant weight to environmental factors on both sides of the balancing test, because, "'any . . . relevant impact'" may be considered when designating critical habitat.  D. Remedy Brief at 6 (quoting 16 U.S.C. § 1533(b)(2), and citing Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce, 792 F.3d at 1027; H.R. Rep. No. 95–1625, at 17 (1978), as reprinted in 1978 U.S.C.C.A.N. 9453, 9467; Section 4(b)(2) Policy, 81 Fed. Reg. 7,228; Jumping Mouse Designation, 81 Fed. Reg. at 14,279-80, 14,307).

Fish & Wildlife also argues that, should the Court order Fish & Wildlife to analyze differently economic impacts and/or provide a more thoroughly reasoned explanation for its exclusion decision, the decision likely would not change.  See D. Remedy Brief at 6-7.  It asserts that accounting for economic impacts associated with the listing would not alter the exclusion analysis, because those costs exist whether an area is included or excluded from the designation. See D. Remedy Brief at 7 (citing Ariz. Cattle Growers' Ass'n, 606 F.3d at 1173).  Fish & Wildlife also asserts that its exclusion decision likely would remain unchanged, even if the listing's economic impacts are relevant to the exclusion analysis, because Fish & Wildlife "would consider the *costs* of the listing, but also the substantial coextensive *benefits* of listing."  D. Remedy Brief at 7 (emphasis added by D. Remedy)(citing Ariz. Cattle Growers' Ass'n, 606 F.3d at 1173 n.14). It also argues that accounting for the "remote and unquantifiable possibility of a water rights taking[s]" would not tip the balance in favor of exclusion for any area designated presently as critical habit.  D. Remedy Brief at 7 (citing Response at 21-24, 23 n.11; Reply at 13-15).  Fish & Wildlife argues additionally that its exclusion decision is unlikely to change if it provides a more thoroughly reasoned supporting explanation, because Fish & Wildlife can "'plausibl[y] . . . redress its failure of explanation on remand while reaching the same result.'"  D. Remedy Brief at 7 (quoting Black Oak Energy, LLC v. FERC, 725 F.3d 230, 244 (D.C. Cir. 2013), and citing N.M. Health Connections, 340 F. Supp. 3d at 1177)(alterations added).

Fish & Wildlife next argues that, should the Court decide vacatur is appropriate, vacatur should be limited to redress only the alleged harm to members of the Stockman's Associations.

D. Remedy Brief at 7.  It asserts that equitable relief must be tailored to the parties before the court and "'should be no more burdensome to [Fish & Wildlife] than necessary to provide complete relief to the [Stockman's Associations and their members].'"  D. Remedy Brief at 7 (quoting Califano v. Yamasaki, 442 U.S. at 702, and citing U.S. Dep't of Def. v. Meinhold, 510 U.S. 939 (1993); Trump v. Hawaii, 138 S. Ct. 2392, 2424-28 (2018)(Thomas, J., concurring))(alterations added).  It notes that the Stockman's Associations oppose limited vacatur by alleging that  "'[t]here is nothing constitutionally suspect with the possibility of being given more relief than necessary.'"  D. Remedy Brief at 7 (quoting Reply at 9 n.4)(alteration in D. Remedy).  Fish & Wildlife asserts that, by arguing for the legality of "'more relief than necessary,'" the Stockman's Associations admit implicitly that complete vacatur goes beyond redressing their members' alleged injuries.  D. Remedy Brief at 8 (quoting Reply at 9 n.4).  It also asserts that the argument by the Stockman's Associations is "legally inaccurate," because it cites a single, off-topic law review article as support in which the author contends that "punitive damages may exceed the amount needed to directly redress the injury."  D. Remedy Brief at 7 n.2 (citing Harold J. Krent, Laidlaw: Redressing the Law of Redressability, 12 Duke Envtl. L. & Pol'y F. 85, 111-12 (2001)).  Fish & Wildlife also asserts that the allegation is deficient legally, because the "'punitive damages remedy is legal, not equitable,'" and is awarded for the purpose of punishing egregious misconduct.  D. Remedy Brief at 7 n.2 (quoting Curtis v. Loether, 415 U.S. 189, 195-96 (1974)).  It contends, in comparison, that vacatur is an equitable remedy and that vacating an inadequately analyzed agency decision is dissimilar to punishing egregious conduct.  See D. Remedy Brief at 7 n.2.

Fish & Wildlife argues that the Court has discretionary power to remedy APA violations with limited vacatur.  See D. Remedy Brief at 8.  It notes that the Tenth Circuit concluded that, for APA violations, "'district court[s] may vacate the *entire* [agency action], or [] may fashion *some narrower form of injunctive relief based on equitable arguments*.*"  D. Remedy Brief at 8 (quoting WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d at 1240)(first and third alteration added, and second alteration in D. Remedy Brief)(emphasis in D. Remedy Brief).  Fish & Wildlife asserts that the Court should follow Wyo. Snowmobile Ass'n, in which the Honorable Nancy D. Freudenthal, United States District Judge for the United States District Court for the District of Wyoming, determined that limited vacatur of critical habitat designation was the appropriate remedy for Fish & Wildlife's defective economic impacts analysis.  See D. Remedy Brief at 8

(citing Wyo. Snowmobile Ass'n, 741 F. Supp. 2d at 1264-67).[16]  It notes that Judge Freudenthal considered whether vacatur would "'endanger the [listed species],'" then decided to vacate the single unit designated as critical habitat for which the plaintiffs specifically requested exclusion. D. Remedy Brief at 8-9 (Wyo. Snowmobile Ass'n, 741 F. Supp. 2d at 1267).  Fish & Wildlife indicates that Judge Freudenthal supported her holding by concluding "'that the economic impact analysis is primarily designed and intended to assist [Fish & Wildlife] as to exclusion requests [. . . and,] it does not seem appropriate to enjoin the [critical habitat rule's] implementation on a nationwide basis.'"  D. Remedy Brief at 8 (quoting Wyo. Snowmobile Ass'n, 741 F. Supp. 2d at 1267)(first and second alterations added, and third alteration in D. Remedy).

Fish & Wildlife also argues that "[n]umerous other courts have partially vacated a critical habitat designation to tailor the relief to the alleged injury and avoid unnecessary risk to listed species during remand."  D. Remedy Brief at 9.  It notes that courts have customized vacatur by setting aside only the portions of critical habitat designation which: (i) overlapped with the plaintiff's private land when Fish & Wildlife failed to explain sufficiently how that land was "'occupied'" by the listed species, D. Remedy Brief at 9 (quoting Otay Mesa Prop., L.P. v. U.S. Dep't of Interior, 646 F.3d at 918-19); (ii) burdened the plaintiffs' interests when Fish & Wildlife conducted a faulty economic impact analysis and/or scientific evaluation for the entire critical habitat designation, see D. Remedy Brief at 9 (citing Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 344 F. Supp. 2d at 126-33, 136;  Neb. Habitat Conservation Coal. v. U.S. Fish & Wildlife Serv., No. 4:03-CV-3059, at *21 (D. Neb. Oct. 13, 2005)(Strom, J.)); and (iii) were not areas that "'should remain in place in order to avoid risk of harm to the [species] from vacatur,' while the agency addressed conceded errors in its economic analysis," D. Remedy Brief at 9 (quoting Coos Cty. Bd. of Cty. Comm'rs v. U.S. Dep't of Interior, No. 02-cv-6128-HO, at *2-3 (D. Or. June 19, 2003)(Hogan, J.))(alteration in D. Remedy Brief).

Fish & Wildlife next argues for the specific areas of the designation to which vacatur should be tailored.  See D. Remedy Brief at 9.  It asserts that vacating any area of the designation would result in Jumping Mouse losing essential protections.  See D. Remedy Brief at 9. Fish &

---

[16]Fish & Wildlife argues preemptively that Wyo. Snowmobile Ass'n's coextensive-approach-related holding is no longer good law, because: (i) Fish & Wildlife effectively overruled N.M. Cattle Grower's Ass'n by subsequently updating its regulatory definitions which founded the Tenth Circuit's coextensive-approach ruling; and (ii) Judge Freudenthal did not consider the updated regulatory definitions' effect on N.M. Cattle Growers Ass'n.  See D. Remedy Brief at 8 n.3 (citing Response at 18-20).

Wildlife contends that, if the Court remands to Fish & Wildlife to use the coextensive approach and/or account for costs of takings of water rights, then the Court should limit vacatur to designated units which cause injury to members of the Stockman's Associations.  See D. Remedy Brief at 9-10.  It asserts that, if it is required to reassess economic impacts using the coextensive approach, then vacating unit 5 would particularly be inappropriate.  See D. Remedy Brief at 10 n.4.  Fish & Wildlife indicates that unit 5 is located in Arizona, and the Ninth Circuit upheld Fish & Wildlife's use of the incremental effects approach as lawful under the Endangered Species Act.  See D. Remedy Brief at 10 n.4.

Fish & Wildlife also argues that, should the Court hold that Fish & Wildlife have not provided a sufficiently reasoned explanation for not excluding units 3 and 4, then equitable vacatur clearly favors leaving untouched the six designation units that the Stockman's Associations do not challenge for legal deficiencies.  See D. Remedy Brief at 10.  Fish & Wildlife contends that the Court should not vacate the designation's units 1-2 and 5-8, because those units do not harm members of the Stockman's Associations.  See D. Remedy Brief at 10.  It also argues that setting aside those units may cause irreversible harm to the Jumping Mouse, because: (i) only one Jumping Mouse population is located in units 1, 6, 7, and 8, and, unit 2 contains merely two populations; (ii) one bad season of adverse modification to critical habitat could devastate local Jumping Mouse populations; and (iii) "[l]osing even one unit of Jumping Mouse population would add to its already high risk of extinction."  D. Remedy Brief at 10-11 (citing Endangered Status for Jumping Mouse, 79 Fed. Reg. at 33,122; Jumping Mouse Status Report at 42-43, 45).  Fish & Wildlife further argues that the Court should tailor vacatur specifically to subunits 4B-E.  See D. Remedy Brief at 10.  Fish & Wildlife contends that, although the Stockman's Associations allege that their members hold grazing allotments near or within units 3 and 4, they have not demonstrated that unit 3 harms those members.  See D. Remedy Brief at 10 (citing Salazar Decl. ¶¶ 14-15 at 4; Stone Decl. ¶ 12 at 4; Response at 11-16).  It argues that the Court should limit vacatur to the designated areas which the Stockman's Associations have standing to challenge, and they evidence standing only by purporting that subunits 4B-E injure their members.  See D. Remedy Brief at 10 (citing Ctr. for Biological Diversity v. Jewell, No. CV-14-02506-TUC-RM, 2017 WL 8788052 (D. Ariz. Oct. 25, 2017)(Márquez, J.); Califano v. Yamasaki, 442 U.S. at 702).

Fish & Wildlife finally argues that the vacatur should exclude subunits 3C and 4B -- the two subunits which the Jumping Mouse does not occupy.  See D. Remedy Brief at 11.  It asserts that subunits 3C and 4B are unlikely to be excluded from the designation if the case is remanded.  See D. Remedy Brief at 11.  Fish & Wildlife indicates that, although subunits 3C and 4B were "'completely unoccupied'" at the time of the listing, and occupy land on which members of the Stockman's Associations hold grazing allotments, these subunits are "'essential'" to Jumping Mouse's survival and recovery.  D. Remedy Brief at 11 (quoting Jumping Mouse Designation, 81 Fed. Reg. at 14,300).  It asserts that the Jumping Mouse populations in units 3 and 4 "lack the redundancy or resiliency to be viable long-term unless they can expand into [s]ubunits 3C and 4B."  D. Remedy Brief at 11 (citing Jumping Mouse Status Report at 61-62).  Fish & Wildlife also asserts that unoccupied areas are least likely to be affected by using the coextensive approach to consider economic impacts.  See D. Remedy Brief at 11 (citing Screening Memo at 10-11).  It further asserts that, "because [Subunits 3B and 4C] are unoccupied, the listing of the Jumping Mouse does not protect these habitat areas under either Section 7 or 9 of the [Endangered Species Act]."  D. Remedy Brief at 11 (citing 16 U.S C. §§ 1536(a), 1538(a)(1); 50 C.F.R. § 17.3).

8.     **The Intervenors' Remedy Brief.**

The Environmental Intervenors first argue that vacatur would be inappropriate should the Court remand to Fish & Wildlife to correct any decision-making errors associated with promulgating the designation.  See I. Remedy Brief at 7.  They note that, typically, "'when a regulation is not promulgated in compliance with the APA, the regulation is invalid'"; however, equity can demand that the regulation be left in place while the agency corrects deficiencies.  I. Remedy Brief at 6 (quoting Coal. of Ariz./N.M. Ctys., 2009 WL 8691098 at *3).  The Environmental Intervenors indicate that district courts within the Tenth Circuit have found it appropriate to "'depart from the normal rule of setting aside illegal agency action where it would defeat the purpose of the statute at issue.'"  I. Remedy Brief at 8 (quoting S. Utah Wilderness All. v. Burke, No. 2:12-cv-257-DAK, 2015 WL 2452932, at *2 (D. Utah May 22, 2015)(Kimball, J.), vacated by, 2017 WL 11516766 (May 17, 2017); Coal. of Ariz./N.M. Ctys., 2009 WL 8691098 at *2).

The Environmental Intervenors argue that vacatur would defeat the purpose that the Endangered Species Act has for requiring Fish & Wildlife to designate critical habitat for listed species.  See I. Remedy Brief at 8. They assert that the purpose of the Endangered Species Act's

critical-habitat-designation provision is to "'to provide a means whereby the ecosystems upon which endangered species . . . depend may be conserved,'" including all areas of habitat that are "'essential for the conservation of the species.'"   I. Remedy Brief at 8 (quoting 16 U.S.C. §§ 1531(b), 1532(5)(A)).  The Environmental Intervenors indicate that "'conservation'" means to use all necessary methods and procedures to aid the threatened or endangered species' recovery to the point where protections provided under the Endangered Species Act are no longer necessary. I. Remedy Brief at 8 (quoting 16 U.S.C. § 1532(5)(A)).  They insist that vacatur would defeat the purpose of designating critical habitat, which is to conserve necessary ecosystems for the survival and "'*recovery*'" of a listed species.  See I. Remedy Brief at 8 (quoting Ctr. for Native Ecosystems v. Cable, 509 F.3d 1310, 1322 (10th Cir. 2007), and citing Gifford Pinchot, 378 F.3d at 1070)(emphasis in Ctr. for Native Ecosystems v. Cable).

The Environmental Intervenors also argue that the Supreme Court determined that Congress' "'plain intent'" when enacting the Endangered Species Act "'was to halt and reverse the trend toward species extinction, whatever the cost' . . . which 'is reflected not only in the stated policies of the Act, but in literally every section of the statute.'"   I. Remedy Brief at 8 (quoting Tenn. Valley Auth., 437 U.S. at 184)(alteration in I. Remedy Brief).  They note that the Supreme Court recognized that the Endangered Species Act's legislative origins began with congressional findings which indicated that the "'greatest [threat] [of extinction to a species] was destruction of natural habitat.'"  I. Remedy Brief at 9 (quoting Tenn. Valley Auth., 437 U.S. at 179, and citing S. Rep. No. 93-307, p. 2 (1973), reprinted in 1973 U.S. Code Cong. & Admin. News 2289, 2290)(first alteration in I. Remedy Brief, and second alteration added).  The Environmental Intervenors assert that, when considering whether vacatur is appropriate, the Court should weigh heavily Congress' intent for enacting the Endangered Species Act -- ensuring the survival and recovery of threatened or endangered species primarily by conserving essential habitat.  See I. Remedy Brief at 9 (citing Ctr. for Native Ecosystems v. Salazar, 795 F. Supp. 2d at 1243).  They maintain that the designation should not be vacated during remand, because it protects essential habitat for the conservation of Jumping Mouse.  See I. Remedy Brief at 9.

The Environmental Intervenors next argue that vacating the designation is unwarranted, because vacatur likely would have dire consequences for the Jumping Mouse.  See I. Remedy Brief at 9.  They insist that vacating the designation would exacerbate the already-high-risk of extinction

to the Jumping Mouse, because: (i) the Jumping Mouse requires "exceptionally specialized habitat" that has been and is presently being lost, which has resulted in extirpations, population-size reductions, and isolated populations; (ii) the Jumping Mouse's habitat loss and extirpations are expected to continue, and all populations identified since 2005 are of insufficient size to be resilient without conservation protections; and (iii) since 2011, habitat loss has substantially impacted at least eleven of the twenty-nine Jumping Mouse populations that are known to exist. I. Remedy Brief at 9 (citing Jumping Mouse Status Report at 3, 5-6). The Environmental Intervenors indicate that the Jumping Mouse's essential habitat and resources are being lost primarily to grazing impacts, which include "'trampling of streambanks, burrow collapse, loss of riparian cover, soil compaction, modification of riparian plant communities, lowering water tables, and the resulting microclimatic changes[.]'" I. Remedy Brief at 9-10 (quoting Jumping Mouse Status Report at 6, 88, 97)(alteration in I. Remedy Brief). They indicate that, "because of 'the magnitude and imminence of grazing pressures on the jumping mouse and its habitat,' [Fish & Wildlife] concluded 'that livestock grazing is the most significant factor causing continuing impacts in five of the eight [designated units],'" including four subunits -- 3A-B, 4C, 4E -- of the six subunits that the Stockman's Associations challenge. I. Remedy Brief at 10 (quoting Jumping Mouse Status Report at 97, and citing Jumping Mouse Designation, 81 Fed. Reg. 14,300-05)(alterations added).

The Environmental Intervenors further argue that vacating the designation would significantly harm the Jumping Mouse, because "even a short lapse in protection can be devastating to populations." I. Remedy Brief at 10. They assert that grazing is expected to contribute continuously to the destruction of essential habitat for the Jumping Mouse, and, without protections, its habitat can be lost to grazing in as little as three months. See I. Remedy Brief at 10 (citing Jumping Mouse Status Report at 85, 93, 96). The Environmental Intervenors also assert that, if the designation is vacated, then federal agencies "would no longer be required to ensure 'that any action authorized, funded, or carried out by such agency[,]' such as the issuance of a grazing permit, 'is not likely to . . . result in the destruction or adverse modification of [critical] habitat.'" I. Remedy Brief at 10-11 (quoting 16 U.S.C. § 1536(a)(2))(alterations in I. Remedy Brief). They assert, additionally, that, if the designation is vacated, then the listing's protections will not safeguard areas which the Jumping Mouse does not occupy. See I. Remedy Brief at 11.

The Environmental Intervenors insist that unoccupied areas are essential for the Jumping Mouse's survival and recovery,[17] because occupied areas attach to an insufficient amount of suitable habitat to sustain resilient populations. See I. Remedy Brief at 11 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,300). They contend that the essential unoccupied areas provide habitat for expanding the Jumping Mouse's population, connectivity, and transplantation/relocation if necessary, as well as the restoration of dietary-vegetation for the Jumping Mouse. See I. Remedy Brief at 11 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,300).

The Environmental Intervenors argue that the Stockman's Associations allege, but fail to demonstrate, that allowing the designation to remain in place during remand would unduly prejudice their members. See I. Remedy Brief at 11-12. They indicate that, after the designation was finalized, the Stockman's Associations waited for over eighteen months before filing the Complaint. See I. Remedy Brief at 12 (citing Jumping Mouse Designation at 14,263; Complaint at 1). The Environmental Intervenors assert that the Stockman's Associations idled for over one year and a half, and, as a result, they unreasonably allege that designation should be vacated during remand because of its overly burdensome impacts on their members. See I. Remedy Brief at 12. They contend that the Stockman's Associations have not satisfied the requirement of showing "that the maintenance of the designation *during remand* will meaningfully prejudice [their members], not that [members] are prejudiced by its existence in perpetuity." I. Remedy Brief at 12 (citing Coal. of Ariz./N.M. Ctys., 2009 WL 8691098 at *4; P. Remedy Brief at 11)(emphasis in I. Remedy Brief).

The Environmental Intervenors further argue that any prejudice that the designation remaining in place during remand may cause to members of the Stockman's Association would be minimal. See I. Remedy Brief at 12. They assert that "'[l]ess than 1%' of acres within critical habitat have 'been excluded from livestock use, resulting in no adjustment to permitted numbers or seasons of use[,]' with 'many miles of stream and numerous water lanes' available to 'provide access for watering cattle.'" I. Remedy Brief at 12 (quoting Jumping Mouse Home Page at 6-

---

[17]The Intervenors note that the Stockman's Associations argue that vacating protections for unoccupied areas of the designation will not significantly impact the Jumping Mouse's survival. See I. Remedy Brief at 11 n.1 (citing P. Remedy Brief at 12). They contend that the Stockman's Associations' "'focus on survival ignores the fact that 'the purpose of establishing "critical habitat" is for the [Fish & Wildlife] to carve out territory that is not only necessary for the species' survival *but also essential for the species' recovery*.'" I. Remedy Brief at 11 n.1 (quoting Gifford Pinchot, 378 F.3d at 1070)(alteration added)(emphasis in I. Remedy Brief).

7)(alterations in I. Remedy Brief).  They also assert that the designation's impacts on members of the Stockman's Associations have been alleviated, because the United States Forest Service constructed "'upland water developments, and other range improvements to reduce grazing pressure on riparian areas,' ensuring '[n]o reductions in permitted numbers or significant change in season of use was required on any allotment.'"  I. Remedy Brief at 12 (quoting Jumping Mouse Home Page at 6-7)(alteration in I. Remedy Brief).  The Environmental Intervenors contend that the designation being maintained during remand will result in no prejudice, or at least no meaningful prejudice to members of the Stockman's Associations, and that the Court could further reduce potential prejudice by setting a deadline for Fish & Wildlife to correct any administrative errors.  See I. Remedy Brief at 12 (citing Ctr. for Biological Diversity v. Norton, 240 F. Supp. 2d at 1109).

The Environmental Intervenors argue that vacatur is inappropriate, because all of Fish & Wildlife's potential errors are "minimal and easily rectified."  I. Remedy Brief at 13.  They indicate that the Stockman's Associations do not challenge Fish & Wildlife's finding that the designation is based on the best available science.  See I. Remedy Brief at 13.  The Environmental Intervenors assert that Fish & Wildlife could correct potential errors with its economic impact analysis and/or exclusion decision, because the Endangered Species Act requires Fish & Wildlife to finalize critical habitat designation within one year of issuing a proposed rule or listing a species.  See I. Remedy Brief at 13 (citing 16 U.S.C. §§ 1533(b)(6)(A)(ii), (C)(ii)).  They also assert that, if Fish & Wildlife must account for costs of water rights upon which the designation infringes, then the Stockman's Associations could expedite that process if they can and should be willing to supply Fish & Wildlife information regarding the dates and locations of restricted access to their members' water rights.  See. I. Remedy Brief at 13.

The Environmental Intervenors finally argue that, if the Court decides to vacate the designation, then it should limit vacatur to the subunits that members of the Stockman's Associations use.  See I. Remedy Brief at 13-14.  They note that, in Wyo. Snowmobile Ass'n, Judge Freudenthal enjoined only the areas of critical habitat that the plaintiff argued Fish & Wildlife did not consider for exclusion.  See I. Remedy Brief at 14.  The Environmental Intervenors insist that vacatur tailored to the specific subunits which the Stockman's Associations' challenge in the Complaint would redress injuries to their members and also guarantee the retainment of the

Jumping Mouse's essential protections in other areas.  See I. Remedy Brief at 14.  They also request, alternatively, that, if the Court orders vacatur of the entire designation, then the Court should require Fish & Wildlife to finalize a new designation "'as soon as possible . . . consider[ing] what work is necessary to publish the final rule and how quickly that can be accomplished[, . . . but] without regard to [Fish & Wildlife's] other priorities under the [Endangered Species Act].'" I. Remedy Brief at 14 (quoting Forest Guardians v. Babbitt, 174 F.3d 1178, 1193 (10th Cir. 1998))(first two alterations in I. Remedy Brief, third and fourth alterations added).   The Environmental Intervenors indicate that such a deadline also should be consistent with limitations that the Endangered Species Act sets forth -- a proposed designation issued within one year of the Court order, and the finalized version issued no more than one year later.  See I. Remedy Brief at 14 (citing Ctr. for Biological Diversity v. Norton, No. 02-1067 LH/RHS, 2003 WL 27384876, at *4 (D.N.M. Sept. 30, 2003)(Hansen, J.)).  They note that Fish & Wildlife "do not appear to oppose such a two-year deadline."  I. Remedy Brief at 14 n.2 (citing D. Remedy Brief at 5).

### LAW REGARDING STATUTORY STANDING UNDER THE APA

Plaintiffs suing under the APA must show that their complaint is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Srv. Orgs. v. Camp, 397 U.S. 150, 153 (1970).  Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing.  See, e.g., Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224 (2012); Hill v. Warsewa, 947 F.3d 1305, 1309 n.3 (10th Cir. 2020).  The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."   Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014). Notably, the test "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'"  Lexmark Int'l v. Static Control Components, 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. at 225).  Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."  Lexmark Int'l v. Static Control Components, 572 U.S. at 130 (internal quotation marks and citations omitted).  See Air Courier Conference of Am. v.

Am. Postal Workers Union, AFL-CIO, 498 U.S. 517 (1991)(concluding that postal employees are not within the zone of interests that the Private Express statutes, 18 U.S.C. §§ 1693-99 and 39 U.S.C. §§ 601-06, protect).  This "lenient approach" preserves the APA's flexible judicial-review provisions.  Lexmark Int'l v. Static Control Components, 572 U.S. at 130.  There "need be no indication of congressional purpose to benefit the would-be plaintiff."  Clark v. Sec. Industry Ass'n, 479 U.S. 388, 399-400.  Finally, whether a plaintiff's interest is protected "is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies . . . ."  Bennett v. Spear, 520 U.S. 154, 175-76 (1997).  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883.  But see Jonathan R. Siegel, Zone of Interests,  92 Geo. L.J. 317, 336-37 (2004).

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

Under the APA,

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702.  The APA states that district courts can:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be--

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (F)     unwarranted by the facts to the extent that the facts are
> subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d at 1580. See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1323.  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant."  Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 305 F.R.D. at 272.

### 1.     Reviewing Agency Factual Determinations.

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).  The APA's two linguistic formulations amount to a single substantive standard of review.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984)(Scalia, J.)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)).  See also id. at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.  The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." (emphasis in original)).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record.  See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order

involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted."). See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had."). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing Fed. R. Evid. 201(b))("We take judicial notice of this document, which is included in the record before us in [another case]."); id. at 702 n.22. In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances or inadvertent omission from the administrative record. See Compassion Over Killing v. U.S. Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017); Nat'l Min. Ass'n v. Sec. of U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted). The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999). Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172. The agency must articulate the same

rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80 (1943). While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(internal citations omitted).

##### 2.  Reviewing Agency Legal Interpretations.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States of America, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing. See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994). This is known as Chevron deference, named after the seminal case, Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[18]  Chevron deference is a two-step process[19] that first asks whether the statutory provision in question is clear and, if it is not, then asks whether the agency's interpretation of the unclear statute is reasonable. See Maralex Resources, Inc. v. Barnhardt, 913 F.3d 1189 1198-99 (10th Cir. 2019). As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in

---

[18]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all. Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years. See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[19]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all. See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006). Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000). An affirmative answer to all three inquiries results in the agency's decision passing step zero.

> *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . .
> (1984).  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is clear,
> we must give effect to that intent.  If the statute is silent or ambiguous on that
> specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

<u>United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug</u>, 22 F.3d

at 238 (citation omitted).

A number of policy considerations animate <u>Chevron</u> deference, among them: (i) statutory

interpretation, <u>i.e.</u>, that Congress, by passing extremely open-ended and vague organic statutes,

grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency,

<u>i.e.</u>, that agencies are more competent than the courts at filling out the substantive law in their

field; (iii) political accountability, <u>i.e.</u>, that agencies, as executive bodies ultimately headed by the

President of the United States of America, can be held politically accountable for their

interpretations; and (iv) efficiency, <u>i.e.</u>, that numerous, subject-matter specialized agencies can

more efficiently promulgate the massive amount of interpretation required to maintain the modern

regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but

Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to, for example, adjudicate whether a

regulated party followed them -- courts accord agencies what is known as <u>Auer</u> or <u>Seminole Rock</u>

deference.  <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452 (1997)("<u>Auer</u>"); <u>Bowles v. Seminole Rock & Sand

Co.</u>, 325 U.S. 410 (1945).  This deference is applied in the same manner as <u>Chevron</u> deference and

is substantively identical.  The Court has previously expressed its concerns about <u>Auer</u> deference.

<u>See, e.g.</u>, <u>Mohon v. Agentra</u>, 400 F. Supp. 3d 1189, 1221-25 (D.N.M. 2019); <u>Jarita Mesa Livestock

Grazing Ass'n v. U.S. Forest Service</u>, 305 F.R.D. at 286-89.  The Supreme Court recently

addressed whether it should overrule <u>Auer</u> deference in <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2408

(2019).  Although the Supreme Court declined to overrule <u>Auer</u>, the majority opinion took pains

to "reinforce its limits."  139 S. Ct. 2408.  The Court noted that <u>Auer</u> deference is appropriate

"only if a regulation is genuinely ambiguous," "even after a court has resorted to all the standard

tools of interpretation."  139 S. Ct. 2414.  To earn deference in this scenario, the agency's

interpretation must still be "'reasonable.'"  139 S. Ct. at 2415 (quoting <u>Thomas Jefferson Univ. v.

Shalala</u>, 512 U.S. 504, 515 (1994)).  <u>Auer</u> deference is also "'unwarranted'" "when a court

concludes that an interpretation does not reflect an agency's authoritative, expertise-based 'fair,

[or] considered judgment.'"  139 S. Ct. at 2414 (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)).  Deference is therefore not appropriate where the regulatory interpretation is not "the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views,"  139 S. Ct. at 2416 (quoting United States v. Mead Corp., 533 U.S. 218, 257-59 (2001)(Scalia, J., dissenting)), does not "in some way implicate [the agency's] substantive expertise," 139 S. Ct. at 2417, or is a convenient, post hoc rationalization to defend past agency action, see 139 S. Ct. at 2417.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

### 3.    Waiving Sovereign Immunity.

The APA waives sovereign immunity with respect to non-monetary claims.  See 5 U.S.C. § 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:

5 U.S.C. § 702.  Claims for money damages seek monetary relief "to substitute for a suffered loss." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir. 2009)(emphasis in original).  Claims that do not seek monetary relief or that seek "specific remedies that have the effect of compelling monetary relief" are not claims for monetary damages.

- 116 -

Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1298.  To determine whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and asses the plaintiff's prime object or essential purpose; "'[a] plaintiff's prime objective or essential purpose is monetary unless the non-monetary relief sought has significant prospective effect or considerable value apart from the claim for monetary relief.'"  Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting Burkins v. United States, 112 F.3d 444, 449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States."  28 U.S.C. § 1346(a)(2).  It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief.  See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated?  Second, does the Tucker Act expressly or impliedly forbid the relief that Normandy seeks, such that the APA's waiver does not apply?"  Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING 5 U.S.C. § 701(A) AND APA's PRECLUSION OF JUDICIAL REVIEW

The APA's judicial review provisions are contained in 5 U.S.C. §§ 701-06.  Section 701(a) carves out two categories of agency decisions that are not subject to judicial review.  It states that the APA's judicial review provisions do not apply "to the extent that -- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

### 1.    Statutory Preclusion.

The APA "creates a 'presumption favoring judicial review of administrative action.'" Sackett v. EPA, 566 U.S. 120, 128 (2012)(quoting Block v. Cmty. Nutrition Inst., 467 U.S. 340,

345 (1984)).   The APA's presumption of judicial review is overcome only when there is "persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140 (1967), abrogated by Califano v. Sanders. 430 U.S. 99 (1977). Overcoming this presumption is a "heavy burden," Dunlop v. Bachowski, 421 U.S. 560, 567 (1975), overruled in part by Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley, 467 U.S. 526 (1984), and it is especially difficult for Congress to preclude judicial review of constitutional claims, see Cuozzo Speed Techs., LLC v. Lee, 136 S. Ct. 2131, 2141 (2016); Lepre v. Dep't of Labor, 275 F. 3d 59, 75 (D.C. Cir. 2001)(Silberman, J., concurring).   The Supreme Court "'has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible' in the statutory scheme.'" Block v. Cmty. Nutrition Inst., 467 U.S. at 351 (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. at 157).

Absent express preclusion, courts may still find that a statute's regulatory scheme precludes judicial review. For example, in Block v. Community Nutrition Institute, the Supreme Court concluded that the Agricultural Marketing Agreement Act of 1937 implicitly precluded dairy consumers from obtaining review of the Secretary of Agriculture's milk market orders.   467 U.S. 340, 348 (1984).   The Agricultural Marketing Agreement Act permitted the Secretary of Agriculture to set minimum prices for milk products upon the consent of two-thirds of affected dairy producers. See 467 U.S. at 432.   Consumers, meanwhile, had no right to participate in the administrative process establishing market orders. See 467 U.S. at 436.   Dairy producers could obtain judicial review of these orders after exhausting administrative remedies. See 467 U.S. at 436.   The Supreme Court concluded that allowing consumers to challenge the Secretary's orders "would severely disrupt this complex and delicate administrative scheme," because otherwise every producer who also consumed dairy could challenge the Secretary of Agriculture's orders without first exhausting administrative remedies.   467 U.S. at 438.

2.   **Committed to Agency Discretion By Law.**

The APA's exclusion of judicial review for action committed to agency discretion by law "is a very narrow exception." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971).   As opposed to 5 U.S.C. § 701(a)(1) preclusion, which relies on evidence of Congressional intent, courts may conclude that "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard

against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985). See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 410 (citing S. Rep. No. 752, at 26 (1945)).

There is a tension between 5 U.S.C. § 701(a)(2), which precludes review for agency action "committed to agency discretion by law," and 5 U.S.C. § 706(2)(A), which authorizes courts to "set aside agency action, findings, and conclusions found to be . . . an abuse of discretion."  In attempting to explain this apparent conflict, the Supreme Court first stated that "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion,'" and discretion was committed to the agency under law.  Heckler v. Chaney, 470 U.S. at 830.  Writing in dissent in Webster v. Doe, Associate Justice Antonin Scalia argued instead that the phrase "committed to agency discretion by law" refers to the common law of judicial review of agency action.  486 U.S. 592, 609 (1988)(Scalia, J., dissenting).  Thus, agency action is committed to its discretion by law not when there is no law for a court to apply, but when it is "of the sort that is traditionally unreviewable."  486 U.S. at 610.  Justice Scalia argued that traditionally unreviewable issues "included principles ranging from the 'political question' doctrine, to sovereign immunity . . . , to official immunity to prudential limitations upon the courts' equitable powers, to what can be described no more precisely than a traditional respect for the functions of the other branches."  486 U.S. at 608-09.  See Charles H Kochm Jr., An Issue-Driven Strategy for Review of Agency Decisions, 43 Admin. L. Rev. 511, 549-552 (1991).

The Supreme Court adopted Justice Scalia's explanation in Lincoln v. Vigil, 508 U.S. 182, 191 (1993)("Over the years, we have read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" (citing Webster v. Doe, 486 U.S. at 608 (Scalia, J., dissenting))).  It concluded that 5 U.S.C. § 701(a)(2) precluded judicial review of the Indian Health Services' decision to reallocate funds from the Indian Children's Program, because the "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."  Lincoln v. Vigil, 508 U.S. at 192.  It compared an agency's lump-sum allocation to the decision whether to institute enforcement proceedings, noting that both require "'a complicated

balancing of a number of factors which are peculiarly within its expertise.'" Lincoln v. Vigil, 508 U.S. at 191 (quoting Heckler v. Chaney, 470 U.S. at 831).

<h3 style="text-align:center">LAW REGARDING THE ENDANGERED SPECIES ACT</h3>

A paramount purpose of the Endangered Species Act is to "conserve endangered and threatened species and the ecosystems on which they depend." People for Ethical Treatment of Property Owners v. United States Fish and Wildlife Service, 852 F.3d 990, 994 (10th Cir. 2014)("People for Ethical Treatment of Property Owners")(citing 16 U.S.C. § 1531(b)). Congress, in turn, vests power within two executive officers -- the Secretary of the Interior and the Secretary of Commerce -- to carry out the Act's purpose. See People for Ethical Treatment of Property, 852 F.3d at 994 (citing 16 U.S.C. § 1532(15)). The Secretary of the Interior and the Secretary of Commerce "delegate[] their implementation responsibilities to, respectively, [the Fish & Wildlife Service] and the National Marine Fisheries Services." People for Ethical Treatment of Property, 852 F.3d at 994.

Before outlining the critical habitat designation process of Fish & Wildlife, it is important to understand how the Endangered Species Act first "defines the objects of its protections, that is both 'endangered species' and 'threatened species.'" People for Ethical Treatment of Property, 852 F.3d at 994. "An endangered species 'is in danger of extinction throughout all or a significant portion of its range,' except for insect species determined to be pests "present[ing] an overwhelming and overriding risk to man." People for Ethical Treatment of Prop. Owners, 852 F.3d 990, 994-95 (citing 16 U.S.C. § 1532(6)). "A threatened species is one 'which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.'" People for Ethical Treatment of Prop. Owners, 852 F.3d at 994-95 (quoting 16 U.S.C. § 1532(20)).

Following the listing of "endangered" or "threatened species," the Endangered Species Act then "authorizes the Secretary of the Interior to list domestic or foreign species as endangered or threatened." People for Ethical Treatment of Prop. Owners, 852 F.3d at 995(quoting Wyo. Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1231 (10th Cir. 2000)(citing 16 U.S.C. § 1533(a)-(b))). The Endangered Species Act, in turn, outlines at least five factors that the Secretary of Interior considers when listing a species as "endangered or threatened: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range, (B) overutilization for commercial, recreational, scientific or educational purposes, (C) disease or predation, (D) the inadequacy of

existing regulatory mechanisms or (E) "other natural or manmade factors affecting its continued existence."  People for Ethical Treatment of Prop. Owners, 852 F.3d at 995 (quoting 16 U.S.C. § 1533(a)(1)).  Furthermore, "[o]nce a species is so listed, it is afforded certain protections, and federal agencies assume special obligations to conserve, recover and protect that species." Wyo. Farm Bureau Fed'n, 199 F.3d at 1231; People for Ethical Treatment of Prop. Owners., 852 F.3d at 995 (citing Wyo Farm Bureau Fed'n, 199 F.3d at 1231)).

**1.      Fish & Wildlife's Critical Habitat Designation Rulemaking Process Pursuant to the Endangered Species Act.**

As discussed above, the Endangered Species Act's purpose "is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  The Endangered Species Act governs Fish & Wildlife's rule-making when listing species as threatened or endangered, and designating species' critical habitat.  See 16 U.S.C. § 1533(a)-(b).  Fish & Wildlife shall promulgate species-listing regulations by determining whether a species is threatened or endangered based on factors such as: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; . . . [and] (E) other natural or manmade factors affecting its continued existence."  16 U.S.C. § 1533(a)(1)(A)-(B), (E).  Fish & Wildlife shall make species-listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  The Tenth Circuit interprets § 1533(b)(1)(A) as prohibiting Fish & Wildlife from considering economic impacts of listing decisions.  See N.M. Cattle Growers Ass'n, 248 F.3d at 1280.

Fish & Wildlife, while listing species in accordance with regulations promulgated not inconsistent with 16 U.S.C. § 1533(b), shall prudently and concurrently "designate any habitat of [the threatened or endangered species] which is then considered to be critical habitat."  16 U.S.C. § 1533(a)(3)(A)(i).  Fish & Wildlife shall "designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  Fish & Wildlife may exclude any designated area of critical habitat "if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . failure to designate such area as critical habitat

will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2). The Endangered

Species Act's interagency consultation provision mandates:

> Each Federal agency shall, in consultation with and with the assistance of [Fish & Wildlife], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."

16 U.S.C. § 1536(a)(2).

### 2.    Fish & Wildlife's Decisions Under the Endangered Species Act Must Afford the Conservation of Threatened and Endangered Species the Highest Priority.

The Supreme Court in Tennessee Valley Authority v. Hill enjoined the almost-completed

construction of Tellico Dam, which cost nearly $80,000,000.00 to build, because the plaintiff could

not ensure that the dam's construction would not "jeopardize the snail darter or its critical habitat."

437 U.S. at 153, 165-66, 168, 173, 195. In making the decision, the Supreme Court concluded

that Congress intended that actions taken under the Endangered Species Act afford endangered

species the highest priority. See 437 U.S. at 174. The Supreme Court also determined that the

Endangered Species Act's plain language indicates that "Congress viewed the value endangered

species as 'incalculable.'" Tennessee Valley Auth. v. Hill, 437 U.S. at 187 (quoting H.R. 37, 93d

Cong., p 14 (1973-74)). Moreover, the Supreme Court reasoned that, even though enjoining the

dam's construction would have substantial economic and social consequences, Congress enacted

the Endangered Species Act "to halt and reverse the trend toward species extinction, whatever the

cost." 437 U.S. at 184. Providing some historical basis to contextualize the Act's purpose, the

Supreme Court explained:

> When Congress passed the Act in 1973, it was not legislating on a clean slate. The first major congressional concern for the preservation of the endangered species had come with passage of the Endangered Species Act of 1966, 80 Stat. 926, repealed, 87 Stat. 903. In that legislation Congress gave the Secretary [of the Interior] power to identify "the names of the species of native fish and wildlife found to be threatened with extinction," § 1(c), 80 Stat. 926, as well as authorization to purchase land for the conservation, protection, restoration, and propagation of "selected species" of "native fish and wildlife" threatened with extinction. §§ 2(a)– (c), 80 Stat. 926–927. Declaring the preservation of endangered species a national policy, the 1966 Act directed all federal agencies both to protect these species and "insofar as is practicable and consistent with the[ir] primary purposes," § 1(b), 80 Stat. 926, "preserve the habitats of such threatened species on lands under their jurisdiction." Ibid. (Emphasis added.) The 1966 statute was not a sweeping prohibition on the taking of endangered species, however, except on federal lands, § 4(c), 80 Stat. 928, and even in those federal areas the Secretary was authorized to allow the hunting and fishing of endangered species. § 4(d)(1), 80 Stat. 928.

> In 1969 Congress enacted the Endangered Species Conservation Act, 83 Stat. 275, repealed, 87 Stat. 903, which continued the provisions of the 1966 Act while at the same time broadening federal involvement in the preservation of

endangered species. Under the 1969 legislation, the Secretary was empowered to list species "threatened with worldwide extinction," § 3(a), 83 Stat. 275; in addition, the importation of any species so recognized into the United States was prohibited. § 2, 83 Stat. 275. An indirect approach to the taking of endangered species was also adopted in the Conservation Act by way of a ban on the transportation and sale of wildlife taken in violation of any federal, state, or foreign law. § 7(a)–(b), 83 Stat. 279.

Despite the fact that the 1966 and 1969 legislation represented "the most comprehensive of its type to be enacted by any nation" up to that time, Congress was soon persuaded that a more expansive approach was needed if the newly declared national policy of preserving endangered species was to be realized. By 1973, when Congress held hearings on what would later become the Endangered Species Act of 1973, it was informed that species were still being lost at the rate of about one per year, 1973 House Hearings 306 (statement of Stephen R. Seater, for Defenders of Wildlife), and "the pace of disappearance of species" appeared to be "accelerating." H.R.Rep.No.93–412, p. 4 (1973)[;] H.R.Rep.No.93–412, p. 4 (1973). Moreover, Congress was also told that the primary cause of this trend was something other than the normal process of natural selection:

> "[M]an and his technology has [sic] continued at any ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife. The truth in this is apparent when one realizes that half of the recorded extinctions of mammals over the past 2,000 years have occurred in the most recent 50-year period." 1973 House Hearings 202 (statement of Assistant Secretary of the Interior).

That Congress did not view these developments lightly was stressed by one commentator:

> "The dominant theme pervading all Congressional discussion of the proposed [Endangered Species Act of 1973] was the overriding need to devote whatever effort and resources were necessary to avoid further diminution of national and worldwide wildlife resources. Much of the testimony at the hearings and much debate was devoted to the biological problem of extinction. Senators and Congressmen uniformly deplored the irreplaceable loss to aesthetics, science, ecology, and the national heritage should more species disappear." Coggins, Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973, 51 N.D.L.Rev. 315, 321 (1975). (Emphasis added.)

The legislative proceedings in 1973 are, in fact, replete with expressions of concern over the risk that might lie in the loss of any endangered species. Typifying these sentiments is the Report of the House Committee on Merchant Marine and Fisheries on H.R. 37, a bill which contained the essential features of the subsequently enacted Act of 1973; in explaining the need for the legislation, the Report stated:

> "As we homogenize the habitats in which these plants and animals evolved, and as we increase the pressure for products that they are in a position to supply (usually unwillingly) we threaten their—and our own—genetic heritage.

> "The value of this genetic heritage is, quite literally, incalculable."

> "From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They

are keys to puzzles which we cannot solve, and may provide answers
to questions which we have not yet learned to ask."

> "To take a homely, but apt, example: one of the critical
> chemicals in the regulation of ovulations in humans was found in a
> common plant. Once discovered, and analyzed, humans could
> duplicate it synthetically, but had it never existed -- or had it been
> driven out of existence before we knew its potentialities -- we would
> never have tried to synthesize it in the first place."

> "Who knows, or can say, what potential cures for cancer or
> other scourges, present or future, may lie locked up in the structures
> of plants which may yet be undiscovered, much less analyzed? . . .
> Sheer self-interest impels us to be cautious.

> "The institutionalization of that caution lies at the heart of
> H.R. 37 . . . . ."

H.R.Rep.No.93-412, pp. 4-5 (1973)[;] H.R.Rep.No.93-412, pp. 4-5 (1973).
(Emphasis added.)

Tennessee Valley Auth. v. Hill, 437 U.S. at 153, 174-78.

After outlining this important legislative history of the Endangered Species Act, the

Supreme Court underscored just how "concerned" Congress was "about the unknown uses that

endangered species might have and about the unforeseeable place such creatures may have in the

chain of life on this planet." Tennessee Valley Auth. v. Hill, 437 U.S. at 179 (emphasis in the

original).

### 3.   Federal Courts May Review Fish & Wildlife's Area-Exclusion Decisions for Abuse of Discretion.

The Endangered Species Act's § 4(b)(2) critical-habitat-exclusion provision states that:

[Fish & Wildlife] may exclude any area from critical habitat if [it] determines that
the benefits of such exclusion outweigh the benefits of specifying such area as part
of the critical habitat unless [Fish & Wildlife] determines, based on the best
scientific and commercial data available, that the failure to designate such area as
critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2). In Weyerhaeuser, the Supreme Court determined that this critical-habitat-

exclusion provision is not exempt from judicial review as an APA, § 701(a)(2) exception. 139 S.

Ct. at 371-72 (citing 16 U.S.C. § 1533(b)(2)). The Supreme Court also indicated that the

§ 701(a)(2) exception only applies in the few cases where courts generally view a particular agency

decision as unreviewable, "such as the allocation of funds from a lump-sum appropriation, or a

decision not to reconsider a final action." Weyerhaeuser, 139 S. Ct. at 370 (citing Lincoln v. Vigil,

508 U.S. 182, 191 (1993); ICC v. Locomotive Eng'rs, 482 U.S. 270, 282 (1987)). Comparatively,

challenges to Fish & Wildlife's impact analysis for its exclusion decisions were "the sort of routine

dispute[s] that federal courts regularly review." 139 S. Ct. at 370.  The Supreme Court concluded

that the § 701(a)(2) exemption applies only to statutory provisions lacking agency decision-

making standards against which courts may review such agency decisions for abuse of discretion.

See Weyerhaeuser 139 S. Ct. at 370 (citing Lincoln v. Vigil, 508 U.S. at 191).  It determined that

the procedural mandate of the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to

evaluate economic and other impacts before deciding whether to exclude a designated area of

critical habitat.  See 139 S. Ct. at 370.  The Supreme Court recognized that the Endangered Species

Act's exclusion provision was not "'drawn so that a court would have no meaningful standard

against which to judge [] [Fish & Wildlife's] exercise of [its] discretion' not to exclude."

Weyerhaeuser, 139 S. Ct. at 371-72 (quoting Lincoln v. Vigil, 508 U.S. at 191)(alterations added).

Overall, it held that Fish & Wildlife's exclusion decisions are reviewable judicially for abuse of

discretion, because, even though: "[t]he word 'may' certainly confers discretion on [Fish &

Wildlife] . . . it does not segregate [its] discretionary decision not to exclude from the mandated

procedure to consider the economic and other impacts of designation when making [its] exclusion

decisions."  Weyerhaeuser, 139 S. Ct. at 371.  Or in other words, with this pronouncement, the

Supreme Court, clarified that Fish & Wildlife's discretionary exclusion decisions are not

independent from the Endangered Species Act's § 4(b)(2) procedural mandate.  Weyerhaeuser,

139 S. Ct. at 371.

## LAW REGARDING ASSOCIATION STANDING

An organization may represent its members' interests provided it can establish that: "(a)

its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State

Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). See Am. Forest & Paper Ass'n v. EPA,

154 F.3d 1155-59 (10th Cir. 1998).  "An association, representing a class, must meet a similar

test for standing as individuals do."  League of United Latin Am. Citizens, N.M. (LULAC) v.

Ferrera, 792 F. Supp. 2d 1222, 1232 (D.N.M. 2011)(Browning, J.).

1.    **Injury in Fact.**

To meet the test's first prong, "the association must allege that its members, or any one of

them, are suffering immediate or threatened injury as a result of the challenged action of the sort

that would make out a justiciable case had the members themselves brought suit." <u>Warth v. Seldin</u>,

422 U.S. 490, 511 (1975).  Further, the Supreme Court of the United States of America requires

allegations of "specific, concrete facts demonstrating that the challenged practices harm [plaintiffs]

and that [plaintiffs] personally would benefit in a tangible way from the court's intervention."

<u>Warth v. Seldin</u>, 422 U.S. at 508.

## 2.   Causation.

"The issue in the causation inquiry is whether the alleged injury can be traced to the

defendant's challenged conduct, rather than to that of some other actor not before the court."

<u>Ecological Rights Found. v. Pacific Lumber,</u> 230 F.3d 1141, 1151 (9th Cir. 2000) (citing <u>Lujan v.</u>

<u>Defenders of Wildlife,</u> 504 U.S. 555, 560 (1992).  The Tenth Circuit has distinguished between

the injury-in-fact requirement and the causation requirement:

> Whether an increased risk will or will not occur due to the agency action
> determines whether a plaintiff has suffered injury in fact, not causation . . . . [T]he
> risk must be actual, threatened or imminent. However, once the plaintiff has
> established the likelihood of the increased risk for purposes of injury in fact, to
> establish causation . . . the plaintiff need only trace the risk of harm to the agency's
> alleged failure to follow the [law].

<u>Comm. to Save the Rio Hondo v. Lucero</u>, 102 F.3d 445, 451-452 (10th Cir. 1996).  The relevant

showing for purposes of Article III standing, is injury to the plaintiff.  <u>See</u> <u>Friends of the Earth,</u>

<u>Inc. v. Laidlaw Env. Services (TOC), Inc.</u>, 528 U.S. 167, 181 (2000).

## 3.   Redressability.

To establish redressability, "a plaintiff must . . . establish it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." <u>Comm. to Save the Rio</u>

<u>Hondo v. Lucero</u>, 102 F.3d at 452.  A plaintiff seeking injunctive relief satisfies the redressability

requirement "by alleging a continuing violation or the imminence of a future violation of an

applicable statute or standard."  <u>NRDC v. Sw. Marine</u>, 236 F.3d 985, 995 (9th Cir. 2000).  For

purposes of a standing analysis, however, the court assumes that the alleged legal violations have

occurred and asks whether a favorable decision in the case will redress the injury that the plaintiffs

have alleged.  <u>See Comm. to Save the Rio Hondo v. Lucero</u>, 102 F.3d at 452.  To satisfy

redressability, the plaintiff need show only "the likelihood (as opposed to speculation [or certainty]

) that the injury will be redressed by a favorable decision." <u>Sw. Ctr. for Biological Diversity v.</u>

<u>Clark</u>, 90 F.Supp.2d 1300, 1310 (D.N.M. 1999)(Mecham, Senior Judge).  Where the plaintiff has

established that the challenged action causes him or her an ongoing injury in fact, then an order

invalidating and enjoining further engagement in the challenged action will redress the injury.  See Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. at 185–186.

### 4.    Germane to Its Purpose.

The final element for the association to show is that the interests it seeks to protect are germane to the association's purpose.  See Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. at 181.  Merriam-Webster Online defines germane as (i) "closely akin" and (ii) "being at once relevant and appropriate."  Germane, Marriam-Webster Online (last visited October 9, 2020), http://www.merriamwebster.com/dictionary/germane.   Sometime standing is confused with ripeness.  Standing and ripeness are closely related doctrines "in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention."  Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1234 (10th Cir. 2004)(quoting Johnson v. Missouri,  142 F.3d 1087, 1090 n. 4 (8th Cir. 1998)).  The difference between the two is that standing concerns who may bring an action while ripeness concerns when the action may be brought. See ACORN v. City of Tulsa, Okla., 835 F.2d 735, 738 (10th Cir. 1987).

### LAW REGARDING TAKINGS CLAIMS UNDER THE FIFTH AMENDMENT

The Takings Clause of the Fifth Amendment to the Constitution of the United States, declares that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V.  The Supreme Court has stated: "The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, . . . prohibits the government from taking private property for public use without just compensation," Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001). See Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226 (1897).  Supreme Court case law has revealed a spectrum of prohibited takings under the Fifth Amendment.  For example, a government actor can "take" property for the purposes of the Fifth Amendment either by physically depriving the owner of the property or by placing upon the property such restrictive regulations that the owner is effectively deprived of the ability to use the property.  See Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001)(noting that "even a minimal 'permanent physical occupation of real property' requires compensation under the Clause," and that "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause").  The Court has even recognized the occurrence of takings "when government actions do not encroach upon or occupy the property yet still affect and

limit its use to such an extent." Palazzolo v. Rhode Island, 533 U.S. at 617 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)).  Justice Holmes articulated an important limitation in proscribing the extent of government regulation of private property rights: "[W]hile property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." Palazzolo v. Rhode Island, 533 U.S. at 617 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)).

Guided by this principle, the Supreme Court has offered some benchmarks to guide lower courts in their determinations regarding "whether a particular government action goes too far and effects a regulatory taking." Palazzolo v. Rhode Island, 533 U.S. at 617.  In Lucas v. South Carolina Coastal Council, for instance, the Supreme Court determined that notwithstanding certain qualifications, "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." 505 U.S. 1003, 1015 (1922); see also 505 U.S. at 1035 (Kennedy, J. concurring); Agins v. City of Tiburon, 447 U.S. 255, 261 (1980).  Yet, even "[w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." Palazzolo v. Rhode Island, 533 U.S. at 617 (citing Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124, 1978).  The fundamental purpose of the Takings Clause – which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," Armstrong v. United States, 364 U.S. 40, 49 (1960) is the unifying principle that must inform courts' takings inquiries.   See Palazzolo v. Rhode Island, 533 U.S. at 617.

For a Takings Clause claim, state law determines what property rights exist. See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 707 (2010)("Generally speaking, state law defines property interests...."); Vandevere v. Lloyd, 644 F.3d 957, 963 (9th Cir.2011)( "[W]e look to state law to determine what property rights exist and therefore are subject to 'taking' under the Fifth Amendment.").

## ANALYSIS

For the reasons explained below, the Court concludes that: (i) the Stockman's Associations show sufficient concrete economic injuries to establish Article III associational standing to

challenge Fish & Wildlife's critical habitat designation for the Jumping Mouse species; (ii) Fish & Wildlife's decision to use the incremental effects approach to consider economic impacts associated with the designation is consistent with the Endangered Species Act's § 4(b)(2); (iii) Fish & Wildlife did not abuse its discretion by failing to consider other designation costs, such as compensating the members of the Stockman's Associations for reducing the value of their water rights, and the interference with members' water rights does not amount to a taking under the Fifth Amendment; (iv) the Stockman's Associations administratively waived their claims challenging Fish & Wildlife's decision not to exclude Units 3 and 4 from the designation because no member of the Stockman's Associations raised any challenge to the inclusion of these units, except for subunit 3c, during the proposed designation's public comment period; (v) notwithstanding the waiver, however, Fish & Wildlife has provided a sufficiently reasoned explanation to support its conclusion not to exclude Units 3 and 4 from the designation pursuant to the Endangered Species Act's § 4(b)(2) and its internal Section 4(b)(2) Policy governing its decision-making standards regarding exclusion.    Furthermore, because of the Court's rejection of the Stockman's Associations challenges here, it deems remedy unnecessary in this case.  If the Court were to have ruled favorably on any one of the aforementioned questions, however, the Court still would not vacate the critical habitat designation in its entirety; rather, it would tailor vacatur in a narrow manner as to address only the units in which the Stockman's Associations' members show concrete injuries.  This tailored vacatur would leave untouched remaining units of the critical habitat designation.

## I.    THE STOCKMAN'S ASSOCIATIONS SATISFY THE REQUISITE ELEMENTS OF ASSOCIATION STANDING TO CHALLENGE FISH & WILDLIFE'S CRITICAL HABITAT DESIGNATION OF UNITS 3 AND 4.

Otero Cattleman's Association and Northern NM Stockman's Association, the two plaintiff organizations composing the Stockman's Associations, argue that they have standing to challenge Fish & Wildlife's critical habitat designation of Units 3 and 4 for the Jumping Mouse because they meet the three elements required for associational standing: (i) the members of the Stockman's Associations would otherwise have standing; (ii) the Stockman's Associations were established for a purpose that is relevant to their members' interests that the Stockman's Associations strive to protect; and (iii) members of the Stockman's Associations are not required to participate in the lawsuit based on claims and requests for relief.  See Petition at 17 (citing Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).  In its Brief in Response to

Petitioners' Brief in Support of Petition for Review at 6-11, filed September 23, 2019 (Doc. 32), Fish & Wildlife contend that both Otero Cattleman's Association and Northern NM Stockman's Association lacked association standing to bring this suit, alleging that both associations' members fail to show the requisite "concrete injury" under <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. at 343.  Upon evaluation of two new declarations that members of the Otero Cattleman's Association submitted and referenced in the Stockman's Associations' reply brief filed on October 18, 2019, Fish & Wildlife amended its position at the subsequent October 31, 2019 hearing. Specifically referencing the evidence the Otero Cattleman's Association put forth at the October 31, 2019 hearing, Fish & Wildlife conceded that the Otero Cattleman's Association had established standing under <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. at 343.  <u>See</u> Tr. at 16:14-17:7 (Flanagan).  In validating its new position, Fish & Wildlife's counsel, Ms. Devon Flanagan, cited the newly submitted evidence that Otero County Cattleman Association members use Unit 4 of the critical habitat designation, and therefore, show that the designation of Unit 4 impacts their allotments.  Northern NM Stockman's Association members put forth no equivalent evidence, however; so Ms. Flanagan maintained that the Northern NM Stockman had fail to show standing under <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. at 343.

For the purpose of the Court's analysis, it will evaluate the standing of both the Otero County Cattleman Association and the Northern NM Stockman's Association, which comprise the collective Stockman's Associations.

### A. THE MEMBERS OF THE STOCKMAN'S ASSOCIATIONS MEET THE FIRST ELEMENT OF STANDING, BECAUSE THEY SHOW SUFFICIENT ECONOMIC "INJURY IN FACT" THAT IS "FAIRLY TRACEABLE" TO FISH & WILDLIFE'S DESIGNATION OF UNITS 3 AND 4 AS CRITICAL HABITATS FOR THE JUMPING MOUSE, AND THERE IS "A LIKELIHOOD" THAT REMOVAL OF THE DESIGNATION WILL "REDRESS" THEIR ALLEGED ECONOMIC INJURIES.

Association standing's first element under <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. at 343, demands that the association demonstrate an "injury in fact."  To meet the test's prong, therefore, "the association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." <u>Warth v. Seldin</u>, 422 U.S. at 511. Further, the Supreme Court requires allegations of "specific, concrete facts demonstrating that the challenged practices harm [plaintiffs] and that [plaintiffs] personally would benefit in a tangible way from the court's intervention." <u>Warth v. Seldin</u>, 422 U.S. at 508.  Element one encompasses

the "causation" inquiry as well, in that the injury must be "fairly traceable" to defendants with "a likelihood that the requested relief will redress the alleged injury." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998). In other words, "[t]he issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." Ecological Rights Found. v. Pacific Lumber, 230 F.3d at 1151 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 555)). The Tenth Circuit has distinguished between the injury-in-fact requirement and the causation requirement:

> Whether an increased risk will or will not occur due to the agency action determines whether a plaintiff has suffered injury in fact, not causation . . . . [T]he risk must be actual, threatened or imminent. However, once the plaintiff has established the likelihood of the increased risk for purposes of injury in fact, to establish causation ... the plaintiff need only trace the risk of harm to the agency's alleged failure to follow the [law].

Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 451-52. The relevant showing for purposes of Article III standing, is injury to the plaintiff. See Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. at 181.

In its response brief, Fish & Wildlife argued that the Stockman's Associations lack standing, because none of their declarants own property within the critical habitat designation, and none of the declarants can show that their access to water on their private property will decrease because the designation. See Response at 11-12. In advancing the argument, Fish & Wildlife dismissed statements Stockman's Association's members make that the designation "lowers [their] property values as a result of negative perception of land designated critical habitat" and results in their "decreased access to water." See Mariano Lucero Decl. ¶ 11, at 2; see also Manuel Lucero Decl. ¶ 15, at 3; Michael Lucero Decl. ¶ 11, at 2; Medeiros Decl. ¶ 15, at 3; Mershon Decl. ¶ 12, at 2. However, given Fish & Wildlife's concession at the October 31, 2019, hearing regarding Otero Cattleman's Association standing, see Tr. At 9:17-10:3, the Court assumes that Fish & Wildlife maintains this argument only in connection to the standing of the Northern NM Stockman. Regardless, Fish & Wildlife's argument lacks a sound basis in the relevant facts.

Evidence demonstrates that members of both the Otero Cattleman's Association and the Northern NM Stockman's Association graze cattle in the Santa Fe and Lincoln National Forests, both of which lie in or around Units 3 and 4 of the critical habitat designations. See Screening Memo at 11-12 (AR D002745-46) (list of allotments affected by designation); Carlos Salazar Decl. Decl. ¶¶ 12–15 at 4; Stone Decl. ¶¶ 11–12, at 4; Lucero, Decl. ¶¶ 5–8, 9 at 2; Mariano Lucero

Decl. ¶ 6, at 2; Holcomb Medeiros Decl. ¶ 11, at 3; Goss Decl. ¶ 11, at 3; Mershon Decl. ¶ 7, at 3. The economic impact analysis in the Screening Memo that the Industrial Economics generated on Fish & Wildlife's behalf "identified grazing as the main activity occurring within the areas proposed for designation that is likely to experience impacts from the rule." Screening Memo at 6 ((AR D002740).).   Furthermore, as Mr. Damien Schiff, Stockman's Association's counsel explained at the October 31, 2019, hearing, the nature of grazing allotments means that, even if an association member does not own property within a given unit of land, she "has a right to use a grazing allotment on Forest Service land," which "entails the requirement to have private base property associated with that grazing allotment." Tr. at 4:21-24 (Schiff).  See Tr. at 7:19-8:1 (Schiff).  Because of this right, as Mr. Schiff further noted, invariably Fish & Wildlife's critical habitat designation of Units 3 and 4 will increase costs to ranchers in the area because of a resulting "negative economic impact" known as the "perceptional effects phenomenon." Tr. at 5:6-11, 8:14-16 (Schiff).

When advancing the "perceptional effect phenomenon" economic impact theory, Mr. Schiff cited a declaration from a certified third-party appraiser that the Stockman's Associations commissioned, which explains how the critical habitat designation reduces the market value of ranchers' associated base property ranches.  See Tr. at 5:6-11 (Schiff); Tr. at 8:14-16 (Schiff). Relatedly, Stockman's Associations' members have submitted evidence demonstrating that the negative public perception associated with their property as a result of the critical habitat designation of Units 3 and 4 has resulted in decreased individual land values.  See Perceptional Effects Memo at 1 (AR D002726).  Because the Supreme Court holds that a decrease in land value resulting from a critical habitat designation is sufficient for an association to demonstrate standing, see Weyerhaeuser, 139 S. Ct. at 368 n.1, the Court holds that Stockman's Associations members have shown sufficient economic injury to satisfy element one of association standing under Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. at 343.

Yet, even beyond the decreased market values of their properties, association members, as Mr. Schiff explained, face other immediate and long-term costs related to the critical habitat designation. .  See Tr. at 5:14-8:2 (Schiff).  These costs are connected to burdens such as installing fencing exclosures in grazing allotments and members' anticipated reduction in the number of

cattle grazed.  See Tr. at 5:14-8:2 (Schiff).  See also Petition at 17.  These costs, tied inherently to the critical habitat designation, intersect with the members' abilities to use their allotments.

Furthermore, members from both the Otero Cattleman's Association and Northern NM Stockman's Association can show economic injuries in the form of increased regulatory costs because of the critical habitat designation.  CITE In fact, upon the designation of Units 3 and 4 as critical habitats, ranchers faced immediate increased citizen suit liability related to their property holdings because the additional burdens that the Endangered Species Act imposes.  For example, under the Endangered Species Act, grazing permit renewals will require § 7 consultations, see 16 U.S.C.  § 1536(a) -- consultations that can be onerous in terms of time and cost investment to applicants.  See Screening Memo at 7 (AR D002741-42).  Furthermore, the Endangered Species Act offers individuals power to enjoin any activity of others that violates the Endangered Species Act, see 16 U.S.C. § 1540(g), which can encompass a range of activities, including "habitat modification or degradation,"  50 C.F.R. § 17.3.  This authority means that, following the critical habit designation of Units 3 and 4, Stockman's Association members will be impacted on a fiscal and regulatory level in the immediacy and over the long-term, thus constituting sufficient economic injury that is "fairly traceable" to Fish & Wildlife's critical habit designation of the areas.  Steel Co. v. Citizens for a Better Env't, 523 U.S. at 102-03.

At the October 31, 2019, hearing, Mr. Schiff also contended that the critical habit designation results in direct injuries to association members related to the requisite fencing of Units 3 and 4 following the designation.  See Tr. at 5:14-8:2 (Schiff).  ).  See also Screening Memo at 13-14 (AR D002747-D002748).  Referencing the October 8, 2019, Medeiros Suppl. Decl., Mr. Schiff explained that, although designated cattle lanes have been allowed in the Units following the critical habitat designation  -- which allow members' cattle to access the watering holes that have otherwise been fenced off by the critical habitat designation -- the cattle lanes are inadequate, because they congest cattle movement.  See Tr. at 6:22-25 (Schiff)   This congestion, in turn, generates stress within the cattle,  which ultimately could result in a reduction in the livestock value. See Tr. at 7:1-7 (Schiff).  Relatedly, as Mr. Schiff explained further, additional management requirements that increase cattle congestion pose because of the cattle lanes imposes obstacles on ranchers' abilities to manage their allotments.  See Tr. at 7:1-7 (Schiff)).  These obstacles, too,

could result in a negative economic impact "above and beyond" those that ranchers already face because of the critical habitat designation.  See Tr. at 7:10 (Schiff).

Finally, while it is true, as Mr. Schiff conceded at the October 31, 2019, hearing, that none of the Stockman's Associations members live in one of the designated critical habitat units, owning private property within a designation is not essential for standing.   See Lujan v. Defenders of Wildlife, 504 U.S. at 559.  Rather, in accordance with Supreme Court precedent, the Court emphasizes that the ranchers have permits, which allow them to use portions of Units 3 and 4 by way of grazing allotments.  See Lujan v. Defenders of Wildlife, 504 U.S. at 559.  Often, the values of ranchers' private properties are tied inherently to the values of these permits that allow for grazing on the associated allotments.  The Court, therefore, determines that any form of restrictions or regulations on these allotments will impact invariably the value of ranchers' private properties, which therefore creates sufficient economic injury to association members to satisfy sanding's the first element of standing under Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. at 343.

### B.   THE STOCKMAN'S ASSOCIATIONS MEET ELEMENT TWO OF ASSOCIATION STANDING, BECAUSE THEY SEEK TO PROTECT THE RANCHING INTERESTS OF THEIR INDIVIDUAL MEMBERS, WHICH IS AN OBJECTIVE FOR WHICH THE ASSOCIATIONS WERE FOUNDED TO PROTECT.

The association standing test's second element requires the Stockman's Associations to show that "the interests it seeks to protect" here -- the interests of its individual rancher members -- are "germane to the [organizations'] purpose[s]." Hunt Wash. State Apple Advertising Comm'n, 432 U.S. at 343.  Merriam–Webster Online defines germane as (i) "closely akin" and (ii) "being at once relevant and appropriate." Germane, Merriam-Webster Online (Online ed.) http://www.merriamwebster.com/dictionary/germane (last visited September 3, 2020).  See also Wyoming Trucking Ass'n, Inc. v. Bentsen, No. 94-CV-0107-B, 1995 WL 333852, at *5 n.4 (D. Wyo. Feb. 7, 1995)("Webster's Third New International Dictionary (Unabridged) (1971) defines germane as 'closely akin' or 'having a close relationship.'").

Carlos Salazar, President of the Northern NM Stockman's Association, and Gary Stone, President of the Otero Cattleman's Association, declare that the Stockman's Associations were formed to protect the individual members' ranching interests.  See Petition at 11 (citing Salazar Decl. ¶¶ 5-7, at 2; Stone Decl. ¶¶ 5-6, at 1-2).  The Northern NM Stockman's Association and the Otero Cattleman's Association, therefore, are membership-driven organizations, which means that

the rancher-members drive the associations ultimate decisions and directions through their various membership-related activities.  See Petition at 11 (citing Salazar Decl. ¶¶ 5–7, at 2; Stone Decl. ¶¶ 5–6, at 1-2).   These activities range from voting for leadership candidates or serving in organizational leadership roles to work on various initiatives that further the associations' overarching goals.  See Petition at 11 (citing Salazar Decl. ¶¶ 5–7, at 2; Stone Decl. ¶¶ 5–6, at 1-2).   The Stockman's Associations would be hollow entities without their membership constituencies.  See Petition at 11 (citing Salazar Decl. ¶¶ 5–7, at 2; Stone Decl. ¶¶ 5–6, at 1-2). In protecting these individual members' interests, the Stockman's Associations, therefore, are protecting the purposes that are germane to their formation and continue to be germane for the associations' existences.  See Petition at 11 (citing Salazar Decl. ¶¶ 5–7, at 2; Stone Decl. ¶¶ 5–6, at 1-2).

## C.  THE STOCKMAN'S ASSOCIATIONS MEET STANDING'S THIRD ELEMENT, BECAUSE THE RELIEF THEY REQUEST DOES NOT REQUIRE THEIR INDIVIDUAL RANCHERS' PARTICIPATION.

The association standing test's third element requires that the Stockman's Associations demonstrate that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. at 343.  In this case, the Stockman's Associations request prospective relief only in the form of the Court holding unlawful, and setting aside, Fish & Wildlife's critical habitat designations of Units 3 and 4.   See P. Remedy Brief at 1-8.  "'Individual participation' [of members] is not normally necessary when an association seeks prospective or injunctive relief for its members"; however, "such participation would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue."   United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 546 (1996)(citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343).  Association Standing's third element does not pose a high burden on associations.  As the Supreme Court explained in United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. at 544-45:

> The test's first prong is grounded in Article III as an element of the constitutional case or controversy requirement. Resort to general principles, however, leads to the conclusion that the third prong is a prudential impediment that Congress may abrogate. Hunt's requirement that an organization suing as representative include at least one member with standing to present, in his or her own right, the claim pleaded by the association is an Article III necessity for the association's

representative suit. <u>Hunt's</u> second prong is complementary to the first, because it raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary. But once an association has satisfied <u>Hunt's</u> first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more. The third prong is best seen as focusing on matters of administrative convenience and efficiency, not on elements of a case or controversy. Circumstantial evidence of that prong's prudential nature is seen in the wide variety of other contexts in which a statute, federal rule, or accepted common-law practice permits one person to sue on behalf of another, even where damages are sought.

<u>See</u>, <u>e.g.</u>, 42 U.S.C. § 2000e–5(f)(1).

In light of the lenient standard, and with the Supreme Court's direction in mind, the Court concludes that the Stockman's Associations have satisfied association standing's third element, because by its nature, the relief requested by the Stockman's Associations does not require the participation of individual members either of the Northern NM Stockman's Association or the Otero Cattleman's Association. Ultimately then, because the Stockman's Associations sufficiently show that their individual (i) "members would otherwise have standing to sue in their own right," (ii) "the interests [they] seek[] to protect are germane to the [Northern NM Stockman's Association's and Otero Cattleman's Association's] purpose[s]" and (iii) "neither the claim asserted nor the relief requested requests the participation of individual members in the lawsuit," the Court concludes that the associations have met the requisite elements of standing under <u>Hunt v. Washington State Apple Advert. Comm'n</u>, 432 U.S. at 343.

## II.   FISH & WILDLIFE'S DECISION TO USE THE INCREMENTAL EFFECTS APPROACH IS A WELL-REASONED AND PERSUASIVE METHOD TO ASSESS THE DESIGNATION'S ECONOMIC COSTS AND, BECAUSE FISH & WILDLIFE NO LONGER CONFLATES ITS REGULATORY DEFINITIONS FOR THE JEOPARDY STANDARD AND THE ADVERSE MODIFICATION STANDARD, THE INCREMENTAL EFFECTS APPROACH IS CONSISTENT WITH THE ENDANGERED SPECIES ACT'S § 4(b)(2).

The Endangered Species Act's process for designating critical habitat requires that Fish & Wildlife first give some consideration to the economic impact of designating critical habitat. <u>See</u> 16 U.S.C. § 1533(b)(2). The Court first reviews this procedure and its connection to the Endangered Species Act's requirement that Fish & Wildlife consult with other federal agencies to ensure that agencies do not authorize, fund, or carry out any action that might "result in the destruction or adverse modification of habitat of" a listed species. 16 U.S.C. § 1536(a)(2). Although the Tenth Circuit held in <u>N.M. Cattle Growers Ass'n</u> that the baseline or incremental effects approach is inconsistent with the Endangered Species Act's § 4(b)(2), the Tenth Circuit's

reasoning primarily focused on Fish & Wildlife's nearly identical regulatory definitions for "jeopardize the continued existence," and for "destruction or adverse modification."  50 C.F.R. § 402.02 (effective October 31, 1984).  See N.M. Cattle Growers Ass'n, 248 F.3d at 1285.  Since the Tenth Circuit decided N.M. Cattle Growers Ass'n, Fish & Wildlife has formally codified the incremental effects approach, see 50 C.F.R. § 424.19, and amended the adverse modification standard's definition such that the incremental effects approach accounts for some costs that go beyond the listing's economic impact.  The Court concludes that Fish & Wildlife's use of the incremental effects approach flows from Fish & Wildlife's interpretation of "economic impact" in the Endangered Species Act's § 4(b)(2).  16 U.S.C. § 1533(b)(2).  Although Chevron dictates the Court's analysis of issues that turn on an agency's interpretations of a statute, the Court concludes that Chevron does not apply, because the incremental effects approach's codification is an interpretative rule, rather than a legislative rule to which Chevron applies.  Alternatively, if Chevron applies, the Court would conclude that Fish & Wildlife is entitled to Chevron deference, because the Endangered Species Act's § 4(b)(2) does not address directly the economic impact analysis methodology that Fish & Wildlife must use, and because Fish & Wildlife's decision to use the incremental effects approach rests on a permissible construction of the Endangered Species Act.  Finally, although Chevron does not apply, Fish & Wildlife is entitled to some deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944)("Skidmore").  Fish & Wildlife's amendment of the adverse modification standard's definition minimizes the concerns that the Tenth Circuit voiced in N.M. Cattle Grower's Ass'n, because the adverse modification standard's current definition does not lead Fish & Wildlife to determine that designating critical habitat will result in no incremental costs.  The Court thus concludes that the incremental effects approach is well-reasoned, has the power to persuade, and is no longer inconsistent with the Endangered Species Act's mandate that Fish & Wildlife consider the "economic impact" of designating critical habitat. 16 U.S.C. § 1533(b)(2).

### A.  THE ENDANGERED SPECIES ACT OFFERS A PROCEDURE UNDER WHICH FISH & WILDLIFE MUST LIST A SPECIES AS THREATENED OR ENDANGERED AND DESIGNATE CRITICAL HABITAT.

In 1973, Congress enacted the Endangered Species Act in response to concerns that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untampered by adequate concern and conservation."  16 U.S.C. § 1531(a)(1).  Congress' stated purpose for enacting the Endangered

Species Act is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Endangered Species Act grants the Secretary of the Interior the authority to list species that he or she determines to be endangered or threatened.[20]  See 16 U.S.C. § 1533(a)(1). When determining whether to list a species, the Secretary of the Interior "shall make determinations . . . solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A). The Tenth Circuit and other Courts of Appeals have interpreted this statutory provision as "clearly bar[ring] economic considerations from having a seat at the table when the listing determination is being made." N.M. Cattle Growers Ass'n, 248 F.3d at 1277. See Ariz. Cattle Growers' Ass'n, 606 F.3d at 1172 ("The decision to list a species as endangered or threatened is made without reference to the economic effects of that decision."). After the Secretary of the Interior lists a species as endangered or threatened, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The Tenth Circuit refers to this standard as the "jeopardy standard," N.M. Cattle Growers Ass'n, 248 F.3d at 1283, and Fish & Wildlife defines "[j]eopardize the continued existence" as "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species," 50 C.F.R. § 402.02.

The Endangered Species Act also requires that the Secretary of the Interior, "concurrently with making" the listing determination "that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). Moreover, the Secretary of the Interior "shall designate critical habitat, and make revisions thereto, . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other

---

[20]In determining whether any species is an endangered species or a threatened species, the Secretary of the Interior must consider the following factors: (i) "the present or threatened destruction, modification, or curtailment of its habitat or range"; (ii) "overutilization for commercial, recreational, scientific, or educational purposes"; (iii) "disease or predation"; (iv) "the inadequacy of existing regulatory mechanisms"; and (v) "other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1)(A)-(E).

relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).  The

Endangered Species Act provides the following definition for critical habitat:

> (i)    the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii)    specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A)(i)-(ii).  Accordingly, the critical habit designation "may include specific

areas found both inside of and outside of the geographic area occupied by the species."  N.M.

Cattle Growers Ass'n, 248 F.3d at 1282.  In addition, the Secretary of the Interior

> may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. 1533(b)(2).  After the Secretary of the Interior designates an area as critical habitat,

federal agencies must consult with him or her to "insure that any action authorized, funded, or

carried out by such agency . . . is not likely to . . . result in the destruction or adverse modification

of habitat of such species which is determined by the Secretary . . . to be critical."  16 U.S.C.

§ 1536(a)(2).  The Tenth Circuit refers to this standard as the "adverse modification standard,"

N.M. Cattle Growers Ass'n, 248 F.3d at 1283, and Fish & Wildlife defines "[d]estruction or

adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of

critical habitat as a whole for the conservation of a listed species,"[21] 50 C.F.R. § 402.02.

        After consulting with another federal agency about an agency action, Fish & Wildlife must

provide the federal agency a written statement that sets forth Fish & Wildlife's opinion,

summarizes the information on which the opinion is based, and details "how the agency action

affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  If Fish & Wildlife

---

        [21]When the Tenth Circuit decided N.M. Cattle Growers Ass'n, Fish & Wildlife employed a slightly different definition for "destruction or adverse modification":

> a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.  Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02 (effective October 31, 1984).

determines that an agency action is likely to jeopardize a listed species' likelihood of survival and recovery or adversely modify the listed species' critical habitat, then Fish & Wildlife must "suggest [] reasonable and prudent alternatives" that do not jeopardize the species or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A). Conversely, if Fish & Wildlife determines that an agency action is not likely to jeopardize a listed species' likelihood of survival and recovery or adversely modify the listed species' critical habitat, Fish & Wildlife must provide the federal agency a written statement that: (i) "specifies the impact of such incident taking on the species"; (ii) "specifies those reasonable and prudent measures . . . necessary or appropriate to minimize such impact"; and (iii) "sets for the terms and conditions" with which the federal agency must comply. 16 U.S.C. § 1536(b)(4)(C)(i), (ii), and (iv).

> **B.    ALTHOUGH THE TENTH CIRCUIT HELD IN N.M. CATTLE GROWERS ASS'N THAT THE BASELINE OR INCREMENTAL EFFECTS APPROACH IS INCONSISTENT WITH THE ENDANGERED SPECIES ACT'S § 4(b)(2), FISH & WILDLIFE HAS SINCE CODIFIED THE INCREMENTAL EFFECTS APPROACH THROUGH FORMAL RULEMAKING AND AMENDED THE ADVERSE MODIFICATION STANDARD'S DEFINITION ON WHICH THE TENTH CIRCUIT RELIED TO REACH ITS HOLDING.**

The parties disagree how Fish & Wildlife should assess "the economic impact . . . of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The Stockman's Associations argue that Fish & Wildlife "underestimated the economic impacts of the designation because it only took into account the incremental costs of the designation." Petition at 19. The Stockman's Associations contend that, when designating critical habitat, the Endangered Species Act mandates that Fish & Wildlife apply the coextensive approach, rather than the incremental effects approach, to economic analysis. See Petition at 19-20. The coextensive approach requires Fish & Wildlife to analyze not only the designation's economic impacts, but also "the costs beyond the designation itself, including the costs associated with the listing of the species, before designating critical habit" -- hence, according to the Stockman's Associations, Fish & Wildlife should assess costs that are "coextensive" with both the listing and the designation. Petition at 19. Fish & Wildlife counters, however, that the incremental approach, which considers the designation's economic impacts that "go[] beyond the listing itself," comports with the Endangered Species Act's § 4(b)(2), and it notes that it calculated $23,000,000.00 in economic costs associated with the Jumping Mouse's designation. Response at 18. Fish & Wildlife argues that the incremental approach it used to calculate economic costs for the Jumping Mouse's

designation is different from the baseline approach that the Tenth Circuit rejected in <u>N.M. Cattle</u> <u>Growers Ass'n</u>, because, there, Fish & Wildlife used the baseline approach "to determine that there would be *zero* costs associated with designating critical habitat for the Southwestern Willow Flycatcher."  Response at 17 (citing <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1280, 1285).  Fish & Wildlife argues that, although the Tenth Circuit interpreted the Endangered Species Act and subsequently endorsed the coextensive approach, <u>N.M. Cattle Growers Ass'n</u> no longer controls, because Fish & Wildlife has since amended regulations upon which the Tenth Circuit relied, and because Fish & Wildlife has since codified the incremental effects approach "through formal notice-and-comment rulemaking," thus entitling it to <u>Chevron</u> deference.  Response at 20.

Much of the parties' briefs and arguments at the October 31, 2019, hearing center on the extent to which <u>N.M. Cattle Growers Ass'n</u> should guide the Court's analysis.  <u>See</u> Petition at 14-17; Response at 16-22; Tr. at 26:24-64:20 (Schiff, Flanagan).  In <u>N.M. Cattle Growers Ass'n</u>, several New Mexico agricultural groups challenged Fish & Wildlife's critical habitat designation for the Willow Flycatcher.  <u>See</u> <u>N.M. Cattle Growers Ass'n</u>, 428 F.3d at 1279-80.  The plaintiffs argued that Fish & Wildlife's adoption of the baseline approach to assess the designation's economic impacts was an "erroneous construction" of the Endangered Species Act's § 4(b)(2). <u>N.M. Cattle Growers Ass'n</u>, 428 F.3d at 1280.  The Tenth Circuit described Fish & Wildlife's rationale for the baseline approach:

> The baseline approach utilized by the FWS is premised on the idea that the listing of the species (which will occur prior to or simultaneously with the [critical habitat designation]) will have economic impacts that are not to be considered.  The primary statutory rationale for this position comes from 16 U.S.C. § 1533(b)(1)(A), which states that listing determinations be made "solely on the basis of the best scientific and commercial data available."  Thus, the baseline approach moves any economic impact that can be attributed to listing below the baseline and, when making the [critical habitat designation], takes into account only those economic impacts rising above the baseline.

<u>N.M. Cattle Grower's Ass'n</u>, 428 F.3d at 1280.  Fish & Wildlife had determined that all economic impacts that stem from the Willow Flycatcher's critical habitat designation were equally attributable to the Willow Flycatcher's listing determination, and, thus, Fish & Wildlife concluded that the Willow Flycatcher's critical habitat designation would have zero economic impacts.  <u>See</u> <u>N.M. Cattle Growers Ass'n</u>, 428 F.3d at 1280.

When the Tenth Circuit decided <u>N.M. Cattle Growers Ass'n</u> in 2001, Fish & Wildlife had interpreted the Endangered Species Act's § 4(b)(2) as permitting the baseline approach when

assessing a designation's economic impacts, but Fish & Wildlife had not codified its interpretation

through the formal rulemaking process. See N.M. Cattle Growers Ass'n, 428 F.3d at 1281. The

Tenth Circuit noted that, "[b]ecause the statutory interpretation resulting in the baseline approach

has never undergone the formal rulemaking process, it remains an informal interpretation not

entitled to deference." N.M. Cattle Growers Ass'n, 428 F.3d at 1281 (citing Hunnicutt v. Hawk,

229 F.3d 997, 1000 (10th Cir. 2000)). Rather than apply Chevron deference, the Tenth Circuit

asked whether Fish & Wildlife's baseline approach derives from an interpretation of the

Endangered Species Act's § 4(b)(2) that is "'well reasoned' and has the 'power to persuade.'"

N.M. Cattle Growers Ass'n, 428 F.3d at 1281 (quoting Fristoe v. Thompson, 144 F.3d 627, 631

(10th Cir. 1998)). While the Tenth Circuit did not conclude explicitly that the Endangered Species

Act's § 4(b)(2) is ambiguous as to which economic impacts approach Fish & Wildlife should

adopt, the Tenth Circuit interpreted the statutory text and analyzed the Endangered Species Act's

legislative history to determine whether the baseline approach comports with the statute. See N.M.

Cattle Growers Ass'n, 428 F.3d at 1281-85.

The Tenth Circuit said that the "crux of the statutory dispute is in determining the meaning

of 'economic impact.'" N.M. Cattle Growers Ass'n, 428 F.3d at 1283 (quoting 16 U.S.C.

§ 1533(b)(2)). Whereas Fish & Wildlife used the baseline approach and attributed nearly all

economic impacts to causes other than the critical habitat designation, such as the listing

determination, the plaintiffs contended that Fish & Wildlife must consider all economic impacts,

"regardless of whether those impacts are caused co-extensively by any other agency action (such

as listing)." N.M. Cattle Growers Ass'n, 428 F.3d at 1283. The Tenth Circuit then traced the

parties' conflicting interpretations to Fish & Wildlife's long-held policy positions, which 50 C.F.R.

§ 402.02 -- the regulatory provision that codifies Fish & Wildlife's "jeopardy standard" and

"adverse modification standard" -- reflects:

> The root of the problem lies in the FWS's long held policy position that
> [critical habitat designations] are unhelpful, duplicative, and unnecessary. . . .
>
> In turn, the policy position of the FWS finds its root in the regulations
> promulgated by the FWS in 1986 defining the meaning of both the "jeopardy
> standard" (applied in the context of listing) and the "adverse modification
> standard" (applied in the context of designated critical habitat). Action violating
> the jeopardy standard is action reasonably expected "to reduce appreciably the
> likelihood of both the survival and recovery of a listed species." 50 C.F.R.
> § 402.02. Action violating the adverse modification standard is action "that
> appreciably diminishes the value of critical habitat for both the survival and
> recovery of a listed species." Id. Thus, the standards are defined as virtually

identical, or, if not identical, one (adverse modification) is subsumed by the other (jeopardy).

N.M. Cattle Growers Ass'n, 428 F.3d at 1283 (citation omitted). Because almost all action that violates the adverse modification standard also violates the jeopardy standard, Fish & Wildlife had concluded that the Willow Flycatcher's designation would not result in any economic impacts beyond the listing's economic impacts, which play no consideration in Fish & Wildlife's listing determinations. See N.M. Cattle Growers Ass'n, 428 F.3d at 1283-84.

The Tenth Circuit disagreed with Fish & Wildlife's position that designating critical habitat for the Willow Flycatcher would result in no economic impacts, in part because the "statutory language is plain in requiring some kind of consideration of economic impact in the [critical habitat designation] phase." N.M. Cattle Growers Ass'n, 428 F.3d at 1285. Moreover, the Tenth Circuit reasoned that 50 C.F.R. 402.02's "definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless." N.M. Cattle Growers Ass'n, 428 F.3d at 1285.[22] In the Tenth

---

[22]The parties sometimes refer to this conflation of the jeopardy standard and adverse modification standard as "functional equivalence." Response at 19; Reply at 9; Tr. at 49:12-13 (Flanagan). In Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, the Honorable Royce Lamberth, Senior United States District Judge for the United States District Court for the District of Columbia, analyzed N.M. Cattle Growers Ass'n, and noted that Fish & Wildlife's regulatory definitions for "jeopardize the continued existence," and for "destruction or adverse modification" are the basis for Fish & Wildlife's "functional equivalence" of the effects of listing a species with the effects of designating critical habitat. Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 344 F. Supp. 2d at 127-29. Judge Lamberth defined functional equivalence as "the theory that the designation of critical habitat serves a minimal additional function separate from [] listing a species -- that the effects of designation are mainly a subset of the effects of listing." Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 344 F. Supp. 2d at 127. Judge Lamberth then echoed the Tenth Circuit by concluding that Fish & Wildlife's regulatory definitions in 50 C.F.R. § 402.02 are inconsistent with the Endangered Species Act's text. See Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 344 F. Supp. 2d at 129 ("The Tenth Circuit saw . . . the same flaws in the functional equivalence regulation that [] other circuits found repugnant.").

> The regulation, then, is the root of the Service's doctrine of functional equivalence: the regulation permits the Service to assert that actions meeting the adverse modification standard almost always meet the jeopardy standard, making consideration of jeopardy a proxy for consideration of adverse modification.
>
> The effect of functional equivalence on economic impact analysis and on conservation efforts quickly follows. The doctrine and regulation hold that actions interfering with conservation but not survival are not adverse modification or destruction. Thus, the Service's own regulation causes it to undercut the importance of critical habitat, to underestimate the number of Section 7 consultations, and thus, to undercount the economic impact of its regulations while simultaneously under-protecting the species it is statutorily charged with protecting.

Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 344 F. Supp. 2d at 129.

Circuit's view, Fish & Wildlife's baseline approach misconstrues the Endangered Species Act's § 4(b)(2), because of Fish & Wildlife's syllogistic reasoning: (i) after listing a species, agencies cannot act in ways that jeopardize the species' survival and recovery, and after designating critical habitat, agencies cannot act in ways that adversely modify the critical habit; (ii) almost all actions that adversely modify critical habitat also jeopardize the species' survival and recovery, so prohibiting actions that adversely modify critical habitat does not have any economic impacts beyond the economic impacts of prohibiting actions that jeopardize a species; and, thus (iii) designating critical habitat has no economic impacts beyond the economic impacts of listing a species.  See N.M. Cattle Growers Ass'n, 428 F.3d at 1285; Cape Hatteras Access Preservation Alliance v. U.S. Dep't of Interior, 344 F. Supp. at 127 ("Circuit courts are uncomfortable with this syllogism that threatens to, as a practical matter, remove from consideration the economic analysis required by statute.").   The Tenth Circuit emphasized that it must "give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation."   N.M. Cattle Growers Ass'n, 428 F.3d at 1285 (citing Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Compensation Programs, 927 F.2d 1150, 1153 (10th Cir. 1991)).  The Tenth Circuit rejected the baseline approach, because "economic analysis done using the FWS's baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02." N.M. Cattle Growers Ass'n, 428 F.3d at 1285.  Accordingly, the Tenth Circuit concluded that "Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." N.M. Cattle Growers Ass'n, 428 F.3d at 1285.

Two developments since the Tenth Circuit decided N.M. Cattle Growers Ass'n in 2001 complicate N.M. Cattle Growers Ass'n's applicability to this case.  See Colorado v. Fish & Wildlife, 362 F. Supp. 3d at 988.  First, in Gifford Pinchot, the Ninth Circuit invalidated Fish & Wildlife's "adverse modification" definition in 50 C.F.R. § 402.02, and Fish & Wildlife subsequently amended its regulatory definition.[23]   Gifford Pinchot, 378 F.3d at 1077.  When the

---

[23]The Tenth Circuit did not invalidate the adverse modification definition in N.M. Cattle Growers Ass'n, but it noted that, although Fish & Wildlife's regulatory definitions for "jeopardize the continued existence," and "destruction or adverse modification," were "not before" it, these definitions "have been the cause of much confusion in that they inform the FWS's interpretation of the ESA's economic impact analysis."  N.M. Cattle Growers Ass'n, 248 F.3d at 1283.  The Tenth Circuit further noted that "federal courts have begun to recognize that the results they produce are inconsistent with the intent and language of the ESA."  N.M. Cattle Growers Ass'n,

Tenth Circuit decided <u>N.M. Cattle Growers Ass'n</u> and when the Ninth Circuit decided <u>Gifford Pinchot</u>, 50 C.F.R. § 402.02 defined "destruction or adverse modification" as

> a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02 (effective October 31, 1984). The Ninth Circuit reasoned that "it is logical and inevitable that a species requires more critical habitat for recovery than is necessary for the species['] survival," but an agency action does not violate Fish & Wildlife's adverse modification standard unless the action would "'appreciably diminish[] the value of critical habitat for *both* the survival *and* recovery of a listed species.'" <u>Gifford Pinchot</u>, 378 F.3d at 1069 (quoting 50 C.F.R. § 402.02 (effective October 31, 1984))(first alteration added and second alteration in <u>Gifford Pinchot</u> only)(emphasis in <u>Gifford Pinchot</u> only). The Endangered Species Act defines "critical habitat" as areas that are "essential to the conservation" of a listed species. 16 U.S.C. 1532(5)(A). The Ninth Circuit concluded that Fish & Wildlife's adverse modification definition "contradicts Congress's express command" that Fish & Wildlife designate critical habitat to prohibit destruction of areas that are essential to a listed species' conservation, because it "fails to provide protection of habitat when necessary only for species' recovery." <u>Gifford Pinchot</u>, 378 F.3d at 1069-70. The Ninth Circuit further reasoned:

> The [Fish & Wildlife Service] FWS could authorize the complete elimination of critical habitat necessary only for recovery, and so long as the smaller amount of critical habitat necessary for survival is not appreciably diminished, then no "destruction or adverse modification," as defined by the regulation, has taken place. This cannot be right. If the FWS follows its own regulation, then it is obligated to be indifferent to, if not to ignore, the recovery goal of critical habitat.

<u>Gifford Pinchot</u>, 378 F.3d at 1069-70 (quoting 50 C.F.R. § 402.02 (effective October 31, 1984)).

<u>See</u> <u>Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior</u>, 344 F. Supp. 2d at 129 (observing that the "regulation hold[s] that actions interfering with conservation but not survival are not adverse modification or destruction"). The Ninth Circuit thus held that the adverse modification standard's conjunctive phraseology -- requiring consultation only when agency action appreciably diminishes critical habitat's value for both the survival and recovery of a listed species -- "sets the

---

248 F.3d at 1283 n.2 (citing <u>Sierra Club v. U.S. Fish and Wildlife Serv.</u>, 245 F.3d 434 (5th Cir. 2001)).

bar too high," and it invalidated Fish & Wildlife's regulatory definition as contrary to the

Endangered Species Act. Gifford Pinchot, 378 F.3d at 1069.[24]

Second, in 2013, Fish & Wildlife codified the incremental effects approach through formal

rulemaking processes. See Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,061-62;

50 C.F.R. § 424.19. Section 424.19(b) of Title 50 of the Code of Federal Regulations governs

impact analysis for designating critical habitat, and it states:

> (b)     Prior to finalizing the designation of critical habitat, the Secretary
> will consider the probable economic, national security, and other relevant impacts
> of the designation upon proposed or ongoing activities. The Secretary will consider
> impacts at a scale that the Secretary determines to be appropriate, and will compare
> the impacts with and without the designation. Impacts may be qualitatively or
> quantitatively described.

50 C.F.R. § 424.19(b). The second half of the regulatory provision's second sentence -- "will

compare the impacts with and without the designation" -- is the incremental effects approach's

textual basis in the codified regulation, 50 C.F.R. § 424.19(b), and it "provide[s] further guidance

on how the Services will consider impacts of critical habitat designation," Regulation Revisions

for Impact Analysis, 78 Fed. Reg. 53,061.

> The second phrase of the second sentence, "and will compare the impacts
> with and without designation," clarifies that impact analyses evaluate the
> incremental impacts of the designation. This evaluation is sometimes referred to
> as an "incremental analysis" or "baseline approach." For the purpose of the impacts
> analysis required by the first sentence of section 4(b)(2) of the Act, the incremental
> impacts are those probable economic, national security, and other relevant impacts
> of the proposed critical habitat designation on ongoing or potential Federal actions
> that would not otherwise occur without the designation. Put another way, the
> incremental impacts are the probable impacts on Federal actions for which the
> designation is the "but for" cause.

> To determine the incremental impacts of designating critical habitat, the
> Services compare the protections provided by the critical habitat designation (the
> world with the particular designation) to the combined effects of all conservation-
> related protections for the species and its habitat in the absence of the designation
> of critical habitat (the world without designation, i.e., the baseline condition
> including listing). Thus, determining the incremental impacts requires identifying
> at a general level the additional protections that a critical habitat designation would
> provide for the species. This determination does not require prejudging the precise
> outcomes of hypothetical section 7 consultations. Finally, the Services determine
> the probable impacts of those incremental protections on Federal actions, in terms
> of economic, national security, or other relevant impacts (the incremental
> impacts). . . . Probable impacts to Federal actions could occur on private as well as
> public lands.

> . . . .

---

[24]In 2019, Fish & Wildlife amended the adverse modification definition, which now reads:
"Destruction or adverse modification means a direct or indirect alteration that appreciably
diminishes the value of critical habitat as a whole for the conservation of a listed species."
50 C.F.R. § 402.02.

Finally, because the primary purpose of an economic analysis is to facilitate the mandatory consideration of the economic impact of a designation of critical habitat, to inform the discretionary 4(b)(2) exclusion analysis, and to determine compliance with relevant statutes and Executive Orders, the economic analysis should focus on the incremental impact of the designation.

Use of an incremental analysis in each of these contexts is the only logical way to implement the Act. The purpose of the impact analysis is to inform the Secretary's decision about whether to engage in the discretionary exclusion analysis under the second sentence of section 4(b)(2) of the Act (addressed in paragraph (c)). To understand the difference that designation of an area as critical habitat makes and, therefore, the benefits of including an area in the designation or excluding an area from the designation, one must compare the hypothetical world with the designation to the hypothetical world without the designation. For this reason, the Services compare the protections provided by the designation to the protections without the designation. This methodology is consistent with the general guidance given by the Office of Management and Budget to executive branch agencies as to how to conduct cost-benefit analyses.

Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,061-62. As discussed above, the Tenth Circuit determined in N.M. Cattle Growers Ass'n that Fish & Wildlife's interpretation of the Endangered Species Act's § 4(b)(2) to support its adoption of the baseline approach -- which had not undergone the formal rulemaking process -- was not entitled to Chevron deference. See N.M. Cattle Growers Ass'n, 248 F.3d at 1281. Should the Court determine, however, that the Endangered Species Act's § 4(b)(2) does not address what economic impact analysis methodology Fish & Wildlife should apply to critical habitat designations, Fish & Wildlife's promulgation of the incremental effects approach renders N.M. Cattle Growers Ass'n less applicable.

C. **UNDER TENTH CIRCUIT PRECEDENT, CHEVRON DOES NOT APPLY TO FISH & WILDLIFE'S CODIFICATION OF THE INCREMENTAL EFFECTS APPROACH, BECAUSE THE INCREMENTAL EFFECTS APPROACH REPRESENTS AN INTERPRETIVE RULE, NOT A LEGISLATIVE RULE, AND CHEVRON APPLIES ONLY TO LEGISLATIVE RULES.**

The Stockman's Associations and Fish & Wildlife disagree whether Fish & Wildlife's interpretation of the Endangered Species Act's § 4(b)(2) is entitled to Chevron deference. See Response at 20; Reply at 10. Moreover, the Stockman's Associations, Fish & Wildlife, and the Environmental Intervenors dispute whether the Endangered Species Act's § 4(b)(2) is ambiguous about which economic impact analysis Fish & Wildlife should apply to critical habitat designations. See Response at 20; Reply at 10; Tr. at 60:17-64:20 (Shannon). The APA contains a framework for judicial review of agency determinations. See 5 U.S.C. § 706. Whether the Endangered Species Act's § 4(b)(2) permits Fish & Wildlife to use the incremental effects approach to assess the economic impact of designating critical habitat is a question of statutory interpretation, so the Court must determine whether Fish & Wildlife's decision to use the

incremental effects approach is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  The Tenth Circuit has noted, however, that "'[a]ppellate review under APA section 706(2)(C) proceeds under the familiar <u>Chevron</u> framework.'"  <u>WildEarth Guardians v. U.S. Fish and Wildlife Serv.</u>, 784 F.3d 677, 683 (10th Cir. 2015)(quoting <u>Iowa League of Cities v. EPA</u>, 711 F.3d 844, 876 (8th Cir. 2013))(alteration added).  The Court concludes, however, that <u>Chevron</u> does not apply, because the incremental effects approach flows from an interpretive rule and not from a legislative rule to which <u>Chevron</u> applies.[25]  Alternatively, if <u>Chevron</u> applies, the Court would conclude that the Endangered Species Act's § 4(b)(2) does not address directly the economic impact analysis methodology that Fish & Wildlife must use, that Fish & Wildlife's decision to use the incremental effects approach rests on a permissible construction of the Endangered Species Act and, thus, that Fish & Wildlife would be entitled to <u>Chevron</u> deference.

>        1.    <u>**Chevron Dictates the Court's Analysis, Because Fish & Wildlife's Use of the Incremental Effects Approach Flows from Fish & Wildlife's Interpretation of "Economic Impact" in the Endangered Species Act's § 4(b)(2).**</u>

Fish & Wildlife notes that "numerous courts have upheld the Service's discretion to utilize the incremental effects approach."  Response at 21 (citing <u>Ariz. Cattle Growers' Ass'n</u>, 606 F.3d at 1173; <u>Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior</u>, 344 F. Supp. 2d at 129; <u>Fisher v. Salazar</u>, 656 F. Supp. 2d at 1371; <u>Colorado v. Fish & Wildlife</u>, 362 F. Supp. 3d at 988).  Of these cases, only <u>Colorado v. Fish & Wildlife</u> was decided by a court that the Tenth Circuit binds, and in none of these cases did the court ask whether <u>Chevron</u> applies to the Endangered Species Act's § 4(b)(2) in the first place.  Rather, most courts have assessed Fish & Wildlife's use of the baseline/incremental effects approach under the highly deferential arbitrary-or-capricious standard, <u>see</u>, <u>e.g.</u>, <u>Ariz. Cattle Growers' Ass'n</u>, 606 F.3d at 1163, 1172; <u>Fisher v. Salazar</u>, 656 F. Supp. 2d at 1365, 1372-73, in accordance with the APA's judicial review provision, <u>see</u> 5 U.S.C.

---

[25]As the Court discusses below in Part II.D, where a court determines that <u>Chevron</u> does not apply to an agency decision or action, the court must consider the decision or action "under the framework set forth in <u>Skidmore</u>[v. Swift & Co.], 323 U.S. 134 (1944)("<u>Skidmore</u>")]."  <u>Carpio v. Holder</u>, 592 F.3d 1091, 1098 (10th Cir. 2010)(citing <u>McGraw v. Barnhart</u>, 450 F.3d 493, 500 (10th Cir. 2006)).  Although the <u>Skidmore</u> framework is less deferential than that in <u>Chevron</u>, an agency's interpretation of a statute under the <u>Skidmore</u> framework "may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency and given the value of uniformity in its administrative and judicial understandings of what a national law requires.'"  <u>McGraw v. Barnhart</u>, 450 F.3d at 501 (quoting <u>United States v. Mead Corp.</u>, 533 U.S. at 234).

§ 706(2)(A).  For example, in <u>Fisher v. Salazar</u>, the plaintiffs challenged Fish & Wildlife's use of the baseline approach, and the Honorable William Henry Stafford, Jr., United States District Judge for the United States District Court for the Northern District of Florida, concluded that the "[p]laintiffs have failed to demonstrate that the FWS's choice of method was arbitrary or capricious." <u>Fisher v. Salazar</u>, 656 F. Supp. 2d at 1372-73.  The Ninth Circuit similarly held in <u>Ariz Cattle Growers' Ass'n</u> that Fish & Wildlife's use of the baseline approach is not arbitrary or capricious.  <u>See</u> 606 F.3d at 1172.

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).  Section 706 sets the following framework for judicial review of agency determinations:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall --
>
> (1)    compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2)    hold unlawful and set aside agency action, findings, and conclusions found to be --
>
>> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> (B)    contrary to constitutional right, power, privilege, or immunity;
>>
>> (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> (D)    without observance of procedure required by law;
>>
>> (E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>>
>> (F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.  The arbitrary-or-capricious standard, <u>see</u> 5 U.S.C. § 706(2)(B), and the substantial-evidence standard, <u>see</u> 5 U.S.C. § 706(2)(E), amount to a single substantive standard of review.

See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d

at 683-84 (explaining that, as to factual findings, "there is no *substantive* difference between what

[the arbitrary or capricious standard] requires and what would be required by the substantial

evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported

only by evidence that is not substantial in the APA sense" (emphasis in original)).   Under the

arbitrary-or-capricious standard, "'review is narrow and deferential; we must uphold the agency's

action if it has articulated a rational basis for the decision and has considered relevant factors.'"

Mountain Side Mobile Estates P'ship v. Sec'y of Hous. and Urban Dev., 56 F.3d 1245, 1250 (10th

Cir. 1995)(quoting Colo. Dep't of Soc. Servs. V. U.S. Dep't of Health & Human Servs., 29 F.3d

519, 522 (10th Cir. 1994)).

       The arbitrary-or-capricious standard generally does not apply to questions of law.   See

Mountain Side Mobile Estates P'ship v. Sec'y of Hous. and Urban Dev., 56 F.3d at 1250

("However, these limitations do not apply to questions of law."); Slingluff v. Occupational Safety

& Health Review Comm'n, 425 F.3d 861, 866 (10th Cir. 2005)(same).   But see Interstate Erectors,

Inc. v. Occupational Safety and Health Review Comm'n, 74 F.3d 223, 226 (10th Cir. 1996)(stating

that "the [Occupational Safety and Health Review] Commission's legal conclusions will generally

be upheld if found not to be arbitrary, capricious, an abuse of discretion or otherwise not in

accordance with law" (citing 5 U.S.C. § 706(2)(A)).

> The APA directs courts to set aside agency actions that are taken "in excess of
> statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.
> § 706(2)(C).  Because of this provision, "an essential function of our review under
> the APA is determining whether an agency acted within the scope of its authority."
> Copar Pumice Co. v. Tidwell, 603 F.3d 780, 801 (10th Cir. 2010).  If it is otherwise
> appropriate, we apply the test established by Chevron, U.S.A., Inc. v. Natural
> Resources Defense Council, 467 U.S. 837 . . . (1984), when asking whether an
> agency has acted within its authority.  See Pub. Lands Council v. Babbitt, 167 F.3d
> 1287, 1293-94 (10th Cir. 1999); see also Iowa League of Cities v. EPA, 711 F.3d
> 844, 876 (8th Cir.2013)("Appellate review under APA section 706(2)(C) proceeds
> under the familiar Chevron framework.").

WildEarth Guardians v. U.S. Fish and Wildlife Serv., 784 F.3d at 683.  Thus, where "the issue

turns on [an agency's] interpretation of a statute it administers, our analysis is dictated by

Chevron."   Sierra Club v. U.S. E.P.A., 99 F.3d 1551, 1555 (10th Cir. 1996).  Moreover, the

"'[f]ailure to apply the correct legal standard . . . is grounds for reversal.'"  Mountain Side Mobile

Estates P'ship v. Sec'y of Hous. and Urban Dev., 56 F.3d at 1250 (quoting Nielson v. Sullivan,

992 F.2d 1118, 1119-20 (10th Cir. 1993))(alteration in <u>Mobile Estates P'ship v. Sec'y of Hous.</u>
<u>and Urban Dev.</u>).

Whether the Endangered Species Act's § 4(b)(2) permits Fish & Wildlife to apply the
incremental effects approach to determine the economic impact of designating critical habitat is a
matter of statutory interpretation.  The Court must determine whether Fish & Wildlife's use of the
incremental effects approach is consistent with the congressional mandate that Fish & Wildlife
"designate critical habitat . . . on the basis of the best scientific data available and after taking into
consideration the economic impact . . . of specifying any particular area as critical habitat."  16
U.S.C. § 1533(b)(2).  The parties do not argue that the Court should apply the APA's arbitrary-or-
capricious standard, and the Court further holds that such standard is inapplicable to the question
before it.  Accordingly, <u>Chevron</u> dictates the Court's analysis.

The federal judiciary accords considerable deference to agencies' interpretations of their
own organic statutes -- the statutes Congress has tasked an agency with enforcing, from which it
derives its authority to act.  <u>See</u> <u>United States v. Undetermined Quantities of Bottles of an Article</u>
<u>of a Veterinary Drug</u>, 22 F.3d at 238.  This deference is known as <u>Chevron</u> deference, and it
involves a two-step process: first asking whether the statutory provision in question is clear, and
then, if it is not clear, asking whether the agency's interpretation of the unclear statute is a
reasonable one.  <u>See</u> <u>United States v. Undetermined Quantities of Bottles of an Article of a</u>
<u>Veterinary Drug</u>, 22 F.3d at 238.  As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> [Chevron].  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is clear,
> we must give effect to that intent. If the statute is silent or ambiguous on that
> specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

<u>United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug</u>, 22 F.3d
at 238 (citation omitted).

There is, additionally, a threshold step -- the so-called step zero -- which asks whether
<u>Chevron</u> deference applies to the agency decision at all.  <u>See</u> Cass R. Sunstein, <u>Chevron Step Zero</u>,
92 Va. L. Rev. 187 (2006); <u>Matadin v. Mukasey</u>, 546 F.3d 85, 93 (2d Cir. 2008)(Walker, J.,
concurring).  Step zero asks whether "Congress delegated authority to the agency generally to
make rules carrying the force of law, and that the agency interpretation claiming deference was

promulgated in the exercise of that authority."  United States v. Mead Corp., 533 U.S. at 226-27.

In United States v. Mead Corp., the Supreme Court noted that "[d]elegation of such authority may

be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-

comment rulemaking, or by some other indication of a comparable congressional intent."  533

U.S. at 227.  See 533 U.S. at 229 ("It is fair to assume generally that Congress contemplates

administrative action with the effect of law when it provides for a relatively formal administrative

procedure tending to foster the fairness and deliberation that should underlie a pronouncement of

such force.").  That being said, the Tenth Circuit recently has noted that "[l]egislative rules

generally receive Chevron deference, whereas interpretive rules 'enjoy no Chevron status as a

class.'"  Aposhian v. Barr, 958 F.3d 969, 979 (10th Cir. 2020)(quoting United States v. Mead

Corp., 533 U.S. at 232).  Whether Chevron applies thus depends on the category of rule in which

an agency rule fits.  See Aposhian v. Barr, 958 F.3d at 979; Renewable Fuels Ass'n v. U.S. Envtl

Prot. Agency, 948 F.3d 1206, 1244 (10th Cir. 2020).

> ## 2. The Endangered Species Act Delegates Legislative Power to Fish & Wildlife to Designate Critical Habitat After Considering the Designation's Economic Impact and to Determine How It Considers Such Economic Impacts.

Fish & Wildlife is one of the two agencies charged with administering the Endangered

Species Act.[26]  See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 651

(2007)("The Fish and Wildlife Service (FWS) administers the Endangered Species Act with

respect to species under the jurisdiction of the Secretary of the Interior, while the National Marine

Fisheries Service (NMFS) administers the Endangered Species Act with respect to species under

the jurisdiction of the Secretary of Commerce." (citing 50 C.F.R. §§ 17.11, 222.101(a), 223.102,

402.01(b))).  Although Congress delegates the authority to designate critical habitat "by regulation

promulgated in accordance with subsection (b) and to the maximum extent prudent and

determinable" to the Secretary of the Interior, 16 U.S.C. § 1533(a)(3)(A), the Secretary of the

Interior has delegated the authority to administer the Endangered Species Act with respect to non-

---

[26]The Endangered Species Act defines "Secretary" to mean " "the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970."  16 U.S.C. § 1532(15).  "Generally, marine species are under the jurisdiction of the Secretary of Commerce and all other species are under the jurisdiction of the Secretary of the Interior."  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 586 n.3 (1992)(same).  Because the Jumping Mouse is not a marine species, Fish & Wildlife, under the Secretary of the Interior's jurisdiction, administers the Endangered Species Act with respect to the Jumping Mouse.  See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. at 651.

marine species to Fish & Wildlife, which is an agency within the United States Department of the Interior, see 50 C.F.R. § 402.01; Sierra Club v. U.S. Fish and Wildlife Serv., 245 F.3d at 437 n.8. Before designating critical habitat by promulgating regulation, the Secretary must consider "the economic impact . . . of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Moreover, § 1533(h) states that the "Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively," and the "Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection." 16 U.S.C. § 1533(h). The Court thus concludes that Congress has delegated legislative authority to Fish & Wildlife to designate critical habitat after considering a designation's potential economic impacts, and that it gives Fish & Wildlife broad discretion to determine how to assess economic impact. See 16 U.S.C. § 1533(a)(3), (b)(2). Cf. Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1141 (9th Cir. 2007)("In the ESA, Congress expressly delegated authority to the Service to develop criteria for evaluating petitions to list endangered species.").

> **3.  The Incremental Effects Approach's Codification is Not a Legislative Rule, Because It Does Not Change Existing Law, Policy, or Practice and Does Not Directly Affect Individuals' Rights and Obligations, and, Thus, It Lacks Necessary Substantive Characteristics to Constitute a Legislative Rule.**

Fish & Wildlife promulgated a final rule that codifies the incremental effects approach pursuant to congressionally delegated authority and that final rule became effective October 30, 2013. See Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058. Although Fish & Wildlife's promulgation of the Regulation Revisions for Impact Analysis satisfies procedural requirements necessary for Chevron to apply, the rule lacks vital substantive characteristics, and, thus, the Court concludes that Chevron does not apply. Congress has delegated legislative authority to Fish & Wildlife to promulgate legislative rules, but not all regulations are legislative rules that "carr[y] the force of law." United States v. Mead Corp., 887 F.3d at 226. The Supreme Court has held that, "in order for a regulation to have the 'force and effect of law,' it must have certain substantive characteristics and be the product of certain procedural requisites." Chrysler Corp. v. Brown, 441 U.S. 281, 301 (1979). The "central distinction among agency regulations" under the APA "is that between 'substantive rules' on the one hand and 'interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice' on the other."

Chrysler Corp. v. Brown, 441 U.S. at 301 (quoting 5 U.S.C. § 553(b), (d)).  The Tenth Circuit has

recently explained this distinction in greater detail:

> A legislative rule is one that "is promulgated pursuant to a direct delegation
> of legislative power by Congress and . . . changes existing law, policy, or practice."
> Rocky Mountain Helicopters, Inc. v. F.A.A., 971 F.2d 544, 546 (10th Cir. 1992).
> A legislative rule affects individual rights and obligations, and, if it is "the product
> of certain procedural requisites," it has the force and effect of law.  Chrysler Corp.
> [v. Brown], 441 U.S. at 301-02 . . . .  An interpretive rule, on the other hand,
> "attempts to clarify an existing rule but does not change existing law, policy, or
> practice."  Rocky Mountain Helicopters[, Inc. v. F.A.A.], 971 F.2d at 546-47.  An
> interpretive rule simply "'advise[s] the public of the agency's construction of the
> statute and rules which it administers.'"  Sorenson Commc'ns, Inc. v. F.C.C., 567
> F.3d 1215, 1222 (10th Cir. 2009) (quoting Shalala v. Guernsey Mem. Hosp., 514
> U.S. 87, 99 . . . (1995)).

Aposhian v. Barr, 958 F.3d at 979-89.  In Aposhian v. Barr, the agency rule at issue redefined the

statutory term "machinegun" under the National Firearms Act, 16 U.S.C. §§ 5845(b), to include

any "bump-stock" accessory that increases the shooting capacity of firearms to greater than a single

shot per trigger-pull, Aposhian v. Barr, 958 F.3d at 975-77 (citing Bump-Stock-Type Devices, 83

Fed. Reg. at 66,514).  The National Firearms Act expressly stated that the Bureau of Alcohol,

Tobacco, Firearms, and Explosives ("ATF") "'shall prescribe all needful rules and regulations for

the enforcement of'" the statute.  958 F.3d at 975 (quoting 16 U.S.C. § 7805).  The Tenth Circuit

concluded that the agency rule is a legislative rule, because it: (i) "demonstrates that ATF intended

to change the legal rights and obligations of bump-stock owners"; (ii) evinces ATF's "'intent to

exercise legislative authority by expressly invoking the Chevron framework and then elaborating

at length as to how Chevron applies'"; and (iii) "was published in the Code of Federal

Regulations."  Aposhian v. Barr, 958 F.3d at 980 (quoting Guedes v. Bur. Of Alcohol, Tobacco,

Firearms & Explosives, 920 F.3d 1, 18-19 (D.C. Cir. 2019)).  One other consideration is "whether

the agency has explicitly invoked its general legislative authority."  Guedes v. Bur. Of Alcohol,

Tobacco, Firearms & Explosives, 920 F.3d at 19 (internal quotation marks omitted).

> **a.     The Incremental Effects Approach Does Not Change Existing
>         Law, Policy, or Practice, but Rather Interprets and Clarifies
>         Fish & Wildlife's Existing Practices.**

The Regulation Revisions for Impact Analysis and 50 C.F.R. § 424.19 do not change prior

regulations, but rather clarifies existing regulations.  In its Executive Summary, the Regulation

Revisions for Impact Analysis state that "these revisions will not change how we implement the

[Endangered Species] Act; rather, the revisions serve to codify the current practices of the

agencies."  Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058.  The Regulation

Revisions for Impact Analysis make several changes to 50 C.F.R. § 424.19 to "clarify the instructions for making information available to the public, considering the impacts of critical habitat designations, and considering exclusions from critical habitat." Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058. Before Fish & Wildlife promulgated the Regulation Revisions for Impact Analysis in late 2013, 50 C.F.R. § 424.19 read:

> The Secretary shall identify any significant activities that would either affect an area considered for designation as critical habitat or be likely to be affected by the designation, and shall, after proposing designation of such an area, consider the probable economic and other impacts of the designation upon proposed or ongoing activities. . . .

50 C.F.R. § 424.19 (October 31, 1984). The Regulation Revisions for Impact Analysis divided 50 C.F.R. § 424.19 into three subparagraphs, see Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,059, and 50 C.F.R. § 424.19(b)

> implements the first sentence of section 4(b)(2) of the [Endangered Species] Act, which directs the Secretary to consider the economic impact, the impact on national security, and any other relevant impact of specifying any particular area as critical habitat. This paragraph states that the impact analysis should focus on the incremental effects resulting from the designation of critical habitat.

Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,059. Effective October 30, 2013, 50 C.F.R. § 424.19(b) states:

> Prior to finalizing the designation of critical habitat, the Secretary will consider the probable economic, national security, and other relevant impacts of the designation upon proposed or ongoing activities. The Secretary will consider impacts at a scale that the Secretary determines to be appropriate, and will compare the impacts with and without the designation. Impacts may be qualitatively or quantitatively described.

50 C.F.R. § 424.19(b) (effective October 30, 2013).

Although the incremental effects approach was formally promulgated in 78 Fed. Reg. 53,059, and then codified in 50 C.F.R. § 424.19(b), this formal process and the subsequent codification do not answer definitively the question whether the administrative rule is a legislative rule to which Chevron applies or an interpretive rule beyond Chevron's application. Neither the Stockman's Associations nor Fish & Wildlife asserts that the Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058, or 50 C.F.R. § 424.19(b) is a legislative rule or an interpretive rule, as the parties' arguments assume that Chevron applies. Fish & Wildlife insists, however, that Chevron applies, because, after the Tenth Circuit decided N.M. Cattle Growers Ass'n, Fish & Wildlife "underwent formal rulemaking codifying the incremental effects approach it uses today." Response at 19. According to Fish & Wildlife, because its interpretation of the Endangered

Species Act is codified through formal rulemaking, its interpretation is entitled to <u>Chevron</u> deference.  <u>See</u> Response at 20.  Agencies must publish in the Federal Register, among other things, "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).  Although "substantive rules . . . as authorized by law" amount to legislative rules, "statements of general policy or interpretations of general applicability" are interpretive rules.  5 U.S.C. § 552(a)(1)(D).  <u>See</u> <u>Chrysler Corp. v. Brown</u>, 441 U.S. at 301-02. Moreover, the "Administrative Committee of the Federal Register . . . may require . . . the preparation and publication . . . of complete codifications of the documents of each agency of the Government having general applicability and legal effect," 44 U.S.C. § 1510(a), which "shall be designated as the Code of Federal Regulations," 44 U.S.C. § 1510(b) (internal quotation marks omitted).  In <u>Aposhian v. Barr</u>, the Tenth Circuit analyzed whether an administrative rule, <u>see</u> <u>Bump-Stock-Type Devices</u>, 83 Fed. Reg. at 66,514, is a legislative rule to which <u>Chevron</u> applies or an interpretive rule to which <u>Chevron</u> does not apply, <u>see</u> <u>Aposhian v. Barr</u>, 958 F.3d at 979-81.  Although the administrative rule had been codified in the Code of Federal Regulations, this distinction alone did not determine <u>Chevron</u>'s applicability, as the Tenth Circuit nonetheless inquired whether the regulation changed prior law and affected individuals' rights and obligations. <u>See</u> <u>Aposhian v. Barr</u>, 958 F.3d at 979-81.  It follows that agencies may publish substantive, legislative rules in the Code of Federal Regulations, but not all regulations published in the Code of Federal Regulations and the Federal Register are necessarily substantive, legislative rules. Although 50 C.F.R. § 424.19(b) invokes the incremental effects approach with its mandate that Fish & Wildlife "compare the impacts [of a critical habitat designation] with and without the designation," this codification alone does not transform the administrative rule into a legislative rule carrying the force of law.

The incremental effects approach -- as promulgated in the Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058, and codified in 50 C.F.R. § 424.19(b) -- is an interpretive rule, not a legislative rule, because it does not change any of Fish & Wildlife's policies.  The Regulation Revisions for Impact Analysis emphasizes that Fish & Wildlife uses the incremental effects approach to assess economic impacts before it designates critical habitat:

> The second phrase of the second sentence [of 50 C.F.R. § 424.19(b)], "and will compare the impacts with and without designation," clarifies that impact

analyses evaluate the incremental impacts of the designation.  This evaluation is sometimes referred to as an "incremental analysis" or "baseline approach."  For the purpose of the impacts analysis required by the first sentence of section 4(b)(2) of the [Endangered Species] Act, the incremental impacts are those probable economic, national security, and other relevant impacts of the proposed critical habitat designation on ongoing or potential Federal actions that would not otherwise occur without the designation.  Put another way, the incremental impacts are the probable impacts on Federal actions for which the designation is the "but for" cause.

Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,062.  As discussed above, Fish & Wildlife made small changes to 50 C.F.R. § 424.19(b) to clarify that it uses the incremental effects approach, but its revisions do "not change how [Fish & Wildlife] implement[s] the [Endangered Species] Act; rather, the revisions serve to codify the current practices of the agencies."  Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058.  The Tenth Circuit is clear that "an interpretive rule merely classifies or explains existing law or policy without changing it."  Knutzen v. Eben Ezer Lutheran Hous. Ctr., 815 F.2d 1343, n.6 (10th Cir. 1987)(citing Powderly v. Schweiker, 704 F.2d 192, 1098 (9th Cir. 1983); Allen v. Bergland, 661 F.2d 1001, 1007 (4th Cir. 1981)).  Moreover, "[a] rule is interpretive if it is promulgated by an agency having authority to issue substantive rules and if it attempts to clarify an existing rule but does not change existing law, policy, or practice."  Rocky Mountain Helicopters, Inc. v. F.A.A., 971 F.2d at 546-47.  Fish & Wildlife's intent to clarify how it analyzes a critical habitat designation's economic impact by codifying the incremental effects approach thus indicates that Fish & Wildlife did not change existing rules or policies, but rather explained how it interprets existing rules.

Although the Court above concludes that Congress has delegated to Fish & Wildlife the authority to promulgate substantive rules carrying the force of law, not all rules that Fish & Wildlife promulgates are necessarily substantive rules, particularly if all they do is clarify an existing rule without changing existing law, policy, or practice.  In Aposhian v. Barr, the administrative rule at issue redefined the statutory term "machinegun" under the National Firearms Act, 16 U.S.C. §§ 5845(b), to include any "bump-stock" accessory that increases the shooting capacity of firearms to greater than a single shot per trigger-pull, Aposhian v. Barr, 958 F.3d at 975-77 (citing Bump-Stock-Type Devices, 83 Fed. Reg. at 66,514).  The parties insisted that the administrative rule is an interpretive rule, because it merely "clarif[ies]" ATF's interpretation of statutory terms in 26 U.S.C. 5845(d)'s definition for "machinegun."  Aposhian v. Barr, 958 F.3d at 976.  The Tenth Circuit concluded, however, that the administrative rule changed the law,

because it "directed bump-stock owners to either destroy or surrender to ATF any bump stock in their possession and stated that '[t]he rule would criminalize only future conduct, not past possession of bump-stock-type devices that ceases by the effective date of this rule.'" Aposhian v. Barr, 958 F.3d at 980 (quoting Bump-Stock-Type Devices, 83 Fed. Reg. at 66,525)(alteration in Aposhian v. Barr only).    Conversely, the Tenth Circuit determined in Rocky Mountain Helicopters, Inc. v. F.A.A. that an agency regulation that prohibited the use of night vision goggles did not alter existing law, policy, or practice, because "[n]ight vision goggles . . . had never been allowed in civil aviation," and the Tenth Circuit thus concluded that the regulation was an interpretive rule.  971 F.2d at 547.[27]

---

[27]As discussed above, in Mead Corp. v. United States, the Supreme Court held that "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  Mead Corp. v. United States, 533 U.S. at 226-27.  Professor Thomas W. Merrill at Columbia Law School has observed that the opinion "left readers wondering whether having the force of law was an independent criterion, with certain consequences following for the required package of procedures in the usual case (but not always), or whether following certain procedures was in fact the test for determining whether action has the force of law."  Thomas W. Merrill, Step Zero After City of Arlington, 83 Fordham L. Rev. 753, 766 (2014).  Professor Merrill argues that "neither the procedures the agency employs nor the deference the court gives the agency determines whether its action has the force of law."  Merrill, 83 Fordham L. Rev. at 764. Rather, the opposite is true -- actions having the force of law have "certain consequences for the procedures agencies must follow . . . [and] for the degree of deference a court gives the agency." Merrill, 83 Fordham L. Rev. at 764.

The parties argue whether the Endangered Species Act's § 4(b)(2) is ambiguous, and, thus, they disagree whether Fish & Wildlife satisfies Chevron's step one.  Their arguments thus presume that Chevron applies and sidestep the threshold inquiry whether Chevron applies in the first place -- what many legal scholars label as Chevron's step zero.  See Sunstein, 92 Va. L. Rev. at 187. Tenth Circuit caselaw addressing whether Chevron applies to an administrative regulation has evolved significantly in recent years.  The Court notes that Aposhian v. Barr -- which the Tenth Circuit issued on May 7, 2020, after the parties submitted their briefs and presented their arguments at the October 31, 2019, hearing -- offers the most exhaustive discussion of Chevron's applicability.   There, the Tenth Circuit noted that, "[i]nitially, the applicability of Chevron depends on what kind of rule the [administrative rule at issue] represents" -- a legislative rule or an interpretive rule.  Aposhian v. Barr, 958 F.3d at 979.  Legislative rules, as discussed below, "must have certain substantive characteristics and be the product of certain procedural requisites." Chrysler Corp. v. Brown, 441 U.S. at 301.  In some pre-Aposhian v. Barr opinions, however, the Tenth Circuit suggests that a rule is legislative -- and thus Chevron applies -- so long as the rule satisfies procedural requisites.  For example, in 2017, the Tenth Circuit interpreted Mead Corp. v. United States as "creat[ing], in effect, a 'safe harbor of Chevron deference' for agency interpretations produced via formal agency action -- formal rulemaking or adjudication -- and those produced via informal notice-and-comment rulemaking."   Sinclair Wyo. Refining Co. v. U.S. Envtl. Prot. Agency, 887 F.3d at 991 (quoting 3 Koch, Jr. & Murphy, Admin. L. & Prac. § 10:12). Moreover, in 2001, the Tenth Circuit determined that Chevron did not apply to Fish & Wildlife's "statutory interpretation resulting in the baseline approach," because Fish & Wildlife's interpretation "ha[d] never undergone the formal rulemaking process."   N.M Cattle Growers Ass'n, 248 F.3d at 1281 (citing Hunnicutt v. Hawk, 229 F.3d at 1000).

The Court surmises that the parties may assume that Chevron applies, because Fish & Wildlife codified the incremental effects approach through formal rulemaking processes, and because the Endangered Species Act delegates the authority to power to issue legislative rules.  In

The minor revisions to 50 C.F.R. § 424.19 and the explanatory commentary in the Regulation Revisions for Impact Analysis indicate that the incremental effects approach is not new for Fish & Wildlife, and that the codification of this approach does not change how Fish & Wildlife implements the Endangered Species Act.  According to the Regulation Revisions for Impact Analysis, "between 2002 and 2007, the Services generally did not conduct an incremental analysis; instead they conducted a broader analysis of impacts pursuant to the guidance from the . . . Tenth Circuit" in N.M. Cattle Growers Ass'n.  Regulation Revisions for Impact Analysis, 78 Fed. Reg.

---

Aposhian v. Barr, however, the Tenth Circuit did not assume that the administrative rule at issue is legislative or that Chevron applies solely because the rule, which is codified in the Code of Federal Regulations, resulted from formal notice-and-comment proceedings.  See Aposhian v. Barr, 958 F.3d at 979-81.  Instead, the Tenth Circuit inquired into the rule's substantive characteristics -- i.e., whether the rule changes prior law, policy, or practice, and affects individuals' rights and obligations.  See 958 F.3d at 979-81.  Legislative rules, after all, have substantive and procedural characteristics.  See Chrysler Corp. v. Brown, 441 U.S. at 301.  Simply asking whether Congress has delegated authority to issue legislative rules and whether an agency has relied upon such authority in promulgating a particular rule "may often be of limited value," because such an inquiry ignores the rule's substantive characteristics.  Nadav D. Ben Zur, Note, Differentiating Legislative from Nonlegislative Rules: An Empirical and Qualitative Analysis, 87 Fordham L. Rev. 2125, 2136-44 (2019)(citing Metro. Sch. Dist. v. Davila, 969 F.2d 485, 490 (7th Cir. 1982)).  As Ben Zur observes: "Because agencies have the power to issue interpretive rules, and because many agencies also have delegated legislative rulemaking authority, inquiring whether the agency acted pursuant to statutory delegation often fails to illuminate whether the rule is legislative or nonlegislative."  Ben Zur, 87 Fordham L. Rev. at 2139.

The Tenth Circuit's criteria for triggering Chevron's applicability may set the bar too high, as some courts require less indicia of Congressional intent to delegate legislative rulemaking authority before concluding that Chevron applies.  See, e.g., Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv., 475 F.3d at 1143 (concluding that a Fish & Wildlife policy enjoys Chevron status, because the Endangered Species Act affords Fish & Wildlife the authority to develop such policies, and because the plaintiff had "presented no evidence that the [policy] has ever been treated (by the Service or parties presenting petitions to list species) as anything other than legally binding"); Ariz. Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1028 (D. Ariz. 2008)(Bolton, J.)("Generally, formal agency actions, such as those resulting from notice-and-comment rulemaking, warrant Chevron deference."), aff'd 606 F.3d 1160 (9th Cir. 2010).  Moreover, in 1995, the Supreme Court upheld an administrative regulation that interprets and defines "take" in the Endangered Species Act's § 9(a)(1) after reasoning that the "latitude the ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes that we owe some degree of deference to the Secretary's reasonable interpretation."  Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 703-04 (1995).

Courts have applied a variety of tests to determine whether an administrative rule is a legislative rule or an interpretive rule.  See Ben Zur, 87 Fordham L. Rev. at 2136-44 (identifying six distinct texts that various Courts of Appeals employ).  Not all courts recognize the legislative-rule-versus-interpretive-rule determination's relevance to Chevron's step zero inquiry, however, even though the Supreme Court has emphasized that Chevron applies to legislative rules "carrying the force of law," but "interpretive rules . . . enjoy no Chevron status as a class."  United States v. Mead Corp., 533 U.S. at 232.  Last, the Court questions the logic of categorically applying Chevron to legislative rules that affect individuals' rights and obligations while applying a less deferential review to interpretive rules that do not change the law or affect individuals' rights and obligations.  Nevertheless, the Tenth Circuit binds the Court, and, as Aposhian v. Barr makes clear, the Court must -- as a threshold matter -- inquire whether Chevron applies by determining whether the incremental effects approach's codification is a legislative rule or an interpretive rule.  See 958 F.3d at 979-81.

53,062.  The Regulation Revisions for Impact Analysis note that the Tenth Circuit held that "an incremental analysis rendered meaningless the requirement of considering the impacts of the designation, as there were no incremental impacts to consider," because Fish & Wildlife's jeopardy standard had subsumed the adverse modification standard.   Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,062.  The Regulation Revisions for Impact Analysis then state that, in 2004, the Ninth Circuit invalidated Fish & Wildlife's "destructive or adverse modification" definition in Gifford Pinchot, and, "[s]ince then, the Services have been applying 'destruction or adverse modification' in a way that allows the Services to define an incremental effect of designation."  Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,062-63 (quoting 50 C.F.R. § 402.02).  According to the administrative rule, "[t]his process eliminated the predicate for the Tenth Circuit's analysis.  Therefore, the Services have concluded that it is appropriate to consider the impacts of designation on an incremental basis."  Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,062.  Although Fish & Wildlife temporarily did not use the incremental effects approach -- also termed the baseline approach -- after the Tenth Circuit decided N.M. Cattle Growers Ass'n in 2001, Fish & Wildlife resumed applying the method to economic analysis of critical habitat designations sometime between 2004 and 2007.  Thus, when, in 2013, Fish & Wildlife promulgated the Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,058-63, and codified the incremental effects approach in 50 C.F.R. § 424.19(b), Fish & Wildlife had been applying the incremental effects approach for at least six years.  Accordingly, codifying the incremental effects approach through formal notice-and-comment rulemaking did not "'change[] existing law, policy, or practice.'"  Aposhian v. Barr, 958 F.3d at 980 (quoting Rocky Mountain Helicopters, Inc. v. F.A.A., 971 F.2d at 546)(alteration added).  Instead, the codification functions as an "interpretive rule [that] 'advise[s] the public of the agency's construction of the statute and rules which it administers.'"  Aposhian v. Barr, 958 F.3d at 980 (quoting Sorenson Commc'ns, Inc. v. F.C.C., 567 F.3d at 1222)(first alteration added and second alteration in Aposhian v. Barr only).  See Shalala v. Guernsey Mem. Hosp., 514 U.S. at 99 (same).

> **b.**      **The Incremental Effects Approach Does Not Directly Affect Individuals' Rights and Obligations.**

The minor revisions to 50 C.F.R. § 424.19 and the explanatory commentary in the Regulation Revisions for Impact Analysis also do not affect individuals' rights and obligations.  In Aposhian v. Barr, the Tenth Circuit determined that an administrative rule defining machinegun

as including bump-stock devices affects individuals' rights and obligations, because the rule at issue criminalized possession of such devices after the regulation's effective date.  See 958 F.3d at 980.  The Tenth Circuit relied on Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives, in which the D.C. Circuit analyzed the same issue and concluded that the same administrative rule "makes clear throughout that possession of bump-stock devices will become lawful only as of the Rule's effective date, not before."  Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d at 18.  According to the Tenth Circuit, "[t]his effort to 'directly govern[] the conduct of members of the public, affecting individual rights and obligations' is 'powerful evidence' that ATF intended the Final Rule to be a binding application of its rulemaking authority."  Aposhian v. Barr, 958 F.3d at 980 (quoting Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d at 18)(first alteration added and second alteration in Aposhian v. Barr only).  In contrast, 50 C.F.R. § 424.19(b) and the Regulation Revisions for Impact Analysis do not affect individual rights and obligations, but rather explain how Fish & Wildlife calculates the costs of critical habitat designations, which may arise from Section 7 consultations after designating such habitat. Although Fish & Wildlife's use of the incremental effects approach may result in Section 7 consultations – in which the Secretary of the Interior must ensure that other federal agencies do not authorize or fund actions that adversely modify critical habitat -- that implicate some individuals' rights and obligations, such impacts on the public would be indirect consequences. Unlike in Aposhian v. Barr, the incremental affects approach does not "'directly govern[] the conduct of members of the public.'"  Aposhian v. Barr, 958 F.3d at 980 (quoting Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d at 18)(alteration in Aposhian v. Barr only)(emphasis added).  The incremental effects approach thus impacts Section 7 consultations and agency actions, and not private individuals' rights and obligations.

> **c.** **Fish & Wildlife Does Not Express Intent That the Incremental Effects Approach is a Legislative Rule in the Incremental Effects Approach's Codification.**

Finally, in the Regulation Revisions for Impact Analysis, Fish & Wildlife does not invoke Chevron or express intent to exercise legislative authority, further counseling that the incremental effects approach is an interpretive rule.  In Aposhian v. Barr, the Tenth Circuit noted that "ATF, when promulgating the Final Rule, 'further evinced its intent to exercise legislative authority by expressly invoking the Chevron framework and then elaborating at length as to how Chevron applies to the [Final] Rule.'"  958 F.3d at 980 (quoting Guedes v. Bur. Of Alcohol, Tobacco,

Firearms & Explosives, 920 F.3d at 18-19)(alteration in Aposhian v. Barr only).  The Regulation Revisions for Impact Analysis note that 50 C.F.R. § 424.19(b) "implements the first sentence of section 4(b)(2) of the [Endangered Species] Act," Regulation Revisions for Impact Analysis, 78 Fed. Reg. 53,061, which states that the "Secretary shall designate critical habitat . . . after taking into consideration the economic impact . . . of specifying any particular area as critical habitat," 16 U.S.C. § 1533(b)(2).  Fish & Wildlife does not, however, invoke legislative authority to consider economic impacts however it sees fit, and the Regulation Revisions for Impact Analysis make no mention of Chevron.  Cf. Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d at 19 ("Because 'interpretive rules . . . enjoy no Chevron status as a class,' . . . the Bureau's exegesis on Chevron would have served no purpose unless the agency intended the Rule to be legislative in character." (quoting Mead Corp. v. United States, 533 U.S. at 232)).

While the Regulation Revisions for Impact Analysis do not refer to Chevron, they contain several paragraphs discussing the Tenth Circuit's reasoning in N.M. Cattle Growers Ass'n.  See Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,062.  They state that Fish & Wildlife's current application of the adverse modification standard "allows the Services to define an incremental effect of designation," because Fish & Wildlife's revised application of the adverse modification standard "eliminate[s] the predicate for the Tenth Circuit's analysis."  Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,062.  The Regulation Revisions for Impact Analysis note that the Ninth Circuit has "concluded that the 'faulty premise' that led to the invalidation of the incremental analysis approach" in N.M. Cattle Grower's Ass'n -- the conflation of the jeopardy standard and adverse modification standard's regulatory definitions -- "no longer applies," because the Ninth Circuit had invalidated the adverse modification standard's definition in Gifford Pinchot, and thus, in Fish & Wildlife's view, the incremental effects approach is now appropriate.  Regulation Revisions for Impact Analysis, 78 Fed. Reg. at 53,063 (quoting Ariz. Cattle Growers' Ass'n, 606 F.3d at 1173).  Although the Ninth Circuit invalidated the previous adverse modification standard's definition in 50 C.F.R. § 402.02, which Fish & Wildlife has since amended, the text of the Endangered Species Act's § 4(b)(2) has not changed.  In N.M. Cattle Growers Ass'n, the Tenth Circuit noted that the previous adverse modification standard's regulatory definition might also be "inconsistent with the intent and language of the ESA," but the question before the Tenth Circuit was whether the baseline approach -- or incremental effects

approach -- is consistent with the Endangered Species Act.  <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1283 n.2.   The Tenth Circuit ultimately held that the incremental effects approach is incompatible with the Endangered Species Act's text, because Fish & Wildlife's jeopardy standard subsumed its adverse modification standard and rendered any economic impact analysis meaningless, because Fish & Wildlife almost always determined that designating critical habitat has no economic impacts.  <u>See</u> <u>N.M. Cattle Growers Ass'n</u>, 249 F.3d at 1285.

Although Fish & Wildlife has since amended the adverse modification standard's definition, Fish & Wildlife's codification of the incremental effects approach does not, by itself, overturn <u>N.M. Cattle Growers Ass'n</u>, or change existing law, policy, or practice such that the incremental effects approach's codification is a legislative rule, because the Court concludes that <u>Chevron</u> does not apply.  <u>Cf.</u> <u>Brand X</u>, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction <u>otherwise entitled to</u> <u>Chevron</u> deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." (emphasis added)); <u>Montoya v. Sheldon</u>, 286 F.R.D. 602, 612 n.5 (D.N.M. 2012)(Browning, J.)("Generally, a district court must faithfully follow controlling Tenth Circuit precedent, but there is an exception where the statute or rule on which the prior decision was based has changed." (citing <u>San Juan Cty., Utah v. United States</u>, 503 F.3d 1163, 1189-90 (10th Cir. 2007), <u>abrogated on other grounds by</u> <u>Hollingsworth v. Perry</u>, 570 U.S. 694 (2013))).   Because the Court concludes that, under <u>Aposhian v. Barr</u>, Fish & Wildlife's codification of the incremental effects approach is an interpretive rule to which <u>Chevron</u> does not apply, the Court does not reach <u>Chevron</u>'s step one and will not apply <u>Chevron</u> deference to Fish & Wildlife's interpretation of "economic impact" as permitting the incremental effects approach. 16 U.S.C. § 1533(b)(2).

   **4.** **Alternatively, If <u>Chevron</u> Applies to the Incremental Effects Approach's Codification, the Court Would Conclude that Fish & Wildlife is Entitled to <u>Chevron</u> Deference, Because the Endangered Species Act Does Not Directly Address What Economic Impact Analysis Methodology Fish & Wildlife Should Apply, and the Incremental Effects Approach Derives from a Reasonable and Permissible Interpretation of the Statute.**

In the alternative, if the Court were to conclude that the incremental effects approach's codification is a legislative rule to which <u>Chevron</u> applies, the Court would hold that: (i) the "economic impact" provision in the Endangered Species Act's § 4(b)(2) is ambiguous about the impact analysis methodology which Fish & Wildlife should use to assess the economic impact of

designating critical habitat; and (ii) Fish & Wildlife's use of the incremental effects approach

derives from a permissible construction of the statutory text.  16 U.S.C. § 1533(b)(2).

> The <u>Chevron</u>-deference analysis proceeds in two steps.  <u>Chevron</u>, 467 U.S.
> at 842 . . . .  First, if Congress has spoken "directly" to the "precise question at
> issue," the inquiry ends, and we must give effect to the express intent of Congress.
> <u>Id.</u>  However, "if the statute is silent or ambiguous with respect to the specific issue,
> the question for the court [in step two] is whether the agency's answer is based on
> a permissible construction of the statute."  <u>Id.</u> at 843 . . . .

<u>Big Horn Coal Co. v. Sadler</u>, 924 F.3d 1317, 1322 (10th Cir. 2019)(alteration in <u>Bigo Horn Coal</u>

<u>Co.</u> only).  In <u>N.M. Cattle Growers Ass'n</u>, the Tenth Circuit did not apply <u>Chevron</u> to Fish &

Wildlife's informal interpretation of the Endangered Species Act's § 4(b)(2) and adoption of the

baseline/incremental effects approach, but it also did not conclude that the Endangered Species

Act's § 4(b)(2) is unambiguous, or that the statutory provision's "plain terms 'directly addres[s]

the precise question at issue.'"  <u>Brand X</u>, 545 U.S. at 986 (quoting <u>Chevron</u>, 467 U.S. at 843).  In

contrast, an appellate court's conclusion that a statute is unambiguous has binding stare decisis

effect.  See <u>Brand X</u>, 545 U.S. at 125.

> ### a.     If <u>Chevron</u> Applies, the Incremental Effects Approach's Codification Would Satisfy <u>Chevron</u>'s Step One, Because the Endangered Species Act's § 4(b)(2) is Ambiguous and Does Not Directly Address What Economic Impact Analysis Methodology Fish & Wildlife Should Use to Consider the Economic Impact of <u>Designating Critical Habitat</u>.

Fish & Wildlife argues that the Tenth Circuit implied in <u>N.M. Cattle Growers Ass'n</u> that

the Endangered Species Act is ambiguous as to the economic impact methodology which Fish &

Wildlife should use.  <u>See</u> Response at 20.  Fish & Wildlife asserts that consulting legislative history

is inappropriate when the statutory is unambiguous, and, because the Tenth Circuit proceeded to

review the legislative history of the Endangered Species Act, the Court should infer that the statute

is ambiguous.  <u>See</u> Response at 20 (citing <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1281, 1283,

1285).  In <u>New Mexico v. Dep't of Interior</u>, 854 F.3d 1207 (10th Cir. 2017), the Tenth Circuit

advised that "an inquiry into legislative history is generally appropriate at <u>Chevron</u> step one and,

more specifically, that it is appropriate even where the statute's text and structure evince

Congress's intent with crystalline clarity."  854 F.3d at 1227.  <u>See</u> <u>Big Horn Coal Co. v. Sadler</u>,

924 F.3d at 1323 ("To determine whether Congress has spoken directly to an issue, <u>we look at</u>

<u>both the statute's language and the legislative history</u>." (emphasis added)).  Moreover, in <u>N.M.</u>

<u>Cattle Growers Ass'n</u>, the Tenth Circuit's limited reliance on legislative history is unrelated to

economic impact methodology.  <u>See</u> 248 F.3d at 1283.  For example, the Tenth Circuit cited

S. Rep. No. 106-26, at 2, to demonstrate that Fish & Wildlife almost never designates critical habitat unless a court order requires it to do so, see N.M. Cattle Growers Ass'n, 248 F.3d at 1283, and it referenced H.R. Rep. No. 97-567, pt. 1, at 29, to emphasize that Fish & Wildlife must not consider economic impacts when deciding whether to list a species, see 248 F.3d at 1284-85

The Endangered Species Act's § 4(b)(2) states: "The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The Tenth Circuit analyzed the "economic impact" provision in Endangered Species Act's § 4(b)(2), and it held that the "statutory language is plain in requiring some kind of consideration of economic impact in the [critical habitat designation] phase." N.M. Cattle Growers Ass'n, 248 F.3d at 1285 (emphasis added). Moreover, the Tenth Circuit stated that "Congress clearly intended that economic factors were to be considered in connection with the [critical habitat designation]." N.M. Cattle Growers Ass'n, 248 F.3d at 1285. In contrast, when determining whether to list a species as endangered or threatened, Fish & Wildlife must consider "solely . . . the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). That Fish & Wildlife must not consider economic impacts when listing a species suggests that Fish & Wildlife also should not consider the economic impacts of listing a species when designating a critical habitat, but the text does not directly address this conundrum.

Like the statutory text, the legislative history sheds little light on how Congress intended Fish & Wildlife to assess economic impacts of designating critical habitat. Congress did not add the economic impact provision to the Endangered Species Act until 1978. See Endangered Species Act Amendments of 1978, Pub. Law No. 95-632, 91 Stat. 3751 (1978). The legislative history explains that this amendment affords the Secretary of the Interior great discretion to determine how much weight to give economic impacts when deciding whether to designate critical habitat:

> Up until this time, the determination of critical habitat has been a purely biological questions. With the addition of this new paragraph, the determination of critical habitat . . . takes on significant added dimensions. Economics and any other relevant impact shall be considered by the Secretary in setting the limits of critical habitat for such a species. The Secretary is not required to give economics or any other "relevant impact" predominant consideration in his specification of critical habitat . . . . The consideration and weight given to any particular impact is completely within the Secretary's discretion.

H.R. Rep. No. 95-1625, at 17 (1978).   Some congressmembers worried, however, that the

economic impact provision would dilute conservation efforts, because "[i]t constitutes a loophole

which could readily be abused by any Secretary of the Interior who is vulnerable to political

pressure, or who is not sympathetic to the basic purposes of the Endangered Species Act."   H.R.

Rep. No. 95-1625, at 69.   Because the Endangered Species Act's § 4(b)(2) affords Fish & Wildlife

wide discretion to weigh economic impacts that it sees fit, and because the lack of congressional

direction in the statute and in the legislative history, the Court concludes that "Congress has [not]

spoken 'directly' to the 'precise question at issue,'" and, thus, the Court proceeds to Chevron's

step two.   Big Horn Coal Co. v. Sadler, 924 F.3d at 1323 (quoting Chevron, 467 U.S. at 843).

> **b.**   **If Chevron Applies, the Incremental Effects Approach's Codification Would Satisfy Chevron's Step Two, Because the Incremental Effects Approach Derives From a Reasonable and Permissible Interpretation of the Endangered Species Act's § 4(b)(2).**

Chevron's step two asks "whether the agency has provided a 'permissible construction' of

the statute."   Aposhian v. Barr, 958 F.3d at 985 (quoting Chevron, 467 U.S. at 843).   Moreover,

an "'agency's interpretation need not be the only one it could have adopted, or the one that this

court would have reached had the question initially arisen in a judicial proceeding.'"   Anderson v.

Dep't of Labor, 422 F.3d 1155, 1181 (10th Cir. 2005)(quoting Salt Lake City v. W. Area Power

Admin., 926 F.2d 974, 978 (10th Cir. 1991)).   Although the Tenth Circuit previously invalidated

the baseline/incremental effects approach, a "court's prior judicial construction of a statute trumps

an agency construction otherwise entitled to Chevron deference only if the prior court decision

holds that its construction follows from the unambiguous terms of the statute and thus leaves no

room for agency discretion."   Brand X, 545 U.S. at 982.

> A contrary rule would produce anomalous results.   It would mean that whether an agency's interpretation of an ambiguous statute is entitled to Chevron deference would turn on the order in which the interpretations issue: If the court's construction came first, its construction would prevail, whereas if the agency's came first, the agency's construction would command Chevron deference.   Yet whether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur.   The Court of Appeals' rule, moreover, would "lead to the ossification of large portions of our statutory law," Mead[ Corp. v. United States], 533 U.S. at 247 . . . (Scalia, J., dissenting), by precluding agencies from revising unwise judicial constructions of ambiguous statutes.   Neither Chevron nor the doctrine of stare decisis requires these haphazard results.

Brand X, 545 U.S. at 983.   The Tenth Circuit did not conclude that the Endangered Species Act's

§ 4(b)(2) unambiguously requires that Fish & Wildlife apply the coextensive approach.   Because

the Court determines above that the Endangered Species Act's § 4(b)(2) is ambiguous how Fish & Wildlife should consider the economic impact of designating critical habitat, <u>Chevron</u> deference applies, and the Tenth Circuit's holding that Fish & Wildlife should apply the coextensive approach does not preclude the Court from concluding that the incremental effects approach stems from a permissible and reasonable interpretation of the Endangered Species Act.

The Court concludes that Fish & Wildlife's use of the incremental effects approach derives from a permissible interpretation of "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat" in the Endangered Species Act's § 4(b)(2). 16 U.S.C. § 1533(b)(2). The statutory provision directs Fish & Wildlife to consider the economic impact of designating critical habitat, so it is reasonable that Fish & Wildlife would ignore or discount the economic impact of other agency actions, such as listing a species. The Tenth Circuit held in <u>N.M. Cattle Growers Ass'n</u> that the "statutory is plain in requiring some kind of consideration of economic impact in the [critical habitat designation] phase." 248 F.3d at 1277. That Fish & Wildlife applied the incremental effects approach and determined that designating the Jumping Mouse's habitat as critical habitat would cost approximately $23,000,000.00 indicates that Fish & Wildlife has satisfied its statutory obligation that it conduct "some kind of consideration of economic impact." <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1277. <u>See</u> Jumping Mouse Designation, 81 Fed. Reg. 14,262. The Endangered Species Act's § 4(b)(2) does not require that Fish & Wildlife consider all economic impacts -- or that Fish & Wildlife consider costs that are coextensive with, or caused by, other agency actions. <u>See</u> 16 U.S.C. § 1533(b)(2). Because Fish & Wildlife's incremental effects approach is based on a reasonable and permissible interpretation of "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat" in the Endangered Species Act's § 4(b)(2), 16 U.S.C. § 1533(b)(2), if <u>Chevron</u> applies, Fish & Wildlife is entitled to the Court's deference.

**D.    FISH & WILDLIFE IS ENTITLED TO SOME DEFERENCE UNDER SKIDMORE V. SWIFT & CO., AND, BECAUSE THE ADVERSE MODIFICATION STANDARD'S CURRENT DEFINITION NO LONGER RENDERS MEANINGLESS ECONOMIC ANALYSIS UNDER THE INCREMENTAL EFFECTS APPROACH, N.M. CATTLE GROWER ASS'N'S CONCERNS THAT THE INCREMENTAL EFFECTS APPROACH VIOLATES THE CONGRESSIONAL MANDATE THAT FISH & WILDLIFE CONSIDER THE ECONOMIC IMPACT OF DESIGNATING CRITICAL HABITAT ARE INAPPLICABLE, AND THE INCREMENTAL EFFECTS APPROACH IS CONSISTENT WITH THE ENDANGERED SPECIES ACT.**

Where a court determines that an agency decision lacks the force of law -- and hence Chevron does not apply -- courts must consider the decision "under the framework set forth in Skidmore." Carpio v. Holder, 592 F.3d 1091, 1098 (10th Cir. 2010)(citing McGraw v. Barnhart, 450 F.3d 493, 500 (10th Cir. 2006)).   Under this framework, which courts frequently label Skidmore deference, the "paramount consideration" is whether an agency's "decision has 'the power to persuade.'"   Carpio v. Holder, 592 F.3d at 1098 (quoting Skidmore, 323 U.S. at 140). As the Honorable Antonin Scalia, then-Associate Justice for the Supreme Court, has explained: "Skidmore deference is a 'statement of the obvious: A judge should take into account the well-considered views of expert observers.'" Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1146 n.10 (10th Cir. 2010)(quoting United States v. Mead Corp., 533 U.S. at 250 (Scalia, J., dissenting)). Although the Supreme Court decided Skidmore four decades before it decided Chevron, Chevron did not "'eliminate Skidmore's holding that an agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency and given the value of uniformity in its administrative and judicial understandings of what a national law requires.'" McGraw v. Barnhart, 450 F.3d at 501 (quoting United States v. Mead Corp., 533 U.S. at 234).   Accordingly, under Skidmore, the "degree of deference . . . 'var[ies] with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.'"   Carpio v. Holder, 592 F.3d at 1098 (quoting United States v. Mead Corp., 533 U.S. at 228)(alteration added).

As the Court concludes above, Chevron does not apply to the incremental effects approach's codification, so the question remains whether Fish & Wildlife's reasoning for using the incremental effects approach has the power to persuade, especially in light of the Tenth Circuit's interpretation of the Endangered Species Act's § 4(b)(2) in N.M. Cattle Growers Ass'n. Fish & Wildlife argues that the incremental effects approach is different from the baseline

approach, which the Tenth Circuit invalidated in N.M. Cattle Grower's Ass'n, because, since 2001, Fish & Wildlife has amended the adverse modification standard's definition, turned away from the functional equivalence theory upon which the adverse modification standard was premised, and begun using the current incremental effects approach. See Response at 17-19. According to Fish & Wildlife, unlike the baseline approach and "false equivalence" theory, the incremental effects approach accounts for economic impacts of "designating critical habitat that go[] beyond the listing itself." Response at 18. Fish & Wildlife emphasizes that it used the incremental effects approach to calculate the designation's economic impact to equal approximately $23,000,000.00, and that this estimation is "a far cry from the assertion" in N.M. Cattle Growers Ass'n that the designation at issue there would have zero economic impact. Response at 18 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,262; N.M. Cattle Growers Ass'n., 248 F.3d at 1280). Fish & Wildlife thus argues that N.M. Cattle Grower's Ass'n is no longer applicable. See Response at 19 (citing Colorado v. Fish & Wildlife, 362 F. Supp. 3d at 988). The Stockman's Associations argue that N.M. Cattle Growers Ass'n binds Fish & Wildlife, because "'Congress clearly intended that economic factors were to be considered,'" and the incremental effects approach "fails to fully vindicate this congressional intention [as] it excludes by design the consideration of at least one prime economic factor -- coextensive costs." Reply at 10 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1284-85). They contend that the incremental effects approach's "'but for'" methodology is unreasonable and flawed, because it excludes the economic impacts of designating critical habitat that are coextensive with listing a species. Reply at 11-12 (quoting N.M. Cattle Growers Ass'n, 248 F.3d at 1283, and citing Wright, 73 Cal. L. Rev. at 1775-77, 1791-94).

Although the baseline approach that the Tenth Circuit invalidated in N.M. Cattle Grower's Ass'n closely resembles the incremental effects approach, Fish & Wildlife's changes to the adverse modification standard's definition fundamentally altered how it conducts economic-impact analysis between the time N.M Cattle Growers Ass'n was decided and now. The baseline approach is a "but-for" test: "[U]nless an economic impact would not result but for the [critical habitat designation], that impact is attributable to a different cause (typically listing) and is not an 'economic impact . . . of specifying any particular area as a critical habitat.'" N.M. Cattle Growers Ass'n, 248 F.3d at 1283 (quoting 16 U.S.C. § 1533(b)(2)). The current incremental approach is

also a "but-for" test in that it "compare[s] the impacts compare the impacts with and without the

designation."  50 C.F.R. § 424.19.  The Regulation Revisions for Impact Analysis add:

> The second phrase of the second sentence, "and will compare the impacts
> with and without designation," clarifies that impact analyses evaluate the
> incremental impacts of the designation.  <u>This evaluation is sometimes referred to
> as an "incremental analysis" or "baseline approach."</u>  For the purpose of the impacts
> analysis required by the first sentence of section 4(b)(2) of the Act, the incremental
> impacts are those probable economic, national security, and other relevant impacts
> of the proposed critical habitat designation on ongoing or potential Federal actions
> that would not otherwise occur without the designation.  <u>Put another way, the
> incremental impacts are the probable impacts on Federal actions for which the
> designation is the "but for" cause.</u>

Regulation Revisions for Impact Analysis, 78 Fed. Reg, at 53,058 (quoting 50 C.F.R.

§ 424.19)(emphasis added).  Fish & Wildlife's regulation thus acknowledges that the baseline

approach and the incremental effects approach are two different names for the same "but-for"

methodology.  Regulation Revisions for Impact Analysis, 78 Fed. Reg, at 53,058.  When the Tenth

Circuit decided <u>N.M. Cattle Growers Ass'n</u>, the jeopardy standard -- which requires that the

Secretary of the Interior ensure that other federal agencies do not authorize or fund certain

prohibited actions after Fish & Wildlife lists a species -- and the adverse modification standard --

which requires that the Secretary of the Interior ensure that other federal agencies do not authorize

or fund certain prohibited actions after Fish & Wildlife designates critical habitat -- were identical,

because both standards circumscribed actions that negatively impact "both the survival and

recovery of a listed species."  50 C.F.R. § 402.02 (effective October 31, 1984).  Hence, under the

nearly identical regulatory definitions in effect at that time, designating critical habitat would not

implicate or prohibit any actions that listing a species already implicates or prohibits, and, thus,

designating critical habitat would not produce any incremental economic impact beyond the

listing's economic impact.

The Endangered Species Act's text and structure link the adverse modification standard

and Fish & Wildlife's consideration of economic impact,[28] because: (i) after Fish & Wildlife

---

[28]The Tenth Circuit explicitly acknowledged the interlocking relationship of "destruction
or adverse modification" in 16 U.S.C. § 1536(a)(2), which Fish & Wildlife defines in 50 C.F.R.
§ 402.02, and "economic impact" in 15 U.S.C. § 1533(b)(2), which Fish & Wildlife has interpreted
as permitting the incremental effects approach in 50 C.F.R. § 424.19 and the Regulation Revisions
for Impact Analysis, 78 Fed. Reg, at 53,058.  According to the Tenth Circuit, Fish & Wildlife's
regulatory definitions for the jeopardy standard and the adverse modification standard "have been
the cause of much confusion in that they inform the FWS's interpretation of the ESA's economic
impact language," but the Tenth Circuit declined to invalidate the adverse modification standard's
definition, because that issue was not before it.  <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1283.
<u>See id.</u> at 1283 n.2 (noting that, although "these regulatory definitions are not before us today,

designates critical habitat, it must ensure that other federal agencies do not authorize or fund actions that destroy or adversely modify such habitat, see 16 U.S.C. § 1536(a)(2); and (ii) prohibiting agencies from authorize or funding actions that were not prohibited before the designation produces an economic impact, which the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to consider before designating critical habitat, see 16 U.S.C. § 1533(b)(2).  The adverse modification standard is an administrative regulation that interprets and implements "destruction or adverse modification of habitat" in the Endangered Species Act's § 7(a)(2), which is codified in 16 U.S.C. § 1536(a)(2), whereas the incremental effects approach results from Fish & Wildlife's interpretation and implementation of "taking into consideration the economic impact . . . of specifying any particular area as critical habitat" in the Endangered Species Act's § 4(b)(2), which is codified in 16 U.S.C. § 1533(b)(2).  As the Court notes above, § 1536(a)(2) states that each federal agency must consult with the Secretary of the Interior to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536(a)(2).  In turn, § 1533(b)(2) mandates that the Secretary of the Interior consider the "economic impact" of a proposed critical habitat designation before promulgating the designation, 16 U.S.C. § 1533(b)(2), which would include the costs of otherwise permissible actions that the Secretary of the Interior must ensure that agencies do not authorize or fund under § 1536(a)(2), because the action might jeopardize a species' survival or destroy critical habitat. The Tenth Circuit noted in N.M. Cattle Growers Ass'n that, because the jeopardy standard and the adverse modification standard were "virtually identical," designating critical habitat would not prohibit agencies from authorizing or funding any actions that listing a species did not already prohibit, and, thus, designating critical habitat did not result in any economic impact beyond a listing's economic impact.  248 F.3d at 1283.

Although the Ninth Circuit invalidated the adverse modification standard in 2004, Fish & Wildlife did not formally amend the adverse modification standard's regulatory definition until

_____

federal courts have begun to recognize that the results they produce are inconsistent with the intent and language of the ESA" (citing Sierra Club v. U.S. Fish and Wildlife Serv., 245 F.3d 434)).

2016, and again in 2019.[29]   Fish & Wildlife does not explain how the adverse modification standard's amended definition -- or the informal definition it employed when it designated the Jumping Mouse's critical habitat in 2013, before Fish & Wildlife formally amended the regulatory definition that the Ninth Circuit had invalidated -- is materially different from the jeopardy standard's definition.   The Court determines, however, that the adverse modification standard's

---

[29]The Regulation Revisions for Impact Analysis state that, since sometime between 2004, when the Ninth Circuit invalidated the previous adverse modification standard's definition, and 2007, "the Services have been applying 'destruction or adverse modification' in a way that allows the Services to define an incremental effect of designation.  This process eliminated the predicate for the Tenth Circuit's analysis.'"   Regulation Revisions for Impact Analysis, 78 Fed. Reg, at 53,063.  In 2016, Fish & Wildlife made the following changes to the adverse modification standard's regulatory definition, which became effective March 14, 2016:

> After considering public comments, Congressional intent, relevant case law, and the Services' collective experience in applying the "destruction or adverse modification" standard over the last three decades, we finalize the following regulatory definition: Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species.  Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

Interagency Cooperation -- Endangered Species Act of 1973, as Amended; Definition of Destruction or Adverse Modification of Critical Habitat 81 Fed. Reg. 7,216.  Three years later, Fish & Wildlife again amended the adverse modification standard's regulatory definition by making the following changes, which became effective September 26, 2019:

> We revised the definition of "destruction or adverse modification" by adding the phrase "as a whole" to the first sentence and removing the second sentence of the prior definition.  The Act requires Federal agencies, in consultation with and with the assistance of the Secretaries, to insure that their actions are not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species. In 1986, the Services established a definition for "destruction or adverse modification" (51 FR 19926, June 3, 1986, codified at 50 CFR 402.02) that was found to be invalid by the U.S. Court of Appeals for the Fifth (2001) and Ninth (2004) Circuits. In 2016, we revised the definition, in part in response to these court rulings (81 FR 7214; February 11, 2016).

> In this final rule, we have further clarified the definition.  The addition of the phrase "as a whole" to the first sentence reflects existing practice and the Services' longstanding interpretation that the final destruction or adverse modification determination is made at the scale of the entire critical habitat designation.   The deletion of the second sentence removes language that is redundant and has caused confusion about the meaning of the regulation.  These revisions are unchanged from the proposed rule, and further explanation of their background and rationale is provided in the preamble text of the proposed rule.

Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,981.  Meanwhile, the jeopardy standard's regulatory definition remains the same as when the Tenth Circuit decided N.M. Cattle Growers Ass'n: "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

current definition is broader than the jeopardy standard's definition, because the adverse modification standard encompasses actions that "appreciably diminish the value of critical habitat as a whole for the <u>conservation</u> of a listed species," whereas the jeopardy standard is limited to actions that "reduce appreciably the likelihood of <u>both the survival and recovery</u> of a listed species." 50 C.F.R. § 402.02 (emphasis added). <u>See</u> <u>Gifford Pinchot</u>, 378 F.3d at 1059 (noting that "conservation" is a broader concept than "survival," and concluding that the adverse modification standard's prohibition of actions that affect "both survival *and* conservation fails to provide protection of habitat when necessary only for species' recovery" (emphasis in original)). After listing a species, the Secretary of the Interior must consult only with other federal agencies about actions that affect the survival <u>and</u> recovery of the listed species, but, after designating critical habitat, the Secretary of the Interior must consult with other federal agencies about any action that affects the conservation of the listed species. Congress defines "conservation" broadly in the Endangered Species Act: "The terms 'conserve', 'conserving', and 'conservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). Many actions affect a species' conservation without affecting the species' likelihood of survival, recovery, or both. <u>See</u> <u>Sierra Club v. U.S. Fish and Wildlife Serv.</u>, 245 F.3d at 441-42 (reasoning that conservation is "a much broader concept than mere survival," and concluding that "[r]equiring consultation only where an action affects the value of critical habitat to both the recovery *and* survival of a species imposes a higher threshold . . . " (emphasis in original)). Put differently, the adverse modification standard is grounded in evaluating actions that impact conservation, which is a lower threshold than the jeopardy standard, which requires consultation for actions that impact both survival and recovery. Hence, the adverse modification standard applies to many actions to which the jeopardy standard does not apply, and, accordingly, designating critical habitat produces an economic impact beyond the economic impact of listing a species, which agencies must not consider when determining whether to list species.

In <u>N.M. Cattle Growers Ass'n</u>, the Tenth Circuit determined that <u>Chevron</u> was inapplicable to the baseline approach and instead applied <u>Skidmore</u> deference, "ask[ing] if the agency's interpretation is 'well reasoned' and has the 'power to persuade.'" 248 F.3d 1277 (quoting <u>Fristoe</u>

v. Thompson, 144 F.3d at 631; S. Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d at 834).  The Tenth Circuit held that the baseline approach is "not in accord with the language" of the Endangered Species Act, because Fish & Wildlife's conflated definitions for the jeopardy standard and the adverse modification standard meant that the incremental costs of designating critical habitat would almost always, if not always, be zero.  N.M. Cattle Growers Ass'n, 248 F.3d at 1285.  The Tenth Circuit reasoned that, "[a]lthough 50 C.F.R. 402.02 is not at issue here, the regulation's definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless."  248 F.3d at 1285.  Because, under the old adverse modification standard, designating critical habitat always would result in virtually zero incremental costs, the Tenth Circuit concluded that the baseline approach failed to give effect to the "congressional directive" in the Endangered Species Act's § 4(b)(2) that "economic impacts be considered at the time of critical habitat designation."  N.M. Cattle Growers Ass'n, 248 F.3d at 1285 (citing Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Compensation Programs, 927 F.2d at 1153).  With no incremental costs to consider, the Tenth Circuit concluded that Fish & Wildlife's adverse modification standard left only coextensive costs,[30] and it held that Fish & Wildlife must consider such costs to give effect to the Endangered Species Act's § 4(b)(2).  See N.M. Cattle Growers Ass'n, 248 F.3d at 1285 ("Because . . . the FWS's baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02, we conclude Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes.").

The jeopardy standard no longer subsumes the adverse modification standard, so the concerns that permeate N.M. Cattle Growers Ass'n no longer plague the incremental effects approach.  Although the Court "must faithfully follow controlling Tenth Circuit precedent, [] there

---

[30]Judge Lamberth characterizes the Tenth Circuit's analysis in N.M. Cattle Growers Ass'n as "[a]pparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02."  Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior, 344 F. Supp. 2d at 129.  Even though the Tenth Circuit suggested that the adverse modification standard in 50 C.F.R. § 402.02 is the source of "much confusion," is the "root" of the problem with Fish & Wildlife's economic impact analysis, and produces results that are "inconsistent" with the Endangered Species Act, N.M. Cattle Growers Ass'n, 248 F.3d at 1283 & n.2, the Tenth Circuit nevertheless "found another way to require the Service to perform a more rigorous economic analysis" by invalidating the incremental effects approach and not the adverse modification standard's definition, Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior, 344 F. Supp. 2d at 129-30.  According to Judge Lamberth, "[t]his is an instance of a hard case making bad law."  Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior, 344 F. Supp. 2d at 130.

is an exception when the statute or rule on which the prior decision was based has changed." Montoya v. Sheldon, 286 F.R.D. at 612 n.5 (citing San Juan Cty., Utah v. United States, 503 F.3d at 1189-90). As the Court discusses above, the Tenth Circuit's reasoning in N.M. Cattle Growers Ass'n relies heavily on Fish & Wildlife's conflated definitions for the jeopardy standard and the adverse modification standard, which the Tenth Circuit identified as the "root" of Fish & Wildlife's policy position that critical habitat designations are unhelpful and typically have zero economic impacts. N.M. Cattle Growers Ass'n, 248 F.3d at 1283. See id. at 1283 & n.2 (suggesting that the regulatory definitions for the jeopardy standard and the adverse modification standard are "inconsistent with the intent and language of the ESA," and concluding that "these regulatory definitions . . . have been the cause of much confusion in that they inform the FWS's interpretation of the ESA's economic impact language"). Since Fish & Wildlife has amended the adverse modification standard's definition several years ago, designating critical habitat now produces economic impacts beyond those associated with listing a species, because the current adverse modification standard sets a lower threshold than the jeopardy standard for triggering Section 7 consultations to review actions that other agencies authorize and fund. Thus, the incremental effects approach no longer automatically leads Fish & Wildlife to determine that designating critical habitat will result in zero economic costs.

The Endangered Species Act's § 4(b)(2) has not changed since the Tenth Circuit interpreted its text in N.M. Cattle Growers Ass'n, and, thus, the Tenth Circuit's construction of the statute binds the Court, but the adverse modification standard's definition has changed, so the Tenth Circuit's analysis of how the adverse modification standard "inform[s]" Fish & Wildlife's economic impact analysis does not bind the Court. N.M. Cattle Growers Ass'n, 248 F.3d at 1283. The Tenth Circuit does not interpret the Endangered Species Act's § 4(b)(2) as unequivocally requiring that Fish & Wildlife use the coextensive approach. The Tenth Circuit analyzed the Endangered Species Act's § 4(b)(2) and held that the "statutory language is plain in requiring some kind of consideration of economic impact in the [critical habitat designation] phase." N.M Cattle Growers Ass'n, 248 F.3d at 1285 (emphasis added). Whereas the previous adverse modification standard's definition routinely caused Fish & Wildlife to determine that designating critical habitat entails zero economic impacts under the baseline approach, the current definition does not suffer this same defect. Rather, the incremental effects approach "give[s] some effect to the

congressional directive that economic impacts be considered at the time of critical habitat designation." N.M. Cattle Growers Ass'n, 248 F.3d at 1285. Moreover, the Tenth Circuit held that Fish & Wildlife's use of the incremental effects approach violated the Endangered Species Act's § 4(b)(2), "[b]ecause economic analysis done using the FWS's baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02," which defines the jeopardy standard and adverse modification standard. N.M. Cattle Growers Ass'n, 248 F.3d at 1285. Accordingly, because the adverse modification standard's current definition does not lead Fish & Wildlife to determine that designating critical habitat will result in no incremental costs, the incremental effects approach is no longer inconsistent with the Endangered Species Act's mandate that Fish & Wildlife consider the "economic impact" of designating critical habitat. 16 U.S.C. § 1533(b)(2).

The Tenth Circuit concluded in N.M. Cattle Growers Ass'n that the baseline approach lacks the power to persuade, because the adverse modification standard at that time did not require any Section 7 consultations that the jeopardy standard did not already require, and, thus, designating critical habitat entailed no additional economic impacts under the baseline approach. With Fish & Wildlife's amendment to the adverse modification standard, Fish & Wildlife's reasons for using the incremental effects approach are much more persuasive, because the adverse modification standard now requires Section 7 consultations after designating critical habitat which the jeopardy standard did not require after listing a species. The incremental effects approach now accounts for the additional costs of Section 7 consultations after designating critical habitat, thereby giving effect to the congressional mandate that Fish & Wildlife consider the "economic impact" of designating critical habitat. 16 U.S.C. § 1533(b)(2).

Numerous courts have concluded that a "but-for" methodology -- whether a court calls it the baseline approach or the incremental effects approach -- stems from a reasonable construction of the Endangered Species Acts' § 1533(b)(2), given that the jeopardy standard no longer subsumes the adverse modification standard. See, e.g., Ariz. Cattle Growers' Ass'n, 606 F.3d at 1173; Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior, 344 F. Supp. 2d at 130; Colorado v. Fish & Wildlife, 362 F. Supp. 3d at 988; Fisher v. Salazar, 656 F. Supp. 1357, 1371 (N.D. Fla. 2009)(Stafford, J.); Ctr. for Biological Diversity v. Bureau of Land Mgmt., 422 F. Supp. 2d 1115, 1152-53 (N.D. Cal. 2006)(Illston, J.). In Ariz. Cattle Growers' Ass'n, the Honorable Betty B. Fletcher, then-United States Circuit Judge for the United States Court of Appeals for the

Ninth Circuit, noted that <u>N.M. Cattle Growers Ass'n</u> "rel[ied] on a faulty premise" -- Fish & Wildlife's conflated definitions for the jeopardy standard and the adverse modification standard -- which Fish & Wildlife has since corrected by amending the adverse modification standard's definition. <u>Ariz. Cattle Growers' Ass'n</u>, 606 F.3d at 1173. Judge Fletcher also gives one of the most persuasive defenses for the baseline approach/incremental effects approach:

> The baseline approach is, if anything, more logical than the co-extensive approach. The very notion of conducting a cost/benefit analysis is undercut by incorporating in that analysis costs that will exist regardless of the decision made. Moreover, the practical relevance of the economic analysis under the Endangered Species Act is to determine the benefits of excluding or including an area in the critical habitat designation: if there is no net benefit (such as a reduction in economic impacts) to excluding the area, the agency must designate it. <u>See</u> 16 U.S.C. § 1533(b)(2). The baseline approach, in contrast to the co-extensive approach, reflects this purpose.
>
> Congress has directed the FWS to list species, and thus impose a regulatory burden, without consideration of the costs of doing so. <u>See</u> 16 U.S.C. § 1533(a); <u>N.M. Cattle Growers</u>, 248 F.3d at 1282. It would be strange to conclude that Congress intended the FWS to consider costs at the critical habitat phase that the agency was barred from considering at the listing phase where, as a result, the analysis would bear little relationship to reality. It would also be strange to conclude that Congress intended to use the critical habitat designation to require the agency to consider the previously irrelevant costs of listing the species, particularly given that the decision to exclude an area from critical habitat for economic reasons is discretionary. <u>See</u> 16 U.S.C. § 1533(b)(2); <u>Bennett v. Spear</u>, 520 U.S. 154, 172 . . . (1997). The simpler explanation is that the economic analysis of the critical habitat designation is exactly what it sounds like and is not intended to incorporate the burdens imposed by listing the species.

<u>Ariz. Cattle Growers' Ass'n</u>, 606 F.3d at 1173. Judge Fletcher's reasoning echoes that of Judge Lamberth:

> The baseline approach is a reasonable method for assessing the actual costs of a particular critical habitat designation. To find the true cost of a designation, the world with the designation must be compared to the world without it. This is precisely the advice that the Office of Management and Budget gives to federal agencies conducting impact analysis: "Identify a baseline. Benefits and costs are defined in comparison with a clearly stated alternative. This normally will be a "no action" baseline: what the world will be like if the proposed rule is not adopted." Office of Management and Budget, <u>Circular A-4: Regulatory Analysis</u> 2 (Sept. 17, 2003). In order to calculate the costs above the baseline, those that are the "but for" result of designation, the agency may need to consider the economic impact of listing or other events that contribute to and fall below the baseline. The Service, however, must not allow the costs below the baseline to influence its decision to designate or not designate areas as critical habitat. That would be inconsistent with the ESA's prohibition on considering economic impacts during the species listing process.

<u>Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior</u>, 344 F. Supp. 2d at 130. The incremental effects approach gives effect to the Endangered Species Act's directive that Fish & Wildlife consider some economic impacts before designating critical habitat. <u>See</u> <u>N.M. Cattle</u>

Growers Ass'n, 248 F.3d at 1285; 16 U.S.C. § 1533(b)(2).  Because the Tenth Circuit's reason for

rejecting the incremental effects approach is no longer applicable, N.M. Cattle Growers Ass'n does

not compel the Court to reject Fish & Wildlife's use of the incremental effects approach.

Moreover, Fish & Wildlife's use of the incremental effects approach is well-reasoned and

persuasive -- it considers the economic impact of designating critical habitat without accounting

for the economic impact of listing a species, which the Endangered Species Act prohibits, and the

incremental effects approach no longer leads Fish & Wildlife automatically to conclude that

designating critical habitat has no economic impacts.[31]  See N.M. Cattle Growers Ass'n, 248 F.3d

at 1284.  For these reasons, under Skidmore, Fish & Wildlife's use of the incremental effects

approach is well-reasoned, persuasive, and consistent with the Endangered Species Act's § 4(b)(2).

## III.   FISH & WILDLIFE DID NOT ABUSE ITS DISCRETION WHEN FAILING TO CONSIDER THE COSTS OF JUST COMPENSATION FOR THE ALLEGED TAKING OF WATER RIGHTS HELD BY MEMBERS OF THE STOCKMAN'S ASSOCIATIONS.

In addition to concluding that Fish & Wildlife's use of the incremental effects approach is

consistent with the Endangered Species Act's § 4(b)(2), the Court holds that Fish & Wildlife did

not abuse its discretion by failing to consider designation costs, such as compensating the members

of the Stockman's Associations for reducing the value of their water rights, with respect to property

within the critical habitat designation.  Rather, the Court determines that Fish & Wildlife acted

reasonably under the Endangered Species Act because its economic analysis was not legally

required to include speculative costs related to a hypothetical taking of members' water rights, as

no data related to those rights was readily available to Fish & Wildlife at the time.  And, because

the Court determines that Fish & Wildlife acted reasonably in excluding water rights

compensation, the Court rejects the Stockman's Associations argument that Fish & Wildlife's

---

[31]At the October 31, 2019, hearing, Fish & Wildlife advanced a hypothetical that is illustrative and convincing as well.  Fish & Wildlife argued that, if a business spends $100.00 on facility improvements, and later considers spending an additional $50.00 to improve its facilities, then the business focuses only on the incremental costs and benefits of the additional $50.00 worth of improvements for determining whether to pay for the improvements.  See Tr. at 38:2-10 (Flanagan).  It asserted that the incremental effects approach appropriately ignores costs of decisions made before designating critical habitat, such as costs associated with listing a species, just like the business would not account for the already-spent $100.00 when considering whether to pay for the additional facility improvements.  See Tr. at 38:10-14 (Flanagan).  The Court concludes that this logic is sound and in accord with the Endangered Species Act's text, which requires Fish & Wildlife to consider the economic impact "of specifying any particular area as critical habitat" -- not the economic impact of listing a species.  16 U.S.C. § 1533(b)(2).  See N.M. Cattle Growers Ass'n, 248 F.3d at 1284 ("It is true that the ESA clearly bars economic considerations from having a seat at the table when the listing determination is being made.").

failure to compensate members for the value of their water rights amounts to a taking under the

Fifth Amendment to the Constitution.

### A.  UNDER THE ENDANGERED SPECIES ACT, FISH & WILDLIFE IS VESTED WITH DISCRETION WHEN MAKING CRITICAL HABITAT DETERMINATIONS, AND MUST ACT PRUDENTLY BASED ON "THE BEST SCIENTIFIC AND COMMERCIAL DATA AVAILABLE."

As the Court explained *infra*, the Endangered Species Act's purpose is twofold: "to provide

a means whereby the ecosystems upon which endangered species and threatened species depend

may be conserved," and "to provide a program for the conservation of such endangered species

and threatened species."  16 U.S.C. § 1531(b).  Pursuant to these objectives, the Endangered

Species Act governs Fish & Wildlife's rule-making when listing species as threatened or

endangered, and designating species' critical habitat.  See 16 U.S.C. § 1533(a)-(b).  Under the

Endangered Species Act, Fish & Wildlife shall promulgate species-listing regulations by

determining whether a species is threatened or endangered based on factors such as: "(A) the

present or threatened destruction, modification, or curtailment of [the species'] habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes; . . . [and] (E)

other natural or manmade factors affecting its continued existence."  16 U.S.C. § 1533(a)(1)(A)-

(B), (E).  Fish & Wildlife shall make species-listing determinations "solely on the basis of the best

scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

### B.  FEDERAL COURTS MAY REVIEW FISH & WILDLIFE'S AREA-EXCLUSION DECISIONS FOR ABUSE OF DISCRETION.

In the process of making species-listing determinations, Fish & Wildlife must act in

accordance with regulations promulgated under 16 U.S.C. § 1533(b), and shall prudently and

concurrently "designate any habitat of [the threatened or endangered species] which is then

considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). The designation of critical habitat,

in turn, must be determined based on Fish & Wildlife's evaluation of "the best scientific data

available" -- an evaluation that must follow its "consideration [of] the economic impact, the impact

on national security, and any other relevant impact, of specifying any particular area as critical

habitat." 16 U.S.C. § 1533(b)(2). Significantly as well, Fish & Wildlife is offered discretion in

drawing the boundaries of critical habitat designations, and may exclude any designated area of

critical habitat "if [it] determines that the benefits of such exclusion outweigh the benefits of

specifying such area as part of the critical habitat, unless . . . failure to designate such area as critical habitat will result in the extinction of the species concerned."  16 U.S.C. § 1533(b)(2).

Notwithstanding, Fish & Wildlife's broad grant of exclusionary discretion is not without limits.  Rather, in Weyerhaeuser, the Supreme Court determined that the Endangered Species Act's critical-habitat exclusion provision under § 4(b)(2)[32] is not exempt from judicial review as an APA § 701(a)(2) exception.  139 S. Ct. at 371-72.  Instead, the Supreme Court clarified that the § 701(a)(2) exception is applicable only in exceptional cases where courts generally view a particular agency decision as unreviewable "such as the allocation of funds from a lump-sum appropriation, or a decision not to reconsider a final action."  139 S. Ct. at 370 (citing Lincoln v. Vigil, 508 U.S. at 191; ICC v. Locomotive Eng'rs, 482 U.S. 270, 282 (1987)).  Comparatively, any challenges to Fish & Wildlife's impact analysis for its exclusion decisions were "the sort of routine dispute[s] that federal courts regularly review."  139 S. Ct. at 370.  Moreover, because the Supreme Court determined that the procedural mandate of the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to evaluate economic and other impacts before deciding whether to exclude a designated area of critical habitat, see 139 S. Ct. at 370, the Court determined that the exclusion provision was not "'drawn so that a court would have no meaningful standard against which to judge the Secretary of the Interior's exercise of his discretion not to exclude.'"  139 S. Ct. at 371-72 (quoting Lincoln v. Vigil, 508 U.S. at 191).  The Supreme Court, therefore, held that Fish & Wildlife's exclusion decisions were reviewable judicially for abuse of discretion, because, even though the word "'may' certainly confers discretion on the Secretary," Fish & Wildlife's discretionary exclusion decisions were not independent from the Endangered Species Act's § 4(b)(2) procedural mandate.  139 S. Ct. at 371.

---

[32]The Endangered Species Act's § 4(b)(2), the critical-habitat-exclusion provision, reads as follows:   "The Secretary of the Interior may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area . . . unless he determines . . . that the failure to designate such area as critical habitat will result in the extinction of the species concerned . . ."

C.   **FISH & WILDLIFE DID NOT ABUSE ITS DISCRETION WHEN FAILING TO CONSIDER THE COSTS OF JUST COMPENSATION FOR THE ALLEGED TAKING OF WATER RIGHTS HELD BY MEMBERS OF THE STOCKMAN'S ASSOCIATIONS, BECAUSE ITS DECISION-MAKING WAS REASONABLY BASED ON FORESEEABLE COSTS RATHER THAN SPECULATIVE COSTS ASSOCIATED WITH MEMBERS' HYPOTHETICAL WATER RIGHTS.**

Under prevailing case law, the Court holds that Fish & Wildlife did not abuse its discretion when failing to consider the costs of just compensation for the alleged taking of water rights held by members of the Stockman's Associations.  The Court reaches this holding based on its assessment that Fish & Wildlife acted reasonably in its assessment of the incremental impacts of the designation -- in that the assessment was estimated to include only foreseeable costs associated with the designation, as opposed to the speculative costs connected to the Stockman's Associations' members' water rights.

1.   **The Parties Dispute Whether Fish & Wildlife's Must Assess All of the Pertinent Incremental Impacts Associated with the Critical Habitat Designation.**

In its petition, the Stockman's Associations argue that even if the Court were to determine that Fish & Wildlife's incremental effects approach in its economic analysis is lawful, Fish & Wildlife "must still assess all of the pertinent incremental impacts," which it did not do when it failed to consider members' costs associated with fencing -- namely, the cost of reducing members' access to water.  Petition at 25.  Specifically, as the Stockman's Associations contend, because the critical habitat designation of units 3 and 4 interferes with their members' water rights in the Santa Fe and Lincoln National Forests, Fish & Wildlife has engaged in an unconstitutional "taking" of property under the Fifth Amendment, for which it (i) must pay just compensation to their members, and (ii) account for in its calculation of the critical habitat designation's economic impacts.  See Petition at 24-25 (citing Sacramento Grazing Association, Inc. v. United States, 135 Fed. Cl. 168, 197 (2017)).   In addition, refuting Fish & Wildlife's defense that the fencing exclusions would not be on privately owned land that members possessed, the Stockman's Association contends that, "[u]nder New Mexico law, the right to beneficial use of water is a property interest distinct and severable from a right to use land."  Petition at 25 (quoting Sacramento Grazing Association, Inc. v. United States, 135 Fed. Cl. at 197)(alteration added).

On the other hand, Fish & Wildlife counters that its failure to account for members' water rights is not an abuse of discretion, but, rather, is reasonable given that the costs directly associated with the grazing allotment water rights of the Stockman's Association's members are "highly

speculative."  Response at 22.  Fish & Wildlife also counter that it need not  consider economic

impacts associated with the designation that only "hypothetically" infringe upon the grazing

allotment water rights of the Stockman's Association's members, as those economic impacts are

"too uncertain or speculative."  Response at 23-24 (quoting <u>Alaska Oil & Gas Ass'n v. Jewell</u>, 815

F.3d 544, 565 (9th Cir. 2016)).  Instead, Fish & Wildlife argues that it reasonably "factored in the

costs for [it] to *avoid* taking grazers' water rights at all,"  Response at 17, 22 (emphasis in original),

which include costs it calculated for developing "'cattle lanes'" and pipes for transporting water

from fenced-off sources, Response at 22 (quoting U.S. Forest Fish & Wildlife, Southwestern

Region: Comments on the economic analysis for New Mexico meadow jumping mouse proposed

critical      habitat      (posted      May      7,      2014),      at      D003496-97,

https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0053  (last visited June 15,

2020)).  Finally, Fish & Wildlife notes that it has factored in economic impacts relating to potential

AUM reductions, and that "reducing AUMs for grazing on federal land does not 'take' water rights

or other private property rights."  Response at 22 (quoting <u>Walker</u>, 162 P.3d at 888, and citing

Screening Memo at 8-10).

### 2.    The Case Does Not Fall Squarely Within the Contours of Applicable New Mexico Water Law Precedent.

Given the Court's location in the District of New Mexico, it is not unfamiliar with the issue

of water rights.  To the contrary, water rights are a frequent source of litigation in the Tenth Circuit,

as well as within district and state courts across the region.  <u>See</u> e.g., <u>Diamond Bar Cattle Co. v.</u>

<u>United States</u>, 168 F.3d at 1213-1217; <u>Walker v. United States</u>, 2007-NMSC-038, 162 P.3d at 882.

For example, in <u>Walker v. United States</u>, the Supreme Court of New Mexico was asked to certify

a question related to the State of New Mexico's recognition of plaintiffs' limited forage right

implicit in their vested water rights.  <u>See</u> 2007-NMSC-038, 162 P.3d at 888-890.  In the process

of answering the question in the negative, the Supreme Court of New Mexico outlined the

following helpful and illustrative history of the principles and historical development of New

Mexico Water Law.  <u>See</u> 2007-NMSC-038, 162 P.3d at 888-890.

> The prior appropriation doctrine governs water law in New Mexico.  *See*
> N.M. Const. art. XVI, § 2 ("Priority of appropriation shall give the better right.");
> *Montgomery v. Lomos Altos, Inc.,* 2007–NMSC–002, ¶ 5 n. 3, 141 N.M. 21, 150
> P.3d 971 (citing NMSA 1978, § 72–1–2 (1907)).  Under prior appropriation, "the
> right to use water is considered a property right which is separate and distinct from
> ownership of the land." *KRM, Inc. v. Caviness,* 1996–NMCA–103, ¶ 6, 122 N.M.
> 389, 925  P.2d 9; *see* Charles T. DuMars & A. Dan Tarlock, *Symposium*

*Introduction: New Challenges to State Water Allocation Sovereignty,* 29 Nat. Resources J. 331, 332 (1989)(noting that under prior appropriation a "water right [is] a quasi-exclusive property right (*not tied to the locus of use* )" (emphasis added)). Thus, a water right is not an automatic stick in the bundle of rights a landowner receives upon purchasing even a fee interest in land.

Under the doctrine of prior appropriation, water rights are both established and exercised by beneficial use, which forms "the basis, the measure and the limit of the right to use of the water." N.M. Const. art. XVI, § 3. A water right is separate and distinct from a right to adjacent land because it is derived not from the rights in the land, but "from appropriation for beneficial use." *Olson v. H & B Props., Inc.,* 118 N.M. 495, 498, 882 P.2d 536, 539 (1994). As a result of the separate and distinct nature of a water right, that right must be exercised or lost; one cannot sit on water rights to the exclusion of any other claimant without putting them to beneficial use. *See* Ira G. Clark, *Water in New Mexico: A History of Its Management and Use* 39 (1987) ("Since the criterion was application of water to beneficial use, this was not a property right which could be acquired in perpetuity; it had to be exercised to be kept alive.").

The sole exception to the general rule that water rights are separate and distinct from the land is water used for irrigation. *See KRM,* 1996–NMCA–103, ¶ 8, 122 N.M. 389, 925 P.2d 9 (holding that Section 72–1–2 and NMSA 1978, § 72–5–22 (1953) "evince an intent to create a limited statutory exception to the general rule that water rights and land ownership are distinct property rights"). Irrigation water rights are appurtenant to the land, meaning that any conveyance of the land will carry the water right with it unless the water right is expressly reserved by the grantor. *See* NMSA 1978, § 72–1–2 (1953) (providing that "all waters appropriated for irrigation purposes ... shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water"); § 72–5–22 (providing that "the transfer of title of land in any manner whatsoever shall carry with it all rights to the use of water appurtenant thereto for *irrigation* purposes, unless previously alienated in the manner provided by law" (emphasis added)); *Turner v. Bassett,* 2005–NMSC–009, ¶ 10, 137 N.M. 381, 111 P.3d 701 (noting that under Sections 72-1-2 and 72-5-22, "water that is applied to irrigation becomes appurtenant to the land on which it is used")  . . . .

As indicated by its historical evolution in the West, a primary feature of the prior appropriation doctrine and its concomitant beneficial use requirement was the need for water to be mobile or divertible to other areas of use and not tied to the surrounding land. *See* 2 Joseph W. Dellapenna, Waters and Water Rights 11.02(a), (d) (Robert E. Beck, ed., 1991 ed., 2001 Repl.Vol.) (noting the key attributes of prior appropriation address the need in arid regions to divert and transport water in order to place it to beneficial use). Because water is a scarce commodity in the West, mobility and transferability are necessary to meet changing social goals. This often means moving water from one location to another and also from one use to another. *See Kaiser Steel Corp. v. W.S. Ranch Co.,* 81 N.M. 414, 419, 467 P.2d 986, 991 (1970)(discussing how even private parties may exercise powers of condemnation to construct facilities to transport water and put it to beneficial use such as mining); Clark, *supra,* at 39 (stating that prior appropriation "had released the arid western region from restricting its scant water resources to the limits of riparian lands, making possible the diversion of those waters to areas where they could be applied more effectively").

Water rights are therefore not tied to a particular location or even a particular source. *See* NMSA 1978 § 72-5-23 (1985) (change of place of use); NMSA 1978 § 72-5-24 (1985) (change of purpose); NMSA 1978 § 72-12-7 (1985) (change of location of well for groundwater). As such, water rights are not considered ownership in any particular water source, but rather a right to use a certain amount of water to which one has a claim via beneficial use. *See* Joseph L. Sax, *Rights that "Inhere in the Title Itself": The Impact of the* Lucas *Case on*

*Western Water Law,* 26 Loy. L.A. L.Rev. 943, 944 ("Water has been described as merely usufructuary; as belonging to the public; as subject to public servitudes; as incapable of full ownership; as subject to constraints that it be used nonwastefully, reasonably, beneficially, etc." (citation omitted)). Thus, under prior appropriation, as a separate protected property right, a vested water right can be "sold, leased, or transferred." *KRM,* 1996–NMCA–103, ¶ 5, 122 N.M. 389, 925 P.2d 9.

Walker v. United States, 2007-NMSC-038, 162 P.3d at 888-890.

Despite the Stockman's Association's attempt to portray this claim as an issue of members' vested water rights, however, it is not. Rather, as Fish & Wildlife argue appropriately, this case is indeed, an issue of speculative water rights, meaning that the case does not fall within the legal framework of Walker v. United States, 2007-NMSC-038, 162 P.3d at 882, or Diamond Bar Cattle Co. v. United States, 168 F.3d at 1210, both of which involved plaintiffs' claims of a right of forage incident to their existing, vested water rights. Accordingly, the Court is tasked only with analyzing the reasonableness of Fish & Wildlife's actions under the Endangered Species Act under the Administrative Procedure Act.

### 3. Fish & Wildlife's Actions Related to the Designation of Units 3 and 4 Were Reasonable.

As noted infra, under the Endangered Species Act's § 4(b)(2), Fish & Wildlife is granted discretion to designate critical habitat, and shall do so based on "the best scientific and commercial data available." At the time Fish & Wildlife conducted its economic impact assessment, no data was readily available related to the w Stockman's Associations' members' water rights, and any information related to such water rights was highly speculative. In adhering to the regulations, therefore, Fish & Wildlife decided reasonably to focus its economic impact analysis on foreseeable costs associated with avoiding taking members water rights See Reply at 16. These costs, which readily available source documentation and data support, include cost estimates associated with (i) "the development of alternative water sources for cattle that may be required if fencing limits access to water," Designation Final Rule 81 Fed. Reg. 14, 287 (AR D003442); (ii) "mitigat[ing] the loss of water access to livestock because fencing," Fish & Wildlife Public Comment at 1-2 (AR D003496-97)(stating that these particular estimates relate to establishing "cattle lanes" that allow members' cattle access to water sources even if some riparian areas were to be fenced-off or water is to be piped outside of the exclosure); (iii) potentially reducing AUMs if Fish & Wildlife were to determine that forage or water access would have to be further reduced, Screening Memo at 8, (AR D002742). See Response at 17.

As the Supreme Court of New Mexico noted, "[w]ater rights are . . . not tied to a particular location or even a particular source . . . .  As such, water rights are not considered ownership in any particular water source, but rather a right to use a certain amount of water to which one has a claim via beneficial use." Walker v. United States, 2007-NMSC-038, 162 P.3d at 890.  The Court, therefore, finds reasonable Fish & Wildlife's explanation that it did not calculate costs for the taking of the Stockman's Associations' members' water rights because it was "unaware of any instances where water rights . . . would be significantly impacted by this designation." See Response at 17 (quoting Designation Final Rule, 81 Fed. Reg. 14,283 (AR D003438)).  This conclusion was because, as Fish & Wildlife explains, its critical habitat designation fencing was not proposed nor expected to occur on private lands.  See Response at 17.  See also Designation Final Rule, 81 Fed. Reg. 14,276 (AR D003431); Designation Final Rule, 81 Fed. Reg. 14,281 (AR D003436).  Furthermore, during its planning, Fish & Wildlife indicated that it would take measures to ensure water access remain available within the allotments, meaning Fish & Wildlife did not act unreasonably in believing that none of the members of the Stockman's Associations would be completely prevented from accessing water needed to support their permitted AUMs. See Petition at 17.

Finally, as noted by the Supreme Court of New Mexico and the Tenth Circuit, not all grazers on public land possess water rights.  See Walker, 2007-NMSC-038, 162 P.3d at 888-90; Diamond Bar Cattle Co., 168 F.3d at 1210.  Instead, grazers must demonstrate that they have consistently put the claimed amount of water to beneficial use.  See Walker, 2007-NMSC-038, 162 P.3d at 888-90; Diamond Bar Cattle Co., 168 F.3d at 1210.  In this case, members of the Stockman's Associations cannot point to any data or source available to Fish & Wildlife at the time it devised its economic impact assessment or at the time of its designation of Units 3 and 4 as critical habitats, which either: (i) could identify which members of the Stockman's Association's members had vested water rights, or (ii) could provide economic information regarding the scope or value of the alleged water rights that members now allege have been "taken" in violation of the Fifth Amendment.  Ultimately then, given the severe lack of available "scientific and commercial data," 16 U.S.C. § 1533(b)(1)(A), the Court finds that Fish & Wildlife acted "within its discretion" when choosing "not to include those costs deemed too uncertain or speculative in the total potential incremental cost of the [critical habitat] designation," and, equally, behaved reasonably when

focusing only on the measurable costs related to the critical habit designation as it relates to grazers' access to water.  See Alaska Oil & Gas Ass'n v. Jewell, 815 F.3d at 565.

In the alternative, however, even if the Court were to determine that Fish & Wildlife committed an error in not analyzing the cost of just compensation to the members of the Stockman's Associations related to the cost of their water rights, only prejudicial error requires reversal under the APA.  See Prairie Band Pottawatomie Nation v. Fed. Highway Admin., 684 F.3d 1002, 1008 (10th Cir. 2012).  Here, the Court determines that any error allegedly committed by Fish & Wildlife is harmless, because Fish & Wildlife's cost of compensating members for lost water rights would be subsumed by the costs it already calculated in the economic impact statement related to the potential reduction of AUMs or the reduction in the value of private property associated with the grazing.  See Response at 17 n. 10.  For these reasons, the Court concludes that Fish & Wildlife did not abuse its discretion when failing to consider the costs of just compensation for the alleged taking of water rights held by members of the Stockman's Associations.

**D.**    **EVEN IF FISH & WILDLIFE ABUSED ITS DISCRETION WHEN FAILING TO ACCOUNT FOR COSTS RELATED TO THE WATER RIGHTS OF THE STOCKMAN'S ASSOCIATIONS' MEMBERS IN ITS ECONOMIC IMPACT ANALYSIS, IT DID NOT COMMIT A TAKING UNDER THE FIFTH AMENDMENT.**

**1.**    **The Parties Dispute the Taking Clause's Applicability to the Water Rights of the Stockman's Associations Members.**

As a sub-part of its overarching contentions that Fish & Wildlife abused its discretion in failing to consider costs related to its members' water rights, the Stockman's Associations also argue that the critical habitat designation's interference with their members' water rights constitutes a taking under the Fifth Amendment requiring just compensation.  See Petition at 24-25 (citing Sacramento Grazing Association, Inc. v. United States, 135 Fed. Cl. at 197.  In turn, Fish & Wildlife rebuts the constitutional theory of the Stockman's Associations theory, arguing that, even if members had advanced, more than "speculative" evidence demonstrating their legal entitlement to water rights on Units 3 and 4, those alleged water rights are not "'tied to a particular location or even a particular source'; [and] as long as water can be accessed, even if from a different location, no taking has occurred."  Response at 15 (quoting Walker v. United States, 2007-NMSC-038, 162 P.3d at 890).  In addition, Fish & Wildlife cites Walker v. United States as a basis for its argument that no taking can occur when members still have access to water sources, even if those sources are located elsewhere  See Response at 15 (citing 2007-NMSC-038, 162 P.3d at 890).

Based on this legal principle, Fish & Wildlife emphasize that (i) the members of the Stockman's Associations can still access grazing-allotment water sources in the purportedly burdened areas of the designation through existing cattle lanes, see Response at 15, (ii) the agency has outlined plans for future installments of cattle lanes to maintain access to water sources within the designation, see Response at 15,  and (iii) there is an availability of water sources outside of the critical habitat designation, as the Administrative Record and publicly available documents subject to judicial notice show.  See Response at 10 (citing Designation Final Rule, 81 Fed. Reg. 14,287; 14,320-21; Designation Final Rule 81 Fed. Reg. 14, 287 (AR D003442); Fish & Wildlife Public Comment at 1-2 (AR D003496-97)).  See also Declaration of Devon Lea Flanagan on Behalf of U.S. Fish & Wildlife  ¶¶ 5-8, at 2-3 (dated September 23, 2019), filed September 23, 2019 (Doc. 32-1); New Mexico Meadow Jumping Mouse (*Zapus hudsonius luteus*) Report, at 3 (dated September 23, 2019), filed September 23, 2019 (Doc. 32-1)("Cattle lanes will be installed in all of their exclosure areas to maintain access to water for cattle grazing on allotments where fencing is being installed.").[33]

### 2.      Federal Takings Law Covers State and Local Governments' Advanced Public Purposes.

The Takings Clause, "applicable to the States through the Fourteenth Amendment, . . . declares that 'private property' shall not "be taken for public use, without just compensation." U.S. Const. amend. V.; Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001).  See Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226 (1897).  The Supreme Court has read public use to encompass a number of "public purposes" that state and local governments advance.  Kelo v. City of New London, Conn., 545 U.S. 469, 479-80, (2005).  See Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 241 (1984).  See also Berman v. Parker, 348 U.S. 26, 75 (1954).  Equally, the Supreme Court also has determined that a number of advanced public uses have constituted government takings under the Fifth Amendment.  See e.g., Palazzolo v. Rhode Island, 533 U.S. at 617; Lucas

---

[33]Fish & Wildlife concedes that Medeiros is the only declarant from the Stockman's Associations who asserts specific facts relating to their takings argument based on her contention that fencing has been proposed on the Agua Chiquita creek, which her ranch uses to water cattle. See Response at 10 (quoting Medeiros Decl. ¶ 13, at 3).  Here too, however, Fish & Wildlife undermine Medeiros' assertion, arguing that the evidence still fails to demonstrate an imminent injury necessary to show a taking has occurred.  See Response at 10.  This scenario is because, as Fish & Wildlife explains, there are maps in the record demonstrating that the fencing on Agua Chiquita creek currently has and, as proposed, will continue to designate cattle lanes to ensure water access.  See Flanagan Decl. ¶ 7, at 2-3.  Fish & Wildlife also reference another map that shows numerous other water sources available within the same pasture.  See Flanagan Decl. ¶ 8, at 3

v. South Carolina Coastal Council, 505 U.S. at 1015; Agins v. City of Tiburon, 447 U.S. at 261; Brown v. Legal Foundation of Wash., 538 U.S. 216, 231-232 (2003); Armstrong v. United States, 364 U.S. 40, 49 (1960).

For example, a government actor can "take" property for Fifth Amendment purposes either by physically depriving the owner of the property or by placing upon the property such restrictive regulations that the owner is effectively deprived of the ability to use the property.  See Palazzolo v. Rhode Island, 533 U.S. at 617 (2001)(noting that "even a minimal permanent physical occupation of real property requires compensation under the Clause," and that "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause")(internal quotations omitted).  The Supreme Court has recognized even that the occurrence of takings "when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent." Palazzolo v. Rhode Island, 533 U.S. at 617 (citation omitted).   Justice Holmes articulated an important limitation in proscribing the extent of government regulation of private property rights: "[W]hile property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking."  Palazzolo v. Rhode Island, 533 U.S. at 617 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. at 415).  With this principle as a guide, the Supreme Court has offered some benchmarks to direct lower courts in their determinations regarding "whether a particular government action goes too far and effects a regulatory taking." Palazzolo v. Rhode Island, 533 U.S. at 617.  In Lucas v. South Carolina Coastal Council, for instance, the Supreme Court determined that, notwithstanding certain qualifications, "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." 505 U.S. at 1015. See also 505 U.S. at 1035 (Kennedy, J. concurring); Agins v. City of Tiburon, 447 U.S. at 261.  Yet, even:

> Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.

Palazzolo v. Rhode Island, 533 U.S. at 617 (citing Penn Central Transportation Co. v. New York City, 438 U.S. at 124.  For a Takings Clause claim, state law determines what property rights exist. See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. at 707 ("Generally speaking, state law defines property interests . . . ."); Vandevere v. Lloyd, 644 F.3d at

963( "[W]e look to state law to determine what property rights exist and therefore are subject to 'taking' under the Fifth Amendment.").

### 3.    The Stockman's Associations Members Do Not Offer Evidence Showing Actual Property Ownership in the Alleged Water Rights at Issue.

The Stockman's Associations argue that, by limiting their abilities to graze cattle on Units 3 and 4, Fish & Wildlife has enacted a barrier between the members and their water rights.  See Petition at 17-18.  This barrier, according to the Stockman's Associations, results in members' inabilities to use their water rights, thus eliminating the water rights in their entirety.  The Court declines to adopt this argument in full.  New Mexico state law determines the nature of any alleged property interest taken by the federal government.  See Walker v. United States, 69 Fed. Cl. 222, 223–24 (2005)("Walker II"), certified question answered, Walker v. United States, 2007-NMSC-038, 162 P.3d at 882.  In New Mexico, water rights are an interest separate from ownership of the associated surface estate.  See Walker v. United States, 007-NMSC-038, 162 P.3d at 885 (citing Walker II, 69 Fed.Cl. at 227).

The argument that the Stockman's Associations advance here is similar to the argument that the plaintiffs advanced unsuccessfully in Walker v. United States, 2007-NMSC-038, 162 P.3d at 886.  Unlike the plaintiffs in Walker, however, here, as the Court explained, the members of the Stockman's Associations have failed to offer evidence showing actual property ownership of the alleged water rights at issue.  Even assuming, however, that the members of the Stockman's Association have established vested water rights -- meaning they have shown that they have put the alleged amount of water to beneficial use since before the United States withdrew the land at issue from the public domain, see Walker v. United States, 2007-NMSC-038, 162 P.3d at 888-90; Diamond Bar Cattle Co. v. United States, 168 F.3d at 1210 (10th Cir. 1999) -- those vested water rights have not been forced into non-use.  The Court reaches this conclusion based on the Supreme Court of New Mexico's principle that, "even if appurtenant to [the critical habit designation units], water rights can be severed from that land and applied to another use at a different location."  Walker v. United States, 2007-NMSC-038, 162 P.3d at 882.  Namely, as with other forms of alienable property rights, water rights can be "severed from the allotments, moved to other lands, used for other purposes, or even sold."  Walker v. United States, 2007-NMSC-038, 162 P.3d at 892 (citing Colvin Cattle Co. v. United States, 67 Fed. Cl 568, 570 (2005);  § 72-5-23 (laying out

the process for changing place of use of an appurtenant water right); New Mexico Statutes (NMSA) 1978 § 72-5-24 (laying out the process for changing the purpose of use and place of diversion for a vested water right);  NMSA 1978 § 72-12-7 (laying out the process for changing well location and use); Mathers v. Texaco, Inc., 421 P.2d 771, 778 (1966) (noting that New Mexico statutes "expressly recognize that the right to use water upon certain lands may be severed from such lands and become appurtenant to other lands, or may be transferred for other purposes and other uses"); Tarlock, 41 Nat. Resources J. at  777 ("Water rights, despite their usufructuary character, have always been treated as transferable property rights.").

With this directive as a guide, the Court finds convincing the map exhibits that Fish & Wildlife submits, which indicate collectively that grazing-allotment water sources still can be accessed both within the critical designation – through existing cattle lanes -- as well as outside of the designation through other available water sources.  See Response at 15.  See also , e.g., Designation Final Rule 81 Fed. Reg. 14, 287 (AR D003442); Jumping Mouse Designation, 81 Fed. Reg. 14,319-20 (AR D003475-76); Fish & Wildlife Public Comment at 1-2 (AR D003496-97); Flanagan Decl., ¶  ¶ 7-8, at 2-3.  Therefore, "the value of the [members of the Stockman's Associations] water rights[s] do[] not depend entirely on stock watering at the same location." Walker v. United States, 2007-NMSC-038, 162 P.3d at 892 (citing Colvin Cattle Co. v. United States, 67 Fed. Cl at 570)(noting that although a rancher was no longer permitted to graze cattle on certain Bureau of Land Management ("BLM") lands, he continued to have a vested water right appurtenant to said lands, and thus the newly authorized rancher on the BLM lands had to haul in his own water).  As long as water can be accessed -- even if from a different location -- no taking has occurred.  See Walker v. United States, 2007-NMSC-038, 162 P.3d at 890.

In addition, even if the Court were to continue operating under the assumption that the members of the Stockman's Associations maintain vested water rights, "the requirement that water must be put to beneficial use does not give rise to an interminable right to continue that same beneficial use."  Walker v. United States, 2007-NMSC-038, 162 P.3d at 892 (citing First State Bank of Alamogordo v. McNew, , 33 N.M. 414, 437 (1928)("It . . . does not follow that, because water has been appropriated for a particular use, it forever thereafter must be applied to that use.")). The Supreme Court of New Mexico's offers an apt example to support this proposition, explaining that, "if one acquires a water right by beneficially using water in a milling operation, which

operation is subsequently shut down because environmental violations, the mill operator cannot claim a right to continue milling just to protect the water rights." Walker v. United States, 2007-NMSC-038, 162 P.3d at 892.  Accordingly, and similar to the challenges that the plaintiffs faced in Walker v. United States, even if the members of the Stockman's Association owned permits to graze on Units 3 and 4, which impliedly grant them water rights on those allotments, the permits, and the water rights necessarily, are "conditions on the permission of the federal government to go on the land." 2007-NMSC-038, 162 P.3d at 892.  Now,  members of the Stockman's Associations have lost the license to graze on this land, "they cannot now rely on a right to continue a particular beneficial use to maintain the water right that they were able to acquire by way of government permission in the first place."  2007-NMSC-038, 162 P.3d at 892.  For these reasons, the Court holds that the laws of New Mexico do not support the claim of the Stockman's Associations that Fish & Wildlife have taken their members' water rights through the critical habitat designation of Units 3 and 4.  The members, therefore, are not entitled to just compensation for those rights.

**IV.      FISH & WILDLIFE HAS NOT ACTED ARBITRARILY OR CAPRICIOUSLY, OR ABUSED ITS DISCRETION, BY NOT EXCLUDING UNITS 3 AND 4 FROM THE CRITICAL HABITAT DESIGNATION.**

The next argument of Stockman's Associations is that Fish & Wildlife has violated the Endangered Species Act and the APA by failing to provide a reasoned explanation for not excluding Units 3 and 4 from the critical habitat designation. See Petition at 26 (citing 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1533(b)(2)).  As foundational basis for the argument, the Stockman's Associations first reference Weyerhaeuser, where the Supreme Court concluded that Fish & Wildlife's decisions whether to exclude areas from a critical habitat designation may be subject to judicial review for abuse of discretion. See Petition at 26 (citing Weyerhaeuser, 139 S. Ct. at 371).  Relatedly, the Stockman's Associations argues that the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to balance economic and other impacts when deciding whether to exclude areas from critical habitat designation, and then provide a reasoned explanation for its final decision. See Petition at 26 (citing Judulang v. Holder, 565 U.S. 42, 53 (2011)).  The Stockman's Associations, therefore, find problematic Fish & Wildlife's finalization of the critical habitat designation where it "declined to exclude Units 3 and 4 from the designation because it purportedly could not identify 'any disproportionate costs that are likely to result from the designation.'" Petition at 26 (quoting Endangered and Threatened Wildlife and Plants; Designation of Critical

Habitat for the New Mexico Meadow Jumping Mouse; Final Rule, 81 Fed. Reg. 14,264, 14,307 (March 16, 2016)(to be codified at 50 C.F.R. pt. 17)("Jumping Mouse Designation")).  They assert that Fish & Wildlife's decision rationale was "fatally vague and indecisive,"  Petition at 27 (citing SEC v. Chenery Corp., 332 U.S. 194 (1947)), and its "failure to explain its decision is, by definition, an abuse of discretion,"  Petition at 16 (citing Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  The Stockman's Associations further demand that Fish & Wildlife set forth a decision-making standard for determining whether to exclude areas from critical habitat designation, and that otherwise, the agency's process  will be opaque and amorphous.  See Petition at 29-30.  Fish & Wildlife's failure to develop a decision-making standard, the Stockman's Associations warn, could lead to negative consequences  such as "keeping the public in the dark," and courts having no "yardstick to measure the rationality of Fish & Wildlife's determinations."  Petition at 29-30 (citing Sierra Club v. Salazar, 177 F. Supp. 3d 512, 532 (D.D.C. 2016)(Walton, J.)).

Fish & Wildlife counter that it did not act arbitrarily or capriciously, or abuse its discretion, in its decision to not exclude Units 3 and 4 from the critical habitat designation.  See Response at 24.  As an initial matter, however, Fish & Wildlife argues that the Court need not review the issue because the Stockman's Associations have waived administratively the claim as to the non-exclusion of Units 3 and 4, except with respect to Subunit 3c, because "neither [the Stockman's Associations] nor any other individual raised this issue during the public comment periods."  Response at 24.  It maintains that contentions not pressed upon an agency during its decision-making process should not be eligible for judicial review, because, without notice, an agency does not have enough time or resources to "'ferret out every possible alternative' and explicitly and individually discuss why they did not exclude every possible segment of critical habitat."  Response at 24 (quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 551 (1978), and citing Wilson v. Hodel,758 F.2d 1369, 1372-73 (10th Cir. 1985)).  Here, Fish & Wildlife argues that the Stockman's Associations had reasonable notice to issue public comments, given that the agency issued the proposed designation along with an economic impacts analysis for possibly excluding particular areas from the designation, and "*explicitly* solicited comments regarding the exclusion of other areas."   Response at 24-25 (emphasis in original)(citing Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for the

New Mexico Meadow Jumping Mouse, 78 Fed. Reg. 37,328, 37,328-62 (proposed June 20, 2013)(to be codified at 50 C.F.R. pt. 17)("Proposed Mouse Designation"); Proposed Mouse Designation; reopening of comment period, 79 Fed. Reg. 19,307, 19,308-10 (reopened April 8, 2014)(to be codified at 50 C.F.R. pt. 17)).  Fish & Wildlife argues further that, although some public commenters "opposed the *designation* of Units 3 and 4 as critical habitat" based on procedural defects or the habitat's biological incompatibilities, there are different critical habitat analyses associated with designating versus excluding areas under the Endangered Species Act's § 4(b)(2).  Response at 24 n.12 (emphasis in original)(citing Charles N. Lakins, Esq., Public Comments on Proposed Mouse Designation at 3 (posted Aug. 22, 2013), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0035 (last visited June 15, 2020); Charles, N. Lakins, Esq., Public Comments on Proposed Mouse Designation at 8 (posted May 8, 2014), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0055 (last visited June 15, 2020); Pete Domenici, Esq., Public Comments on Proposed Mouse Designation at 4 (issued May 8, 2014)(not posted); Judyann Medeiros, Public Comments on Proposed Mouse Designation, D003490 (posted May 9, 2014), https://www.regulations.gov/document?D=FWS-R2-ES-2013-0014-0088 (last visited June 15, 2020)).  Fish & Wildlife asserts that, because the Stockman's Associations and their members "'did not raise this argument in [their] comments on the proposed rule, [they] cannot raise it now,' and [the] Court should dismiss this claim for all but Unit 3C."  Response at 25 (quoting US Magnesium, LLC v. EPA, 690 F.3d 1157, 1167 n.3 (10th Cir. 2012)).

In the alternative, however, if the Court determines that the Stockman's Associations did not waive this claim, Fish & Wildlife maintains that, its decision not to exclude Units 3 and 4 from the designation was a reasonable use of its discretion, see Response at 25, because "Section 4(b)(2) provides that Fish & Wildlife 'may exclude any area from critical habitat if [the Secretary] determines that the benefits of such exclusion outweigh the benefits' of inclusion, and exclusion will not cause the species' extinction."  Response at 25 (quoting 16 U.S.C. § 1533(b)(2))(alteration added).  Fish & Wildlife indicates that several courts have determined that Fish & Wildlife has discretion whether to exclude areas from critical habitat and, until recently, its exclusion decisions were not eligible for judicial review.  See Response at 25 (citing Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce, 792 F.3d 1027, 1034-35 (9th Cir. 2015); Cape Hatteras Access

Pres. All. v. U.S. Dep't of Interior, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010)(Lamberth, J.)).  It also indicates that, in 2018, although the Supreme Court concluded in Weyerhaeuser, 139 S. Ct. at 371, that Fish & Wildlife's decisions whether to exclude areas from critical habitat designation may be reviewed judicially for abuse of discretion, the Supreme Court also qualified the holding, stating that the "'[t]he use of the word "may"' in the second sentence of Section 4(b)(2) 'certainly confers discretion on the Secretary.'" 139 S. Ct. at 371.  Altogether, Fish & Wildlife asserts that it "has broad discretion over exclusion and is never *required* to exclude an area even if the benefits of exclusion outweigh the benefits of inclusion." Response at 25-26 (emphasis in original).

Considering the parties' arguments in full, the Court will address first the issue of the Stockman's Association's administrative waiver.  Here, the Court concludes that the Stockman's Associations have waived their claim challenging Fish & Wildlife's decision not to exclude Units 3 and 4, because members failed to raise their concerns regarding the exclusion of the Units based on findings of the economic impacts analysis during the public comment period that Fish & Wildlife provided.  Notwithstanding the Court's determination of this question, however, it will subsequently proceed to analyze the merits of the argument of the Stockman's Associations that Fish & Wildlife's decision not to exclude Units 3 and 4 from the critical habitat designation was an unreasonable abuse of its discretion.  Here, too, the Court finds in favor of Fish & Wildlife, determining ultimately that Fish & Wildlife has not acted arbitrarily or capriciously, or abused its discretion, by not excluding Units 3 and 4 from the critical habitat designation, because it provided a sufficiently reasoned explanation for so acting, which underscores its conclusion that there are no disproportionate costs associated with the designation's boundaries.

### A. THE STOCKMAN'S ASSOCIATIONS HAVE ADMINISTRATIVELY WAIVED THEIR CLAIM CHALLENGING FISH & WILDLIFE'S DECISION NOT TO EXCLUDE UNITS 3 AND 4.

"Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice." Wilson v. Hodel, 758 F.2d at 1372–73 (quoting United States v. L.C. Tucker Truck Lines, 344 U.S. 33, 37 (1952).  See also Federal Power Commission v. Colorado Interstate Gas, 348 U.S. 492, 498–499 (1955).  "Time and resources are simply too limited" for a court to determine that an agency's final decision fails "because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at

the time the project was approved." Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 551 (1978).   In fact, "[a] reviewing court usurps the agency's function when it sets aside the administrative determination on a ground not theretofore presented . . . ." Wilson v. Hodel, 758 F.2d at 1373 (quoting Unemployment Compensation Commission of Territory of Alaska v. Aragan, 329 U.S. 143, 155 (1946)). "Thus, absent exceptional circumstances, a reviewing court will not consider contentions which were not pressed upon the administrative agency." US Magnesium, LLC v. U.S. E.P.A., 690 F.3d 1157, 1167 (10th Cir. 2012) (citing Unemployment Compensation Commission of Territory of Alaska v. Aragan, 329 U.S. at 155). See also Hormel v. Helvering, 312 U.S. 552, 557 (1940)).

Conforming to appropriate agency practice, here, Fish & Wildlife issued both a proposed rule and a notice regarding its economic impact assessment, in which it identified areas it was considering for exclusion from the critical habitat designation and explicitly solicited comments regarding the exclusion of other areas. See Reopening of Comment Period, 79 Fed. Reg. 19,308-10 (AR D002894-96); Proposed Mouse Designation, 78 Fed. Reg. 37,329-362 (AR D002481-515).  Not once during the open comment period did a public commenter propose that either Units 3 or 4 be excluded from the critical habitat designation under the Endangered Species Act's § 4(b)(2) because of either the disproportionate economic impacts of including the Units in the analysis or because the benefits of exclusion outweighed the benefits of inclusion.  See Commenters only raised concerns regarding the disproportionate economic impact of conclusion in relation to Unit 3c. See  Response at 24. See also Response at 24, n.12 (citing Lakins, Public Comments on Proposed Mouse Designation at 3 (posted Aug. 22, 2013); Lakins, Public Comments on Proposed Mouse Designation at 8 (posted May 8, 2014); Domenici, Esq., Public Comments on Proposed Mouse Designation at 4 (issued May 8, 2014)(not posted); Medeiros, Public Comments on Proposed Mouse Designation, (AR D003490) (posted May 9, 2014),

Yet, despite the Stockman's Association's failure to submit comments related either to the disproportionate economic impacts or to the benefits of exclusion outweighing the benefits of inclusion in relation to Units 3 and 4 during the open comment period, they insist that they "'can satisfy the exhaustion requirement merely by making a 'general objection' under a statute to an agency action without referencing any specific violations of that statute.'"  Reply at 11 (quoting Or. Nat. Desert Ass'n v. McDaniel, 751 F. Supp. 2d 1151, 1161 (D. Or. 2011)(Papak, J.)).

Accordingly, as the Stockman's Associations suggest, both Associations did just that by "submitt[ing] a notice letter to the Service, apprising the agency of the specific deficiencies in its exclusion decision-making, prior to filing suit."   Reply at 11.   Relatedly, the Stockman's Associations reference the comment letter that the Northern N.M. Stockman's Association submitted during the rulemaking process, in which it raised a general objection to the Jumping Mouse's critical habitat designation.  See Salazar, Comments on New Mexico Jumping Mouse Designation of Critical Habitat at 1-3 (AR D002921-23)(issued May 7, 2014)(not posted).  The letter also highlights the potential harms that the designation of Units 3 and 4 poses to ranchers' water rights, grazing leases, base properties.  See Salazar, Comments on New Mexico Jumping Mouse Designation of Critical Habitat at 1-2 (AR D002921-22)(issued May 7, 2014)(not posted). For example, one member of the Stockman's Associations, who owns a Santa Fe National Forest grazing permit, submitted a comment during the open period stating that "designation of critical habitat is . . . going to hurt our business."  Johnson, Public Comments Processing: US Fish & Wildlife Service Designation of Critical Habitat for the Jumping Mouse at 2 (AR D002986) (issued May 8, 2014)(not posted).   She explained subsequently that he "personally fe[lt] that the livestock industry is being targeted."  Johnson, Public Comments Processing: US Fish & Wildlife Service Designation of Critical Habitat for the Jumping Mouse at 2 (AR D002986) (issued May 8, 2014)(not posted).  Another member of the Stockman's Association, who owned a grazing permit in the Lincoln National Forest, submitted a comment issuing a general objection to Fish & Wildlife's denial of members' grazing and water rights.  Holcomb Lt Col USAF (RET) Comment on Proposed Agua Chiquita Habitat at 1-2 (AR D002905-06) (issued April 27, 2014(posted May 5, 2014).  He also questions the agency's mouse conservation policy that, in his opinion, "has already been proven to be a dismal failure." Holcomb Lt Col USAF (RET) Comment on Proposed Agua Chiquita Habitat at 2 (AR D002906) (issued April 27, 2014(posted May 5, 2014).

First, aside from an out-of-Tenth Circuit opinion from the U.S. District Court for the District of Oregon, the Stockman's Associations can cite no binding authority to support their premise that they "'can satisfy the exhaustion requirement merely by making a 'general objection' under a statute to an agency action without referencing any specific violations of that statute.'" Reply at 11 (quoting Or. Nat. Desert Ass'n v. McDaniel, 751 F. Supp. 2d at 1161).  The Court,

therefore, concludes that the argument is unconvincing, particularly, given that the premise runs against the general principles of fairness both to agencies and to future litigants that motivates the rule under Wilson v. Hodel, 758 F.2d at 1372-73.  The Stockman's Associations also similarly do not to respond to the rule enunciated in the other binding authority on point,  US Magnesium, LLC v. U.S. E.P.A., 690 F.3d at 1167, in that they offer no "exceptional circumstances" excusing their failure to respond directly to the  Wilson v. Hodel  rule, in that they advance "exceptional circumstances" justifying their lack of submission of relevant comments related to Units 3 and 4 during the open comment period.  See 758 F.2d at 1372-73.  See also Response at 24.

Nonetheless, as Fish & Wildlife concedes, and as the Court recognizes now, during this period, some members of the Stockman's Associations did oppose the designation of Units 3 and 4 as critical habitats.  See Response at 24.  It is axiomatic, however, based on a mere reading of the content of those comments, that the written opposition related not to the specific disproportionate economic impacts grounds for excluding Units 3 and 4, but rather, related only to general opposition against the designation of the units as critical habitats -- opposition that was voiced either on biological grounds, see Lakins, Public Comments on Proposed Mouse Designation at 3 (AR D002376)(posted Aug. 22, 2013; Lakins, Esq., Public Comments on Proposed Mouse Designation at 8 (AR D003054)(posted May 8, 2014); Domenici, Public Comments on Proposed Mouse Designation at 4 (AR D002990)(issued May 8, 2014)(not posted); Medeiros, Public Comments on Proposed Mouse Designation, (AR D003490)(posted May 9, 2014), or on procedural defect grounds, see Lakins, Esq., Public Comments on Proposed Mouse Designation at 8 (AR D003054)(posted May 8, 2014).  Under the directives of both the Supreme Court and the Tenth Circuit, however, general opposition made by the Stockman's Association's members to the designation of Units 3 and 4 on other grounds aside from the disproportionate economic impact contention that they raise now in litigation, do not offer fair notice to Fish & Wildlife, an agency whose "[t]ime and resources" are already limited given the invariable demands of its work and wide-scale planning.  Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 551 (1978).  Moreover, if given notice that the members of the Stockman's Association's had concerns about its economic rationales, which, in Fish & Wildlife's calculation, reasonably justifies the inclusion of Units 3 and 4 within the critical habitat designation, then Fish & Wildlife would have had adequate time to consider "possible alternative[s]" of land to include

within the general region, which could have accomplished adequately its overarching conservation objectives relating to the jumping mouse.  Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. at 551.  Fish & Wildlife did not need to consider alternatives in this case, however, because the lack of commentary the Stockman's Associations members voiced regarding the specific disproportionate economic impacts in relation to the inclusion of Units 4 and 4 within the critical habitat designation meant that the concern was "uncommon" or "unknown" at the time that Fish & Wildlife proceeded to approve the final boundaries of the critical habitat designation. Absent "exceptional circumstances," therefore, which the Stockman's Associations do not allege here, see US Magnesium, LLC v. U.S. E.P.A., 690 F.3d at 1167, it would be presumptuous for the Court to now overstep its Article III role by undermining Fish & Wildlife's final decisions on grounds that the agency lacked notice until this litigation.  See US Magnesium, LLC v. U.S. E.P.A., 690 F.3d at 1167.  For these reasons, the Court concludes that the Stockman's Associations have waived their argument that Fish & Wildlife erred in not excluding Units 3 and 4, apart from Unit 3C, from the critical habitat designation under the Endangered Species Act's § 4(b)(2).

**B.  FISH & WILDLIFE DID NOT ACT ARBITRARILY OR CAPRICIOUSLY OR ABUSE ITS DISCRETION BY NOT EXCLUDING UNITS 3 AND 4 FROM THE CRITICAL HABITAT DESIGNATION, BECAUSE IT PROVIDED A SUFFICIENTLY REASONED EXPLANATION FOR THE INCLUSION OF THE UNITS THAT EMPHASIZES THAT THERE ARE NO DISPROPORTIONATE ECONOMIC IMPACTS AND THE BENEFITS OF EXCLUSION DO NOT OUTWEIGH THE BENEFITS OF INCLUSION.**

Notwithstanding the Court's conclusion that the Stockman's Associations have waived their argument on the issue, the Court still holds that Fish & Wildlife do not act arbitrarily or capriciously, or abuse its discretion, by not excluding Units 3 and 4 from the critical habitat designation.  In making the determination, the Court finds reasonable Fish & Wildlife's explanation for its decision not to exclude Units 3 and 4, which emphasized the agency's findings that there are no disproportionate economic costs related to the Units' inclusion, and their exclusion within the designation does not outweigh the benefits of their inclusion.

**1.  Fish & Wildlife's is Granted Power Under the Endangered Species Act's Section 4 (b)(2) in Making Species-Listing Determinations and Critical Habitat Designations.**

The Endangered Species Act's purpose "is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C.

§ 1531(b).  The Endangered Species Act, in turn, governs Fish & Wildlife's rulemaking when listing species as threatened or endangered, and designating species' critical habit.  <u>See</u> 16 U.S.C. § 1531(b).  In so doing, the Endangered Species Act directs Fish & Wildlife to promulgate species-listing regulations by determining whether a species is threatened or endangered based on factors such as: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range;  (B) overutilization for commercial, recreational, scientific, or educational purposes; . . . [and] (E) other natural or manmade factors affecting its continued existence."  16 U.S.C. § 1533(a)(1)(A)-(B), (E).  Fish & Wildlife shall make species-listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).  The Tenth Circuit interprets § 1533(b)(1)(A) as prohibiting Fish & Wildlife from considering economic impacts of listing decisions.  <u>See</u> <u>N.M. Cattle Growers Ass'n</u>, 248 F.3d at 1280.

Fish & Wildlife, while listing species in accordance with regulations promulgated not inconsistent with 16 U.S.C. § 1533(b), shall prudently and concurrently "designate any habitat of [the threatened or endangered species] which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i).  Fish & Wildlife shall "designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  Fish & Wildlife may exclude any designated area of critical habitat "if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . failure to designate such area as critical habitat will result in the extinction of the species concerned."  16 U.S.C. § 1533(b)(2). The Endangered Species Act's interagency consultation provision mandates that:

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.

16 U.S.C. § 1536(a)(2).

### 2.    Fish & Wildlife's Decisions Under the Endangered Species Act Must Afford the Conservation of Threatened and Endangered Species the Highest Priority.

The Supreme Court in <u>Tenn. Valley Auth.</u> enjoined the almost-completed construction of Tellico Dam, which cost nearly $80,000,000.00 to build, because the plaintiff could not ensure

that the dam's construction would not "jeopardize the snail darter or its critical habitat." 437 U.S. at 165-66, 168, 173, 195.  It concluded that Congress intended actions taken under the Endangered Species Act to afford endangered species the highest priority.  See 437 U.S. at 174.  The Supreme Court also determined the Endangered Species Act's plain language indicates that "Congress viewed the value endangered species as "'incalculable.'"  437 U.S. at 187 (quoting H.R. 37, 93d Cong. (1973-74))(pagination unavailable).  It reasoned that, even though enjoining the dam's construction would have substantial economic and social consequences, Congress enacted the Endangered Species Act "to halt and reverse the trend toward species extinction, whatever the cost." 437 U.S. at 184.

### 3.  Federal Courts May Review Fish & Wildlife's Decisions Under an Abuse of Discretion Standard.

The Supreme Court in Weyerhaeuser determined that the Endangered Species Act's § 4(b)(2) critical-habitat-exclusion provision, which states that:

> The Secretary [of the Interior] may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area . . . unless he determines . . . that the failure to designate such area as critical habitat will result in the extinction of the species concerned,

is not exempt from judicial review as an APA, § 701(a)(2) exception.  Weyerhaeuser, 139 S. Ct. at 371-72 (quoting 16 U.S.C. § 1533(b)(2))(alterations added)(omissions in original).  It indicates that the § 701(a)(2) exception only applies in the few cases where courts generally view a particular agency decision as unreviewable, "such as the allocation of funds from a lump-sum appropriation, or a decision not to reconsider a final action." Weyerhaeuser, 139 S. Ct. at 370 (citing Lincoln v. Vigil, 508 U.S. at 191; ICC v. Locomotive Eng'rs, 482 U.S. 270, 282 (1987)).  Comparatively, challenges to Fish & Wildlife's impact analysis for its exclusion decisions is "the sort of routine dispute that federal courts regularly review."  139 S. Ct. at 370.  The Supreme Court concludes that the § 701(a)(2) exemption applies only to statutory provisions lacking agency decision-making standards against which courts may review such agency decisions for abuse of discretion. See Weyerhaeuser, 139 S. Ct. at 370 (citing Lincoln v. Vigil, 508 U.S. at 191).  It determined that the procedural mandate of the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to evaluate economic and other impacts before deciding whether to exclude a designated area of critical habitat.  See Weyerhaeuser, 139 S. Ct. at 370.  The Supreme Court recognized that the Endangered Species Act's exclusion provision was not "'drawn so that a court would have no meaningful standard against which to judge [the Secretary's] exercise of [his] discretion' not to

exclude." 139 S. Ct. at 371-72 (quoting <u>Lincoln v. Vigil</u>, 508 U.S. at 191)(alterations in original).

Overall, it held that Fish & Wildlife's exclusion decisions are reviewable judicially for abuse of

discretion, because, even though the word "'may' confers discretion on the Secretary [of the

Interior]," Fish & Wildlife's discretionary exclusion decisions were not independent from the

Endangered Species Act's § 4(b)(2) procedural mandate. <u>Weyerhaeuser</u>, 139 S. Ct. at 371.

### 4. The Application of the Endangered Species Act's § 4(b)(2) on Fish & Wildlife's Exclusion Decisions Related to the Jumping Mouse's Critical Habitat Designation.

The Court's fundamental inquiry whether Fish & Wildlife abused its discretion in its

decision to includes Units 3 and 4 within the critical habitat designation for the Jumping Mouse,

must begin with an assessment of the specific wording of the Endangered Species Act's § 4(b)(2),

which, provides explicitly that Fish & Wildlife "may exclude any area from critical habitat if it

determines that the benefits of such exclusion outweigh the benefits of inclusion, and exclusion

will not cause the species' extinction." 16 U.S.C. § 1533(b)(2). As noted infra, the Supreme Court

acknowledges in <u>Weyerhaeuser</u> that "[t]he use of the word 'may'" in § 4(b)(2) "certainly confers

discretion on the Secretary." 139 S. Ct. at 371. The Court, similarly, concludes that Congress'

inclusion of the specific word "may" was deliberate, as to provide Fish & Wildlife the reasonable

discretion to carry out the Endangered Species Act's paramount objectives, which include ensuring

that the United States' best-placed agencies are enabled to act appropriately and efficiently in

"provid[ing] a means whereby the ecosystems upon which endangered species and threatened

species depend may be conserved [and] to provide a program for the conservation of such

endangered species and threatened species." 16 U.S.C. § 1531(b).

Until 2018, courts around the country have deferred consistently to the administrative

powers that Congress granted to Fish & Wildlife under the Endangered Species Act's § 4(b)(2) to

a point of declaring the agency's discretion not subject to judicial review pursuant to 5 U.S.C. §

701(a)(2). <u>See, e.g.</u>, <u>Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce</u>, 792 F.3d

1027, 1035 (9th Cir. 2015)(holding that the National Marine Fisheries Service's decision not to

exclude certain areas from critical habit designation is "unreviewable," because, under 5 U.S.C. §

701(a)(2), "an agency's decision not to exclude critical habitat is unreviewable . . . if the agency

action is 'committed to agency discretion by law'" (quoting 5 U.S.C. § 701(a)(2))); <u>Cape Hatteras</u>

<u>Access Pres. All. v. U.S. Dep't of Interior</u>, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010)(Lamberth,

J.)("Although there is a strong presumption that agency action is reviewable, the APA codifies the

traditional exception that agency action is not reviewable when it is 'committed to agency discretion by law.'" (quoting 5 U.S.C. § 701(a)).  Without question, then, the Supreme Court's decision in <u>Weyerhaeuser</u> represents seemingly a dramatic departure in shifting what once was viewed as complete "committ[ment] to agency discretion" in relation to the evaluation of Fish & Wildlife's discretion over whether to exclude an area of critical habitat from a given designation. 139 S. Ct. at 371.  As a result, courts are now able to evaluate Fish & Wildlife's decisions regarding whether to exclude an area from critical habitat under an abuse of discretion standard. <u>Weyerhaeuser</u>, 139 S. Ct. at 371.  In so doing, courts may inquire whether the agency "appropriately considers all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion." <u>Weyerhaeuser</u>, 139 S. Ct. at 371.

The Court urges the Stockman's Associations, however, not to overplay the significance of the <u>Weyerhaeuser</u> ruling in connection with the facts at hand.  Even under the abuse of discretion standard under <u>Weyerhaeuser</u>, 139 S. Ct. at 371,  the Court concludes that Fish & Wildlife acted reasonably in accordance with its statutory grant of power under the Endangered Species Act's § 4(b)(2).

**C.  FISH & WILDLIFE DID NOT ACT ARBITRARILY OR CAPRICIOUSLY OR ABUSE ITS DISCRETION BY NOT EXCLUDING UNITS 3 AND 4 FROM THE CRITICAL HABITAT DESIGNATION BECAUSE IT PROVIDED A SUFFICIENTLY REASONED EXPLANATION FOR THE INCLUSION OF THE UNITS THAT EMPHASIZED THE FACTS THAT THERE WERE NO DISPROPORTIONATE ECONOMIC IMPACTS AND THE BENEFITS OF EXCLUSION DID NOT OUTWEIGH THE BENEFITS OF INCLUSION.**

Notwithstanding the Court's conclusion that the Stockman's Associations have waived their argument on the issue, the Court still holds that Fish & Wildlife did not act arbitrarily or capriciously, or abuse its discretion, by not excluding Units 3 and 4 from the critical habitat designation.  In making the determination, the Court finds reasonable Fish & Wildlife's explanation for its decision not to exclude Units 3 and 4, which emphasized the agency's findings that there were no disproportionate economic costs related to the  inclusion of the units, and their exclusion within the designation did not outweigh the benefits of their inclusion.

**1.  <u>Congress Grants Fish & Wildlife's Power Under the Endangered Species Act's Section 4 (b)(2) to Make Species-Listing Determinations and Critical Habitat Designations.</u>**

The Endangered Species Act's purpose "is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a

program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Endangered Species Act, in turn, governs Fish & Wildlife's rulemaking when listing species as threatened or endangered, and designating species' critical habit. In so doing, the Act directs the agency to promulgate species-listing regulations by determining whether a species is threatened or endangered based on factors such as: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; . . . [and] (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1)(A)-(B), (E). Fish & Wildlife shall make species-listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The Tenth Circuit interpreted § 1533(b)(1)(A) as prohibiting Fish & Wildlife from considering economic impacts of listing decisions. See N.M. Cattle Growers Ass'n, 248 F.3d at 1280.

Fish & Wildlife, while listing species in accordance with regulations promulgated not inconsistent with 16 U.S.C. § 1533(b), shall prudently and concurrently "designate any habitat of [the threatened or endangered species] which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). Fish & Wildlife shall "designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Fish & Wildlife may exclude any designated area of critical habitat "if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2). The Endangered Species Act's interagency consultation provision mandates that

> [e]ach Federal agency shall, in consultation with and with the assistance of [Fish & Wildlife], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.

16 U.S.C. § 1536(a)(2).

2.      **Fish & Wildlife's Decisions Under the Endangered Species Act Must Afford the Conservation of Threatened and Endangered Species the Highest Priority.**

The Supreme Court in <u>Tenn. Valley Auth.</u> enjoined the almost-completed construction of Tellico Dam, which cost nearly $80,000,000.00 to build, because the plaintiff could not ensure that the dam's construction would not "jeopardize the snail darter or its critical habitat." 437 U.S. at 165-66, 168, 173, 195. It concluded that Congress intended actions taken under the Endangered Species Act to afford endangered species the highest priority. <u>See</u> 437 U.S. at 174. The Supreme Court also determined the Endangered Species Act's plain language indicates that "Congress viewed the value endangered species as "'incalculable.'" 437 U.S. at 187 (quoting H.R. 37, 93d Cong. (1973-74))(pagination unavailable). It reasoned that, even though enjoining the dam's construction would have substantial economic and social consequences, Congress enacted the Endangered Species Act "to halt and reverse the trend toward species extinction, whatever the cost." 437 U.S. at 184.

3.      **Federal Courts May Review Fish & Wildlife's Decisions Under an Abuse of Discretion Standard.**

The Supreme Court in <u>Weyerhaeuser</u> determined that the Endangered Species Act's § 4(b)(2) critical-habitat-exclusion provision, which states that

> '[Fish & Wildlife] may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area . . . unless [Fish & Wildlife] determines . . . that the failure to designate such area as critical habitat will result in the extinction of the species concerned,'

is not exempt from judicial review as an APA, § 701(a)(2) exception. 139 S. Ct. at 371-72 (quoting 16 U.S.C. § 1533(b)(2))(alterations added)(omissions in original). It indicated that the § 701(a)(2) exception was only applied in the few cases where courts generally viewed a particular agency decision as unreviewable, "such as the allocation of funds from a lump-sum appropriation, or a decision not to reconsider a final action." 139 S. Ct. at 370 (citing <u>Lincoln v. Vigil</u>, 508 U.S. at 191; <u>ICC v. Locomotive Eng'rs</u>, 482 U.S. 270, 282 (1987)). Comparatively, challenges to Fish & Wildlife's impact analysis for its exclusion decisions was "the sort of routine dispute that federal courts regularly review." 139 S. Ct. at 370. The Supreme Court concluded that the § 701(a)(2) exemption only applies to statutory provisions lacking agency decision-making standards against which courts may review such agency decisions for abuse of discretion. <u>See</u> 139 S. Ct. at 370 (citing <u>Lincoln v. Vigil</u>, 508 U.S. at 191). It determined that the procedural mandate of the Endangered Species Act's § 4(b)(2) requires Fish & Wildlife to evaluate economic and other

impacts before deciding whether to exclude a designated area of critical habitat.  See 139 S. Ct.

at 370.  The Supreme Court recognized that the Endangered Species Act's exclusion provision was

not "'drawn so that a court would have no meaningful standard against which to judge [] [(Fish &

Wildlife's)] exercise of [(its)] discretion' not to exclude."  139 S. Ct. at 371-72 (quoting Lincoln

v. Vigil, 508 U.S. at 191)(alterations added).  Overall, it held that Fish & Wildlife's exclusion

decisions were reviewable judicially for abuse of discretion, because, even though the word "'may'

certainly confers discretion on the Secretary [of the Interior]," Fish & Wildlife's discretionary

exclusion decisions are not independent from the Endangered Species Act's § 4(b)(2) procedural

mandate.  139 S. Ct. at 371.

> **4.      Fish & Wildlife Acted Reasonably in Accordance with Its Statutory Grant of Power Under the Endangered Species Act's § 4(b)(2).**

The Court's fundamental inquiry of whether Fish & Wildlife abused its discretion in its

decision to includes Units 3 and 4 within the critical habitat designation for the Jumping Mouse,

must begin with an assessment of the specific wording of the Endangered Species Act's § 4(b)(2)

which, provides explicitly that Fish & Wildlife, by way of the Secretary of the Interior, "may

exclude any area from critical habitat if it determines that the benefits of such exclusion outweigh

the benefits of inclusion, and exclusion will not cause the species' extinction.  16 U.S.C. §

1533(b)(2).  As noted infra, the Supreme Court acknowledged in Weyerhaeuser that"[t]he use of

the word 'may'" in § 4(b)(2) "certainly confers discretion on the Secretary." 139 S. Ct. at 371.

This Court, similarly, believes Congress' inclusion of the specific word "may" was deliberate, as

to provide Fish & Wildlife the reasonable discretion to carry out the paramount objectives of the

Endangered Species Act, which include ensuring that the government's best-placed agencies are

enabled to act appropriately and efficiently in "provid[ing] a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved [and] to provide a

program for the conservation of such endangered species and threatened species."  16 U.S.C.

§ 1531(b).

Until 2018, courts around the country have deferred consistently to the administrative

powers granted to Fish & Wildlife under the Endangered Species Act's § 4(b)(2) to a point of

declaring the agency's discretion not subject to judicial review pursuant to 5 U.S.C. § 701(a)(2).

See, e.g., Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce, 792 F.3d 1027, 1035

(9th Cir. 2015)(holding that the decision of the National Marine Fisheries Service not to exclude

certain areas from critical habit designation was "unreviewable" because under 5 U.S.C. § 701(a)(2) "an agency's decision not to exclude critical habitat is unreviewable . . . if the agency action is 'committed to agency discretion by law'" (quoting 5 U.S.C. § 701(a)(2))); Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 731 F. Supp. 2d 15, 28-29 (D.D.C. 2010)("Although there is a strong presumption that agency action is reviewable, the APA codifies the traditional exception that agency action is not reviewable when it is 'committed to agency discretion by law.'" (quoting 5 U.S.C. § 701(a))).   Without question then, the Supreme Court's decision in Weyerhaeuser represented seemingly a dramatic departure in shifting what once was viewed as complete "commit[ment] to agency discretion" in relation to the evaluation of Fish & Wildlife's discretion over whether to exclude an area of critical habitat from a given designation.  As a result, courts are now able to evaluate Fish & Wildlife's decisions regarding whether to exclude an area from critical habitat under an abuse of discretion standard.  Weyerhaeuser, 139 S. Ct. at 371 (citing Bennett v. Spear, 520 U.S. 154, 172 (1997).  In so doing, courts may inquire whether the agency "appropriately consider[ed] all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion."  Weyerhaeuser, 139 S. Ct. at 371

However, the Court urges the Stockman's Associations not to overplay the significance of the Weyerhaeuser ruling in connection with the facts at hand; for even under the abuse of discretion standard under Weyerhaeuser, 139 S. Ct. at 371,  the Court concludes that Fish & Wildlife acted reasonably in accordance with its statutory grant of power under the Endangered Species Act's § 4(b)(2).

### 5.   Fish & Wildlife Acted in Accordance with Discretion Granted Under Its Internal Endangered Species Act Section 4(b)(2) Policy Related to Critical Habitat Designation.

In evaluating the reasonableness of Fish & Wildlife's actions here, the Court turns first to Fish & Wildlife's internal, agency policy pursuant to § 4(b)(2) of the Endangered Species Act ("Section 4(b)(2) Policy").  The Section 4(b)(2) Policy offers guidelines to Fish & Wildlife in its decision-making regarding the designation of critical habitats.  See Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252).

These guidelines are advisory in nature, as opposed to proscribed procedures, and are meant to align with the Endangered Species Act's overarching conservation objectives.  See Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252).

Under the Section 4(b)(2) Policy, Fish & Wildlife, when considering initially the designation of critical habitats for the conservation of an endangered species, is granted explicit discretion to (i) conduct an "initial screening" to evaluate potential exclusions of land within a critical habitat designation and (ii) to decide which units of land warrant more detailed discussion. See Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252).   To assist Fish & Wildlife decisionmakers in reaching these determinations, the Section 4(b)(2) Policy offers some recommended guidelines, including advising that agents consider excluding both Tribal lands, and areas already subject to conservation plans or agreements.  See Section 4(b)(2) Policy, 81 Fed. Reg. 7,229-31 (AR D003253-55).   Importantly, to the extent feasible, the Policy advises decisionmakers to "focus designation of critical habitat on Federal land."  Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252). As Fish & Wildlife explains, this recommendation is intended as a means for Fish & Wildlife to avoid designating private land, which often contains real or perceived burdens that complicate the designation process.  See Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252).  This recommendation is also cognizant of the fact that the benefits of designating federal land as critical habitat are often high because of the requirements for federal actions under the Endangered Species Act's § 7.  See Response at 21 (citing Section 4(b)(2) Policy, 81 Fed. Reg. 7,231-32 (AR D003255-56); Designation Final Rule, 81 Fed. Reg. 14,279 (AR D003434)).

Considering the directives outlined in Fish & Wildlife's Section 4(b)(2) Policy, the Court concludes that Fish & Wildlife acted reasonably in its first steps of critical habitat designation. Specifically, in accordance with Policy guidelines, Fish & Wildlife conducted initially the requisite screening of areas that could potentially warrant exclusion from the critical habitat designation. Immediately thereafter, Fish & Wildlife commenced the public comment period, where it responded to public comments related to the exclusion of the proposed areas.    See Response at 21. See also Jumping Mouse Designation, 81 Fed. Reg. 14,306-12 (AR D003461-67); Jumping Mouse Designation, 81 Fed. Reg. 14,276-77 (D003432-33) (Unit 7); Designation Final Rule, 81 Fed. Reg. 14,279-80 (AR D003434-35) (Units 6 and 3C).  With consideration of these comments, as well as the advice outlined by the Section 4(b)(2) Policy, Fish & Wildlife decided ultimately to exclude two areas covering tribal lands based on its determination that the benefits of their exclusion outweighed the benefits of their inclusion.  See Jumping Mouse Designation, 81 Fed.

Reg. 14,308-12 (AR D003463-67).  In light of agency policy regarding tribal lands, Fish & Wildlife's decision to exclude the two areas was reasonable.  The Court determines also that the reasonableness is underscored by the fact that the government maintains a special trust relationship with tribes, which involves tribes' commitment to protecting jumping mouse habitat on their lands. The existence of this relationship, according to Fish & Wildlife, reduced the benefit value of including the tribal areas while increasing the benefits of their exclusion.  See Response at 21 n. 14 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,307-12 (AR D003464-67)).

Notwithstanding, the Court agrees with Fish & Wildlife that a similar calculus warranting the exclusion of Units 3 and 4 was absent.  Upon initial evaluation of Units 3 and 4, Fish & Wildlife adhered to the proper steps outlined by the Section 4(b)(2) Policy.  This meant that Fish & Wildlife first (i) identified the economic costs of the designation of Units 3 and 4, see Designation Final Rule 81 Fed. Reg. 14,287 (AR D003442); Jumping Mouse Designation, 81 Fed. Reg. 14,305 (AR D003462); Perceptional Effects Memo at 1-9  (AR D002726-35); Screening Memo at  1-21 (AR D002735-56), and subsequently, (ii) assessed qualitatively the benefits of designation of the areas, see Designation Final Rule 81 Fed. Reg. 14,287 (AR D003442); Jumping Mouse Designation, 81 Fed. Reg. 14,305 (AR D003462); Perceptional Effects Memo at 1-9  (AR D002726-35); Screening Memo at  1-21 (AR D002735-56).  The latter qualitative assessment involved Fish & Wildlife considering whether the designation of the two areas would advance the fundamental objectives outlined in the Section 4(b)(2) Policy, which include (i) "promot[ing] [] public awareness of the presence of the jumping mouse and the importance of habitat protection" and (ii) ensuring "potentially greater habitat protection for the jumping mouse."  Response at 22 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,305 (AR D003462); Designation Final Rule, 81 Fed. Reg. 14,277 (AR D003433)).

With these Policy directives in mind, the Court finds rational Fish & Wildlife's explanation of its decision not to exclude Units 3 and 4, and believes the explanation was consistent with the internal guidelines governing its designation decision-making.  See Section 4(b)(2) Policy, 81 Fed. Reg. 7,226 (AR D003250).  Specifically, Fish & Wildlife explained in sufficient detail that its decision for inclusion of the other land areas, including Units 3 and 4, was made in the context of the Jumping Mouse's unique biological characteristics and particular vulnerability to habitat destruction and fragmentation – meaning that its prospects for survival on certain land areas was

less certain than in the areas that Fish & Wildlife chose ultimately to include in the designation. See Jumping Mouse Designation, 81 Fed. Reg. 14,292-93 (AR D003447-48); Response at 22. Moreover, responding specifically to potential concerns of individuals with existing land permits on the units of land considered for designation, Fish & Wildlife explained in detail why the costs of grazing and agricultural interests under the designation still failed to counsel against the exclusion of these areas of land in light of overriding conservation interests,  including, most critically, preventing the extinction of the jumping mouse.  Because these interests were referenced and explained thoroughly by Fish & Wildlife in its explanation of facts, which, in turn, justified its conclusion that the economic costs of inclusion were not disproportionate to the benefits of designating the units of critical habitat, the Court holds that it was reasonable for Fish & Wildlife to decide not to exclude Units 3 and 4.  See Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194 (1978) (under the Endangered Species Act "the balance has been struck in favor of affording endangered species the highest of priorities").

To underscore the consistency and rationality of Fish & Wildlife's designation of units for critical habitat, the Court references also Fish & Wildlife's decision-making process in reaching the conclusion not to exclude Unit 3C -- the only unit that a commenter within the public comments period had argued explicitly that Fish & Wildlife should exclude.  Namely, as consistent with Fish & Wildlife's § 4(b)(2) Policy, and in recognition of the Jumping Mouse species' unique characteristics, when considering initially Unit 3C's designation of Unit 3C, Fish & Wildlife references the amount of unoccupied habitat within the land area as "essential to the conservation of the jumping mouse."  Designation Final Rule, 81 Fed. Reg. 14,279-80 (AR D003434-35). Turning next to the potential economic impacts of the designation of Unit 3C, Fish & Wildlife referenced the estimated costs related to grazing and Fish & Wildlife's prospective consultation activities within the subunit.  See Designation Final Rule, 81 Fed. Reg. 14,2780 (AR D003435). Subsequently, Fish & Wildlife references the last two factors for consideration under the § 4(b)(2) Policy, which included that (i) there were no conservation plans in place currently related to Unit 3C, and (ii) including the unit within the designation would pose no significant impacts to the human environment or national security, as well as no other relevant impacts.  See Designation Final Rule, 81 Fed. Reg. 14,2780 (AR D003435).  Finally, Fish & Wildlife took into consideration the comments the public commenters posed during the open period.  After noting, however, that

"[t]he public commenter did not provide any additional information for the Service to consider," Response at 22 (quoting Designation Final Rule, 81 Fed. Reg. 14,2780 (AR D003435)), Fish & Wildlife decided that the relevant factors weigh in favor of Unit 3C's inclusion within the designation.  See Designation Final Rule, 81 Fed. Reg. 14,2780 (AR D003435)  Given the methodical and transparent nature of this decision-making process, and considering the consistency in which Fish & Wildlife adhered to the § 4(b)(2) Policy recommended guidelines, the Court, too, finds reasonable Fish & Wildlife's inclusion of Unit 3C within the critical habitat designation.

**6.       Fish & Wildlife is Granted Statutory Discretion to Make Exclusion Decisions on a Case-by-Case Basis, Based on Each Tract's Unique Circumstances.**

Countering the detailed findings Fish & Wildlife outlines that support its inclusion of Units 3 and 4, the Stockman's Associations maintain that Fish & Wildlife's explanation is insufficient. Reply at 11-13.  In advancing the argument, the Stockman's Associations reference specifically that Fish & Wildlife fails to offer a universal definition of the characterization "disproportionate costs," as the terms relate to a land unit's inclusion within a critical habitat designation.  Petition at 22-23.  This Court, and other courts around the country, however, find this argument unavailing.

Likely cognizant of the fact that no one unit of land considered for designation possesses the same characteristics as another, and because no threatened species possesses the same survival vulnerabilities or history related to its endangered status, the Endangered Species Act does not require any "one-size-fits-all rule" or ubiquitous standard under which Fish & Wildlife's determinations of critical habitat designation must be judged.  In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig., 709 F.3d 1, 15 (D.C. Cir. 2013)(upholding the Fish & Wildlife's use of a "case-by-case" approach to implementing the Endangered Species Act's statutory term "foreseeable future" and rejecting litigants' attempts to impose general standards where the Act requires none); Maier v. EPA, 114 F.3d 1032, 1043 (10th Cir. 1997)(deferring to an agency's decision to implement a statutory provision "on a case-by-case basis" instead of imposing a universal rule through regulation).  In fact, to impose definitive rules in the case of critical habitat designations almost certainly would be counter-productive, for such stipulations would almost certainly require continuous updating, given the environment's changing nature and the fluidity in which species are classified as endangered.  Fish & Wildlife's § 4(b)(2) Policy recognizes the

unfeasibility for proscribing rigid standards to guide its critical habitat designation decision-making, stating that "it has been the experience of the Services that economic impacts of critical habit designations vary widely, making it infeasible to qualify the level of impacts that would trigger further consideration in all cases."  Section 4(b)(2) Policy, 81 Fed. Reg. at 7,239 (AR D003263).  This infeasibility, then, that underlies the rationale for the Endangered Species Act's offering of factors for Fish & Wildlife to consider in its designation decisions, as opposed to a rigid procedure, standard, or list with items that Fish & Wildlife must check-off one-by-one during each designation process.

Accordingly, the Court declines to adopt the argument of the Stockman's Associations here regarding the imposition of a universal standard around terms such as "disproportionate economic impacts," in in which Fish & Wildlife's designation decisions must be judged.  In fact, to impose such a standard would require the Court to step into the sphere of legislating -- a sphere beyond the Court's Article III role.  See Weyerhaeuser, 139 S. Ct. at 370; Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. at 524-25.  The Court, therefore, concludes that Fish & Wildlife is granted statutory discretion to make exclusion decisions on a case-by-case basis, contingent on each land tract's unique circumstances.

### a. Fish & Wildlife is Not Obligated to Quantify All Costs and Benefits in its Calculus of the Comparative Benefits of a Unit's Inclusion within a Critical Habitat Designation.

Persisting in their request for the Court to impose upon Fish & Wildlife statutory requirements that are not in the Endangered Species Act, the Stockman's Associations next argues that Fish & Wildlife be required to quantify all costs and benefits referenced in its economic impact assessment.  See Petition at 21.  Here too, however, the Stockman's Associations ask for an infeasible demand, as often, intangible factors related to the environment, conservation, and the preservation of an endangered species are impossible to quantify.  The Office of Management and Budget affirms this assessment, and for this reason, explains that, given environment and conservation's specialized nature, costs and benefits can include "qualitative and non-monetized factors."  Similarly, Fish & Wildlife's Section 4(b)(2) Policy emphasizes that economic benefits of designating critical habitat are invariably difficult to quantify for most species, and, in such cases, may be assessed qualitatively.  Section 4(b)(2) Policy, 81 Fed. Reg. at 7,238 (AR D003262)

With this principle in mind, the Court agrees with Fish & Wildlife that, in the case of designating critical habitat for preservation of the Jumping Mouse species, estimated costs are ill

suited to rigid quantification.  See Jumping Mouse Designation, 81 Fed. Reg. 14,289 (AR D003445).  Relatedly, the Court finds reasonable Fish & Wildlife's explanation that to provide specific number amounts related to the estimated costs associated with conservation, it would need hypothetically data that could "estimate the value the public places on preserving the jumping mouse in monetary terms" -- data, which is unavailable.  Jumping Mouse Designation, 81 Fed. Reg. 14,289 (AR D003445).  See also Jumping Mouse Designation, 81 Fed. Reg. 14,308 (AR D003463).  In this case, then, where quantification of the benefits for inclusion of a land unit versus exclusion of the land unit are impossible to ascertain, Fish & Wildlife took advantage of the alternative avenue of estimating costs, as the Section 4(b)(2) Policy recommends.  This avenue allows for Fish & Wildlife to assess qualitatively the benefits for and against inclusion, which Fish & Wildlife ultimately deems weigh in favor of including Units 3 and 4.  In light of the conditions outlined above, rendering definitive quantification relating to the costs and benefits of conservation of the Jumping Mouse within Units 3 and 4 nearly impossible, the Court finds Fish & Wildlife's actions here reasonable and not constituting an abuse of discretion.

> **b.      Fish & Wildlife Did Not Arbitrarily Cite Its Final Threshold Amount of $100 Million as a Benchmark for Its Exclusion Determination.**

Last, the Stockman's Associations dispute Fish & Wildlife's reliance on the $100 million per year threshold, which was referenced in the Screening Memo that Industrial Economics issued for Fish & Wildlife, as well as cited within the final rule relating to Fish & Wildlife's designation decision, as a benchmark for determining which areas to exclude from the critical habitat designation.  Exhibit 1 at 8.  Specifically, the Stockman's Associations argue the threshold amount is arbitrary because there is "no justification in the record for the $100 million threshold."  Exhibit 1 at 8.  Relatedly, the Stockman's Associations accuse Fish & Wildlife of selecting the $100 million threshold amount "in order to minimize the impact of the designation."  Exhibit 1 at 8.  Consequently, according to the Stockman's Associations, Fish & Wildlife's final decision regarding the inclusion of Units 3 and 4 is "contrary" to Fish & Wildlife's "established policy."  Exhibit 1 at 8 (citing Section 4(b)(2) Policy,  81 Fed. Reg. 7,226, 7,248 (AR D003250, D003272)).  When the Services are determining whether to undertake a[n] . . . exclusion analysis as a result of . . . economic impacts . . . , it is the nature of those impacts, not necessarily a particular threshold level, that is relevant to the Services' determination.").

Fish & Wildlife counter the Stockman's Associations' claims, arguing that the $100 million limit was not chosen arbitrarily.  Rather, as Fish & Wildlife explain, the specific monetary threshold comes from Executive Order 12866, which mandates that "agencies [] quantify costs and benefits if an action may have an effect on the economy of $100 million or more in singe year."  Response at 29 (citing Screening Memo at 1).  Moreover, Fish & Wildlife maintains that the $100 million threshold represented a guidepost in which to gauge economic impacts associated with the designation.  See 16 U.S.C. § 1533(b)(2).  The process under Endangered Species Act, § 4(b)(2) required that Fish & Wildlife (i) calculate initially the quantifiable economic impacts associated with the critical habitat designation (of which Fish & Wildlife had sufficient data), (ii) estimate the remaining costs of designation (of which it lacked sufficient data), and, finally, (iii) compare those collective costs to the $100 million threshold.  The purpose of this process and the reliance on the $100 million threshold, according to Fish & Wildlife, was to (i) demonstrate that Executive Order 12866 is not triggered; and (ii) summarize those quantified costs by contextualizing them against a government standard.  See Response at 29.  Fish & Wildlife asserts, however, that it "never indicated that the decision of whether to exclude specific areas was based on whether or not the overall designation exceeded $100 million in costs in a given year."  Response at 29.

Upon evaluation of the statutory sources Fish & Wildlife cites to validate the $100 million threshold, the Court agrees with Fish & Wildlife that the threshold was not arbitrarily chosen, but rather, served as a rational benchmark in which to help inform Fish & Wildlife in its determinations relating to whether to exclude specific areas from the critical habitat designation, particularly Units 3 and 4.  See Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252).  First, as Fish & Wildlife accurately notes, § 3(f)(1) of Executive Order 12866 outlines explicitly the specific monetary threshold amount of $100 million.  Section 3, which offers relevant definitions for key terms within Executive Order 12866, offers a detailed explanation of a "Significant regulatory action" within subsection (f) as one: "Hav[ing] an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities[.]"  Executive Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)("Exec. Order 12866").

The Court, therefore, agrees with Fish & Wildlife, that this explicit threshold, in turn, offered a quantifiable federal guidepost in which to inform rationally Fish & Wildlife's decision-making process regarding its final critical habitat designation, particularly its final determinations of which areas to exclude versus to include in light of several factors, including "economic impact."  16 U.S.C. § 1533(b)(2).).

> The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2)(emphasis added).

Last, the Court takes particular issue with the argument of the Stockman's Associations that there was "no justification in the record for the $100 million threshold," Exhibit 1 at 8, given the fact that the $100 million threshold was listed explicitly in Executive Order 12866.  The Court takes issues as well with the Stockman's Associations accusation that Fish & Wildlife selected the threshold amount simply "to minimize the impact of the designation."  Exhibit 1 at 8.  As to the latter point specifically, the Court emphasizes the fact that the $100 million threshold was cited and calculated initially by Industrial Economics, a third-party consultant, as a collective total based on its cost estimates of the designation's potential impacts related to "grazing as the main activity occurring with the areas proposed for designation," as well as impacts related "to water use and management; transportation; recreation; development; and species and habitat management." Screening Memo at 6 (AR D002740).  For these reasons, the Court concludes that the final amount of $100 million, cited within the Screening Memo and referenced by Fish & Wildlife as a benchmark for its final exclusion determination, was not arbitrary.

Ultimately, the Court concludes that Fish & Wildlife (i) acted in accordance with its internal Section 4(b)(2) Policy related to critical habitat designation; (ii) acted rationally in making context-based determinations regarding designation that were tied to its consideration of the specific characteristics of the land it contemplated designating, as well as consideration of the specialized vulnerabilities of the jumping mouse; (iii) acted rationally in estimating unascertainable qualitative costs related to designation when evaluating the relative impacts of the

inclusion versus exclusion of Units 3 and 4; and (iv) relied reasonably on the $100 million threshold, as Executive Order 12866 states, to make its final determination in accordance with the discretionary procedures that the Endangered Species Act's § 4(b)(2) outlines. The Court holds, therefore, that Fish & Wildlife did not act arbitrarily or capriciously, or abuse its discretion, by not excluding Units 3 and 4 from the critical habitat designation.

## V. IN LIGHT OF THE COURT'S HOLDINGS IN FAVOR OF FISH & WILDLIFE, THE COURT WILL KEEP INTACT THE CRITICAL HABITAT DESIGNATION FOR THE JUMPING MOUSE.

Upon full evaluation of the parties' arguments, the Court issues the following conclusions: (i) the Stockman's Associations suffer sufficient economic injury to establish associational standing under Article III of the Constitution to challenge the decision that Fish & Wildlife made to designate as critical habitat for the Jumping Mouse land on which members of the Stockman's Associations graze cattle; (ii) Fish & Wildlife's use of the "incremental effects" approach to consider economic impacts associated with the critical habitat designation does not violate the Endangered Species Act's § 4(b)(2) and the APA; (iii) Fish & Wildlife did not abuse its discretion by failing to consider additional designation costs, such as compensating the members of the Stockman's Associations for reducing the value of their water rights, with respect to property within the designation, and an interference with the alleged water rights of the members of the Stockman's Associations does not amount to a taking under the Fifth Amendment; (iv) the Stockman's Associations administratively waived their claims challenging Fish & Wildlife's decision not to exclude particular units of land -- Units 3 and 4 -- from the critical habitat designation, because no Stockman's Associations members raised explicit concerns about the inclusion of these units, except for concerns raised about Subunit 3c, during the proposed designation's open comment period; (v) notwithstanding the Stockman's Associations' administrative waiver on this issue, Fish & Wildlife offers a sufficiently reasoned explanation to support its conclusion not to exclude Units 3 and 4 from the critical habitat designation, which includes its reasonable determination that there were no disproportionate costs associated with the inclusion of the Units -- a determination that is consistent with Fish & Wildlife's internal § 4(b)(2) Policy pursuant to the Endangered Species Act. In light of these conclusions, the Court rules against the Stockman's Associations petition for review. Accordingly, it is unnecessary for the Court to direct remedy to the Stockman's Associations by way of either (i) remanding to Fish &

Wildlife to comply with its statutory obligations under the Endangered Species Act's § 4(b)(2), or (ii) vacating Fish & Wildlife's critical habitat designation for the Jumping Mouse.

In the alternative, however, if the Court had ruled affirmatively on one of the preceding issues, holding that (i) Fish & Wildlife's use of the "incremental effects" approach violates the Endangered Species Act's § 4(b)(2) and the APA; (ii) Fish & Wildlife abused its discretion by not considering designation costs such as compensating the members of the Stockman's Associations for reducing their water rights value with respect to property within the designation, or an interference with the alleged water rights of the Stockman's Associations amounts to a taking under the Fifth Amendment; or (iii) Fish & Wildlife abused its discretion in its decision not to exclude Units 3 and 4 from the critical habitat designation, the Court would still determine inappropriate the vacatur remedy that the Stockman's Associations request. Rather, were the Court to find a remedy necessary at all, the Court would instead remand to Fish & Wildlife to address the deficiencies of the current critical habitat designation for the Jumping Mouse under the Endangered Species Act's § 4(b)(2). The remand remedy would be most appropriate, as it would avoid vacating essential protections Fish & Wildlife has enacted to protect the endangered Jumping Mouse species. Nonetheless, if the Court did conclude ultimately that the circumstances warrant vacatur, it would still not require vacatur of the entire critical habitat designation. Rather, the Court would order for a limited form of vacatur, thus allowing Fish & Wildlife to tailor its adjustments of the boundaries of the current critical habitat designation to address the narrow injuries alleged by the Stockman's Associations in relation only the critical habit designation's Units 3 and 4. Similar to the first proposed remedy's objectives, the Court views this limited remedy to be essential in that it would avoid exposing the Jumping Mouse to potentially irreparable harm across other Units of land within the current critical habitat designation that do not implicate the interests of the members of the Stockman's Associations.

A. **EVEN IF THE COURT HAD RULED AFFIRMATIVELY ON ONE OF THE CHALLENGES THE STOCKMAN'S ASSOCIATIONS ADVANCED AGAINST FISH & WILDLIFE'S CRITICAL HABITAT DESIGNATION OF THE JUMPING MOUSE, THE COURT WOULD NOT GRANT THE PRIMARY REQUESTED REMEDY OF VACATUR OF THE STOCKMAN'S ASSOCIATIONS; RATHER THE COURT WOULD REMAND TO FISH & WILDLIFE FOR THE PURPOSE OF FISH AND WILDLIFE ADDRESSING DEFICIENCIES OF THE DESIGNATION UNDER THE ENDANGERED SPECIES ACT'S SECTION 4(B)(2).**

In the case that the Court had ruled affirmatively on one of the challenges the Stockman's Associations advanced against Fish & Wildlife's critical habitat designation for the Jumping Mouse, the Court would still find inappropriate the Stockman's Associations' request for vacatur. The Court reaches this decision based on a weighing of equities under <u>Allied-Signal, Inc. v. Nuclear Regulatory Comm'n</u>, 988 F.2d 146, 150-51 (D.C. Cir. 1993)("<u>Allied Signal</u>"), concluding ultimately, that the potential disruptive consequences of a change in the critical habitat designation rule posed to Fish & Wildlife and the Jumping Mouse outweigh the seriousness of the critical habitat rule's deficiencies to the Stockman's Associations  <u>See</u> Allied Signal, 988 F.2d at 150-51.

### 1.   The Parties Dispute the Balancing of Equities that Favors or Disfavors a Vacatur Remedy.

The Stockman's Associations argue that the Court should vacate the designation if it grants their Petition for Review.  <u>See</u> P. Remedy Brief at 5.  They indicate that vacatur of unlawful or arbitrary agency decisions is the default remedy under the Endangered Species Act and under the APA.  <u>See</u> P. Remedy Brief at 5.  The Stockman's Associations insist that the Court should not deviate from that default remedy, because the designation causes significant economic harm to their members.  <u>See</u> P. Remedy Brief at 5.

Supporting their demand for the vacatur remedy, the Stockman's Associations explain that, "'[b]ecause the ESA contains no internal standard for review,'" the APA governs violations of the Endangered Species Act.  P. Remedy Brief at 5-6 (quoting <u>Vill. of False Pass v. Clark</u>, 733 F.2d 605, 609-10 (9th Cir 1984), and citing 5 U.S.C. § 706; <u>Biodiversity Legal Found. v. Babbitt</u>, 146 F.3d 1249, 1252 (10th Cir. 1998); <u>Wyo. Farm Bureau Fed'n v. Babbitt</u>, 199 F.3d 1224, 1231 (10th Cir. 2000))(alterations added).  They note further that the APA mandates that "'[t]he reviewing court *shall* . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  P. Remedy Brief at 6 (quoting 5 U.S.C. § 706(2)(A))(alterations added). The Stockman's Associations insist, therefore, that, "'[t]ypically, when an agency violates the Administrative Procedure Act and the Endangered Species Act,' a court will 'vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.'"  P. Remedy Brief at 6 (quoting <u>Defs. of Wildlife v. EPA</u>, 420 F.3d 946, 978 (9th Cir. 2005), <u>rev'd on other grounds</u>, <u>sub nom.</u> <u>Nat'l Ass'n of Home Builders v. Defs. of Wildlife</u>, 551 U.S. 644 (2007)).

The Stockman's Associations argue that vacatur as the default remedy is consistent with the APA and the Endangered Species Act, because legislation can strip equitable powers from courts.  See P. Remedy Brief at 6 (citing Tenn. Valley Auth., 437 U.S. at 194).  They assert that Congress sought to supersede courts' power to tailor equitable remedies for APA violations by specifically crafting the language in 5 U.S.C. § 706(2)(A), which states that a court "'*shall . . . hold unlawful and set aside*' unlawful and arbitrary agency action."  P. Remedy Brief at 6 (alteration in P. Remedy)(emphasis added by P. Remedy)(citing Brian S. Prestes, Remanding Without Vacating Agency Action, 32 Seton Hall L. Rev. 108, 145–46 (2001)).  The Stockman's Associations argue that the Endangered Species Act's citizen action provision, see 16 U.S.C. § 1540(g)(5), permits relief to be sought under other statutes, including U.S.C. § 706(2)(A), and, reading together the two statutes, "vacatur is the default remedy for violating the [Endangered Species Act]."  P. Remedy Brief at 6 n.1 (citing Defs. of Wildlife, 420 F.3d at 978).  They argue that the Endangered Species Act's § 4(b)(2) "'imposes a categorical requirement that [Fish & Wildlife] tak[e] into consideration economic and other impacts *before* [designating critical habitat]'"; thus, vacatur is the default remedy, because Fish & Wildlife cannot properly designate critical habitat after improperly considering impacts. P. Remedy Brief at 7 (quoting Weyerhaeuser, 139 S. Ct. at 371, and citing N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., No. CIV 02-0199 JB/LCS, 2004 WL 6409640 at *5 (D.N.M. Aug. 31, 2004)(Browning, J.))(first and third alteration added, and second alteration in P. Remedy)(emphasis in P. Remedy Brief).  The Stockman's Associations also indicate that the Tenth Circuit vacated the critical habitat designation in N.M. Cattle Growers Ass'n after deciding that Fish & Wildlife unlawfully used the baseline approach to consider economic impacts.  See P. Remedy Brief at 8.  They argue that the Tenth Circuit's vacatur ruling also applies to Fish & Wildlife's exclusion decision, because the Endangered Species Act's exclusion-consideration provision is "part of a 'unified process for weighing the impact of designating an area as critical habitat,'" and Fish & Wildlife's exclusion decision is accompanied by a "'contemporaneous[ly] [crafted] explanation'" which was reasoned insufficiently and "'not sustainable on the administrative record made.'"  P. Remedy Brief at 8 (first quoting Weyerhaeuser, 139 S. Ct. at 371, then quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 549 (1978), and citing Jumping Mouse Designation, 81 Fed. Reg. at 14,263-325)(alterations added).

The Stockman's Associations also argue that "equities favor vacatur of [the designation]." P. Remedy Brief at 9.  They note that the Tenth Circuit has not always vacated agency decisions that violate the APA; yet, the Tenth Circuit has treated vacatur discretionarily and has not expressed factors for lower courts to discern when vacatur is appropriate.  See P. Remedy Brief at 9 (citing N.M. Health Connections, 340 F. Supp. 3d at 1175-77).  The Stockman's Associations assert that, as a result, Tenth Circuit district courts generally follow factors, which other Courts of Appeals -- principally the United States Court of Appeals for the District of Columbia -- establish. See P. Remedy Brief at 9 (citing N.M. Health Connections, 340 F. Supp. 3d at 1177).  They indicate that other Courts of Appeals' vacatur-consideration factors include "the seriousness of the deficiencies in the rulemaking[,] and the consequences of vacating the rule before remand."  P. Remedy Brief at 9 (citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993)("Allied-Signal").[34]  The Stockman's Associations assert, however, that courts "tend to [consider factors to determine whether vacatur is inappropriate] only 'where the agency's failure is a lack of explanation or reasoned decisionmaking.'" P. Remedy Brief at 10 (quoting N.M. Health Connections, 340 F. Supp. 3d at 1177).  They also assert that, "[w]hen the agency's decision is unlawful for other reasons, a court likely has less discretion to remand without vacatur."  P. Remedy Brief at 10 (citing Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1290 (11th Cir. 2015)).

Countering the Stockman's Associations arguments in support of vacatur, Fish & Wildlife contend that, if the Court rules in favor of the Stockman's Associations, then the Court should not vacate the designation.  See Tr. at 106:19-110:10 (Flanagan).  As Fish & Wildlife further explains, vacatur is an equitable remedy, which the Court has the authority to order; however, here, the equities do not favor vacatur.  See Tr. at 106:20-24 (Flanagan).  Specifically, in this case, the administrative record evidences that vacatur of the critical habitat designation would impact negatively the existing conservations efforts made to preserve the Jumping Mouse species, because: (i) the Jumping Mouse is dependent on very specialized critical habitat, and local Jumping

[34]The Stockman's Associations assert that other Courts of Appeals' non-vacatur holdings are "not without controversy," that "'the Tenth Circuit has never adopted Allied-Signal and [that the Tenth Circuit] in a 1999 decision followed a plain language interpretation of APA § 706.'"  P. Remedy at 9 n.2 (quoting Michael S. Freeman & Joel Minor, Selected Issues on Standing, Injunctions, and Remedies in Oil and Gas Litigation, 2017 No. 1 RMMLF-INST 9 at *27 (2017), and citing Checkosky v. SEC, 23 F.3d 452, 490 (D.C. Cir. 1994)(Randolph, J., concurring); Milk Train, Inc. v. Veneman, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting))(alteration added).

Mouse populations are extirpated rapidly when such habitat is not protected; (ii) when Fish & Wildlife finalized the designation, it found that the Jumping Mouse occupies only twenty-nine locations, and Jumping Mouse populations were compromised in eighteen of those locations; and (iii) one bad season without critical habitat protections can result in devastating and irreversible consequences to the Jumping Mouse's survival and recovery.   See Tr. at 106:24-107:21 (Flanagan).   Relatedly, Fish & Wildlife assert that the equities heavily favor not vacating the designation should the Court remand to Fish & Wildlife, because, as the "Court has recognized in adopting the basic principles used by the D.C. Circuit, when the consequences of vacating can be quite disruptive, the equity point[s] to remanding the agency without vacatur."[35]  Tr. at 107:22-108:2 (Flanagan).

Fish & Wildlife argue, alternatively, that, should the Court decide that vacatur is the appropriate remedy, then the Court should limit vacatur to the designation's Units 3 and 4, which purportedly impact members of the Stockman's Associations.  See Tr. at 108:2-109:17 (Flanagan). As an extension of this argument, Fish & Wildlife requests that, if the Court determines that the Northern NM Stockman's Association lacks associational standing, then the Court should tailor vacatur further to avoid vacating Unit 3 altogether.  See Tr. at 108:5-7 (Flanagan).  To support this request, Fish & Wildlife reference Califano v. Yamasaki, 442 U.S. 682 (1979), where the Supreme Court concluded: "'Equitable relief must be tailored to the parties before the Court and should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" Tr. at 108:11-18 (Flanagan)(quoting Califano v. Yamasaki, 442 U.S. at 702).  With this in mind, Fish & Wildlife insists that, because the Stockman's Associations do not object to the designation of units outside of Otero County, then vacatur of the entire designation would be unnecessary, and indeed, devastating to the goals of conservation of the Jumping Mouse  that the critical habitat initiative fundamentally intends.  See Tr. at 108:19-24 (Flanagan).   Fish & Wildlife reference multiple court decisions in support of this tailored remedy.  See Tr. at 108:25-109:19 (Flanagan). For example, citing Otay Mesa Prop., L.P. v. United States Department of Interior, 646 F.3d 914 (D.C. Cir. 2011), an opinion that the Honorable Brett Kavanaugh, then-United States Circuit Judge for the D.C. Circuit authored, Fish & Wildlife emphasizes that the D.C. Circuit "vacated [only]

---

[35]Based on the Court's independent research, the Court concludes that Fish & Wildlife refers to N.M. Health Connections, 340 F. Supp. 3d at 1177 (citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 151 (D.C. Cir. 1993)).

the critical habitat rule just as to the property that was held by the plaintiff after finding that the critical habitat designation was based on a faulty premise." Tr. at 109:3-12 (Flanagan).

###     2.     The Court Uses the Allied-Signal Test to Determine When to Remand Without Vacatur of an Agency's Action.

According to the Tenth Circuit, when a Court concludes that an agency action is arbitrary and capricious, "[v]acatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts." WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d 1222, 1239 (10th Cir. 2017).   WildEarth Guardians v. United States Bureau of Land Management does not cite any authority for that proposition.  See 870 F.3d at 1239.  The Tenth Circuit's assertion that vacatur is a form of injunctive relief implies that the traditional standard for injunctive relief applies to vacatur under the APA:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

The Tenth Circuit has not, however, performed the traditional four-factor inquiry when vacating agency action -- or ordering a district court to vacate agency action on remand -- under the APA, which suggests that the Tenth Circuit does not treat vacatur fully as injunctive relief. See, e.g., Utah Envtl. Cong. v. Bosworth, 439 F.3d 1184, 1195 (10th Cir. 2006)(concluding that the United States Forestry Service acted arbitrarily and capriciously for failing to comply with the Endangered Species Act, and vacating the agency's action without any further analysis). See also WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d at 1239-40 (treating Utah Envtl. Cong. v. Bosworth and similar cases as good law).  Further, the APA's text indicates that vacatur is the mandatory remedy for arbitrary and capricious agency action, which is at odds with the Tenth Circuit's statement that vacatur is a form of injunctive relief.  See 5 U.S.C. § 706 ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusion found to be . . .  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."). See also Murphy v. Smith, ––– U.S. ––––, 138 S. Ct. 784, 787 (2018)(Gorsuch, J.)("[T]he word 'shall' usually creates a mandate, not a liberty, so the verb phrase 'shall be applied' tells [the appellate court] that the district court has some nondiscretionary duty to perform." (quoting 42

U.S.C. § 1997e(d)(2))); <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes &</u> <u>Lerach</u>, 523 U.S. 26, 35 (1998)("The Panel's instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion."). Likewise, Supreme Court precedent indicates that vacatur and injunctions are distinct forms of relief:

> An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. If a less drastic remedy (such as partial or complete vacatur of [the agency's] deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.

<u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 165-66 (2010).  Consequently, the Court concludes that the discussion of <u>WildEarth Guardians v. United States Bureau of Land Management</u> indicates that vacatur under the APA is a form of discretionary relief, akin to an injunction, even though vacatur is not, strictly speaking, a form of injunctive relief.  Vacatur is a form of "equitable relief," however, and so, upon a "balance [of] the equities," vacatur may not be appropriate in all cases.  <u>Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs</u>, 781 F.3d 1271, 1290 (11th Cir. 2015).  <u>See</u> <u>Rio Grande Silvery Minnow v. Bureau of Reclamation</u>, 601 F.3d 1096, 1139 (10th Cir. 2010)("Vacatur is an equitable remedy, indeed an 'extraordinary' one, and the decision whether to grant vacatur is entrusted to the district court's discretion." (citing <u>U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship</u>, 513 U.S. 18, 26 (1994) ); <u>Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation & Enf't</u>, No. 12-cv-01275-JLK, 2015 WL 1593995, at *1 (D. Colo. April 6, 2016)(Kane, J.)("[C]ourts retain equitable discretion to fashion an appropriate remedy, and in some cases equitable principles counsel in favor of remand without vacatur." (citation omitted)(citing 5 U.S.C. § 702; <u>Pac. Rivers Council v. U.S. Forest Serv</u>., 942 F.Supp.2d 1014, 1021 (E.D. Cal. 2013)(England, Jr., C.J.))).

Instead of applying the traditional test for injunctive relief, the United States Court of Appeals for the D.C. Circuit has developed a test to determine when a court should remand without vacatur of the agency's action.  <u>See</u> <u>Allied-Signal,</u> 988 F.2d at 150-51.  "The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'"  <u>Allied-Signal</u>, 988 F.2d  146, 150-51 (quoting <u>Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin</u>., 920 F.2d 960, 967 (1990)).  Courts primarily use this test where the agency's failure is a lack of explanation or reasoned decisionmaking.

See, e.g., Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1290 (applying the test "[i]n circumstances . . . where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process" and not deciding "whether remand without vacatur is permissible when the agency has erred to such an extent as to indicate that its ultimate decision was unlawful"); Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d at 150 (providing the test after stating that "[a]n inadequately supported rule . . . need not necessarily be vacated"), Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d at 966 (providing the test after stating the court "commonly remand[s] without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking but also where the order was otherwise arbitrary and capricious" (citations omitted)).  The Tenth Circuit has not endorsed the District of Columbia Circuit's test or otherwise "specifically addressed the factors to be considered in determining whether vacatur is an appropriate remedy."  Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation & Enf't, 2015 WL 1593995, at *2.

Although the Tenth Circuit offers no guidance on the issue of appropriate remedy here, a number of courts around the country use the Allied-Signal test, see, e.g., Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1290, Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d at 966, and the Court has also relied historically on the test when addressing remedy.  See New Mexico Health Connections v. United States Dep't of Health & Human Servs., 340 F. Supp. 3d 1112, 1177 (D.N.M. 2018)(Browning, J.).  The Court, therefore, finds the D.C. Circuit's test persuasive in this case and will use it to evaluate the appropriate remedy in the scenario that the Court were to rule affirmatively on any of the claims brought by the Stockman's Associations against Fish & Wildlife.  Ultimately, for the reasons explained below, on balance, the Court concludes that vacatur is an inappropriate remedy.

        a.     **The Potential Disruptive Consequences of a Change in the Critical Habitat Designation Rule Posed to Fish & Wildlife and the Jumping Mouse Outweigh the Seriousness of the Critical Habitat Rule's Potential Deficiencies to the Stockman's Associations.**

Where "there is at least a serious possibility that the [agency] will be able to substantive its decision on remand" and "the consequences of vacating may be quite disruptive," the equities point to remanding to the agency without vacatur.  Allied-Signal, Inc. v. U.S. Nuclear Regulatory

Comm'n, 988 F.2d at 151.   Remand without vacatur also may be appropriate "where it is not at

all clear that the agency's error incurably tainted the agency's decisionmaking process," or where

the agency's error "may turn out to be inconsequential."   Black Warrior Riverkeeper, Inc. v. U.S.

Army Corps. of Eng'rs, 781 F.3d at 1290.   On the other hand, remand with vacatur is appropriate

where "such fundamental flaws in the agency's decision make it unlikely that the same rule would

be adopted on remand."   Pollinator Stewardship Council v. EPA, 806 F.3d 520, 532 (9th Cir.

2015).   The United States Court of Appeals for the Eleventh Circuit also has found vacatur

appropriate where an agency promulgated an administrative rule "with the notice-and-comment

procedures mandated by the APA," and provided no explanation for not using those procedures.

Alabama v. Centers for Medicare & Medicaid Servs., 674 F.3d 1241, 1244 (11th Cir. 2012).

Another serious deficiency counseling vacatur is where the agency's reasoning behind a rule is

"flimsy, and [the agency's] half-hearted attempt to defend its decision in this court is but another

indication that [the rule] is a hopeless cause."   Fox Television Stations, Inc. v. FCC, 280 F.3d

1027, 1053 (D.C. Cir. 2002).

> **b.    Vacatur of the Critical Habitat Designation Poses a Number of Disruptive Consequences to Fish & Wildlife and the Jumping Mouse.**

When considering the application of prong two of the Allied Signal equitable balancing

test -- "the disruptive consequences of an interim change that may itself be changed" -- in the

context of the current critical habitat designation for the Jumping Mouse, the Court references Fish

& Wildlife's fundamental objectives of Fish & Wildlife in their critical habitat designation

decision-making pursuant to the Endangered Species Act, which include (i) "provid[ing] a means

whereby the ecosystems upon which endangered species and threated species depend may be

conserved," and (ii) "provid[ing] a program for the conservation of such endangered species and

threatened species."   16 U.S.C. § 1531(b).   Dually, the Court considers the Jumping Mouse

species' historic evolution, specialized habitat requirements, and vulnerabilities of the Jumping

Mouse species, with particular attention to the fact that the species is "highly vulnerable to

extirpations when habitat is lost or fragmented."   D. Remedy Brief at 2 (quoting Listing Final Rule,

79 Fed. Reg. 33,121 (AR D003211)).   Elaborating upon the species' unique vulnerabilities, Fish

& Wildlife report, "if resources are not available in a single season, jumping mice populations will

be greatly impacted."   D. Remedy Brief at 2 (citing Jumping Mouse Designation, 81 Fed. Reg.

15,002 (quoting D003447)).  To back up this contention, Fish & Wildlife submit that at present, 18 of the 29 Jumping Mouse populations that have been identified since 2005, have already been compromised.  See D. Remedy Brief at 3 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,272 (AR D003429)).  Furthermore, at the time of the species' listing under the Endangered Species Act in 2014, none of the remaining populations were "of sufficient size to be resilient," and "all of the remaining locations" of which the species occupied, were "at considerable risk of extirpation in the near-term (between now and the next 10 years)."  D. Remedy Brief at 3 (quoting Listing Final Rule, 79 Fed. Reg. 33,122 (AR D003212).

With the evidence as to the Jumping Mouse's current state as background, the Court takes seriously Fish & Wildlife's argument that vacating the current critical habitat rule would likely have "substantial 'disruptive consequences'" for the Jumping Mouse,  D. Remedy Brief at 2 (quoting Allied-Signal, 988 F.2d at 150-51), given the species would "likely be without critical habitat protection for up to several years,"  D. Remedy Brief at 2.  As Fish & Wildlife explains, these "disruptive consequences" would accrue for the Jumping Mouse, because of the time and delay that would be involved as Fish & Wildlife would be forced to re-conduct its analysis, and procedural steps pursuant to Endangered Species Act's § 4(b)(2) and its internal Section 4(b)(2) Policy, to issue a revised final rule designating critical habitat.  D. Remedy Brief at 2 (citing Millsap Dec. ¶ 9 at 4).  Moreover, there is fear that the process of revising a final critical habitat rule itself could be counter-productive and self-defeating for Fish & Wildlife, as the years it would be required to spend, which would include commissioning a new economic impacts assessment, re-considering areas for exclusion, opening up a another public comment period, and then subsequently, imposing a new rule, could indeed  "expose the Jumping Mouse to irreversible harm and prevent it from recovering to the point needed to avert extinction."  D. Remedy Brief at 2 (citing Designation Final Rule, 81 Fed. Reg. 14,277 (AR D003433)).  Even worse, prolonged exposure without the critical habitat designation could result in extra delay for the species' recovery because it would lack requisite habitat protections for population expansion.  See D. Remedy Brief (citing Designation Final Rule, 81 Fed. Reg. 14,299 (AR D003455).  This duration, in turn, could lead to the Jumping Mouse being listed under the Endangered Species Act for a lengthier period.  Not only would the Jumping Mouse's protracted listing under the Endangered Species Act prove harmful to the objectives of the Stockman's Associations, but, it could prove

counter-productive to the grazing objectives of the Stockman's Associations, as it might require

Fish & Wildlife to designate even greater allotments of land to a future Jumping Mouse critical

habitat designation.

Finally, the Court takes note of the disruptive consequences posed to Fish & Wildlife itself

in the case of vacatur.  On this note, the Court places emphasis on Fish & Wildlife's argument that,

if the current Jumping Mouse's critical habitat designation rule is vacated, it would be forced to

re-allocate limited agency resources to re-initiating discussions with other federal agencies,

including the Forest Service, most of which, as Fish & Wildlife report, would no longer have any

legal obligation to prevent the destruction or adverse modification of Jumping Mouse's critical

habitat.  See D. Remedy Brief at 3.  This lack of legal obligation could mean that Fish & Wildlife

would have to re-engage with agencies on up to 35 proposed agency actions (some of which are

pending currently) that could have the potential of negatively affecting the Jumping Mouse or its

critical habitat.  See D. Remedy Brief at 3 (citing Millsap Decl. ¶ 7 - ¶ 8, at 4), 50 C.F.R. §

402.16(a)(4) (requiring re-initiation if "critical habitat [is] designated that may be affected by the

identified action")).

      **c.**    **The "Seriousness" of the Critical Habitat Designation Rule's "Deficiencies" and the Rule's Effects on the Stockman's Associations Do Not Warrant Vacatur of the Critical Habitat Designation Rule.**

When considering the application of prong one of the Allied-Signal equitable balancing

test -- "the seriousness of the [critical habitat designation rule's] deficiencies (and thus the extent

of doubt whether [Fish & Wildlife] chose correctly)," Allied-Signal, 988 F.2d at 150-51 -- in the

context of the Jumping Mouse's current critical habitat designation -- the Court first must evaluate

the specific deficiencies that the Stockman's Associations allege related to Fish & Wildlife's

critical habitat designation for the Jumping Mouse species.  P. Remedy Brief at 5-7.  Subsequently,

the Court will weigh those deficiencies' "seriousness" of those deficiencies against the "disruptive

consequences" posed to Fish & Wildlife and the Jumping Mouse "of an interim change" in the

critical habitat designation rule if vacatur were imposed as a remedy.  See Allied-Signal, 988 F.2d

at 150-51

To reiterate, the Court issues the following holdings in this case: (i) Fish & Wildlife's use

of the "incremental effects" approach to consider economic impacts associated with the critical

habitat designation does not violate § 4(b)(2) of the Endangered Species Act, and the APA; (ii)

Fish & Wildlife did not abuse its discretion by failing to consider additional designation costs, such as compensating the members of the Stockman's Associations for reducing the value of their water rights, with respect to property within the designation, and an interference with the alleged water rights of the Stockman's Associations does not amount to a taking under the Fifth Amendment; (iii) the Stockman's Associations have administratively waived their claims challenging Fish & Wildlife's decision not to exclude particular units of land -- Units 3 and 4 -- from the critical habitat designation, because no Stockman's Associations members raised explicit concerns about the inclusion of these units, except for concerns raised about subunit 3c, during the proposed designation's open comment period; (iv) notwithstanding the Stockman's Associations' administrative waiver on this issue, Fish & Wildlife offers a sufficiently reasoned explanation to support its conclusion not to exclude Units 3 and 4 from the critical habitat designation, which includes its reasonable determination that there are no disproportionate costs associated with the inclusion of the units -- a determination that is consistent with Fish & Wildlife's internal Section 4(b)(2) Policy pursuant to the Endangered Species Act.

Considering the conclusions the Court has reached, it can justifiably distinguish the case at hand with the one previous case that the Court has faced, where it has ordered vacatur.  See, e.g., New Mexico Health Connections v. United States Dep't of Health & Human Servs., 340 F. Supp. 3d 1112, 1177-83 (D.N.M. 2018)(Brack, J.)("NM Health Connections").  For example, recently, in NM Health Connections, the Court vacated the Health and Human Services' rule regarding risk adjustment transfers only after determining that HHS' budget-neutral approach to a risk adjustment formula, which HHS had used under the Patient Protection and Affordable Care Act ("ACA") to reduce the incentive for insurers to avoid enrolling unhealthy individuals and to stabilize the health insurance market, was arbitrary and capricious.  340 F. Supp. 3d at 1169-1170.  Particularly, unlike in the case at hand, in NM Health Connections, the Court found various deficiencies in HHS' 2014-2018 risk adjustment rules, including that the methodology HHS employed during the implementation of its program across all fifty states relied on erroneous assumptions of budget neutrality under 42 U.S.C. § 18063.  See NM Health Connections, 340 F. Supp. 3d at 1179.

> While it is conceivable that HHS may provide sound reasons for operating the program in a budget-neutral fashion, especially because it purports to have done so for 2019, see HHS Notice of Benefit and Payment Parameters for 2019, 83 Fed. Reg. 16,930, 16,954 (April 17, 2018), the Court does not appreciate HHS attempting to rationalize budget neutrality only now when it should have provided a conscious explanation when it proposed the formula in the first instance. The

> Court, therefore, concludes that HHS' deficiencies in promulgating the 2014-2018
> rules to be great . . .

NM Health Connections, 340 F. Supp. 3d at 1179.  Citing this deficiency, along with HHS's failure

"to provide an explanation for its budget neutrality decision," NM Health Connections, 340 F.

Supp. 3d at 1179; see also NM Health Connections, 340 F. Supp. 3d. at 1170 (concluding that

"HHS did not sufficiently explain its reasons for using statewide average premiums in its risk

adjustment formula by articulating a rational connection between the facts it found and the choice

the agency made")(citation omitted), the Court employed subsequently the same Allied-Signal

equitable balancing factors as it does now in its evaluation of Fish & Wildlife's critical habitat

designation rule.  NM Health Connections, 340 F. Supp. 3d. at 1179.  The Court determined

ultimately that the "great" deficiencies in HHS' 2014-2018 risk adjustment rules outweighed any

disruptive consequences that vacatur of the rule could impose.  NM Health Connections, 340 F.

Supp. 3d. at 1179.

Without question then, the case at hand is distinguishable, for unlike the Court's finding of

a "great" deficiency in connection with the methodology employed by the HHS in its risk

adjustment rules, here, it has not identified deficiencies in any of the methodologies employed by

Fish & Wildlife in relation to its economic impact assessment of other costs related to designation,

including water costs, or in its decision to include Units 3 and 4 in the designation.  Also, unlike

in N.M. Health Connections where the Court faulted HHS for not providing "an explanation for

its budget neutrality decision," 340 F. Supp. 3d at 1170, 1179, here, the Court determines that Fish

& Wildlife did not abuse its discretion, but rather, provided a rational explanation for its exclusion

decisionmaking process as pertaining to Units 3 and 4 pursuant to § 4(b)(2) of the Endangered

Species Act and its internal Section 4(b)(2) Policy.

In the absence of finding concrete deficiencies in connect with Fish & Wildlife's

methodology or decisionmaking therefore, the Court is forced to approach the remedy of vacatur

with the balance already tilted strongly in favor of leaving the critical habitat designation rule in

place.

### d.  The Stockman's Associations Allege that the Deficiencies of the Critical Habitat Designation and Equities Favor Vacatur.

In its remedy brief, the Stockman's Associations allege the following deficiencies related

to Fish & Wildlife's final critical habitat designation rule: (i) Fish & Wildlife's failure to assess

properly the economic impacts related to the designation, which, the Stockman's Associations allege, represents both a procedural defect and a substantive violation of the Endangered Species Act § 4(b)(2), see P. Remedy Brief at 6, and (ii) Fish & Wildlife's "seriously deficient . . . lack of explanation and reasoned decisionmaking about the exclusion" of Units 3 and 4, which, as Fish & Wildlife argue, "led to a truncated exclusion analysis, and a failure to even articulate standards for when exclusion would be appropriate," P. Remedy Brief at 6.

Upon outlining the alleged deficiencies associated with Fish & Wildlife's critical habitat designation, the Stockman's Associations turn subsequently to the vacatur's consequences, arguing centrally that "[k]eeping the designation in place would greatly injure Ranchers," and, therefore, the "effects of leaving the designation in place weigh in favor of setting it aside."  P. Remedy Brief at 7. Elaborating on the "seriousness" of the deficiencies to "Ranchers'" grazing interests, the Stockman's Associations explain that the critical habitat designation has had "significant consequences" to ranchers for the following reasons.  First, according to the Stockman's Associations, the critical habitat designation "directly affects the property values of the ranchers' private property." P. Remedy Br. at 7 (citing Reply Brief at 1-2).  Second, the designation "subjects the ranchers to more burdensome Section 7 consultation."[36] P. Remedy Br. at 7 (citing 16 U.S.C. § 1536(b)(3)(A).  Explaining this premise, the Stockman's Associations contend that in cases where grazing occurs within a designated critical habitat area, "the Forest Service typically engages in Section 7 consultation when the agency issues annual operating instructions."  P. Remedy Brief at 7 (citing Oregon Nat. Desert Ass'n v. Lohn, 485 F. Supp. 2d 1190, 1192 (D. Or. 2007)(King, J.) vacated, No. CIV 06-946-KI, 2007 WL 2377011 (D. Or. June 11, 2007), and vacated as moot, 308 F. App'x 102 (9th Cir. 2009).  Therefore, as the Stockman's Associations explain, while additional Section 7 consultation may not "directly affect the ranchers' income . . . the increased time and uncertainty associated with the Section 7 process affects the ranchers' ability to plan for future grazing seasons," particularly for "ranchers who graze on areas where the [Jumping Mouse] is not located."  P. Remedy Brief at 7 (citing Jumping Mouse Designation, 81 Fed. Reg. 14,298 (AR D003454).

---

[36]The Stockman's Associations contend that, in cases where grazing occurs within a designated critical habitat area, "the Forest Service typically engages in Section 7 consultation when the agency issues annual operating instructions."  P. Remedy Brief at 7 (citing Oregon Nat. Desert Ass'n v. Lohn, 485 F. Supp. 2d 1190, 1192 (D. Or. 2007)(King, J.)) vacated, No. CIV 06-946-KI, 2007 WL 2377011 (D. Or. June 11, 2007), and vacated as moot, 308 F. App'x 102 (9th Cir. 2009).

On the other hand, the Stockman's Associations advance that vacating the critical habitat designation would have "little effect on the protection of the species," given that "[m]ost of the designated units of critical habitats are either partially or entirely unoccupied, and thus any activity in those areas is unlikely to have any significant impact on the mouse's continued existence."  P. Remedy Brief at 7 (Jumping Mouse Designation, 81 Fed. Reg. 14,289, 14,298 (AR D003445, AR D003454)).  Even absent the critical habitat designation, as the Stockman's Associations explain further, other protections connected to § 7 consultations will act as remaining barriers to protect the continued existence of the Jumping Mouse species.  The Stockman's Associations conclude, therefore, that it would be most efficient to vacate Fish & Wildlife's critical habitat designation rule in its entirely, which would free up areas where the "mouse is not or is unlikely to be found." P. Remedy Brief at 8.  This action, in turn, would mean, for the Stockman's Associations, that "the Ranchers will not be unnecessarily subject to a costly designation."  P. Remedy Brief at 8.

> **e.     The Equities Under <u>Allied-Signal</u> Favor Keeping the <u>Critical Habitat Designation Rule in Place</u>.**

Although the Stockman's Associations try to liken their case here with <u>N.M. Health Connections</u>, where this Court ordered vacatur of the HHS risk adjustment rules, <u>see</u> 340 F. Supp. 3d at 1179, as the Court explained has explained supra, the cases are factually distinct.  The most critical distinction is that, unlike its findings in <u>N.M. Health Connections</u> related to deficiencies in HHS' methodology and explanations for such in relation to its risk adjustment rules, the Court finds no deficiencies in Fish & Wildlife's critical habitat designation rule methodology, or in its explanation for its decisionmaking processes.

Specifically, although the Court determines that the Stockman's Associations show sufficient concrete harms to satisfy associational standing, their inability to prove concretely the deficiencies of Fish & Wildlife's designation in connection with (i) Fish & Wildlife's use of the "incremental effects" approach to consider economic impacts associated with the critical habitat designation pursuant to the Endangered Species Act, § 4(b)(2) and the APA; (ii) Fish & Wildlife's failure to consider additional designation costs, such as the ranchers' water rights with respect to property within the designation; and (iii) Fish & Wildlife's decision to include Units 3 and 4 within the critical habitat designation, impacts the ability of the Stockman's Associations ability to demonstrate the "seriousness of the [critical habit designation rule's] deficiencies (and thus the extent of doubt whether [Fish and Wildlife chose correctly)" in its final designation under <u>Allied-</u>

Signal. See 988 F.2d at 151. In fact, despite the abundance of evidence that the Stockman's Associations submitted, the Court agrees with Fish & Wildlife that the only concrete harms that the Stockman's Associations can show resulting from the critical habitat designation are (i) certain adjustments that their ranchers must make to their ranching practices as a result of the fencing of critical habitat within subunit 4E; and (ii) potential impacts on the ranchers' property values given the negative perceptions that critical habitat designations can sometimes entail to the surrounding land. D. Remedy Brief at 3 (citing Medeiros Decl. ¶ 15, at 3). Even the latter harm alleged by the Stockman's Associations is hypothetical, however, in that their ranchers could offer no quantifiable terms to show the extent to which the critical habitat designation impacts their land values negatively. Ultimately, then, the Court concludes that these harms, though they may be serious to members of the Stockman's Associations, remain too speculative and unquantifiable to outweigh the serious and real risks of increasing the Jumping Mouse's rate of endangerment because of lost land and inability to reproduce, and potentially dismantling completely, the Fish & Wildlife's efforts in trying to prevent the total extinction of the species.

### f.    Fish & Wildlife Would Likely Reach the Same Result on Remand.

In light of the evidence Fish & Wildlife submits, which the Court concludes shows the reasonableness of Fish & Wildlife's decisionmaking and methodology in implementing the final critical habitat designation rule, the Court concludes that "there is at least a serious possibility that [Fish & Wildlife] will be able to substantiate its decision on remand." Allied-Signal, 988 F.2d at 151.

First, as discussed above, the Court concludes that the "disruptive consequences" that vacatur poses to Fish & Wildlife and the Jumping Mouse species outweigh the "seriousness" of the deficiencies the Stockman's Associations allege. Notwithstanding the equities question, however, the Court concludes that vacatur particularly would be inappropriate in this case, because "it is not at all clear" that the alleged deficiencies that the Stockman's Associations reference relate to Fish & Wildlife's critical habitat designation rule and "incurably tainted" Fish & Wildlife's multi-step "decisionmaking process." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1290. The Court concludes that this seems to be the case, because, in fact, the Stockman's Associations advance only narrow challenges to the final two steps of Fish & Wildlife's critical habitat designation process. The challenges relate to Fish & Wildlife's (i) lack

of consideration of the full range of costs posed to ranchers by the designation; and (ii) weighing of factors in its consideration of which areas to exclude versus include in the final critical habitat designation.   See 16 U.S.C. § 1533(b)(2); Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252).   Yet, even if the Court were to have ruled affirmatively on one or both of the Stockman's Association's challenges to the final critical habitat designation rule -- thus, determining the existence of "deficiencies" related to Fish & Wildlife's decisionmaking and methodology under Allied-Signal -- the Court does not hold that either of those deficiencies were sufficiently consequential as to have "incurably tainted [Fish & Wildlife's] decisionmaking process." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1290.   As a consequence, the Court is justified in reaching the inference that Fish & Wildlife would likely reach the same critical habitat designation rule on remand.   See Allied-Signal, 988 F.2d at 151.

First, as the Court has established, the Endangered Species Act's § 4(b)(2) offers discretionary powers to the Secretary of the Interior to "designate any habitat of such species which is then considered to be critical habitat."   16 U.S.C. § 1533(a)(3)(A).   Under this broad grant of power, the Endangered Species Act, in turn, provides the Secretary discretion to designate "critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."   16 U.S.C. § 1533(b)(2).   The breadth of this list demonstrates that the Secretary can weigh a number of factors -- aside from economic impact -- in his or her determination of the final designation rule.   Invariably then, this list means that an assessment of "economic impacts" alone will likely not be consequential or determinative independently in the final designation rule.   In fact, based on the provision's listing of distinct factors or consideration, one can infer that the "economic impacts" factor may not have any bearing on the scientific" aspects, the national security aspects, or the other relevant aspects related to the final critical habitat designation.   Rather, some combination of "economic impacts," and "scientific" data, "impact on national security," and "any other relevant impact[s]," 16 U.S.C. § 1533(b)(2), based on the Secretary's best judgment, may prove consequential in the decisionmaking process.   Accordingly, because the Stockman's Associations only advanced a narrow challenge to Fish & Wildlife's "economic impact" considerations, even if the Court were to conclude that Fish & Wildlife economic assessments represent a "deficiency" in its decisionmaking process, its discretionary

grant to consider other factors under the Endangered Species Act's § 4(b)(2) shows that "there is at least a serious possibility" that Fish & Wildlife would reach the same critical habitat designation rule on remand.  Allied-Signal, 988 F.2d at 151.

In addition, the Court takes stock in the fact that other courts, when evaluating Fish & Wildlife's final critical habitat designation rules and decisionmaking processes under § 4(b)(2) of the Endangered Species Act, have considered the economic impacts assessment to be "primarily designed and intended to assist the Secretary as to exclusion requests." Wyo. State Snowmobile Ass'n. v. U.S. Fish & Wildlife Serv., 741 F. Supp. 2d 1245, 1267 (D. Wyo. 2010) (Freudenthal, J.). See also Weyerhaeuser, 139 S. Ct. at 371 (clarifying that the exclusion process "authorizes the Secretary to act on his consideration" of economic and other impacts).  Because the exclusion process is so discretionary, allowing the Secretary to "exclude any area from critical habitat if he determines that the benefits of such outweigh the benefits of specifying such area as part of the critical habitat," 16 U.S.C. § 1553(b)(2), the Court agrees with Fish & Wildlife that  it "would be completely within [Fish & Wildlife's] discretion to reach the exact same result on remand,"  D. Remedy Brief at 5 (citing Response at 20-21; Section 4(b)(2) Policy, 81 Fed. Reg. 7,228 (AR D003252)("[T]he Secretary has broad discretion as to what factors to consider as benefits of inclusion and benefits of exclusion, and what weight to assign to each factor.")).  Here, the Court determines that Fish & Wildlife acted appropriately in considering "other relevant impacts," including environmental impacts, which it cites transparently when explaining its decision to include Units 3 and 4 in the critical habitat designation.  See, e.g., Designation Final Rule, 81 Fed. Reg. 14,307 (AR D003462)(considering if exclusion "is likely to result in conservation"); Designation Final Rule, 81 Fed. Reg. 14,279-80 (AR D003434-35)(listing some significant environmental benefits of inclusion).  To reiterate, therefore it is hard for the Stockman's Associations to make the argument that Fish & Wildlife's economic impact considerations represent either "fundamental flaws" in Fish & Wildlife's decisionmaking, Pollinator Stewardship Council v. EPA, 806 F.3d 520, 532, or were so consequential as to "incurably taint[] [Fish & Wildlife's] decisionmaking process" when reaching the final critical habitat designation rule for the Jumping Mouse.  Ultimately then, even if the Court ruled favorably on one of the Stockman's Association's challenges related to Fish & Wildlife's economic impact considerations or exclusion decisionmaking process, these deficiencies are not sufficiently consequential or fundamental as to

alter the critical habitat designation rule for the Jumping Mouse species on remand.  See <u>Black</u>

<u>Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs</u>, 781 F.3d at 1290; <u>see also</u> <u>Pollinator</u>

<u>Stewardship Council v. EPA</u>, 806 F.3d at 532.  Because of this conclusion, the Court holds that

vacatur would be unwarranted as a remedy in this case.

> **B.   IF THE COURT RULED AFFIRMATIVELY ON ONE OF THE STOCKMAN'S ASSOCIATIONS' CHALLENGES AGAINST FISH & WILDLIFE'S CRITICAL HABITAT DESIGNATION FOR THE JUMPING MOUSE, AND IF THE COURT DETERMINED VACATUR AN APPROPRIATE REMEDY, THE COURT STILL WOULD IMPOSE A NARROW VACATUR, AND ALLOW FISH & WILDLIFE TO ADDRESS DEFICIENCIES WITHIN THE CRITICAL HABITAT DESIGNATION ONLY AS SUCH RELATE TO THE SPECIFIC INJURIES THE STOCKMAN'S ASSOCIATIONS MEMBERS ALLEGE.**

Because the Court rejects the Stockman's Associations' challenges to Fish & Wildlife's

economic analysis and its determination not to exclude Units 3 and 4 from its critical habitat

designation for the Jumping Mouse, remedy in this case is unnecessary.  As also outlined above,

however, if the Court were to rule in favor of the Stockman's Associations on one of their claims,

the Court still deems inappropriate the requested relief of the Stockman's Associations' of full

vacatur of the critical habitat designation.  If the Court determined vacatur warranted, therefore, it

would tailor vacatur narrowly for the specific purposes of: (i) addressing the alleged injuries of the

Stockman's Associations only on the impacted units within the critical habitat designation; and

(ii) maintaining the Jumping Mouse existing protections within units that do not implicate the

interests of Stockman's Associations.

> **1.   <u>The Court Would Tailor, as an Equitable Remedy, Vacatur to Address the Narrow Injuries Alleged by Members of the Stockman's Associations in Connection to Specific Units Within the Critical Habitat Designation.</u>**

The Stockman's Associations oppose Fish & Wildlife's request for a limited vacatur of the

critical habitat designation, which would entail vacatur of only the occupied units that plausibly

affect the interest of the Stockman's Associations ranchers.  P. Remedy Brief at 5-8.  Instead, the

Stockman's Associations request that the Court order full vacatur of the entire critical habitat

designation.  P Remedy Brief at 5-8.  Rationalizing the need to vacate units beyond the units in

which they allege injury, the Stockman's Associations argue that "[t]here is nothing

constitutionally suspect with the possibility of being given more relief than necessary."  <u>See</u> P.

Remedy Brief at 4 n.4.

On the other hand, Fish & Wildlife rebuts the necessity for the Court to vacate its entire critical habitat designation for the Jumping Mouse.  If the Court were to impose vacatur, Fish & Wildlife argues, then the Court should limit vacatur only to the occupied units that "[p]lausibly [i]mpact" the ranchers' interests, meaning it "should be tailored to redress Petitioners' alleged injury while minimizing harm to the public interest."  D. Remedy Brief at 6.

From both a legal and factual level, the Court concludes that the argument of the Stockman's Associations for an expansive vacatur to be erroneous.  First, the Court finds particularly problematic the proposition of the Stockman's Associations that "[t]here is nothing constitutionally suspect with the possibility of being given more relief than necessary."  Reply at 4 n. 4.  This assertion is not a legal argument; rather, it is an aspirational demand that seems to refute settled principles of damages and injury redressability across various fields of law.  Worse, the claims of the Stockman's Associations lack legal support, as the Stockman's Associates cite merely one law review article, whose author advances the thesis that, in certain situations, punitive damages may exceed the amount needed to redress directly a plaintiff's injury.  See Reply at 4 n. 4 (citing Harold J. Krent, Laidlaw: Redressing the Law of Redressability, 12 Duke Envtl. L. & Pol'y F. 85 111-12 (2001)).  Elaborating on the general topic of redressability and the various forms of relief for plaintiffs' injuries, the law review author suggests:

> In lieu of findings, Congress at times seeks to ensure redressability by altering the legislative scheme so that plaintiffs receive tangible benefits from pursuing the suit. Although courts should allow Congress wide latitude in shaping the relief attainable, such relief must redress an interest apart from the litigation itself . . . .
>
> Congress similarly might try to overcome any redressability obstacles by authorizing punitive or nominal damages awards.  Such damage awards are not directly linked to the injuries suffered.  Punitive damages punish the offender, and the amount of the award is not commensurate with restoring plaintiff to its rightful position.  . . .  Most would agree that a recovery of punitive damages satisfied redressability if the plaintiff has in fact suffered injury.  The recovery might be more than necessary to redress the injury, but that should not offend any Article III requirement.  The redressability requirement does not impose any obligation that the congressional remedy be closely tailored to the injury suffered, just that there be some redress.

Krent at 111-12.

Without more, the Stockman's Associations' fail to elucidate how this theoretical proposition applies concretely to this case's particular facts.  In fact, the Court has not relied upon such a proposition in the several times it has confronted the question of vacatur and tailored vacatur, and chooses not to do so now.  See, e.g., N.M. Connections, 340 F. Supp. 3d 1112, 1178-

83 (D.N.M. 2011)(Browning, J.).  Furthermore, in citing this reference to buttress their request for a disproportionate vacatur here, the Stockman's Associations do not accept, importantly, that the punitive damages remedy is legal relief, as opposed to an equitable remedy.  See Tull v. United States, 481 U.S. 412, 422 (1987).  See also Curtis v. Loether, 415 U.S. 189, 195-96 (1974).  Accordingly, the Stockman's Associations' suggestion that the Court should impose a full and unnecessary vacatur of Fish & Wildlife's entire critical habitat designation rule for punitive purposes is extreme, particularly given that courts generally reserve the imposition of punitive damages only for the purposes of "punishing unlawful conduct and deterring its repetition." BMW of North America, Inc. v. Gore. 517 U.S. 559, 568 (1996).  Still, punitive damages must be "reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence." BMW of North America, Inc. v. Gore. 517 U.S. at 568.  At no point has the Stockman's Associations alleged egregiously unlawful conduct on Fish & Wildlife's behalf that the Court must deter as to merit the awarding of punitive damages.

In addition, given that vacatur is an equitable form of relief, the Court adheres appropriately to the legal principle that the Court should tailor equitable relief to the equities.  See Califano v. Yamasaki, 442 U.S. 682, 702 (1979).  See also Dayton Board of Education v. Brinkman, 433 U.S. 406 (1977)(Brennan, J., concurrence).  In this case, the equities to be evaluated are the specific injuries the Stockman's Associations allege in relation to the critical habitat designation rule, as compared to the threats to the Jumping Mouse species' survival and the conservation objectives Fish & Wildlife pursue.  With this in mind, the Court reasons that vacatur "should be no more burdensome to [Fish & Wildlife] than necessary to provide complete relief to the [Stockman's Associations]."  Califano v. Yamasaki, 442 U.S. at 702.

### 2.    A District Court has Discretion to Limit Vacatur to Only the Part of the Critical Habitat Designation that Impacts the Alleged Interests of the Stockman's Associations.

Under certain circumstances, the Tenth Circuit and the Court have recognized that "[v]acatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts" to remedy an Administrate Procedure Act violation.  WildEarth Guardians v. United States Bureau of Land Management, 870 F. 3d at 1240.  See N.M. Connections, 340 F. Supp. 3d at 1178-83.  Nonetheless, vacatur remains discretionary, meaning that the district court has several options in its evaluation of an agency's final rule: "[T]he district court may vacate the

entire [rule], or it may fashion some narrower form of injunctive relief based on equitable arguments." WildEarth Guardians v. United States Bureau of Land Management, 870 F. 3d at 1240. Pursuant to this grant of discretion, district courts across the Tenth Circuit have imposed various degrees of relief under the umbrella of vacatur based on the parties' equities and the deficiencies that courts have determined to exist in connection with the agencies' violative actions. For example, in Wyoming State Snowmobile Association v. U.S. Fish and Wildlife Service, 741 F. Supp. 2d 1245, 1264-67 (D. Wyo. 2010)(Freudenthal, J.), even after determining that Fish & Wildlife's economic analysis was flawed, the court still declined to impose total vacatur of the critical habitat designation rule, given that (i) the economic impact analysis under § 4(b)(2) of the Endangered Species Act was one of many factors for Fish & Wildlife to consider during its decisionmaking process, and relatedly, (ii) "the economic impact analysis is primarily designed and intended to assist the Secretary as to exclusion requests." 741 F. Supp. 2d at 1264-67. The Honorable Nancy D. Freudenthal of the U.S. District Court for the District of Wyoming, concluded, therefore, that she should limit vacatur, reasoning that "it d[id] not seem appropriate to enjoin the [critical habitat rule's] implementation on a nationwide basis." 741 F. Supp. 2d at 1267. Importantly as well, in reaching its determination, Judge Freudenthal placed great emphasis on the fact that total vacatur could possibly "endanger" the lynx, the listed species at issue. 41 F. Supp. 2d at 1267. With this in mind, the court decided ultimately to vacate only the single critical habitat unit that impacted plaintiffs' particular exclusion request. See 41 F. Supp. 2d at 1267.

In addition to Judge Freudenthal in Wyoming State Snowmobile Association v. U.S. Fish and Wildlife Service, other courts have employed similar reasoning pursuant to their discretion to justify imposing only partial vacatur of a critical habitat designation at issue. See 741 F. Supp. 2d at 1267. A fundamental rationale these courts cite has been the dual importance of (i) tailoring the relief directly to only the narrow injuries that the plaintiffs alleged, and (ii) avoiding excessive risk to the listed species during remand. See, e.g., Otay Mesa Property, L.P. v. U.S. Department of Interior, 646 F.3d 914, 918-19 (D.C. Cir. 2011); Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior, 344 F. Supp. 2d 108, 126-32, 132-33 (D.D.C. 2004)(Lamberth, J.); Neb. Habitat Conservation Coal. v. U.S. Fish & Wildlife Serv., No. 4:03-CV-3059, at *21 (D. Neb. Oct. 13, 2005)(Strom, J.)(unpublished)(vacating only the specific portion of a critical habitat designation that directly implicates the plaintiffs' water interests even after finding errors in Fish & Wildlife's

economic analysis and scientific conclusions); <u>Coos Cnty. Bd. of Cnty. Comm'rs v. U.S. Dep't of Interior</u>, No. 02-cv-6128-HO, at *2-3 (D. Or. June 19, 2003)(Hogan, J.) (unpublished)(determining that several critical habitat areas "should remain in place in order to avoid risk of harm to the [species] from vacatur," even after the Department conceded errors in its economic analysis).

In this precedent's backdrop, and with consideration of the discretion the law affords courts in vacatur matters, the Court here concludes that, if it were to impose vacatur, the equitable arguments tilt in favor of limited vacatur. Of foremost concern to the Court in this case is the Jumping Mouse's endangered status. Relatedly, the Court worries that the immediate effects of full vacatur of the critical habitat designation, coupled with the likely prolonged duration that would be required for Fish & Wildlife to consider, design, and enact a new critical habitat designation rule, would eliminate all of the paramount protections in place currently to promote the protection and re-population of the Jumping Mouse species. At best, the elimination of such important protections could result in the perpetuation of the Jumping Mouse's endangered status. At worst, however, the disappearance of these important units of critical habitat designation could result in the irreversible extinction of the remaining Jumping Mouse populations.

3.    **<u>Vacatur Can Be Tied to the Concrete Injuries Alleged by the Stockman's Associations Members in Relation to Specific Units of Land within the Critical Habitat Designation for the Jumping Mouse.</u>**

Third, the Court agrees with Fish & Wildlife that it appears inconsistent for the Stockman's Associations to request total vacatur of the critical habitat designation, despite that they challenge only Fish & Wildlife's exclusion of Units 3 and 4 within the designation. <u>See</u> P. Remedy Brief at 1-8. <u>See also</u> Petition at 20-22. The Stockman's Associations' failure, therefore, to explain why vacatur of the other units of the critical habitat designation is necessary suggests to the Court that they maintain some punitive animus for requesting such a disproportionate remedy.

If the Court were to have ruled favorably on the Stockman's Associations claims in relation to Units 3 and 4, it would choose to limit the vacatur remedy to these units only under the rationale that the equities -- namely, the Jumping Mouse's protection versus the harms posed to the Stockman's Associations -- favor retaining the critical habitat designation of the designation's other units. On this note, the Court agrees with Fish & Wildlife that vacating the other designation's other units "might irreversibly harm the Jumping Mouse's chance for survival and recovery." D. Remedy Brief at 9. This potential is because, according to Fish & Wildlife, "[w]here only one or two small, isolated populations exist, there is a high chance of permanently losing

Jumping Mouse populations in that geographic area." D. Remedy Br. at 10. At present, Units 1, 6, 7, and 8 are home to only one Jumping Mouse species, while Unit 2 contains only two species' populations. D. Remedy Brief at 9 (citing Jumping Mouse Designation, 81 Fed. Reg. at 14,292-3; Jumping Mouse Status Assessment Report (AR D003100-01)). A lack of population variety is dangerous for the Jumping Mouse from a resilience level, and as Fish & Wildlife report further, "[l]osing even one unit of Jumping Mouse population would add to its already high risk of extinction." D. Remedy Brief at 10 (citing Listing Final Rule, 79 Fed. Reg. 33,122 (AR D003212)).

In this regard, the Court takes seriously Fish & Wildlife's contention that, if any one of these remaining units were vacated, and the land were to be re-opened to "grazing" or "other federally permitted actions," the Jumping Mouse species would face immediate vulnerabilities that could result in the "rapid[] extirpation" of its remaining "small, isolated populations." D. Remedy Brief at 10 (citing Jumping Mouse Status Assessment Report (AR D003103)).

Notwithstanding, the Court finds further support for the inappropriateness of full vacatur in this case, given that the Stockman's Associations can identify no legal deficiency related to the units beyond Units 3 and 4 -- meaning there is no concrete injury posed to ranchers by the continued critical habitat designation of these units. For example, even if the Court were to have ruled against Fish & Wildlife's use of the incremental approach in its economic analysis, based on such ruling, it would still be legally inappropriate to vacate Unit 5, located in the Greenlee and Apache Counties in Arizona, see Designation Final Rule, 81 Fed. Reg. at 14,264, given that the Ninth Circuit upheld Fish & Wildlife's use of the incremental effects approach in relation to this unit based on binding Ninth Circuit law, see Ariz. Cattle Growers' Association v. Salazar, 606 F.3d 1160, 1172-74 (9th Cir. 2010). The Ninth Circuit also determined that Fish & Wildlife's economic analysis in connection to Unit 5 complies with Endangered Species Act regulations, and the regulations under Fish & Wildlife's Section 4(b)(2) Policy. See Ariz. Cattle Growers' Association v. Salazar, 606 F.3d at 1173.

Ultimately, even if the Court were to rule in favor of the Stockman's Associations' claims related to Fish & Wildlife's incremental effects approach, economic considerations, and exclusion decisionmaking process in its final implementation of the critical habitat designation rule for the Jumping Mouse, the Court would still be inclined to remand the critical habitat designation to Fish

& Wildlife without vacatur.  In the alternative scenario that the Court determined vacatur were an appropriate remedy, it would decline still to order vacatur of the entire designation; instead, the Court would order a narrower vacatur, which the Court would tailor to the specific injuries that the Stockman's Associations allege, i.e., it would vacate only Units 3 and 4 -- the only units on which the Stockman's Associations allege some form of concrete injury.

**IT IS ORDERED** that: (i) the Plaintiffs' Complaint for Declaratory and Injunctive Relief and Petition for Review, filed on December 6, 2018 (Doc. 1)("Complaint"), is dismissed with prejudice; and (ii) the Court will enter a separate Final Judgment.  Plaintiff's request for remedy in the form of vacatur of Defendant's critical habitat designation for the Jumping Mouse species, filed on December 6, 2019 (Doc. 40)("Remedy") is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Anthony L. Franco
Damien M. Schiff
Jeffrey M. McCoy
Pacific Legal Foundation
Sacramento, California

--and--

A. Blair Dunn
Wester Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

John C. Anderson
   United States Attorney
Manuel Lucero
   United States Assistant Attorney
United States Attorney's Office for the District of New Mexico
Albuquerque, New Mexico

--and--

William Barr
   United States Attorney General
Jean E. Williams
   United States Deputy Assistant Attorney General
Seth M. Barsky

   Wildlife and Marine Resources Section Chief
Meredith L. Flax
   Wildlife and Marine Resources Section Assistant Chief
Washington, D.C.

      *Attorneys for the Defendants*

John Buse
Center for Biological Diversity
Oakland, California

--and--

Ryan Shannon
Center for Biological Diversity
Portland, Oregon

      *Attorneys for Intervenors*